JUDGE BAER

08 CV 5093

Floyd Abrams
Susan Buckley
Adam Zurofsky
Tammy L. Roy
CAHILL GORDON & REINDEL LLP
80 Pine Street New York, New York 10005
Telephone: 212-701-3000

*Attorneys for Defendant The McGraw-Hill Companies, Inc.*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
New Jersey Carpenters Vacation Fund, On Behalf
of Itself and All Others Similarly Situated



RECEIVED
JUN 03 2008
U.S.D.C. S.D. N.Y.
CASHIERS

                        Plaintiffs,

            -against-

HarborView Mortgage Loan Trust 2006-4;
HarborView Mortgage Loan Trust 2006-5;
HarborView Mortgage Loan Trust 2006-9; The
Royal Bank of Scotland Group, plc; Greenwich
Capital Holdings, Inc.; Greenwich Capital
Acceptance, Inc.; Greenwich Capital Markets, Inc.;
Greenwich Capital Financial Products, Inc.; Robert
J. McGinnis; Carol P. Mathis; Joseph N. Walsh, III;
John C. Anderson; James C. Esposito; Fitch
Ratings; Moody's Investors Service, Inc.; and The
McGraw-Hill Companies, Inc.,

                        Defendants.
-----------------------------------------------------------X

Civil Action No. _____

**NOTICE OF REMOVAL**

        Defendant The McGraw-Hill Companies, Inc. ("McGraw-Hill"), by its

undersigned attorneys, hereby remove the above-captioned case pending in the Supreme Court of

the State of New York, County of New York, to the United States District Court for the Southern

District of New York.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332,

as amended by the Class Action Fairness Act of 2005 ("CAFA"), and the claims may be

removed to this Court under 28 U.S.C. § 1453.

As grounds for removal, McGraw-Hill states as follows:

1.      On May 14, 2008, plaintiff New Jersey Carpenters Vacation Fund ("Plaintiff") filed this putative state court class action (the "State Court Action") by filing a complaint entitled New Jersey Carpenters Vacation Fund v. HarborView Mortgage Loan Trust 2006-4, *et al* (the "Class Action Complaint") in the Supreme Court of the State of New York, County of New York on behalf of all purchasers of certain HarborView Mortgage Loan Pass-Through Certificates (the "HarborView Bonds"). This case was assigned an index number of 601451/08.

2.      The Class Action Complaint alleges, among other things, that certain registration statements and prospectuses filed in connection with the HarborView Bonds contained misstatements and omissions in violation of Sections 11, 12 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l, and 77o.

3.      Pursuant to 28 U.S.C. § 1446(a) and (b), this Notice of Removal is being filed in the United States District Court for the Southern District of New York within thirty days after May 14, 2008, *i.e.,* the date that McGraw-Hill received, through service or otherwise, a copy of the Summons and Complaint. Although it is not necessary, all defendants in this action consent to removal. *See* Consent to Notice of Removal, attached as Exhibit B hereto.

Class Action Fairness Act of 2005 ("CAFA")

4.      Pursuant to 28 U.S.C. §§ 1332(d)(2) and 1453, a putative "class action" commenced after February 18, 2005 may be removed to the appropriate United States District Court if: (a) the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and (b) any member of the putative class is a citizen of a state different from any defendant. 28 U.S.C. § 1332(d)(2)(A).

5.      CAFA is applicable to the State Court Action because the Action was commenced on or about May 14, 2008, *i.e.,* after the effective date of CAFA. 28 U.S.C. §§ 1332, 1453.

6.      The State Court Action is a "class action" within the meaning of CAFA because Plaintiff seeks to represent a class of persons in a "civil action filed under" Article 9 of the New York Civil Practice Law and Rules, *i.e.,* a "State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. §§ 1332(d)(1)(B), 1453(a).

7.      The State Court Action satisfies CAFA's amount of controversy requirement. Under 28 U.S.C. § 1332(d)(6), the amount of controversy in a putative class action is determined by aggregating the amount at issue in the claims of all members of the putative class.  Here, the Class Action Complaint alleges that the defendants made false and misleading statements in connection with the issuance of approximately $6.32 billion in mortgage pass-through certificates, and that the value of these certificates has declined substantially due to the defendants' alleged violations. *See* Class Action Complaint ¶¶ 1 & 3.  While McGraw-Hill denies that Plaintiff or any putative class member is entitled to recover any amount or the other relief sought, these allegations plainly make the aggregate amount in controversy in this State Court Action more than $5,000,000, exclusive of interest and costs.  28 U.S.C. § 1332(d)(2).

8.      The State Court Action satisfies CAFA's diversity of citizenship requirement. To establish diversity jurisdiction under CAFA, it is sufficient that any one member of the putative class is a citizen of a state different from any one defendant.  28 U.S.C. § 1332(d)(2)(A). Plaintiff asserts that it is a benefit fund with offices located in the State of New Jersey. *See* Class Action Complaint ¶ 7.  Defendant McGraw-Hill is a citizen of New York and other defendants, on information and belief, are citizens of Delaware, New York and/or Connecticut.

9.      No exceptions to CAFA's applicability apply in this case.

Other Procedural Requirements

10.     In accordance with 28 U.S.C. § 1446(a), attached hereto as Exhibit A are file-stamped copies of all process, pleadings and orders served upon McGraw-Hill in the State Court Action, namely the Summons and Complaint.

11.     McGraw-Hill will promptly serve a copy of the Notice of Removal on Plaintiff's counsel and file with the Clerk of the Supreme Court of the State of New York, County of New York, a Notice of Filing of Notice of Removal pursuant to 28 U.S.C. § 1446(d).

12.     This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11. *See* 28 U.S.C. § 1446(a).

WHEREFORE, this action should proceed in the United States District Court for the Southern District of New York, as an action properly removed thereto.

Dated:   June 3, 2008                          Respectfully submitted,

                                               Floyd Abrams
                                               Susan Buckley
                                               Adam Zurofsky
                                               Tammy L. Roy
                                               CAHILL GORDON & REINDEL LLP
                                               80 Pine Street
                                               New York, New York 10005
                                               Telephone: 212-701-3000
                                               Facsimile: 212-269-5420

                                               *Attorneys for Defendant The McGraw-Hill Companies, Inc.*

# **<u>Exhibit A</u>**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
                                                              X
New Jersey Carpenters Vacation Fund, On Behalf              :
of Itself and All Others Similarly Situated,                :        Index No.
                                                            :
                 Plaintiffs,                                :
                                                            :
       – against –                                          :
                                                            :        **SUMMONS**
HarborView Mortgage Loan Trust 2006-4;                      :
HarborView Mortgage Loan Trust 2006-5;                      :
HarborView Mortgage Loan Trust 2006-9;                      :
The Royal Bank of Scotland Group, plc; Greenwich            :        08601451
Capital Holdings, Inc., Greenwich Capital                   :
Acceptance, Inc.; Greenwich Capital Markets, Inc.;          :
Greenwich Capital Financial Products, Inc.; Robert          :
J. McGinnis; Carol P. Mathis; Joseph N. Walsh, III;         :
John C. Anderson; James C. Esposito; Fitch                  :
Ratings; Moody's Investors Service, Inc.; and The           :
McGraw-Hill Companies, Inc.,                                 :
                                                            :
                 Defendants.                                :
                                                              X



To the above named Defendants:

       **YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiff's attorneys a
Verified Answer to the Verified Complaint in this action within twenty (20) days after the
service of this summons, exclusive of the day of service, or within thirty (30) days after service
is complete if this summons is not personally delivered to you within the State of New York. In
case of your failure to answer, judgment will be taken against you by default for the relief
demanded in the complaint.

Dated: May 14, 2008

                                          Daniel B. Rehns, Esq.
                                          Schoengold Sporn Laitman & Lometti, PC
                                          19 Fulton Street, Suite 406
                                          New York, New York 10036
                                          Tel: (212) 964-0046
                                          *Attorneys for Plaintiffs & Proposed Class*

Trial is desired in the County of New York.
The basis of venue designated above is that Defendants maintain and/or conduct their business in
the County of New York.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

_____ x

New Jersey Carpenters Vacation Fund, On Behalf   :
of Itself and All Others Similarly Situated,

                       Plaintiffs,

           – against –

HarborView Mortgage Loan Trust 2006-4;   :
HarborView Mortgage Loan Trust 2006-5;   :
HarborView Mortgage Loan Trust 2006-9;   :
The Royal Bank of Scotland Group, plc; Greenwich   :
Capital Holdings, Inc., Greenwich Capital   :
Acceptance, Inc.; Greenwich Capital Markets, Inc.;   :
Greenwich Capital Financial Products, Inc.; Robert   :
J. McGinnis; Carol P. Mathis; Joseph N. Walsh, III;   :
John C. Anderson; James C. Esposito; Fitch   :
Ratings; Moody's Investors Service, Inc.; and The   :
McGraw-Hill Companies, Inc.,

                       Defendants.

_____ x

Index No.   **08601451**

**CLASS ACTION**

**VERIFIED COMPLAINT FOR VIOLATION OF SECTIONS 11, 12 and 15 OF THE SECURITIES ACT OF 1933**



    Plaintiff alleges the following upon information and belief and based upon the investigation of their counsel, Schoengold Sporn Laitman & Lometti, P.C., which included a review of United States Securities and Exchange Commission ("SEC") filings by Greenwich Capital Acceptance, Inc. ("GCA") and HarborView Mortgage Loan Trust 2006-4, HarborView Mortgage Loan Trust 2006-5, HarborView Mortgage Loan Trust 2006-9 (collectively the "Issuers" or "HarborView"), as well as regulatory filings and reports, ratings agency reports and advisories about GCA and HarborView, press releases and other public statements issued by the ratings agencies about GCA and HarborView, and their own internal investigation. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action brought by New Jersey Carpenters Vacation Fund (the "NJ Carpenters Fund") alleging violations of Sections 11, 12 and 15 of the Securities Act of 1933, 15 U.S.C. §77a *et seq.* (the "Securities Act"), on behalf of purchasers of HarborView Mortgage Loan Pass-Through Certificates ("Bonds" or "HarborView Bonds") pursuant to or traceable to the following offerings:

- $1.84 billion of Mortgage Loan Pass-Through Certificates, Series 2006-4, issued by HarborView Mortgage Loan Trust 2006-4 on or about April 26, 2006 ("April 2006 HarborView Offering");

- $1.62 billion of Mortgage Loan Pass-Through Certificates, Series 2006-5, issued by HarborView Mortgage Loan Trust 2006-5 on or about June 27, 2006 ("June 2006 HarborView Offering"); and

- $2.86 billion of Mortgage Loan Pass-Through Certificates, Series 2006-9, issued by HarborView Mortgage Loan Trust 2006-9 on or about October 3, 2006 ("October 2006 HarborView Offering");

(collectively, the "Offerings").   The Bonds here are the quintessential mortgage-backed securities ("MBS").  It has become apparent in recent months that one of the prime drivers of the current credit crisis in the United States is that over the last several years financial institutions, such as The Royal Bank of Scotland Greenwich Capital, in an effort to amass massive underwriting fees, have issued billions of dollars of MBSs collateralized with what has now been recognized to be impaired and defective mortgage loans.  The loan originator failed to properly and carefully underwrite the mortgage loans because they were being immediately packaged and sold in public offerings to investors such as Plaintiff.  Underwriters, such as RBS Greenwich Capital, failed to do the due diligence required under the Securities Act because they were obtaining millions of dollars in fees upon the completion of these massive MBS offerings, while the credit rating agencies including Defendants Fitch Ratings ("Fitch"), Moody's Investor

2

Services, Inc. ("Moody's) and Standard & Poors' Ratings Services ("S&P") (collectively, the "Ratings Agencies" or "Rating Agency Defendants") also failed to conduct due diligence and willingly assigned the highest ratings to such impaired instruments since they were received substantial fees from the issuer. All of these failures of due diligence and conflicts leading up to the issuance of impaired securities were founded on material misstatements and omissions in the Registration Statement and Prospectuses in violation of Sections 11, 12 and 15 of the Securities Act. As set forth more fully below, Registration Statement relating to the within Offerings were issued by the same or related entities and contained substantially similar material misstatements and omissions in violations of Sections 11, 12 and 15 of the Securities Act. The issuers of the Bonds were all trusts created by RBS Greenwich Capital for the purpose of the Bond issues. The Bond underwriters, sponsors and sellers were identical in each of the Offerings. In all of the Offerings the Bond Depositor was GCA; the Sponsor and Seller was Greenwich Capital Financial Products, Inc. ("GCFP"); and the underwriter Greenwich Capital Markets, Inc. doing business as "RBS Greenwich Capital" ("GCM"). The Bonds were not and are not listed on a national securities exchange. The claims asserted herein are not based upon any allegations of fraud.

2.      The Offerings were MBSs collaterized with loans originated and underwritten by Countrywide Home Loans, Inc. ("Countrywide"). The Registration Statement issued in connection with the Offerings, *inter alia*, materially misstated or failed to disclose the true impaired and defective quality of the loans collateralizing the Bonds; that the loans were not originated pursuant to the underwriting guidelines stated in the Registration Statement and that the Rating Agencies assigned inaccurate, inappropriate and inflated values and ratings to the Bonds. These misstatements and omissions were issued as a result of Defendants' failure to

3

conduct meaningful and required due diligence in connection with the Offerings. Following the issuance of the Bonds, the underlying collateral experienced higher than anticipated rates of delinquencies and foreclosures.

3.     It was only recently that the material misstatements and omissions in the Registration Statement have begun to come to light. Countrywide, since July 2007, has been forced to write-off over $1.2 billion in subprime mortgages and non-traditional loans as a result of its imprudent and improper lending standards. Further, Countrywide has come under federal criminal investigation for having engaged in improper underwriting of loans including those used as collateral in connection with asset-backed securities offerings. This investigation has revealed Countrywide's stated loan underwriting standards, as described in detail in the Registration Statement, were rampantly disregarded in favor of simply generating sufficient volumes of loans to sell to investors in MBS offerings. Additionally, GCA has become the focus of a SEC probe into the collapse of the subprime mortgage market and has been asked by the SEC to turn over its financial documents in connection with origination of mortgages, accounting, due diligence, sales of securities and insider trading. These developments, in turn, led the Rating Agencies to concede the methodologies employed to rate the Bonds were inappropriate and inaccurate. Moody's admitted the methodology had not been updated since 2002. On December 17, 2007, Moody's applied an appropriate methodology factoring in the absence of *bona fide* underwriting used to originate the Bond collateral resulting in a significant decrease in the ratings on the Bonds. The rating downgrade resulted in a decline in Plaintiff's Bond prices from approximately $91.71 in late November, 2007 to $85.70 by December 31, 2007. In February 2008, Fitch, applying its updated and appropriate methodology, placed several HarborView Bonds on "Ratings Watch Negative." The disclosures regarding the true quality of the Bond collateral

4

originated by Countrywide and the Rating Agencies' admission that they had not used an appropriate rating methodology for the Bonds have resulted in a substantial decline in the value of the Bonds. The value of Plaintiff's investment in HarborView Bonds, originally purchased at par, had declined by *55 percent* as of March 31, 2008. Most recently, on April 29, 2008, S&P downgraded several classes of HarborView Bonds -- previously rated investment grade -- to junk status. All of the foregoing failures by the Defendants resulted in millions of dollars of damages to Plaintiff and members of the class.

## JURISDICTION AND VENUE

4.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, respectively.

5.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

6.      Venue is proper in this County pursuant to Section 22 of the Securities Act. Many of the acts and transactions alleged herein, including the preparation and dissemination of many of the material misstatements contained in the Registration Statement and Prospectuses, occurred in substantial part in this County. Additionally, the Offerings were actively marketed and sold in this County. In addition, Defendant RBS maintains an office in this County and all three Rating Agency Defendants maintain principal executive offices and reside in this County.

## PARTIES

7.      Plaintiff, the New Jersey Carpenters Vacation Fund, is a Taft-Hartley benefit fund with offices located in Edison, New Jersey. The New Jersey Carpenters Vacation Fund purchased 100,000 face value of the HarborView Mortgage Loan Trust, Series 2006-4 Class B1

5

Bonds at par value, an investment of $100,000, on the Offering on April 28, 2006. Plaintiff purchased pursuant to the Registration Statement and Prospectus which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading as set forth herein. At the time of the commencement of this action the value of Plaintiff's HarborView investment had declined to approximately $54,880.77 – a loss of approximately *55 percent* of the Fund's investment.

8.    Defendant Harborview Mortgage Loan Trust 2006-4 was the issuing entity for the April 2006 Offering.  Per its filings with the SEC, Harborview Mortgage Loan Trust 2006-4 has listed 600 Steamboat Road, Greenwich, Connecticut 06830 as its principal office location. Defendant Harborview Mortgage Loan Trust 2006-4 is a common law trust formed under the laws of the State of New York.

9.    Defendant Harborview Mortgage Loan Trust 2006-5 was the issuing entity for the June 2006 Offering.  Per its filings with the SEC, Harborview Mortgage Loan Trust 2006-5 has listed 600 Steamboat Road, Greenwich, Connecticut 06830 as its principal office location. Defendant Harborview Mortgage Loan Trust 2006-5 is a common law trust formed under the laws of the State of New York.

10.    Defendant Harborview Mortgage Loan Trust 2006-9 was the issuing entity for the October 2006 Offering.  Per its filings with the SEC, Harborview Mortgage Loan Trust 2006-9 has listed 600 Steamboat Road, Greenwich, Connecticut 06830 as its principal office location. Defendant Harborview Mortgage Loan Trust 2006-9 is a common law trust formed under the laws of the State of New York.

11.    Defendant The Royal Bank of Scotland Group, plc ("RBS Group") is located at 600 Steamboat Road, Greenwich, Connecticut 06830.  RBS Group is a multi-national

corporation that delivers banking and financial services throughout the world. RBS Group is the parent and sole owner of Greenwich Capital Holdings, Inc. RBS Group maintains an office in New York County located at 101 Park Avenue, New York, New York 10178.

12. Defendant Greenwich Capital Holdings, Inc. ("GCH") is a wholly owned subsidiary of the RBS Group and is located at 600 Steamboat Road, Greenwich, Connecticut 06830. Defendant GCH is the parent and sole owner of GCA, GCFP and GCM.

13. Defendant Greenwich Capital Acceptance Inc. ("GCA") is located at 600 Steamboat Road, Greenwich, Connecticut 06830. Defendant GCA is the wholly owned subsidiary of GCH. Defendant GCA filed Registration Statement and Prospectuses with the SEC in connection with the Offerings. Defendant GCA served as the Depositor in connection with each of the Offerings. The role of the Depositor was to purchase the mortgage loans from the seller and then assign the mortgage loans and all of its rights and interest under the mortgage loan purchase agreement to the trustee for the benefit of the Bondholders. GCA, as Depositor, was also responsible for preparing and filing any reports required under the Securities Exchange Act of 1934.

14. Defendant Greenwich Capital Financial Products, Inc. ("GCFP") is located at 600 Steamboat Road, Greenwich, Connecticut 06830. Defendant GCFP is the wholly owned subsidiary of GCH. Defendant GCFP served as the Sponsor and Seller in each of the Offerings. The sponsor is a purchaser of seasoned, program exception, and non-performing residential mortgages. These loans were purchased from Countrywide on a bulk or flow basis by competitive bid or through a pre-negotiated agreement. It was falsely stated in the Prospectuses that: "All loans acquired by the sponsor were subject to due diligence prior to purchase. Portfolios were reviewed for issues including, but not limited to, credit, documentation,

7

litigation, default and servicing related concerns as well as a thorough compliance review with loan level testing." *See* June 2006 Offering Prospectus at p. 61.   Defendant GCFP is registered with the New York State Department of State, Division of Corporations to do business in New York.

15.    Defendant Greenwich Capital Markets, Inc. d/b/a "RBS Greenwich Capital" ("GCM") is an investment banking firm principally located at 600 Steamboat Road, Greenwich, Connecticut 06830.   Defendant GCM is the wholly owned subsidiary of GCH.   Defendant GCM served as the underwriter for each of the Offerings.   Defendant GCM was intimately involved in the HarborView Offerings.   Defendant GCM failed to perform the requisite level of due diligence not merely once, but on all times in connection with all five of the HarborView Offerings complained of herein.   The Prospectuses disseminated in connection with each of the Offerings contained the same material misstatements and omissions of material fact relating to the "Underwriting Practices" employed in originating the underlying mortgage loans.   GCM is one of the leading underwriters in mortgage-backed securities in the United States.   Since 1987, GCM has helped mortgage lenders issue more than $400 billion in asset-backed securities.   GCM, as an essential part of its investment banking business, has substantial contacts within this County and regularly and continually transacts business in New York -- specifically New York County (*i.e.*, Wall Street and the financial markets) including through the Offerings.

16.    Defendant Robert J. McGinnis ("McGinnis") was, at all relevant times, GCA's President and Director.   Defendant McGinnis signed the Registration Statement for the Offerings.

17.    Defendant Robert J. McGinnis ("McGinnis") was, at all relevant times, GCA's President and Director. Defendant McGinnis signed the Registration Statement for the Offerings.

18.    Defendant Carol P. Mathis ("Mathis") was, at all relevant times, GCA's Chief Financial Officer and Managing Director. Defendant Mathis signed the Registration Statement for the Offerings.

19.    Defendant Joseph N. Walsh, III ("Walsh") was, at all relevant times, GCA's Managing Director and Director. Defendant Walsh signed the Registration Statement for the Offerings.

20.    Defendant John C. Anderson ("Anderson") was, at all relevant times, GCA's Managing Director and Director. Defendant Anderson signed the Registration Statement for the Offerings.

21.    Defendant James C. Esposito ("Esposito") was, at all relevant times, GCA's Managing Director, Director, General Counsel and Secretary. Defendant Esposito signed the Registration Statement for the Offerings.

22.    Defendants McGinnis, Mathis, Walsh, Anderson and Esposito are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with GCA, possessed the power and authority to control the contents of GCA's submissions to the SEC and the market, and participated in the drafting and editing of the Prospectuses. The Individual Defendants all conducted business and had business residences at 60 Steamboat Road, Greenwich, Connecticut 06830.

23.    The Individual Defendants, as officers and/or directors each had a duty to promptly disseminate accurate and truthful information with respect to GCA and HarborView,

9

and to correct any previously issued statements issued by, or on behalf of the GCA and HarborView that had become materially misleading. The Individual Defendants' misrepresentations and omissions in the Prospectuses violated these specific requirements and obligations. The Individual Defendants were signatories to the Registration Statement filed with the SEC and incorporated by reference in the Prospectuses.

24.    Defendant Fitch Ratings ("Fitch") is a credit rating agency with its principal offices located at One State Street Plaza, New York, New York 10004. Fitch performs financial research and analysis for commercial and governmental entities and holds a 10 percent share of the world's credit ratings market. As a condition to the issuance of the HarborView Bonds, Fitch purportedly analyzed the April 2006 Offering to address the likelihood of the receipt of all distributions on the Bonds and assigned appropriate credit ratings for each tranche of that Offering, which was integral in establishing pricing, interest rates and a market for the Harborview Bonds.

25.    Defendant Moody's Investors Services ("Moody's") is a credit rating agency with its principal offices located at 7 World Trade Center at 250 Greenwich Street, New York, New York 10007. Moody's performs financial research and analysis for commercial and governmental entities and holds a 40 percent share of the world's credit ratings market. As a condition to the issuance of the HarborView Bonds, Moody's purportedly analyzed each Offering to address the likelihood of the receipt of all distributions on the Bonds and assigned appropriate credit ratings for each tranche of the Offerings, which was integral in establishing pricing, interest rates and a market for the Harborview Bonds.

26.    Defendant The McGraw-Hill Companies, Inc. maintains a business division d/b/a "Standard & Poors' Ratings Services" ("S&P" shall refer to The McGraw-Hill Companies and

10

its business division Standard & Poors' Ratings Services). Defendant S&P is a credit rating agency with its headquarters located at 55 Water Street, New York, New York 10041. S&P's performs financial research and analysis for commercial and governmental entities and holds a 40 percent share of the world's credit ratings market. As a condition to the issuance of the HarborView Bonds, S&P purportedly analyzed each Offering to address the likelihood of the receipt of all distributions on the Bonds and assigned appropriate credit ratings for each tranche of the Offerings, which was integral in establishing pricing, interest rates and a market for the Harborview Bonds.

27.    The Defendants are all liable, jointly and severally, as participants in the issuance of the HarborView Bonds, including issuing, causing, or making materially misleading statements in the Prospectuses and omitting material facts necessary to make the statements contained therein not misleading.

## CLASS ACTION ALLEGATIONS

28.    Plaintiff brings this action as a class action pursuant to Article 9 of the New York Civil Practice Law and Rules ("CPLR") on behalf of a class consisting of all persons who purchased or acquired HarborView Bonds (the "Class") pursuant and/or traceable to the Registration Statement and Prospectuses issued in connection with the Offerings from the effective dates through the date of the filing of this action. Excluded from the Class are Defendants, their officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

29.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown to Plaintiff at

11

this time and can only be ascertained through appropriate discovery.   Plaintiff reasonably believes that there are thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Defendants and/or the Trustee for the Bonds and may be notified of the pendency of this action by mail, or the internet or publication using the form of notice similar to that customarily used in securities class actions.

30.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of statutory law complained of herein.

31.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained Schoengold, Sporn, Laitman & Lometti, P.C., counsel competent and experienced in class and securities litigation.

32.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the provisions of the Securities Act of 1933 was violated by the Defendants as alleged herein;

b.    whether the Registration Statement and Prospectuses contained materially untrue statements or omitted statements of material fact; and

c.    to what extent the members of the Class have sustained damages pursuant to the statutory measure of damages.

33.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

12

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

34. Currently, the United States is ensnared in a financial crisis arising from undisclosed subprime lending practices and the issuance by financial firms of trillions of dollars of securities purportedly backed or collateralized with such undisclosed defective loans. The Plaintiff and Class have been victims of the misstatements and omissions which have given rise to the current crisis. RBS and its related entities had enormous financial incentive to consummate as many offerings of the Bonds as quickly as possible since they were paid, upon completion of each Offering, a percentage of the amount offered to investors. Since the risk of the loan collateral failing was not assumed by RBS, they also had enormous incentive not to conduct full complete and meaningful due diligence of the loan collateral. Further, the Ratings Agencies were paid by the RBS or the issuer and thus were conflicted and incentivized not to apply the appropriate methodology in rating the Bonds and Bond collateral thereby issuing inflated Bond ratings.

35. The structure of each of the Offerings was largely identical. On or about March 31, 2006, Defendant GCA filed Registration Statement in with the SEC in connection with April 2006 Offering, the June 2006 Offering and the October 2006 Offering. This Registration Statement was incorporated by reference in the Prospectuses issued in connection with each of the HarborView Offerings.

36. In connection with each of the HarborView Offerings, Defendants prepared and disseminated Prospectuses that contained, nearly verbatim, material misstatements of fact and

13

omitted facts necessary to make the facts stated therein not misleading that were reasonably relied upon by Plaintiff and the Class to their own detriment.

**The Prospectuses State Countrywide's Loans Comply With All State and Federal Laws**

37.    Each Prospectus stated that the underlying mortgages purchased and securitized by Defendants were originated by Countrywide and complied with all state and federal laws and regulations:

> *Countrywide Underwriting Guidelines.*
>
> *General.* All of the mortgage loans originated or acquired by Countrywide have been originated or acquired by Countrywide in accordance with its credit, appraisal and underwriting standards. ***Countrywide's underwriting standards are applied in accordance with applicable federal and state laws and regulations.***

See April 2006 Offering Prospectus at S-81; *see also,* June 2006 Offering Prospectus at S-65; October 2006 Offering Prospectus at S-63. (Emphasis added).

38.    The statements contained the preceding paragraph contained untrue statements of material fact. As set forth below, a material portion of the underlying collateral for the HarborView Bonds originated by Countrywide was not "in accordance with its credit, appraisal and underwriting standards," but rather approved based on lax underwriting standards, as evidenced by higher than anticipated rates of delinquencies and foreclosures. Moreover, Countrywide's loan origination division has come under intense federal and state investigation for alleged predatory lending practices in violation of applicable state and federal laws and regulations.

**The Prospectuses State Countrywide's Mortgage Loans Were
Underwritten Pursuant to Established Procedures and Standards**

39.    The Prospectuses stated that the underlying mortgage loans were originated by Countrywide and pursuant to Countrywide's established underwriting guidelines:

**The Originator**

The mortgage loans which were sold to the seller were originated by Countrywide Home Loans, Inc. The information set forth in this section contains a brief description of the underwriting guidelines used for mortgage loans originated by Countrywide.

*Countrywide Home Loans, Inc.*

Countrywide, a New York corporation, is a direct wholly owned subsidiary of Countrywide Financial Corporation (formerly known as Countrywide Credit Industries, Inc.), a Delaware corporation. Countrywide is engaged primarily in the mortgage banking business, and as such, originates, purchases, sells and services (either directly or through subsidiaries) mortgage loans. Countrywide originates mortgage loans through a retail branch system and through mortgage loan brokers and correspondents nationwide. Loans originated, purchased, sold or serviced by Countrywide are principally first-lien, fixed or adjustable rate mortgage loans secured by single-family residences.

*See* April 2006 Offering Prospectus at S-79; *see also*, June 2006 Offering Prospectus at S-63; October 2006 Offering Prospectus at S-68.

40.     The statements contained the preceding paragraph contained untrue statements of material fact.  As set forth below, a material portion of the underlying collateral for the HarborView Bonds originated by Countrywide was not originated in compliance with Countrywide's stated underwriting standards, but rather approved based on lax underwriting standards, whereby Countrywide systematically issued loans to uncreditworthy borrowers who failed to meet the criteria and minimum requirements for Countrywide's various loan programs, as evidenced by higher than anticipated rates of delinquencies and foreclosures and as further set forth herein at paragraphs 65-77 *infra*.

**The Prospectuses State That Countrywide Issued Loans
After An Assessment of Borrower Creditworthiness**

41.     The Prospectuses make clear even though Countrywide had various different types of underwriting programs – *e.g.*, "Full Documentation," "Alternative Documentation," "Reduced Documentation," "No Income/No Asset Documentation" and "Stated Income/Stated

15

Asset Documentation" – all mortgage underwriting was done pursuant to established procedures designed to assure borrower creditworthiness and the likelihood of repayment.

> *Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability* and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to income" ratios) are within acceptable limits.

*See* April 2006 Offering Prospectus at S-82; *see also,* June 2006 Offering Prospectus at S-66; October 2006 Offering Prospectus at S-64. (Emphasis added).

42.    The statements contained the preceding paragraph contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading since Countrywide, in fact, disregarded its Underwriting Guidelines and systematically issued loans to uncreditworthy borrowers who failed to meet the criteria and minimum requirements for Countrywide's various aforementioned loan programs as evidenced by higher than anticipated rates of delinquencies and foreclosures and as further set forth herein at paragraphs 65-77, *infra*.

43.    The Prospectuses clearly stated that when evaluating a potential borrower's creditworthiness Countrywide would generally require a description of income:

> As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income. If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

16

*See* April 2006 Offering Prospectus at S-81; *see also,* June 2006 Offering Prospectus at S-65; October 2006 Offering Prospectus at S-63.

44.     The statements contained the preceding paragraph contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading since Countrywide, in fact, disregarded its Underwriting Guidelines and systematically issued loans to uncreditworthy borrowers who failed to meet the criteria and minimum requirements for Countrywide's various aforementioned loan programs as evidenced by higher than anticipated rates of delinquencies and foreclosures and as further set forth herein at paragraphs 65-77, *infra.*

45.     The Prospectuses clearly stated that Countrywide's underwriters consider a potential borrower's credit history:

> For all mortgage loans originated or acquired by Countrywide Home Loans, Countrywide Home Loans obtains a credit report relating to the applicant from a credit reporting company. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.

*See* April 2006 Offering Prospectus at S-82; *see also,* June 2006 Offering Prospectus at S-66; October 2006 Offering Prospectus at S-64.

46.     The statements contained the preceding paragraph contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading since Countrywide, in fact, disregarded its Underwriting Guidelines and systematically issued loans to uncreditworthy borrowers who failed to meet the criteria and minimum requirements for Countrywide's various aforementioned loan programs as evidenced by higher than anticipated rates of delinquencies and foreclosures and as further set forth herein at paragraphs 65-77, *infra.*

47.     The Prospectuses clearly stated that Countrywide's underwriters consider a potential borrower's FICO Credit Score:

17

> In assessing a prospective borrower's creditworthiness, Countrywide Home Loans may use FICO Credit Scores. *"FICO Credit Scores"* are statistical credit scores designed to assess a borrower's creditworthiness and likelihood to default on a consumer obligation over a two-year period based on a borrower's credit history. ... Under Countrywide Home Loans' underwriting guidelines, borrowers possessing higher FICO Credit Scores, which indicate a more favorable credit history and who give Countrywide Home Loans the right to obtain the tax returns they filed for the preceding two years, may be eligible for Countrywide Home Loans' processing program (the *"Preferred Processing Program"*).

*See* April 2006 Offering Prospectus at S-81; *see also,* June 2006 Offering Prospectus at S-65; October 2006 Offering Prospectus at S-63.

48.    The statements contained the preceding paragraph contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading since Countrywide, in fact, disregarded its Underwriting Guidelines and systematically issued loans to uncreditworthy borrowers who failed to meet the criteria and minimum requirements for Countrywide's various aforementioned loan programs as evidenced by higher than anticipated rates of delinquencies and foreclosures and as further set forth herein at paragraphs 65-77, *infra*.

49.    The Prospectuses clearly stated that Countrywide's underwriters consider a potential borrower's debt-to-income ratio, determined on a loan-by-loan basis, and are only able to make exceptions when "compensating factors are demonstrated by a prospective borrower":

> The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. *Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.*

*See* November 2005 Offering Prospectus at S-69; *see also,* January 2006 Offering Prospectus at S-62; April 2006 Offering Prospectus at S-82; June 2006 Offering Prospectus at S-66; October 2006 Offering Prospectus at S-64. (Emphasis added).

18

50.     The statements contained the preceding paragraph contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading since Countrywide, in fact, disregarded its Underwriting Guidelines and systematically issued loans to uncreditworthy borrowers who failed to meet the criteria and minimum requirements for Countrywide's various aforementioned loan programs as evidenced by higher than anticipated rates of delinquencies and foreclosures and as further set forth herein at paragraphs 65-77, *infra*.

**The Prospectuses State That Mortgages Issued By Third-Party**
**Brokers Are Reviewed Independently And By Countrywide**
**To Assure That The Underwriting Standards Have Been Met**

51.     The Prospectuses stated that mortgages issued through loan correspondent or mortgage brokers that purportedly applied Countrywide's underwriting standards are reviewed by an independent company to determine whether the mortgage loan complies with Countrywide's underwriting guidelines.  Mortgages issued through loan correspondent or mortgage brokers based on Countrywide's standards may be purchased by Countrywide. Moreover, the Prospectuses state that in these circumstances, Countrywide conducts a quality control review of a sample of the mortgage loans:

> *Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker.* In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. *After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage*

19

> *loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself.*

See April 2006 Offering Prospectus at S-81; *see also*, June 2006 Offering Prospectus at S-65; October 2006 Offering Prospectus at S-63. (Emphasis added).

52.     The statements contained the preceding paragraph contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading since Countrywide, in fact, disregarded its Underwriting Guidelines and systematically issued loans and approved loans issued to uncreditworthy borrowers who failed to meet the criteria and minimum requirements for Countrywide's various aforementioned loan programs as evidenced by higher than anticipated rates of delinquencies and foreclosures and as further set forth herein at paragraphs 65-77, *infra.*

**The Prospectuses State That Countrywide Offered Various Loan Programs Based The Amount of Documentation Provided By The Borrower**

53.     The Prospectuses stated that Countrywide's underwriting guidelines offered a range of mortgage loan programs with varying degrees of required documentation from the borrower. Under Countrywide's Full Documentation Program, the prospective borrower submits a complete application which includes documentation regarding the applicant's assets, liabilities, income, credit history, employment history and other personal information.

> The nature of the information that a borrower is required to disclose and whether the information is verified depends, in part, on the documentation program used in the origination process. In general under the Full Documentation Loan Program (the *"Full Documentation Program"*), each prospective borrower is required to complete an application which includes information with respect to the applicant's assets, liabilities, income, credit history, employment history and other personal information. Self employed individuals are generally required to submit their two most recent federal income tax returns. Under the Full Documentation Program, the underwriter verifies the information contained in the application relating to employment, income, assets and mortgages.

20

*See* April 2006 Offering Prospectus at S-82; *see also*, June 2006 Offering Prospectus at S-66; October 2006 Offering Prospectus at S-64.

54. The statements contained the preceding paragraph contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading since Countrywide, in fact, disregarded its Underwriting Guidelines and systematically issued loans to uncreditworthy borrowers who failed to meet the criteria and minimum requirements for Countrywide's various aforementioned loan programs as evidenced by higher than anticipated rates of delinquencies and foreclosures and as further set forth herein at paragraphs 65-77, *infra.*

55. In addition, a potential borrower may be eligible for a loan that limits or eliminates some of the standard disclosure or verification requirements:

> A prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide Home Loans' standard disclosure or verification requirements or both. Countrywide Home Loans offers the following documentation programs as alternatives to its Full Documentation Program: an Alternative Documentation Loan Program (the "*Alternative Documentation Program*"), a Reduced Documentation Loan Program (the "*Reduced Documentation Program*"), a CLUES Plus Documentation Loan Program (the "CLUES Plus Documentation Program"), a No Income/No Asset Documentation Loan Program (the "*No Income/No Asset Documentation Program*"), a Stated Income/Stated Asset Documentation Loan Program (the "*Stated Income/StatedAsset Documentation Program*") and a Streamlined Documentation Loan Program (the "*Streamlined Documentation Program*").

*See* April 2006 Offering Prospectus at S-82; *see also*, June 2006 Offering Prospectus at S-66; October 2006 Offering Prospectus at S-64.

56. The statements contained the preceding paragraph contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading since Countrywide, in fact, disregarded its Underwriting Guidelines and systematically issued loans to uncreditworthy borrowers who failed to meet the criteria and minimum requirements for Countrywide's various aforementioned loan programs as evidenced by higher than anticipated rates of delinquencies and foreclosures and as further set forth herein at paragraphs 65-77, *infra.*

57.   In all events, whether the prospective borrower chooses to apply for a Full Documentation loan or one of Countrywide's other loan programs, the Prospectuses state that Countrywide's underwriting guidelines were accordingly structured to consider all relevant factors necessary to assess prospective borrowers' creditworthiness and ability to repay the loan. Countrywide's Standard Underwriting Guidelines, in pertinent part, are as follows:

> *Standard Underwriting Guidelines*
> Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000.
>
> *           *           *
>
> Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%.
>
> In connection with the Standard Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Program, the CLUES Plus Documentation Program or the Streamlined Documentation Program.
>
> The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.
>
> Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio ranges up to 95%.

22

The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month immediately prior to the date of the mortgage loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections. Cash-out refinances and investor properties are not permitted under the CLUES Plus Documentation Program.

The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

*See* April 2006 Offering Prospectus at S-83-84; *see also*, June 2006 Offering Prospectus at S-67-68; October 2006 Offering Prospectus at S-65-66.

58.    The statements contained the preceding paragraph contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading since Countrywide, in fact, disregarded its Underwriting Guidelines and systematically issued loans to uncreditworthy borrowers who failed to meet the criteria and minimum requirements for Countrywide's various aforementioned loan programs as evidenced by higher than anticipated rates of delinquencies and foreclosures and as further set forth herein at paragraphs 65-77, *infra*.

59.    In addition, Countrywide also underwrote mortgage loans pursuant to its "Expanded Underwriting Guidelines," which in some instances permitted higher Loan-to-Value Rations, higher loan amounts, higher debt-to-income ratios or different documentation

23

requirements than Countrywide's Standard Underwriting Guidelines.    In particular, Countrywide's No Income/No Asset Documentation Program and the Stated Income/Stated Asset Documentation Program were only available pursuant to the Expanded Underwriting Guidelines. Countrywide's Expanded Underwriting Guidelines, in pertinent part, are as follows:

*Expanded Underwriting Guidelines*
Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

\*      \*      \*

Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively.

In connection with the Expanded Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Loan Program, the No Income/No Asset Documentation Program and the Stated Income/Stated Asset Documentation Program. Neither the No Income/No Asset Documentation Program nor the Stated Income/Stated Asset Documentation Program is available under the Standard Underwriting Guidelines.

24

The same documentation and verification requirements apply to mortgage loans documented under the Alternative Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Alternative Documentation Program, mortgage loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines.

Similarly, the same documentation and verification requirements apply to mortgage loans documented under the Reduced Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Reduced Documentation Program, higher loan balances and Loan-to-Value Ratios are permitted for mortgage loans underwritten pursuant to the Expanded Underwriting Guidelines than those permitted under the Standard Underwriting Guidelines. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 90%. The borrower is not required to disclose any income information for some mortgage loans originated under the Reduced Documentation Program, and accordingly debt-to-income ratios are not calculated or included in the underwriting analysis. The maximum Loan-to-Value Ratio, including secondary financing, for those mortgage loans ranges up to 85%.

Under *the No Income/No Asset Documentation Program*, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. *This program is limited to borrowers with excellent credit histories.* Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

*Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income.* The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%. Mortgage loans originated under the Stated Income/Stated Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

See April 2006 Offering Prospectus at S-84-86; *see also*, June 2006 Offering Prospectus at S-68-70; October 2006 Offering Prospectus at S-66-67.  (Emphasis added.)

60.   The statements contained the preceding paragraph contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading since Countrywide, in fact, disregarded its Underwriting Guidelines and systematically issued loans to uncreditworthy borrowers who failed to meet the criteria and minimum requirements for Countrywide's various aforementioned loan programs as evidenced by higher than anticipated rates of delinquencies and foreclosures and as further set forth herein at paragraphs 55-77, *infra*. In addition, the no documentation or stated documentation loans have become known in the mortgage industry as "liars' loans" because many borrowers falsified their income.

**The Prospectuses State That The Price of The Bonds Were Tied To Credit Ratings**

61.   The Bonds were rated by the Rating Agencies, which purported to take into account, *inter alia*, the underwriting standards used in originating the underlying mortgages to address the likelihood of the receipt of all distributions on the mortgage loans by the Bondholders.   The Prospectus stated as follows:

> **Ratings**
> It is a condition to the issuance of the offered certificates that they have the applicable rating or ratings by Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P") and Fitch Ratings ("Fitch") indicated under "Initial Certificate Ratings" in the table on page S-1.
>
> The ratings assigned by each rating agency named above address the likelihood of the receipt of all distributions on the mortgage loans by the related certificate-holders under the agreement pursuant to which the certificates are issued. The ratings of each rating agency take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on that mortgage pool is adequate to make payments required by the certificates. However, ratings of the certificates do not constitute a statement regarding frequency of prepayments on the related mortgage loans.
>
> The ratings do not address the possibility that, as a result of principal prepayments, holders of the offered certificates may receive a lower than anticipated yield, and such ratings do not address the ability of the seller to

26

repurchase certain mortgage loans for which the interest rate or terms have converted.

The ratings assigned to the offered certificates should be evaluated independently from similar ratings on other types of securities. A rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by such rating agency. The ratings do not address the likelihood that (1) any Basis Risk Shortfalls will be repaid to holders of the LIBOR Certificates, or (2) any payments will be made to the Class 1-A1B, Class 1-A2B, Class 2-A1C or the Class 3-A1C Certificates under the Policy. The ratings of the Class A-R Certificate do not assess the likelihood of return to investors except to the extent of the $100 principal amount and interest thereon.

The depositor has not engaged any rating agency other than Moody's, S&P and Fitch to provide ratings on the offered certificates. However, there can be no assurance as to whether any other rating agency will rate the offered certificates or, if it does, what ratings would be assigned by that rating agency. Any rating on the offered certificates by another rating agency, if assigned at all, may be lower than the ratings assigned to the offered certificates by Moody's, S&P and Fitch.

*See* April 2006 Offering Prospectus at S-158; *see also,* June 2006 Offering Prospectus at S-135; October 2006 Offering Prospectus at S-137. (Emphasis added.)

62.     The statements contained the preceding paragraph contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading since the Rating Agencies issued the ratings based on an outdated credit rating methodology designed in or about 2002 and because the Rating Agencies presumed that the loans were of high credit quality issued in compliance with the stated underwriting guidelines when, in fact, Countrywide had systematically disregarded its stated Underwriting Guidelines, as set forth herein at paragraphs 65-77, *infra.*

**The Ratings Agencies Issued Among Highest Ratings For Each of The Certificates**

63.     The Prospectuses listed the Rating Agencies credit rating for the each tranche of the HarborView Bonds, as follows:

27

**HarborView Mortgage Loan Trust 2006-4**

| Class | Class Principle Balance | Initial Certificate Ratings | | |
|---|---|---|---|---|
| | | Moody's | S&P | Fitch |
| 1-A1A | $353,029,000 | Aaa | AAA | AAA |
| 1-A1B | $151,470,000 | Aaa | AAA | AAA |
| 1-A2A | $278,494,000 | Aaa | AAA | AAA |
| 1-A2B | $69,623,000 | Aaa | AAA | AAA |
| 2-A1A | $381,176,000 | Aaa | AAA | AAA |
| 2-A1B | $158,823,000 | Aaa | AAA | AAA |
| 2-A1C | $95,294,000 | Aaa | AAA | AAA |
| 3-A1A | $125,232,000 | Aaa | AAA | AAA |
| 3-A1B | $48,205,000 | Aaa | AAA | AAA |
| 3-A1C | $19,282,000 | Aaa | AAA | AAA |
| B-1 | $47,089,000 | Aa1 | AA+ | AA+ |
| B-2 | $32,963,000 | Aa2 | AA | AA |
| B-3 | $13,185,000 | Aa2 | AA- | AA- |
| B-4 | $15,069,000 | Aa3 | A+ | A+ |
| B-5 | $11,302,000 | A1 | A | A |
| B-6 | $9,418,000 | A2 | A- | A- |
| B-7 | $7,534,000 | A2 | BBB+ | A- |
| B-8 | $7,534,000 | A3 | BBB | BBB+ |
| B-9 | $7,534,000 | Baa1 | BBB- | BBB |
| B-10 | $16,011,000 | Baa3 | N/R | N/R |

**HarborView Mortgage Loan Trust 2006-5**

| Class | Class Principle Balance | Initial Certificate Rating | |
|---|---|---|---|
| | | Moody's | S&P |
| 1-A1A | $424,667,000 | Aaa | AAA |
| 1-A1B | $106,166,000 | Aaa | AAA |
| 2-A1A | $585,483,000 | Aaa | AAA |
| 2-A1B | $243,951,000 | Aaa | AAA |
| 2-A1C | $146,370,000 | Aaa | AAA |
| B-1 | $40,452,000 | Aa1 | AA+ |
| B-2 | $25,592,000 | Aa2 | AA |
| B-3 | $9,907,000 | Aa3 | AA- |
| B-4 | $9,081,000 | A1 | A+ |
| B-5 | $8,256,000 | A2 | A |
| B-6 | $4,953,000 | A3 | A- |
| B-7 | $5,779,000 | Baa1 | BBB+ |
| B-8 | $5,779,000 | Baa2 | BBB |
| B-9 | $4,953,000 | Baa3 | BBB- |

HarborView Mortgage Loan Trust 2006-9

| Class | Class Principle Balance | Initial Certificate Rating | |
|---|---|---|---|
| | | Moody's | S&P |
| 1A-1A | $832,459,000 | Aaa | AAA |
| 2A-1A | $1,066,905,000 | Aaa | AAA |
| 2A-1B1 | $200,000,000 | Aaa | AAA |
| 2A-1B2 | $244,543,000 | Aaa | AAA |
| 2A-1C1 | $100,000,000 | Aaa | AAA |
| 2A-1C2 | $166,727,000 | Aaa | AAA |
| B-1 | $69,156,000 | Aa1 | AA+ |
| B-2 | $54,748,000 | Aa1 | AA |
| B-3 | $17,289,000 | Aa1 | AA- |
| B-4 | $41,782,000 | Aa2 | N/R |
| B-5 | $31,696,000 | A1 | A- |
| B-6 | $27,374,000 | Baa1 | BBB |
| B-7 | $14,405,000 | Baa3 | BBB- |

64.    The ratings on the Bonds contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading since the Rating Agencies issued the ratings based on an outdated credit rating methodology designed in or about 2002 and because the Rating Agencies presumed that the loans were of high credit quality issued in compliance with the stated underwriting guidelines when, in fact, Countrywide had systematically disregarded its stated Underwriting Guidelines, as set forth herein at paragraphs 65-77, *infra*.

**The Truth Begins To Emerge: Countrywide's**
**Systematic Improper Lending Practices**

65.    In or around early 2007, disclosures began to emerge that revealed that investment banks and home loan lenders had issued billions of dollars of mortgage backed securities collateralized with home loans which were made to uncreditworthy borrowers, significantly inflating the value of those securities. At the center of these predatory lending practices was the world's largest mortgage lender, Countrywide.

29

66.     On or about July 24, 2007, Countrywide shocked the market by reporting that the Company was forced to write-down $417 million in loans in the second fiscal quarter of 2007 alone.  In a press release, Countrywide stated the following:

> Credit-related costs in the second quarter included:
>
> *Impairment on credit-sensitive retained interests.  Impairment charges of $417 million were taken during the quarter on the Company's investments in credit-sensitive retained interests.  This included $388 million, or approximately $0.40 in earnings per diluted share based on a normalized tax rate, or prime home equity loans.  The impairment charges on these residuals were attributable to accelerated increases in delinquency levels and increases in the estimates of future and loss severities on the underlying loans.*

67.     As a result of these disclosures that Countrywide had engaged in the practice of writing bad loans to uncreditworthy borrowers and that it was much more heavily invested in the failing subprime and non-traditional loan markets than had been previously disclosed, rating agencies began what would become a series of ratings downgrades on Countrywide.   Standard & Poor's downgraded Countrywide's credit rating on or about August 16, 2007 from "A/A-1" to "A-/A-2" – making it more expensive for Countrywide to borrow money.  This downgrade was followed up by Fitch Ratings' downgrade of Countrywide Home Loan's (a subsidiary of Countrywide Financial Corporation) servicer ratings on August 24, 2007.

68.     Countrywide is currently under investigation by a panel of the United States Senate for predatory lending – a practice whereby a lender deceptively convinces a borrower to agree to unfair and abusive loan terms, including interest and fees that are unreasonably high.  Countrywide's increased risk of not being able to collect on these predatory mortgage loans puts the HarborView Bonds' underlying mortgage collateral at risk, thereby further increasing the risk to Plaintiff and the Class.

30

69.     During an August 29, 2007 press conference reported in *The Wall Street Journal*, Senator Charles Schumer, chairman of the Senate panel investigating Countrywide's predatory lending practices stated:

> Countrywide's most lucrative brokers are those that make bad loans that are largely designed to fail the borrower .... [Countrywide's] brokers can earn an extra 1 percent of the loan value in commission by adding a three-year prepayment penalty to loans.

70.     The Attorneys General of California, Florida and Illinois have all also launched investigations of Countrywide for deceptive business practices relating to its mortgage lending.

71.     On or about October 26, 2007, Countrywide disclosed that it had been further hurt by the mortgage crisis and suffered a loss of over $1.2 billion in the third quarter of 2007, which was accompanied by forced write-downs of $690 million in subprime mortgages and non-traditional loans because of their rising delinquencies and defaults. This news resulted in a downgrade by Fitch Ratings of Countrywide long-term counterparty credit rating from "A-" to "BBB+." Subsequently, on or about November 19, 2007, Moody's announced that although it would maintain its rating on Countrywide, it had established a "negative outlook" on Countrywide – meaning that a downgrade was imminent.

72.     On or about March 10, 2008, the federal government disclosed that it had initiated a probe into the fraudulent mortgage practices engaged in by Countrywide, including manipulation of the subprime and non-traditional loan markets, knowledge of and disregard for underwriting inaccuracies and misrepresentations, and specific instructions to underwriters by Countrywide not to scrutinize certain types of loans it issued. Subsequently, on April 2, 2008, a Federal Bankruptcy Judge overseeing the proceedings of more than 300 Countrywide related bankruptcies ordered a further inquiry into the misconduct, and specifically the illegal inflation of fees throughout the loan process, that had been occurring at Countrywide.

31

73.    As a direct result of the allegations surrounding the investigation into Countrywide's wrongdoing, on March 12, 2008, Fitch downgraded its long-term issuer default rating to the lowest investment-grade of "BBB-" citing further deterioration of Countrywide's home mortgage portfolio. Soon after, on April 3, 2008, Moody's followed up with a downgrade of Countrywide's bank strength to "D" from "C-'" – indicating severe instability in the mortgage lenders' banking arm due to shrinking liquidity and heavy debt.  Countrywide's shrinking liquidity and heavy debt burden were a direct result of Countrywide's huge portfolio of subprime and non-traditional loans whose market, by April 2008, had dried up completely, resulting in increasing write-downs and losses at Countrywide.

74.    Finally, on April 30, 2008, an article published in *The Wall Street Journal* entitled "Countrywide Loss Focuses Attention on Underwriting – Evidence of Abuses By Outside Brokers; A Fraud in Alaska" revealed that a federal probe of Countrywide, the mortgage loan originator for the Bond collateral, found evidence Countrywide's sales executives deliberately overlooked inflated income figures for many borrowers.  Indeed, Countrywide's "Fast and Easy" mortgage program, in which borrowers were asked to provide little or no documentation of their finances, particularly was prone to abuse by loan offices and outside mortgage brokers.

75.    On May 7, 2008, the *New York Times* published a tongue-in-cheek article entitled "A Little Pity, Please, for Lenders," that attempted to put the onus on the borrowers for the current residential mortgage crisis.  Particularly, the article noted that the low documentation and stated documentation loans that aggressive lenders specialized in -- *e.g.,* Countrywide's No Income/No Assets Program and Stated Income/Stated Assets Program – have "became known within the mortgage industry as "liars' loans" because many of the borrowers falsified their

32

income." However, these relaxed and credit criteria-less loan program were the brain-child of aggressive lenders just looking to amass volume loans for securitizations.

**RBS Greenwich Capital Comes Under Investigation
For Its Role in the Collapse of the Subprime Market**

76.     RBS Greenwich Capital played a prominent role in rise and fall of the U.S. subprime mortgage market. Since 1987, RBS Greenwich Capital has helped mortgage lenders issue more than $400 billion in asset-backed securities. As an underwriter on transactions involving more than $183 billion of securities issued in 2004, RBS Greenwich Capital ranked as the industry's No. 1 underwriter of sub-prime mortgages and the top asset-backed sales organization. In 2005, RBS Greenwich Capital ranked No. 2 in the top ten subprime MBS underwriters. In both 2004 and 2005, RBS Greenwich Capital ranked No. 3 in the top ten non-agency MBS underwriters.

77.     On March 8, 2008, it was reported in a *Stamford Tribune* article entitled "RBS Arm Involved in SEC Inquiry," that RBS confirmed that its Greenwich Capital unit is part of a SEC probe into the collapse of the subprime market and has been order to turn over financial documents to the SEC regarding, *inter alia*, originations of mortgages, accounting, due diligence, sales and insider trading:

> Feb 08, 2008 (The Stamford Advocate - McClatchy-Tribune Information Services via COMTEX) *The Royal Bank of Scotland has confirmed its Greenwich Capital unit is part of a Securities Exchange Commission probe into the collapse of the subprime mortgage market.*
>
> The SEC has opened about three dozen inquiries, including those that involve major investment banks, according to recent published reports.
>
> *Greenwich Capital, a top issuer of mortgage-backed securities in the subprime market, is based on Steamboat Road in Greenwich. The unit was asked by the SEC to hand over some of its financial documents,* but RBS officials would not comment on the probe beyond that.

33

"We will fully cooperate with the SEC or any regulators," said Carolyn McAdam, a spokeswoman for RBS global headquarters in the United Kingdom.
The SEC will not confirm or deny any of the companies it is investigating, a spokesman for the commission said this week.

\*   \*   \*

The SEC opened its investigation in June, launching a dozen investigations into collateralized debt obligations linked to the plummeting value of subprime mortgages.

*The SEC is said to be looking at originations of mortgages, accounting, due diligence, sales of securities and insider trading.*

Recent published reports cite sources claiming the SEC investigation now is moving at a more vigorous pace.

(Emphasis added).

### Rating Methodologies Were Outdated And Inappropriate, Resulting In Inflated Credit Ratings For The HarborView Bonds

78.     Following the Countrywide disclosures, the rating agencies who were essential at pricing the Bonds and bringing them to market at par effectively conceded that the ratings assigned to the Bonds had been inflated.

79.     In 2007, Moody's disclosed that the ratings assigned to mortgage-backed securities collateralized with Countrywide loans were inflated and did not reflect the securities' true values. In April 2007, Moody's announced that the methodology that had been deployed in 2002 and that continued to be used through early 2007 to value the widely failing subprime and non-traditional mortgages that served as collateral for mortgage-backed securities was outdated and would be revised. Moody's cited the "considerable evolution of the mortgage market since 2002" as the reasoning behind the need to revise the rating method of subprime mortgages. As one member of the press noted, this was a "stunning admission; [Moody's] model had been based on a world that no longer existed."

34

80.     Following Moody's announcement, other ratings agencies followed suit with their own reviews and the amending of the methodologies used to rate subprime and non-traditional securities.   In a July 10, 2007 press release, S&P announced that it was going to change the methodology that it had been using to rate MBS deals.   In its July 10 announcement, S&P stated that the standard variables – *i.e.*, FICO credit scores, loan-to-value ratios and ownership status – used to evaluate a borrower's risk for default "are proving less predictive" than in the past.

81.     On August 1, 2007, in a press release, Fitch announced that it had, as a result of the very high levels of delinquency and default experienced by securitizations from 2005 and 2006, revised its rating methodology with respect to the MBS offerings issued in 2005 and 2006 – the same period the HarborView Bonds were issued.   Fitch stated that the changes in methodology were necessary to "capture the rapid deterioration of subprime mortgage performance … due to the interaction of unfavorable home price environment with high-risk mortgage products."

82.     The Ratings Agencies continued to revise their methodologies throughout the summer and early fall of 2007.  By October 2007, the market for subprime and non-traditional mortgages had completely collapsed, and regardless of their new ratings methodologies, the rating agencies were forced to downgrade tens of billions of dollars of mortgage-backed securities collateralized by subprime and non-traditional mortgages.

83.     On December 17, 2007, Moody's announced that it had taken "negative rating actions" on certain HarborView bonds issued in 2006 and late 2005.  Notably, Moody's revealed that the current negative ratings action and downgrades were determined after analysis of HarborView's Bonds using Moody's "updated" rating methodology.

**Moody's take negative ratings actions on certain HarborView Mortgage Loan Trust Option Arm deals issued in 2006 and late 2005**

35

New York, December 17, 2007 – Moody's Investors Service has downgraded the ratings of twenty nine tranches and has placed under review for possible downgrade the ratings of seven tranches from six transactions issued by HarborView Mortgage Loan Trust in 2006 and late 2005. Two downgraded tranches remain on review for possible downgrade. The collateral backing these classes consists of primarily first lien, adjustable-rate negative amortizing Alt-A mortgage loans.

*The ratings were downgraded and placed under review for downgrade based on higher than anticipated rates of delinquency, foreclosure, and REO in the underlying collateral relative to credit enhancement levels. In its analysis Moody's has also applied its published methodology updates to the non-delinquent portion of the transactions.*

(Emphasis added).

84.     Applying a more appropriate method, on December 17, 2007, Moody's downgraded the HarborView Bonds as follows:

**HarborView Mortgage Loan Trust 2006-4**

| Class | Previous Rating: | Downgraded To: |
|---|---|---|
| B-3 | Aa2 | On review for possible downgrade |
| B-4 | Aa3 | On review for possible downgrade |
| B-5 | A1 | A3 |
| B-6 | A2 | Baa2 |
| B-7 | A3 | Ba2 |
| B-8 | A3 | Ba2 |
| B-9 | Baa1 | B3 |
| B-10 | Baa3 | Caa1 |

**HarborView Mortgage Loan Trust 2006-5**

| Class | Previous Rating: | Downgraded To: |
|-------|------------------|----------------|
| B-1 | Aa1 | On review for possible downgrade |
| B-2 | Aa2 | On review for possible downgrade |
| B-3 | Aa3 | On review for possible downgrade |
| B-4 | A1 | Baa2 |
| B-5 | A2 | Ba1 |
| B-6 | A3 | Ba2 |
| B-7 | Baa1 | B1 |
| B-8 | Baa2 | B2 |
| B-9 | Baa3 | B3 (on review for possible further downgrade) |

**HarborView Mortgage Loan Trust 2006-9**

| Class | Previous Rating: | Downgraded To: |
|-------|------------------|----------------|
| B-6 | Baa1 | Baa2 |
| B-7 | Baa3 | Ba2 |

85.     Following Moody's downgrade of the HarborView Bonds, Plaintiff's account statement for the month-ended December 31, 2007, reflects a precipitous decline in the market value of its Bonds – from approximately $91.71 on November 30, 2007 (pre-ratings downgrade) to $85.70 by December 31, 2007 (following the ratings downgrade).

86.     On February 6, 2008, it was reported in a *Dow Jones Newswire* article headlined "Investors Suffer Ratings Revision Fatigue," that the Rating Agencies were again revising their ratings methodologies for the MBS.

> New York (Dow Jones) – Revisions on how leading credit rating agencies evaluate complex securities have become so frequent that market participants increasingly are ignoring their efforts to get a handle on the mess.

37

The cratering subprime home loan market has made a mockery of what were once triple-A-rated securities backed by mortgages as these investments continue to be downgraded, often into junk territory.

Moody's Investor Service's latest attempt to bring order to the subprime debacle -- a proposal to revamp the way it rates complicated securities like mortgage bonds and collateralized debt obligations -- has been met with skepticism, if not downright hostility since it has the potential to confuse an already complex situation.

\*      \*      \*

Fitch, S&P Revise and Revise Again

There has barely been any let-up in the series of changes the rating agencies have proposed since the credit crunch first began.  Just this week, Fitch announced a proposal to make a number of key changes to its rating methodology for CDOs of corporate bonds and loans.  The agency maintains ratings on nearly 600 transactions, with outstanding notional of over $220 billion, which have some exposure to corporate debt, Fitch said in the release.

On Monday, S&P said it revised the correlation and recovery assumptions it uses to rate certain new CDOs and to perform surveillance on CDO transactions backed by residential mortgage-backed securities.

Far from remedying the problems that led to the unprecedented swathes of downgrades, the changes proposed are seen as being insufficient to boost the confidence of investors in the ratings and the new methodologies.

87.    Applying a more appropriate method, on February 12, 2008, Fitch reconsidered its initial ratings on the HarborView Bonds and had placed the HarborView April 2006 Bonds on "Negative Watch."

88.    An April 27, 2008 *New York Times* article entitled, "Triple-A Failure.  The Ratings Game" was largely critical of the Rating Agencies', and in particular Moody's, role in the collapse of the MBS market.   The article referred to the Rating Agencies work as "magic" which transformed "risky mortgages into investment that would be … just as safe, in theory, as other triple-A securities."   The article reported:

Over the last decade, Moody's and its two principal competitors, Standard & Poor's and Fitch, played this game to perfection -- *putting what amounted to gold seals on mortgage securities that investors swept up with increasing élan. For the rating agencies, this business was extremely lucrative. Their profits surged,*

38

*Moody's in particular; it went public, saw its stock increase sixfold and its
earnings grow by 900 percent.*

By providing the mortgage industry with an entree to Wall Street, the agencies
also transformed what had been among the sleepiest corners of finance. No longer
did mortgage banks have to wait 10 or 20 or 30 years to get their money back
from homeowners. Now they sold their loans into securitized pools and -- their
capital thus replenished -- wrote new loans at a much quicker pace.

Mortgage volume surged; in 2006, it topped $2.5 trillion. Also, many more
mortgages were issued to risky subprime borrowers. *Almost all of those subprime
loans ended up in securitized pools; indeed, the reason banks were willing to
issue so many risky loans is that they could fob them off on Wall Street.*

But who was evaluating these securities? *Who was passing judgment on the
quality of the mortgages,* on the equity behind them and on myriad other
investment considerations? Certainly not the investors. *They relied on a credit
rating.*

*Thus the agencies became the de facto watchdog over the mortgage industry.* In
a practical sense, it was Moody's and Standard & Poor's that set the credit
standards that determined which loans Wall Street could repackage and,
ultimately, which borrowers would qualify. Effectively, they did the job that was
expected of banks and government regulators. *And today, they are a central
culprit in the mortgage bust, in which the total loss has been projected at $250
billion and possibly much more.*

(Emphasis added).

89.    The April 27, 2008 *New York Times* article also reported on the credit rating

process employed by Moody's – often processing credit data regarding the Bonds in as little as

24-hours:

Moody's assigned an analyst to evaluate the package, subject to review by a
committee. The investment bank provided an enormous spreadsheet chock with
data on the borrowers' credit histories and much else that might, at very least,
have given Moody's pause. Three-quarters of the borrowers had adjustable-rate
mortgages, or ARMs -- "teaser" loans on which the interest rate could be raised
in short order. Since subprime borrowers cannot afford higher rates, they would
need to refinance soon. This is a classic sign of a bubble -- lending on the belief,
or the hope, that new money will bail out the old.

Moody's learned that almost half of these borrowers -- 43 percent -- did not
provide written verification of their incomes. The data also showed that 12

39

percent of the mortgages were for properties in Southern California, including a half-percent in a single ZIP code, in Riverside. That suggested a risky degree of concentration.

On the plus side, Moody's noted, 94 percent of those borrowers with adjustable-rate loans said their mortgages were for primary residences. "That was a comfort feeling," Robinson said. Historically, people have been slow to abandon their primary homes. When you get into a crunch, she added, "You'll give up your ski chalet first."

Another factor giving Moody's comfort was that all of the ARM loans in the pool were first mortgages (as distinct from, say, home-equity loans). Nearly half of the borrowers, however, took out a simultaneous second loan. Most often, their two loans added up to all of their property's presumed resale value, which meant the borrowers had not a cent of equity.

*In the frenetic, deal-happy climate of 2006, the Moody's analyst had only a single day to process the credit data from the bank. The analyst wasn't evaluating the mortgages but, rather, the bonds issued by the investment vehicle created to house them.* A so-called special-purpose vehicle -- a ghost corporation with no people or furniture and no assets either until the deal was struck -- would purchase the mortgages. Thereafter, monthly payments from the homeowners would go to the S.P.V. The S.P.V. would finance itself by selling bonds. The question for Moody's was whether the inflow of mortgage checks would cover the outgoing payments to bondholders. *From the investment bank's point of view, the key to the deal was obtaining a triple-A rating -- without which the deal wouldn't be profitable. That a vehicle backed by subprime mortgages could borrow at triple-A rates seems like a trick of finance.* "People say, 'How can you create triple-A out of B-rated paper?' "notes Arturo Cifuentes, a former Moody's credit analyst who now designs credit instruments.

(Emphasis added).

90.    In addition, the April 27, 2008 *New York Times* article was critical of the Rating

Agencies' use of statistical models based on historical default patterns and past data that were no

longer relevant in current era:

*Moody's used statistical models to assess C.D.O.'s; it relied on historical patterns of default. This assumed that the past would remain relevant in an era in which the mortgage industry was morphing into a wildly speculative business.* The complexity of C.D.O.'s undermined the process as well. Jamie Dimon, the chief executive of JPMorgan Chase, which recently scooped up the mortally wounded Bear Stearns, says, *"There was a large failure of common sense"* by rating

40

*agencies and also by banks like his. "Very complex securities shouldn't have been rated as if they were easy-to-value bonds."*

(Emphasis added).

91.    By way of example, the April 27, 2008 *New York Times* article took a closer look

at a $750 million MBS that Moody's rated in late 2006 using its outdated model:

> Moody's rated three-quarters of this C.D.O.'s bonds triple-A. *The ratings were derived using a mathematical construct known as a Monte Carlo simulation -- as if each of the underlying bonds would perform like cards drawn at random from a deck of mortgage bonds in the past. There were two problems with this approach. First, the bonds weren't like those in the past; the mortgage market had changed.* As Mark Adelson, a former managing director in Moody's structured-finance division, remarks, it was "like observing 100 years of weather in Antarctica to forecast the weather in Hawaii." *And second, the bonds weren't random. Moody's had underestimated the extent to which underwriting standards had weakened everywhere.* When one mortgage bond failed, the odds were that others would, too.
>
> *Moody's estimated that this C.D.O. could potentially incur losses of 2 percent. It has since revised its estimate to 27 percent.* The bonds it rated have been decimated, their market value having plunged by half or more. A triple-A layer of bonds has been downgraded 16 notches, all the way to B. Hundreds of C.D.O.'s have suffered similar fates (most of Wall Street's losses have been on C.D.O.'s). For Moody's and the other rating agencies, it has been an extraordinary rout.

(Emphasis added.)

92.    The April 27, 2008 *New York Times* article also exposed the inherent conflict of

interest that existed for the Rating Agencies: either give the rating that the investment bank needs

to sell the securitization or risk losing repeat business to your two main competitors:

> The challenge to investment banks is to design securities that just meet the rating agencies' tests. Risky mortgages serve their purpose; since the interest rate on them is higher, more money comes into the pool and is available for paying bond interest. But if the mortgages are too risky, Moody's will object. Banks are adroit at working the system, and pools like Subprime XYZ are intentionally designed to include a layer of Baa bonds, or those just over the border. *"Every agency has a model available to bankers that allows them to run the numbers until they get something they like and send it in for a rating,"* a former Moody's expert in securitization says. *In other words, banks were gaming the system;* according to Chris Flanagan, the subprime analyst at JPMorgan, "Gaming is the whole thing."

41

When a bank proposes a rating structure on a pool of debt, the rating agency will insist on a cushion of extra capital, known as an "enhancement." The bank inevitably lobbies for a thin cushion (the thinner the capitalization, the fatter the bank's profits). It's up to the agency to make sure that the cushion is big enough to safeguard the bonds. The process involves extended consultations between the agency and its client. In short, obtaining a rating is a collaborative process.

*The evidence on whether rating agencies bend to the bankers' will is mixed. The agencies do not deny that a conflict exists, but they assert that they are keen to the dangers and minimize them.* For instance, they do not reward analysts on the basis of whether they approve deals. No smoking gun, no conspiratorial e-mail message, has surfaced to suggest that they are lying. But in structured finance, the agencies face pressures that did not exist when John Moody was rating railroads. On the traditional side of the business, Moody's has thousands of clients (virtually every corporation and municipality that sells bonds). No one of them has much clout. But *in structured finance, a handful of banks return again and again, paying much bigger fees. A deal the size of XYZ can bring Moody's $200,000 and more for complicated deals. And the banks pay only if Moody's delivers the desired rating. Tom McGuire, the Jesuit theologian who ran Moody's through the mid-'90s, says this arrangement is unhealthy. If Moody's and a client bank don't see eye to eye, the bank can either tweak the numbers or try its luck with a competitor like S.&P., a process known as "ratings shopping."*

(Emphasis added.)

93.   Finally, on April 29, 2008, after applying its revised and more appropriate rating methodology to the HarborView Bonds, S&P also downgraded multiple classes of the HarborView Bonds below investment grade to junk status:

**HarborView Mortgage Loan Trust 2006-4**

| Class | Previous Rating: | Downgraded To: |
|-------|------------------|----------------|
| B-4   | A+               | BBB            |
| B-5   | A+               | BB             |
| B-6   | A-               | B              |
| B-7   | BBB+             | B              |
| B-8   | BBB              | CCC            |
| B-9   | BBB-             | CCC            |

HarborView Mortgage Loan Trust 2006-5

| Class | Previous Rating: | Downgraded To: |
|-------|------------------|----------------|
| B-1 | AA+ | BB |
| B-2 | AA | B |
| B-3 | AA- | CCC |
| B-4 | A+ | CCC |
| B-5 | A | CCC |
| B-6 | A- | CCC |
| B-7 | BBB+ | CC |
| B-8 | BBB | CC |

## COUNT I

### Violation of Section 11 of The Securities Act
### Against All Defendants

94.     This claim is brought by Plaintiff and asserted on behalf of all other members of the Class who purchased or acquired HarborView Bonds issued in the Offerings.

95.     Defendants RBS, GCH, GCA, GCFP and HarborView are the registrants for the Offerings and filed the Registration Statement and Prospectuses as the issuer of the HarborView Bonds, as defined in Section 11(a)(1) of the Securities Act and does not arise from or rely upon any allegations of fraud.

96.     The Individual Defendants were officers and/or directors of GCA at the time the Registration Statement and Prospectuses for the Offerings became effective, and with their consent were identified as such in the Registration Statement.  In addition, they signed the Registration Statement or authorized it to be signed on their behalf.

97.     Defendant GCM served as the underwriter for the Offerings and qualifies as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. §

43

77b(a)(11). As such, it participated in the solicitation, offering, and sale of the HarborView Bonds to the investing public pursuant to the Registration Statement and the Prospectuses.

98. The Rating Agencies Defendants served as appraisers as defined in Section 11(a)(4) of the Securities Act. The Rating Agencies Defendants purportedly reviewed and analyzed each Offering and provided the credit rating for each tranche of the HarborView Bonds. The Rating Agencies Defendants' service of providing the credit ratings for the HarborView Bonds was essential to pricing and marketing the bonds. The Rating Agencies Defendants' ratings were contained within the Prospectuses.

99. The Registration Statement and the Prospectuses, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth in paragraphs 39-64, *supra*. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectuses.

100. The Defendants did not make a reasonable investigation and perform due diligence and did not possess reasonable grounds for believing that the statements contained in the Registration Statement and Prospectuses were true, did not omit any material fact, and were not materially misleading.

101. Plaintiff and the other Class members did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions contained in the Registration Statement and the Prospectuses.

102. Plaintiff and other Class members sustained damages as a result of misstatements and omissions in the Registration Statement and the Prospectuses, for which they are entitled to compensation.

44

103.   Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offerings.

## COUNT II

### Violation of Section 12(a)(2) of the Securities Act
### (Against HarborView, RBS, GCH, GCA, GCFP and GCM)

104.   Plaintiff repeats and realleges each and every allegation contained above.

105.   This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all Defendants and does not arise from or rely upon any allegations of fraud.

106.   By means of the Registration Statement and Prospectuses, and by using means and instruments of transportation and communication in interstate commerce and of the mails, the Defendants through the Offering sold HarborView Bonds to Plaintiff and other members of the Class.

107.   Defendants HarborView, RBS, and its subsidiaries, GCH, GCA, GCFP and GCM, the Individual Defendants each successfully solicited these purchases motivated at least in part by its own financial interest.  The Defendants each reviewed and participated in drafting the Prospectus.  Through ensuring the successful completion of the Offerings, the underwriter Defendant GCM obtained substantial underwriting fees.  Defendant RBS and its subsidiaries, Greenwich Capital Holdings, GCA and GCFP were direct beneficiaries of the underwriting fees earned by GCM.

108.   The Registration Statement and the Prospectuses, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above at paragraphs 39-64, supra.  The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectuses.

45

109.   Defendants as "sellers" owed to the purchasers of the HarborView Bonds, including Plaintiff and other Class members, the duty to perform due diligence and make a reasonable and diligent investigation of the statements contained in the Registration Statement and the Prospectuses, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the IPO materials as set forth above.

110.   Plaintiff and other members of the Class purchased or otherwise acquired HarborView Bonds pursuant to the defective Registration Statement and Prospectuses. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement and the Prospectuses.

111.   Plaintiff, individually and representatively, hereby offers to tender to Defendants those securities which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon. Class members who have sold their HarborView Bonds are entitled to rescissionary damages.

112.   By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Class who hold HarborView Bonds purchased pursuant and/or traceable to the Offerings have the right to rescind and recover the consideration paid for their HarborView Bonds and hereby elect to rescind and tender their HarborView Bonds to the Defendants sued herein. Plaintiff and Class members who have sold their HarborView Bonds are entitled to rescissionary damages.

46

## COUNT III

### Violation of Section 15 of The Securities Act
### Against Defendants RBS, GCH and the Individual Defendants

113.    This claim is brought by Plaintiff and asserted on behalf of all Class members who purchased or acquired HarborView Bonds in the Offerings.

114.    This Count is brought pursuant to Section 15 of the Securities Act on behalf of the Class, against all Defendants and does not arise from or rely upon any allegations of fraud.

115.    The Individual Defendants at all relevant times participated in the operation and management of GCA, GCFP and GCM, and conducted and participated, directly and indirectly, in the conduct of GCA, GCFP and GCM's business affairs.

116.    As officers and/or directors of GCA, the Individual Defendants had a duty to disseminate accurate and truthful information in the Registration Statement and the Prospectuses.

117.    Defendant RBS is the Parent Corporation and sole owner of Defendant GCH, the sole owner of GCA, GCFP and GCM, and at all relevant times participated in the operation and management of the GCA, GCFP and GCM, and conducted and participated, directly and indirectly, in the conduct of GCA, GCFP and GCM's business affairs.

118.    As set forth above, it is alleged that the Registration Statement and Prospectuses issued in connection with the HarborView Bond Offerings contained material misstatements and omitted facts necessary to make the facts stated therein not misleading in violation of Sections 11 and 12 of the Securities Act.

119.    Because of their positions of control and authority as senior officers and directors of GCA, the Individual Defendants were able to, and did, control the contents of the Registration Statement and Prospectuses which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.   The Individual

47

Defendants were therefore "controlling persons" of GCA within the meaning of Section 15 of the Securities Act.

120.    In addition, because of its sole ownership of Greenwich Capital Holdings, and indirect ownership of GCA, GCFP and GCM, and its control and authority as Parent Corporation, Defendant RBS was able to, and did, control the contents of the Registration Statement and the Prospectuses which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.   Defendant RBS was therefore a "controlling person" of GCA within the meaning of Section 15 of the Securities Act.

121.    Plaintiff and other Class members purchased HarborView Bonds issued pursuant to the Offerings.  The Offerings were conducted pursuant to the Registration Statement and the Prospectuses.

122.    The Registration Statement and Prospectuses, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.   The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectuses.

123.    Plaintiff and the Class did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions in the Registration Statement and the Prospectuses.

124.    Plaintiff and the Class have sustained damages as a result of the misstatements and omissions of the Registration Statement and the Prospectuses, for which they are entitled to compensation.

125.    Plaintiff brought this action within one year after the discovery of the untrue statements and omissions, and within three years after the Offering.

48

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under CPLR Article 9;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:     New York, New York
           May 14, 2008

                                   Respectfully submitted,

                         By: _____
                                   Samuel P. Sporn
                                   Joel P. Laitman
                                   Christopher Lometti
                                   Frank R. Schirripa
                                   Daniel B. Rehns
                         SCHOENGOLD SPORN LAITMAN &
                         LOMETTI, P.C.
                         19 Fulton Street, Suite 406
                         New York, New York 10038
                         Telephone: (212) 964-0046
                         Facsimile: (212) 267-8137

                         *Counsel for Plaintiff & The*
                         *Proposed Class*

49

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

————————————————————————X

New Jersey Carpenters Vacation Fund, On Behalf  :
of Itself and All Others Similarly Situated,     :        Index No.
                                                 :
                    Plaintiff,                   :
                                                 :
          – against –                            :
                                                 :        VERIFICATION
HarborView Mortgage Loan Trust 2006-4;           :
HarborView Mortgage Loan Trust 2006-5;           :
HarborView Mortgage Loan Trust 2006-9;           :
The Royal Bank of Scotland Group, plc; Greenwich :
Capital Holdings, Inc., Greenwich Capital        :
Acceptance, Inc.; Greenwich Capital Markets, Inc.;  :
Greenwich Capital Financial Products, Inc.; Robert  :
J. McGinnis; Carol P. Mathis; Joseph N. Walsh, III;  :
John C. Anderson; James C. Esposito; Fitch       :
Ratings; Moody's Investors Service, Inc. and The :
McGraw-Hill Companies, Inc.,                     :
                                                 :
                    Defendants.                  :

————————————————————————X

(STATE OF NEW YORK
(CITY OF NEW YORK
(COUNTY OF NEW YORK

        I, Daniel B. Rehns, Esq., being duly sworn, states that he is one of the attorneys for
Plaintiff in this action and that the foregoing complaint is true to his own knowledge, except as to
matters therein stated on information and belief and as to those matters he believes to be true;
that the ground of his belief as to all matters not stated upon his knowledge are upon review of
publicly available information filed with the United States Securities and Exchange Commission,
media and newspaper articles and information contained on the internet; and that the reason why
the verification is not made by Plaintiff is that, Plaintiff New Jersey Carpenters Vacation Fund is
not in the county where Plaintiff's attorney has their office.

                                              Daniel B. Rehns, Esq.

Notary Public

JAY P. SALTZMAN
Notary Public, State of New York
No. 02SA5044563
Qualified in _____ County
Commission Expires September 27, 20__

Sworn to me before this
___ day of _MAY_, 2008

                        50

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------X

New Jersey Carpenters Vacation Fund, On Behalf    :
of Itself and All Others Similarly Situated,       :        Index No.
                                                   :
                  Plaintiffs,                      :
                                                   :
          – against –                              :
                                                   :
HarborView Mortgage Loan Trust 2006-4;             :
HarborView Mortgage Loan Trust 2006-5;             :
HarborView Mortgage Loan Trust 2006-9;             :
The Royal Bank of Scotland Group, plc; Greenwich   :
Capital Holdings, Inc., Greenwich Capital          :
Acceptance, Inc.; Greenwich Capital Markets, Inc.; :
Greenwich Capital Financial Products, Inc.; Robert :
J. McGinnis; Carol P. Mathis; Joseph N. Walsh, III; :
John C. Anderson; James C. Esposito; Fitch         :
Ratings; Moody's Investors Service, Inc.; and The  :
McGraw-Hill Companies, Inc.,                        :
                                                   :
                  Defendants.                      :

----------------------------------------X

---

## VERIFIED COMPLAINT

---

**CERTIFICATION:** I, Daniel B. Rehns, Esq. hereby certify that all of the papers that I have served, filed or submitted to the court in this divorce action are not frivolous as defined in subsection (c) of Section 130-1.1 of the Rules of the Chief Administrator of the Courts.

Dated:     May 14, 2008

SCHOENGOLD SPORN LAITMAN &
LOMETTI , P.C.
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046
Facsimile: (212) 267-8137
       *Counsel for the Plaintiff
              and Proposed Class*

# **<u>Exhibit B</u>**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
New Jersey Carpenters Vacation Fund, On Behalf
of Itself and All Others Similarly Situated

                        Plaintiffs,

           -against-

HarborView Mortgage Loan Trust 2006-4;
HarborView Mortgage Loan Trust 2006-5;
HarborView Mortgage Loan Trust 2006-9; The
Royal Bank of Scotland Group, plc; Greenwich
Capital Holdings, Inc.; Greenwich Capital
Acceptance, Inc.; Greenwich Capital Markets, Inc.;
Greenwich Capital Financial Products, Inc.; Robert
J. McGinnis; Carol P. Mathis; Joseph N. Walsh, III;
John C. Anderson; James C. Esposito; Fitch
Ratings; Moody's Investors Service, Inc.; and The
McGraw-Hill Companies, Inc.,

                       Defendants.
------------------------------------------------------------X

Civil Action No. _____

**NOTICE OF CONSENT TO
REMOVAL**

       Defendants HarborView Mortgage Loan Trust 2006-4, HarborView Mortgage

Loan Trust 2006-5, HarborView Mortgage Loan Trust 2006-9, The Royal Bank of Scotland

Group, plc, Greenwich Capital Holdings, Inc., Greenwich Capital Acceptance, Inc., Greenwich

Capital Markets, Inc., Greenwich Capital Financial Products, Inc., Robert J. McGinnis, Carol P.

Mathis, Joseph N. Walsh, III, John C. Anderson, James C. Esposito, Fitch Ratings and Moody's

Investors Service, Inc. (the "Defendants") hereby consent to the Notice of Removal filed in the

above-captioned action by The McGraw-Hill Companies, Inc. and further state as follows:

       Plaintiff filed its Verified Complaint for Violation of Sections 11, 12 and 15 of the

Securities Act of 1933 (the "Class Action Complaint") in the Supreme Court of the State of New

York, County of New York, Case No. 601451/08, on May 14, 2008.  This written consent is filed

June 3, 2008, within thirty days after the first receipt by any of the Defendants of the Class

Action Complaint.  28 U.S.C. § 1446(b).

The undersigned Defendants reserve the right to file a supplemental statement in

support of their right to have federal jurisdiction maintained over the claims asserted against

them.[1]

Dated:  June 3, 2008

Respectfully submitted,

_____

Thomas C. Rice
James G. Gamble
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone:  212-455-2000
Facsimile:  212-455-2502

*Attorneys for Defendants HarborView Mortgage
Loan Trust 2006-4, HarborView Mortgage Loan
Trust 2006-5, HarborView Mortgage Loan Trust
2006-9, The Royal Bank of Scotland Group, plc,
Greenwich Capital Holdings, Inc., Greenwich
Capital Acceptance, Inc., Greenwich Capital
Markets, Inc., Greenwich Capital Financial
Products, Inc., Robert J. McGinnis, Carol P.
Mathis, Joseph N. Walsh, III, John C. Anderson,
and James C. Esposito.*

---

[1]  By consenting to the removal of this matter, the defendants do not waive and expressly
preserve any and all defenses they may have including, but not limited to, lack of personal
jurisdiction and service of process.

2

_Martin Flumenbaum_

Martin Flumenbaum
Roberta A. Kaplan
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
United States
Telephone: 212-373-3000
Facsimile: 212-757-3990

*Attorneys for Defendant Fitch Ratings*


James J. Coster
Joshua M. Rubins
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue, 11th Floor
New York, NY 10169
Telephone: 212-818-9200
Facsimile: 212-818-9606

*Attorneys for Defendant Moody's Investors Service,
Inc.*

3

Martin Flumenbaum
Roberta A. Kaplan
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
United States
Telephone: 212-373-3000
Facsimile: 212-757-3990

*Attorneys for Defendant Fitch Ratings*

James J. Coster
Joshua M. Rubins
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue, 11th Floor
New York, NY 10169
Telephone: 212-818-9200
Facsimile: 212-818-9606

*Attorneys for Defendant Moody's Investors Service,
Inc.*

3