**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____X

New Jersey Carpenters Vacation Fund, On Behalf :
of Itself and All Others Similarly Situated, :
                                     :
            Plaintiffs, :
                                      :
          – against – :
                                        :

HarborView Mortgage Loan Trust 2006-4, :
HarborView Mortgage Loan Trust 2006-5, :
HarborView Mortgage Loan Trust 2006-9, :
The Royal Bank of Scotland Group, plc, Greenwich :
Capital Holdings, Inc., Greenwich Capital :
Acceptance, Inc., Greenwich Capital Markets, Inc., :
Greenwich Capital Financial Products, Inc., Robert :
J. McGinnis, Carol P. Mathis; Joseph N. Walsh, III, :
John C. Anderson, James C. Esposito, Fitch :
Ratings, Moody's Investors Service, Inc. and The :
McGraw-Hill Companies, Inc., :
                                      :
            Defendants. :
_____X

Civ. No.: 08-5093-HB

**DECLARATION OF JOEL P. LAITMAN IN SUPPORT OF PLAINTIFF'S REPLY**
**MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION TO REMAND**

**SCHOENGOLD SPORN LAITMAN &**
**LOMETTI , P.C.**
  Samuel P. Sporn (SS-4444)
  Joel P. Laitman (JL-8187)
  Christopher Lometti (CL-9124)
  Frank R. Schirripa (FS-1960)
  Daniel B. Rehns (DR-5506)
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046
Facsimile: (212) 267-8137

_Counsel for Plaintiff and The_
_Proposed Class_

I, JOEL P. LAITMAN hereby declare under penalty of perjury the following:

1.    I am a member of the law firm of Schoengold Sporn Laitman & Lometti, P.C. ("SSLL"), counsel for Plaintiff in *New Jersey Carpenters Vacation Fund v. HarborView Mortgage Loan Trust 2006-4, et al.*, No. 08-cv-5093 (HB) (S.D.N.Y.).  I submit this declaration in support of the Plaintiffs' reply memorandum of law in further support of its motion to remand.

2.    Attached hereto as Exhibit A is a true and correct copy of the legislative history for the Class Action Fairness Act of 2005, Senate Report, Report 109-14, dated February 28, 2005.

I hereby declare under the laws of the United States, and under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: July 21, 2008

___/s/ Joel P. Laitman_____
Joel P. Laitman

## <u>CERTIFICATE OF SERVICE</u>

I, Frank Schirripa, counsel for the Plaintiff, hereby certify that on July 21, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of much filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and by sending a copy of the foregoing to each of the addresses listed below:

Floyd Abrams
Susan Buckley
Adam Zurofsky
Tammy L. Roy
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005

Thomas C. Rice
James G. Gamble
SIMPSON THATCHER & BARLETT LLP
425 Lexington Avenue
New York, New York 10017

Martin Flumenbaum
Roberta A. Kaplan
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019

James J. Cotter
Joshua M. Rubins
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue, 11th Floor
New York, New York 10169

_____/s/   Frank R. Schirripa_____
Frank R. Schirripa

**Calendar No. 1**

| 109TH CONGRESS | | REPORT |
| 1st Session | SENATE | 109–14 |

---

## THE CLASS ACTION FAIRNESS ACT OF 2005

---

FEBRUARY 28, 2005.—Ordered to be printed

---

Mr. SPECTER, from the Committee on the Judiciary, submitted the following

# R E P O R T

together with

## ADDITIONAL AND MINORITY VIEWS

[To accompany S. 5]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (S. 5) to amend title 28, United States Code, to allow the application of the principles of federal diversity jurisdiction to interstate class actions, having considered the same, reports favorably thereon, without amendments, do pass.

## CONTENTS

|  |  | Page |
|---|---|---|
| I. | Legislative History | 1 |
| II. | Votes of the Committee | 3 |
| III. | Purposes | 4 |
| IV. | Background and Need for the Legislation | 6 |
| V. | How It Works: S. 5 and Changes in Existing Law | 27 |
| VI. | Section-by-Section Analysis | 29 |
| VII. | Critics Contentions and Rebuttals | 51 |
| VIII. | Congressional Budget Office Cost Estimate | 76 |
| IX. | Regulatory Impact Statement | 78 |
| X. | Additional Views | 79 |
| XI. | Minority Views | 82 |
| XII. | Changes in Existing Law | 96 |

## I. LEGISLATIVE HISTORY

The Senate began consideration of the Class Action Fairness Act in the 105th Congress when the Senate Judiciary Subcommittee on

39–010

2

Administrative Oversight and the Courts convened a hearing on October 30, 1997. John H. Church, Jr., John C. Coffee, Jr., Lewis H. Goldfarb, Paul V. Niemeyer, Martha Preston, and Brian Wolfman testified at the hearing on issues such as unfair class settlements, attorneys' fees, and state court abuses. On September 28, 1998, the Subcommittee on Administrative Oversight and the Courts approved S. 2083, the "Class Action Fairness Act of 1997," introduced by Senators Charles Grassley (R–IA) and Herb Kohl (D–WI), with an amendment in the nature of a substitute. No further action was taken on S. 2083 in the 105th Congress.

On February 3, 1999, S. 353, "The Class Action Fairness Act of 1999," was introduced in the 106th Congress by Senators Charles Grassley (R–IA), Herb Kohl (R–WI), and Strom Thurmond (R–SC). S. 353 was referred to the Senate Committee on the Judiciary. On May 4, 1999, the Judiciary Subcommittee on Administrative Oversight and the Courts held a legislative hearing (S. Hrg. 106–465) on the bill, and received testimony from Eleanor D. Acheson, John H. Beisner, Richard A. Daynard, E. Donald Elliot, John P. Frank, and Stephan G. Morrison.

On June 29, 2000, the Judiciary Committee approved S. 353 with an amendment in the nature of a substitute, offered by Chairman Orrin G. Hatch (R–UT), Senators Charles Grassley and Herb Kohl, by a rollcall vote of 11 years and 7 nays. S. 353 was then ordered favorably by the Committee without additional amendment.

The Senate continued consideration of the Class Action Fairness Act in the 107th Congress when Senator Charles Grassley (R–IA), introduced S. 1712 on November 15, 2001 with Senators Kohl (D–WI), Hatch (R–UT), Carper (D–DE), Thurmond (R–SC), Chafee (R–RI), and Specter (R–PA). While S. 1712 contained similar provisions from its predecessor bills, S. 1712 included some new provisions. On July 30, 2002, the Senate Judiciary Committee, which was then chaired by Senator Leahy (D–VT), held a hearing to discuss class actions generally, during which S. 1712 was discussed at length by Committee members. The Committee received testimony from Paul Bland, Thomas Henderson, former Solicitor General Walter E. Dellinger III, (Insurance) Commissioner Laurence Mirel, Shaneen Wahl and Hilda Bankston. No further action was taken on S. 1712 during the 107th Congress.

On February 4, 2003, Senator Charles Grassley (R–IA) introduced S. 274, the "Class Action Fairness Act of 2003." Senators Herb Kohl (D–WI), Orrin Hatch (R–UT), Thomas Carper (D–DE), Arlen Specter (R–PA), Lincoln Chafee (R–RI), and Zell Miller (D–GA) joined the bill as original cosponsors. On April 11, 2003, the Judiciary Committee reported S. 274 favorably, with amendments, after two days of mark-up. On October 17, 2003, Senator Grassley introduced S. 1751, the "Class Action Fairness Act of 2003," a compromise version of the bill, with Senators Alexander (R–TN), Allen (R–VA), Carper (D–DE), Chafee (R–RI), Cornyn (R–TX), Hagel (R–NE), Hatch (R–UT), Kohl (D–WI), Lugar (R–ID), Miller (D–GA), Specter (R–PA), Sununu (R–NH) and Voinovich (R–OH). Pursuant to Rule XXIV of the Standing Rules of the Senate, a Motion to Proceed to consideration of S. 1751 was filed. On October 23, 2003, the Senate failed to invoke cloture by a vote of 59–39. Senators Grassley, Kohl, Hatch and Carper then negotiated key provisions of the bill with Senators Landrieu (D–LA), Schumer (D–NY), and Dodd

3

(D–CT). The compromise bill, S. 2062, the "Class Action Fairness Act of 2004," was introduced on February 10, 2004 by Senators Grassley, the original sponsor, and Senators Kohl (D–WI), Hatch (R–UT), Carper (D–DE), Chafee (R–RI), Collins (R–ME), Dodd (R–CT), Hagel (R–NE), Landrieu (D–LA), Lugar (R–ID), Miller (D–GA), Schumer (D–NY) Specter (R–PA) and Voinovich (R–OH) as co-sponsors. Pursuant to Rule XXIV of the Standing Rules of the Senate, a Motion to Proceed to consideration of S. 2062 was filed on July 7,2004. Senator Frist (R–TN) promptly filled the amendment tree and filed a cloture motion. On July 8, 2004, the Senate failed to invoke cloture by a vote of 44–43.

On January 25, 2005, Senators Charles Grassley (R–IA), Herb Kohl (D–WI), and Orrin Hatch (R–UT) introduced S. 5, the "Class Action Fairness Act of 2005." Senators Alexander (R–TN), Carper (D–DE), Chafee (R–RI), Collins (R–ME), DeMint (R–SC), DeWine (R–OH), Dodd (D–CT), Ensign (R–NV), Feinstein (D–CA), Frist (R–TN), Hagel (R–NE), Kyl (R–AZ), Landrieu (D–LA), Lieberman (D–CT), Lincoln (D–AR), Lott (R–MS), Lugar (R–IN), Martinez (R–FL), McConnell (R–KY), Santorum (R–PA), Schumer (D–NY), Sessions (R–PA), Snowe (R–ME), Sununu (R–NH), Thune (R–SD), Vitter (R–LA), and Voinovich (R–OH) joined as cosponsors to the bill. On February 3, 2005, the Senate Judiciary Committee reported S. 5 favorably, without amendments.

## II. VOTE ON THE COMMITTEE

Pursuant to paragraph 7 of rule XXVI of the Standing Rules of the Senate, each Committee is to announce the result of rollcall votes taken in any meeting of the Committee on any measure of amendment. The Senate Judiciary Committee, with a quorum present, met on February 3, 2005 to mark up S. 5. The Committee rejected one amendment. The following rollcall votes occurred on S. 5.

A Leahy amendment that would provide for an increase of federal judges' salaries in the amount of 16.5% of their current salaries (rounded to the nearest $100).

| YEAS | NAYS |
|---|---|
| Leahy | Hatch |
| Kennedy (Proxy) | Grassley |
| Biden | Kyl |
| Feingold | DeWine |
| Durbin | Sessions |
| | Graham |
| | Cornyn |
| | Brownback |
| | Coburn |
| | Kohl |
| | Feinstein |
| | Schumer |
| | Specter |

Motion to report favorably S. 5. The motion was approved by 13 yays to 5 nays.

| YEAS | NAYS |
|---|---|
| Hatch | Leahy |

4

Grassley
Kyl
DeWine
Sessions
Graham
Cornyn
Brownback
Coburn
Kohl
Feinstein
Schumer
Specter

Kennedy (Proxy)
Biden
Feingold
Durbin

## III. Purposes

By now, there should be little debate about the numerous problems with our current class action system. A mounting stack of evidence reviewed by the Committee demonstrates that abuses are undermining the rights of both plaintiffs and defendants. One key reason for these problems is that most class actions are currently adjudicated in state courts, where the governing rules are applied inconsistently (frequently in a manner that contravenes basic fairness and due process considerations) and where there is often inadequate supervision over litigation procedures and proposed settlements. The problem of inconsistent and inadequate judicial involvement is exacerbated in class actions because the lawyers who bring the lawsuits effectively control the litigation; their clients—the injured class members—typically are not consulted about what they wish to achieve in the litigation and how they wish it to proceed. In short, the clients are marginally relevant at best. This stands in stark contrast to the designed purpose of class actions. Class actions were designed to provide a mechanism by which persons, whose injuries are not large enough to make pursuing their individual claims in the court system cost efficient, are able to bind together with persons suffering the same harm and seek redress for their injuries. As such, class actions are a valuable tool in our jurisprudential system. However, they are only beneficial when the class members are kept a priority throughout the process.

To make matters worse, current law enables lawyers to "game" the procedural rules and keep nationwide or multi-state class actions in state courts whose judges have reputations for readily certifying classes and approving settlements without regard to class member interests. In this environment, consumers are the big losers: In too many cases, state court judges are readily approving class action settlements that offer little—if any—meaningful recovery to the class members and simply transfer money from corporations to class counsel. Often, the settlement notices in such cases are so confusing that the plaintiff class members do not understand what—if anything—the settlement offers or how they can opt out of it. Multiple class action cases purporting to assert the same claims on behalf of the same people often proceed simultaneously in different state courts, causing judicial inefficiencies and promoting collusive activity. Finally, many state courts freely issue rulings in class action cases that have nationwide ramifications, sometimes overturning well-established laws and policies of other jurisdictions.

5

The Class Action Fairness Act of 2005 is a modest, balanced step that would address some of the most egregious problems in class action practice. The Committee emphasizes, however, that the Act is not intended to be a "panacea" that will correct all class action abuses.

The Act has three key components.

First, S. 5 includes a consumer class action bill of rights, with multiple components. One element prohibits federal courts from approving coupon or "net loss" settlements without making written findings that such settlements benefit the class members. Another element specifies the methods for calculating attorneys' fees in class settlements in which coupons constitute all or part of the relief afforded to claimants to ensure that such fee awards are consistent with the benefits afforded class members or the amount of real work that the class counsel have performed in connection with the litigation. Yet another element of the bill of rights provides an additional mechanism to safeguard plaintiff class members' rights by requiring that notice of class action settlements be sent to appropriate state and federal officials, so that they may voice concerns if they believe that the class action settlement is not in the best interest of their citizens.

Second, S. 5 corrects a flaw in the current diversity jurisdiction statute (28 U.S.C. § 1332) that prevents most interstate class actions from being adjudicated in federal courts. One of the primary historical reasons for diversity jurisdiction "is the reassurance of fairness and competence that a federal court can supply to an out-of-state defendant facing suit in state court." [1] Because interstate class actions typically involve more people, more money, and more interstate commerce ramifications than any other type of lawsuit, the Committee firmly believes that such cases properly belong in federal court. To that end, this bill (a) amends section 1332 to allow federal courts to hear more interstate class actions on a diversity jurisdiction basis, and (b) modifies the federal removal statutes to ensure that qualifying interstate class actions initially brought in state courts may be heard by federal courts if any of the defendants so desire. Thus, S. 5 makes it harder for plaintiffs' counsel to "game the system" by trying to defeat diversity jurisdiction, creates efficiencies in the judicial system by allowing overlapping and "copycat" cases to be consolidated in a single federal court, places the determination of more interstate class action lawsuits in the proper forum—the federal courts.

Third, S. 5 directs the Judicial Conference of the United States to conduct a review of class action settlements and attorneys' fees and to present Congress with recommendations for ensuring that attorneys' fees are determined in a fair and reasonable way. This provision will help address the problem of excessive attorneys' fees and will facilitate legislative oversight of the Judicial Conference's efforts in this area.

---

[1] *Davis* v. *Carl Cannon Chevrolet-Olds, Inc.* 182. F.3d 792, 797 (11th Cir. 1999).

6

IV. Background and Need for Legislation

As set forth in Article III of the Constitution,[2] the Framers established diversity jurisdiction to ensure fairness for all parties in litigation involving persons from multiple jurisdictions, particularly cases in which defendants from one state are sued in the local courts of another state. Interstate class actions which often involve millions of parties from numerous states—present the precise concerns that diversity jurisdiction was designed to prevent: frequently in such cases, there appears to be state court provincialism against out-of-state defendants or a judicial failure to recognize the interests of other states in the litigation. Yet, because of a technical glitch in the diversity jurisdiction statute (28 U.S.C. § 1332), such cases are usually excluded from federal court. This glitch is not surprising given that class actions as we now know them did not exist when the statute's concept was crafted in the late 1700s.

This Committee believes that the current diversity and removal standards as applied in interstate class actions have facilitated a parade of abuses, and are thwarting the underlying purpose of the constitutional requirement of diversity jurisdiction. S. 5 addresses these concerns by establishing "balanced diversity" a rule allowing a larger number of class actions into federal courts, while continuing to preserve primary state court jurisdiction over primarily local matters.

*A. A Brief History of Class Actions*

Although class actions have some roots in common law, the general concept was first codified in 1849, when several states adopted the Field Code.[3] To successfully plead and prosecute class actions, the Field Code merely required that numerous parties demonstrate a common interest in law or fact.

Rule 23 of the Federal Rules of Civil Procedure, the rule governing federal court class actions, was initially adopted in 1938.[4] However, the concept of class actions that are a familiar part of today's legal landscape did not arise until 1966, when Rule 23 was substantially amended to expand the availability of the device. Under Rule 23, a class action can be brought in federal court if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. In addition, a proponent must show that the proposed class meets one of three additional requirements set forth in Rule 23(b). For example, for a Rule 23(b)(3) damages class actions to be certified, a proponent must show that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual

---

[2] In the words of Article III, "[t]he judicial power shall extend to * * * controversies in between citizens of different states."

[3] See Newberg on Class Actions 3d §§ 13–14 to 13–17 (1997).

[4] For a more comprehensive history of Rule 23 see e.g., The Class Action Fairness Act of 1999: Hearings on S. 353 Before the Subcomm. on Administrative Oversight and the Courts of the Senate Comm. of the Judiciary, 106th Cong. (1999) (hereinafter "Hearings on S. 353"), Prepared Statement of John P. Frank.

7

members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."[5]

As originally envisioned, class action lawsuits were to be primarily a tool for civil rights litigants seeking injunctions in discrimination cases.[6] Prof. John P. Frank, a member of the 1966 Advisory Committee on Civil Rules that proposed amending Rule 23 to its current form, testified that those who wrote the new class action rule thought it would rarely (if ever) apply to product liability or mass torts cases.[7] In the 1980s, however, some plaintiffs' lawyers successfully persuaded judges to expand class actions to the area of mass torts.[8] These courts began to expand the types of claims they were willing to certify as class actions because they feared that the large number of individual mass tort cases could slow or stop the judicial system.[9] Thus, class actions have evolved from their original primary purpose—to counter civil rights abuses—and have become a common tool for plaintiffs' attorneys bringing personal injury or product liability claims. Yet, while the landscape of class actions has changed dramatically, the procedural rules regarding which courts can hear class actions, and, consequently, which procedural law will apply to such cases, generally have remained the same since 1966.

### B. Federal Diversity Jurisdiction and Removal Provisions

#### 1. The Basics of Diversity Jurisdiction

The Constitution extends federal court jurisdiction to cases of a distinctly federal character—for instance, cases raising issues under the Constitution or federal statutes, or cases involving the federal government as a party—and generally leaves to state courts the adjudication of local questions arising under state law. However, the Constitution specifically extends federal jurisdiction to encompass one category of cases involving issues of state law: "diversity" cases, or suits "between Citizens of different States."[10]

According to the Framers, the primary purpose of diversity jurisdiction was to protect citizens in one state from the injustice that

---

[5] Fed. R. Civ. P. 23(b)(3). Alternatively for a Rule 23(b)(1) class, the class proponent must show that the prosecution of separate actions by or against individual members of the class would create a risk of either (i) inconsistent or varying adjudication which would establish incompatible standards of conduct for the party opposing the class or (ii) adjudications which, as a practical matter, would be dispositive of the interests of the other members not parties to the adjudications or which would substantially impair or impede their ability to protect their ability to protect their interests. To obtain certification of a Rule 23(b)(2) class, the proponent is required to show that the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

[6] See Hearings on S. 353, Prepared Statement of John P. Frank ("If there was a single, undoubted goal of the committee, the energizing force which motivated the whole rule, it was the firm determination to create a class action system which could deal with civil rights and, explicitly, segregation.").

[7] Administrative Office of the U.S. Courts, Working Papers of the Advisory Committee on Civil Rules on Proposed Amendments to Civil Rule 23 (Vol. 2) ("Advisory Committee Working Papers"), at 260 (1997). Prof. Frank passed away late in 2002. The only surviving member of the 1966 Advisory Committee—Hon. William T. Coleman, Jr.—has testified to a similar effect Id. (Vol. 3), 11/22/96 Public Hearing Tr. at 204 ("I assure you that what the courts have done with respect to Rule 23(b)(3) is far beyond what we * * * ever intended. To the extent that there's difficulty [with class actions, it] is not because of anything that was drafted in 1966, but [because] of how the rule has been handled since that time.").

[8] See John C. Coffee, Jr., Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343, 1358 (1995).

[9] Id. at 1356–58, 1363–64.

[10] U.S. Const. art. III, sec. 2.

8

might result if they were forced to litigate in out-of-state courts.[11] Quoting James Madison, Judge Henry Friendly explained that diversity jurisdiction is essential to a strong union because it "may happen that a strong prejudice may arise in some state against the citizens of others, who may have claims against them."[12] Justice Frankfurter expressed a similar understanding of Madison's concerns: "It was believed that, consciously or otherwise, the courts of a state may favor their own citizens. Bias against outsiders may become embedded in a judgment of the state court and yet not be sufficiently apparent to be made the basis of a federal claim."[13]

In addition to protecting individual litigants, diversity jurisdiction has two other important purposes. In testimony several years ago before the Subcommittee on Administrative Oversight and the Courts, Prof. E. Donald Elliott of the Yale Law School expressed the view that diversity jurisdiction was designed not only to protect against actual discrimination, but also "to shore up confidence in the judicial system by preventing even the appearance of discrimination in favor of local residents."[14] In addition, several legal scholars have noted that the Framers were concerned that state courts might discriminate against interstate businesses and commercial activities, and thus viewed diversity jurisdiction as a means of ensuring the protection of interstate commerce.[15] As former Acting Solicitor General Walter Dellinger testified before the Committee, "diversity jurisdiction has served to guarantee that parties of different state citizenship have a means of resolving their legal differences on a level playing field in a manner that nurtures interstate commerce."[16] Both of these concerns—judicial integrity and interstate commerce—are strongly implicated by class actions.

Over the years since the First Congress enacted provisions in the Judiciary Act of 1789 setting forth the parameters of federal diversity jurisdiction, two statutory limitations on that jurisdiction have been constants. The first is the "amount in controversy" requirement (currently $75,000), which Congress enacted in order to ensure that federal diversity jurisdiction extends only to non-trivial

---

[11] See *Pease* v. *Peck*, 59 U.S. (18 How) 518, 520 (1856) ("The theory upon which jurisdiction is conferred on the court of the United States, in controversies between citizens of different States, has its foundation in the supposition that, possibly, the State tribunal might not be impartial between their own citizens and foreigners."); see also *Martin* v. *Hunter's Lessee*, 14 U.S. (1 Wheat) 304, 347 (1816); *Bank of the United States* v. *Deveaux*, 9 U.S. (5 Cranch) 61, 87 (1809); *Barrow S.S. Co.* v. *Kane*, 170 U.S. 100, 111 (1898) ("The object of the provisions of the constitution and statutes of the United States in conferring upon the circuit courts of the United States jurisdiction of controversies between citizens of different States of the Union * * * was to secure a tribunal presumed to be more impartial than a court of the state in which one litigant resides."); The Federalist No. 80, at 537–38 (Alexander Hamilton) (Jacob E. Cooke, ed. 1961) ("In order to [ensure] the inviolable maintenance of that equality of privileges and immunities to which citizens of the union will be entitled, the national judiciary ought to preside in all cases in which one state or its citizens are opposed to another state or its citizens. To secure the full effect of so fundamental a provision against all evasion and subterfuge, it is necessary that its construction should be committed to that tribunal which, having no local attachments, will be likely to be impartial between the different states and their citizens, and which, owing its official existence to the union, will never be likely to feel any bias inauspicious to the principles on which it is founded.")

[12] H. J. Friendly, The Historic Basis of Diversity Jurisdiction, 41 Harv. L. Rev. 483, 492–93 (1928).

[13] *Burford* v. *Sun Oil Co.*, 319 U.S. 315, 326 (1943) (Frankfurter, J., dissenting).

[14] Hearings on S. 353, Prepared Statement of E. Donald Elliott; see also, Adrienne J. Marsh, Diversity Jurisdiction: Scapegoat of Overcrowded Federal Courts, 48 Brooklyn L. Rev. 197, 201 (1989).

[15] See generally John P. Frank, Historical Bases of the Federal Judicial System, 13 Law & Contemp. Probs. 3, 22–28 (1948); Friendly, supra n. 12.

[16] See Class Action Litigation: Hearing on Class Actions Before the Senate Comm. on the Judiciary, 107th Cong. (2002) (hereinafter "Hearing on Class Actions"), Prepared Statement of Walter E. Dellinger, III.

9

state-law cases.[17] The second is the "complete diversity" require-
ment, a rule that federal jurisdiction lies only when all plaintiffs
are diverse as to all defendants.[18] It is important to recognize that
these procedural limitations regarding interstate class actions were
policy decisions, not constitutional ones. In fact, the U.S. Supreme
Court has repeatedly acknowledged that the complete diversity and
minimum amount-in-controversy requirements are political deci-
sions not mandated by the Constitution.[19] Indeed, as Prof.
Dellinger noted in testimony before this Committee, class action
legislation expanding federal jurisdiction over class actions "would
fulfill the intentions of the Framers because the rationales that un-
derlie the diversity jurisdiction concept apply with equal—if not
greater—force to interstate class actions."[20] It is therefore the pre-
rogative of Congress to modify these technical requirements as it
deems appropriate.

### 2. Removal: How Diversity Cases Arrive in Federal Court

The concept of "removing" cases from state courts to federal
courts is based largely on the same core premise as diversity
jurisdiction—i.e., that an out-of-state defendant in a state court
proceeding should have access to an even-handed federal forum.[21]
The general removal statute, 28 U.S.C. § 1441(a), provides that any
civil action brought in a state court may be removed by the defend-
ant(s) to federal court if the claim could have originally been
brought in federal court. In other words, so long as a federal dis-
trict court could exercise original jurisdiction over a claim, a de-
fendant may remove the case to federal court.

Section 1446(b) of Title 28 outlines the procedure for removal.
Under this provision, a defendant must file papers seeking removal
to federal court within 30 days after receiving a copy of the initial
pleading (or service of summons if a pleading has been filed in
court and is not required to be served on the defendant). If the
original complaint was not removable (or if it could not be deter-
mined from the face of the complaint that it was removable), but
the plaintiff subsequently amends the pleadings in such a way that
removal becomes proper, then the notice of removal must be filed
within 30 days of receipt by the defendant of "a copy of an amend-
ed pleading, motion, order, or other paper from which it may first
be ascertained that the case [is removable]."[22] The Committee
notes that the purpose of this provision is to prevent plaintiffs from
evading federal jurisdiction by hiding the true nature of their case.
Thus, the Committee favors the broad interpretation of "other
paper" adopted by some courts to include deposition transcripts,
discovery responses, settlement offers and other documents or oc-
currences that reveal the removability of a case.[23]

[17] See 28 U.S.C. § 1332(a).
[18] See *Strawbridge* v. *Curtiss*, 7 U.S. (3 Cranch) 267 (1806).
[19] See, e.g., *Newman-Green Inc.* v. *Alfonzo-Larrain*, 490 U.S. 826, 829 n.1 (1989) (noting that "[t]he complete diversity requirement is based on the diversity statute, not Article III of the Constitution."); *Owen Equip. & Co.* v. *Kroger*, 437 U.S. 365, 373 n. 13 (1978) (to the same effect).
[20] See Hearing on Class Actions, Prepared Statement of Walter E. Dellinger, III.
[21] See David P. Currie, Federal Jurisdiction 140 (3d ed. 1990).
[22] 28 U.S.C. § 1446(b).
[23] A broad interpretation of "other paper" is "consistent with the purpose of the removal stat-
ute to encourage prompt resort to federal court when a defendant first learns that the plaintiff
is alleging a federal claim * * * [and] discourages disingenuous pleading by plaintiffs in state
court to avoid removal. *Addo* v. *Globe Life & Accident Ins. Co.*, 230 F.3d 759, 762 (5th Cir.

Continued

10

*C. How Diversity Jurisdiction and Removal Statutes Are Abused*

The current rules governing federal jurisdiction have the unintended consequence of keeping most class actions out of federal court, even though most class actions are precisely the type of case for which diversity jurisdiction was created.[24] In addition, current law enables plaintiffs' lawyers who prefer to litigate in state courts to easily "game the system" and avoid removal of large interstate class actions to federal court.

This gaming problem exists for two reasons. The first is the "complete diversity" requirement. Although the Supreme Court has held that only the named plaintiffs' citizenship should be considered for purposes of determining if the parties to a class action are diverse, the "complete" diversity rule still mandates that all named plaintiffs must be citizens of different states from all the defendants.[25] In interstate class actions, plaintiffs' counsel frequently and purposely evade federal jurisdiction by adding named plaintiffs or defendants simply based on their state of citizenship in order to defeat complete diversity. One witness at the Committee's 2002 hearing on class actions testified that her drug store was named as a defendant in "hundreds of lawsuits" so that "the lawyers could keep the case in a place known for its lawsuit-friendly environment."[26] If all it takes to keep a class action in state court is to name one local retailer, it is no surprise that few interstate class actions meet the complete diversity requirement.

The second problem is created by the amount-in-controversy requirement. In interpreting 28 U.S.C. §1332(a), some federal courts of appeals, relying on a 1974 Supreme Court decision,[27] have held that the amount-in-controversy requirement is normally met in class actions only if each of the proposed class members individually seeks damages in excess of the statutory minimum.[28] That means federal courts can often only hear class actions in which each potential class member claims damages in excess of $75,000.[29] The Committee believes that requiring each plaintiff to reach the $75,000 mark makes little sense in the class action context. After all, class actions frequently involve tens of millions of dollars even though each individual plaintiff's claims are far less than that. Moreover, class action lawyers typically misuse the jurisdictional

2000) (holding a post-complaint settlement letter qualifies as "other paper" under 28 U.S.C. 1446(b)). See also *S.W.S. Erectors* v. *Infax, Inc.*, 72 F.3d 489, 494 (5th Cir. 1996) (holding that deposition testimony qualifies as "other paper" under 28 U.S.C. 1446(b)).

[24] See generally, Victor E. Schwartz, Mark A. Behrens & Leah Lorber, Federal Courts Should Decide Interstate Class Actions: A Call for Federal Class Action Diversity Jurisdiction Reform, 37 Harv. J. Legis. 485 (Summer 2000).

[25] See *Snyder* v. *Harris*, 394 U.S. 332 (1969).

[26] See Hearing on Class Actions, Prepared Statement of Hilda Bankston.

[27] See *Zahn* v. *International Paper Co.*, 414 U.S. 291 (1973).

[28] See *Trimble* v. *Asarco, Inc.*, 232 F.3d 946 (8th Cir. 2000); *Meritcare, Inc.* v. *St. Paul Mercury Ins. Co.*, 166 F.3d 214 (3d Cir. 1999); *Leonhardt* v. *Western Sugar Co.*, 160 F.3d 631 (10th Cir. 1998).

[29] Other federal courts of appeals have held that for a class action to be heard in federal court only one or more named plaintiffs must have claims exceeding $75,000. See, e.g., *Rosmer* v. *Pfizer, Inc.*, 263 F.3d 110 (4th Cir. 2001); *Gibson* v. *Chrysler Corp.*, 261 F. 3d 927 (9th Cir. 2001); *Stromberg Metal Works Inc.* v. *Press Mechanical Inc.*, 77 F.3d 928 (7th Cir. 2000); In re *Abbott Labs., Inc.*, 51 F.3d 524 (5th Cir. 1995), aff'd by an equally divided Court, 529 U.S. 333 (2000); *Allapattah Servs.* v. *Exxon Corp.*, 333 F.3d 1248 (11th Cir. 2003), cert. granted, 125 S. Ct. 317 (2004). In the view of these courts, the value of the claims of the other class members is irrelevant—they are deemed to be part of the class as a matter of supplemental jurisdiction. The Committee stresses, however, that even in those Circuits following this rule, relatively few class actions find their way into federal court because plaintiffs offer named plaintiffs who do not have $75,000 claims or name a non-diverse plaintiff or defendant in order to prevent removal of the case to federal court.

11

threshold to keep their cases out of federal court. For example, class action complaints often include a provision stating that no class member will seek more than $75,000 in relief, even though they can simply amend their complaints after the removal to seek more relief and even though the class action seeks millions of dollars in the aggregate. Under current law, that is frequently enough to keep a major class action in state court.

This leads to the nonsensical result under which a citizen can bring a "federal case" by claiming $75,001 in damages for a simple slip-and-fall case against a party from another state, while a class action involving 25 million people living in all fifty states and alleging claims against a manufacturer that are collectively worth $15 billion must usually be heard in state court (because each individual class member's claim is for less than $75,000). Put another way, under the current jurisdictional rules, federal courts can assert diversity jurisdiction over a typical state law claim arising out of an auto accident between a driver from one state and a driver from another, or a typical trespass claim involving a trespasser from one state and a property owner from another, but they cannot assert jurisdiction over claims encompassing large-scale, interstate class actions involving thousands of plaintiffs from multiple states, defendants from many states, the laws of several states, and hundreds of millions of dollars—cases that have obvious and significant implications for the national economy.

There is a growing chorus of authoritative sources declaring that something is badly amiss with the manner in which federal diversity jurisdictional requirements are applied to class actions:

• The leading federal civil procedure law treatise has noted: "The traditional principles [regarding federal diversity jurisdiction over class actions] have evolved haphazardly and with little reasoning. They serve no apparent purpose."[30]

• In a recent Minnesota state appellate court decision upholding a grant of class certification, a concurring judge noted that the nationwide class action before it was a "poster child for national class action reform. We have here a Minnesota [state] district court, applying a New Jersey consumer fraud statute to a nationwide class of plaintiffs, with few of those plaintiffs residing in New Jersey. And, it is probably a fair assumption that the legislative authors of the New Jersey consumer protection scheme did not have in mind midwestern farmers purchasing agricultural chemicals as the protected class * * * This is not a recipe for uniformity or consistency, it is fair neither to claimants nor defendants and it is long past time for national policy makers to address class action procedures.[31]

• The U.S. Court of Appeals for the Eleventh Circuit apologized for sending an interstate class action back to state court, noting that "an important historical justification for diversity jurisdiction is the reassurance of fairness and competence that a federal court can supply to an out-of-state defendant facing suit in state court." Observing that the out-of-state defendant in that case was confronting "a state court system [prone to] produce[] gigantic awards against out-of-state corporate defendants," the court stated that

---

[30] 14B Charles A. Wright, et al., Federal Practice and Procedure § 3704, at 127 (3d ed. 1998).
[31] Peterson v. BASF Corp., 657 N.W.2d 853, 875 (Minn. Ct. App. 2003), aff'd, 675 N.W. 2d 57 (Minn. 2004).

12

"[o]ne would think that this case is exactly what those who espouse the historical justification for [diversity jurisdiction] would have in mind * * *"[32]

• In that same case, Judge John Nangle, the former chairman of the Judicial Panel for Multidistrict Litigation, concurred: "Plaintiffs' attorneys are increasingly filing nationwide class actions in various state courts, carefully crafting language * * * to avoid * * * the federal courts. Existing federal precedent * * * [permits] this practice * * *, although most of these cases * * * will be disposed of through 'coupon' or 'paper' settlements * * * virtually always accompanied by munificent grants of or requests for attorneys' fees for class counsel * * * [T]his judge is of the opinion that the present [jurisdictional rules] do[] not accommodate the reality of modern class litigation and settlements."[33]

In another case, Judge Anthony Scirica (formerly the chair of the Judicial Conference's Standing Committee on Rules and Procedure and now the Chief Judge of the U.S. Court of Appeals for the Third Circuit) observed that although "national (interstate) class actions are the paradigm for federal diversity jurisdiction because * * * they implicate interstate commerce, foreclose discrimination by a local state, and tend to guard against any bias against interstate enterprises, * * * the current jurisdictional statutes [put] such class actions * * * beyond the reach of the federal courts."[34]

• And even though the Judicial Conference of the United States has historically opposed any expansion of federal jurisdiction over class actions, the Conference has more recently signaled a significant shift in position. In a March 26, 2003 letter to the Committee,[35] the Conference acknowledged "current problems with class action litigation."[36] Further, in that letter, the Conference for the first time "recognize[d] that the use of [expanded] diversity jurisdiction may be appropriate to the maintenance of significant multi-state class action litigation in the federal courts."[37]

The Committee notes that several congressional hearing witnesses (including former Carter Administration Attorney General Griffin Bell and Clinton Administration Solicitor General Walter E. Dellinger) and other legal experts agree that if Congress were to draft an entirely new federal diversity jurisdiction statute and start over in deciding which cases should be subject to federal diversity jurisdiction Congress likely would conclude that interstate class actions are among the cases that most warrant access to the federal courts because they involve the most people, put the most money in controversy, and have the greatest implications for interstate commerce.[38] As Prof. Dellinger noted in his testimony before this Committee, "the rationales that underlie the diversity jurisdiction concept apply with equal—if not greater—force to interstate class actions."[39]

---

[32] *Davis* v. *Cannon Chevrolet-Olds, Inc.,* 182 F.3d 792, 797 (11th Cir. 1999).
[33] Id. at 798.
[34] In re *Prudential Ins. Co. America Sales Practice Litig.,* 148 F.3d 283, 305 (3d Cir. 1998).
[35] Letter to then Chairman Orrin G. Hatch, Comm. on the Judiciary, U.S. Senate, from Leonidas Ralph Mecham, Secretary, Judicial Conference of the United States (dated March 26, 2003).
[36] Id. at 2.
[37] Id.
[38] See generally Hearing on Class Actions; Hearings on S. 353; Hearing on H.R. 1875.
[39] See Hearing on Class Actions, Prepared Statement of Walter E. Dellinger III.

13

*D. Other Abuses of the Class Action Rules*

The ability of plaintiffs' lawyers to evade federal diversity jurisdiction has helped spur a dramatic increase in the number of class actions litigated in state courts—an increase that is stretching the resources of the state court systems. In testimony to the Subcommittee on Administrative Oversight and the Courts, Prof. E. Donald Elliott pointed out that the flood of class actions in our state courts is too well documented to warrant significant discussion, much less debate.[40] According to studies, federal class action filings over the past ten years have increased by more than 300 percent. At the same time, class action filings in state courts have grown more than three times faster—by more than 1,000 percent.[41]

Notably, many of these cases are being filed in improbable jurisdictions. A study conducted in three venues with reputations as hotbeds for class action activity found exponential increases in the numbers of class actions filed in recent years. For example, in the Circuit Court of Madison County, Illinois, a mostly rural county that covers 725 square miles and is home to less than one percent of the U.S. population, the number of class actions filed annually grew from 2 in 1998 to 39 in 2000—an increase of 3,650 percent.[42] A follow-up study found that the number of class actions filed in the county continued to grow dramatically in 2001 and 2002.[43] And in 2003, class action filings there catapulted to 106, up more than 5,000 percent since 1998.[44] According to the president of the Illinois Trial Lawyers Association (an association representing plaintiffs' lawyers), the reason for the 2003 jump in filings was an effort to beat this legislation; plaintiffs' lawyers were "playing it safe" and rushing to get suits filed in case the legislation was enacted in 2004.[45] The same studies also found that most of the class actions brought in Madison County and other magnet courts had little—if anything—to do with the venues where they were brought.[46]

The reason for this dramatic increase in state court class actions cannot be found in variations in class action rules; after all, the rules governing the decision whether cases may proceed as class actions are basically the same in federal and state courts—and of course, they are the same within states, i.e., the same in "magnet" jurisdictions such as Madison County and St. Clair County, Illinois, as they are in more easily accessible jurisdictions such as Cook County, Illinois. In fact, thirty-six states have adopted the basic federal class action rule (Rule 23), sometimes with minor revisions. Of the remaining states, most have rules that are guided by federal court class action policy and contain similar requirements. (Two states, Mississippi and West Virginia, do not have rules or statutes

---

[40] Hearings on S. 353, Prepared Statement of E. Donald Elliott.

[41] See Analysis: Class Action Litigation—A Federalist Society Survey, Class Action Watch at 5 (Vol. 1, No. 1 1998); Deborah Hensler, et al., Preliminary Results of the RAND Study of Class Action Litigation 15 (May 15, 1997); see also Advisory Committee Working Papers (Vol. 1) at ix–x (May 1, 1997) (memorandum of Judge Paul V. Niemeyer to members of the Advisory Committee on Civil Rules).

[42] See John H. Beisner and Jessica Davidson Miller, They're Making A Federal Case Out Of It * * * In State Court, 25 Harv. J. L. & Pub. Pol'y 1 (2001) ("Federal Case").

[43] See John H. Beisner and Jessica Davidson Miller, Class Action Magnet Courts: The Allure Intensifies, 4 BNA Class Action Litig. R. 58 (Jan. 24, 2003).

[44] Trisha L. Howard, Class Actions Set Record Last Year In Madison County/ Possible Change In Law Prompted Rush In Filing, St. Louis Post Dispatch, Jan. 11, 2004.

[45] Id.

[46] See generally Federal Case.

14

authorizing class actions.) Thus, there are no wide variations between federal and state court class action policies.

The Committee finds, however, that one reason for the dramatic explosion of class actions in state courts is that some state court judges are less careful than their federal court counterparts about applying the procedural requirements that govern class actions. In particular, many state court judges are lax about following the strict requirements of Rule 23 (or the state's parallel governing rule), which are intended to protect the due process rights of both unnamed class members and defendants. In contrast, federal courts generally scrutinize proposed settlements much more carefully and pay closer attention to the procedural requirements for certifying a matter for class treatment.[47]

Another problem is that a large number of state courts lack the necessary resources to supervise proposed class settlements properly.[48] Many state judges do not have law clerks, and the explosion of state court class actions has simply overwhelmed their dockets. Not surprisingly, abuses are much more likely to occur when state court judges are unable to give class action cases and settlements the attention they need. Federal judges, in contrast, have access to magistrates and can appoint special masters when they are faced with complex litigation like class actions. Moreover, the average state court judge is assigned 1,568 new cases each year, compared to federal judges, who are assigned, on average, fewer than 500.[49]

The lack of a federal forum for most interstate class actions and the inconsistent administration of class actions in state courts have led to several forms of abuse. First, lawyers, not plaintiffs, may benefit most from settlements. Second, corporate defendants are forced to settle frivolous claims to avoid expensive litigation, thus driving up consumer prices. Third, constitutional due process rights are often ignored in class actions. Fourth, expensive and predatory copy-cat cases force defendants to litigate the same case in multiple jurisdictions, driving up consumer costs.

### 1. Lawyers receive disproportionate shares of settlements

The first such abuse involves settlements in which the attorneys receive excessive attorneys' fees with little or no recovery for the class members themselves. In the now infamous *Bank of Boston* class action settlement,[50] or example, the defendant bank was accused of over-collecting escrow monies from homeowners and profiting from the interest. The settlement, approved by an Alabama state court, awarded up to $8.76 each to individual class members, while the class counsel got more than $8.5 million in fees. To make matters worse, the fees were simply debited directly from individual class members' escrow accounts leaving many of them worse off than they were before the suit. In testimony before the Subcommittee on Administrative Oversight and the Courts, class member Martha Preston recounted how she received $4 from the settle-

---

[47] See Hearings on S. 353, Oral Statement of Senator Charles E. Grassley.

[48] See Hearings on S. 353, Prepared Statement of Stephen G. Morrison ("I think it is clear that the explosion of class action filings can only be attributed to the fact that certain members of the plaintiffs' bar have discovered that some of our state courts can be a fertile playing field for class litigation.").

[49] Compare B. Ostrom, et al., Examining the Work of State Courts 12 (Court Statistics Project 2003) ("Examining the Work of State Courts"), with Administrative Office of U.S. Courts, 2003 Federal Court Management Statistics (2004) ("Federal Court Management").

[50] *Kamilewicz* v. *Bank of Boston*, 92 F.3d 506 (7th Cir. 1996).

15

ment, but was charged a mysterious $80 "miscellaneous deduction," which she later learned was an expense used to pay the class lawyers' $8.5 million settlement fee. Ms. Preston expressed her disbelief over how "people who were supposed to be my lawyers, representing my interests, took my money and got away with it."[51]

A few years ago, the National Law Journal reported on another similarly troubling state court case:

> When 75-year-old Olga Heaven received some legal papers in the mail a few weeks ago, she asked her daughter, a lawyer, to look them over. A good thing, too. If Ms. Heaven had misunderstood the notice or simply thrown it away, her daughter says, she might have been required to sell her house and property as part of a recent class action settlement. * * * Ms. Heaven [was] one of 60 class action plantiff homeowners—many of them unwitting parties to the litigation—who received a notice that a property damage suit against a local oil refinery had settled. * * * The unusual deal requires settling plaintiffs to sell their homes to [the defendant refinery owner] for two times their tax-assessed value. In addition, the plaintiffs are required to withdraw from the lawsuit * * * and release any property damage or personal injury claims against [the defendant], which was accused of polluting the area. The settlement was set up [as] a so-called opt-out class, meaning that homeowners would be included in the deal [and required to sell their homes] unless they sent in responses to the notice within 30 days. * * * The total payout by [the defendant] could be as much as $1.1 million. Plaintiffs' lawyers could earn as much as $200,000, depending on how many plaintiffs participate in the deal.[52]

Through several hearings over the past several years, the Committee has become aware of numerous class action settlements approved by state courts in which most—if not all—of the monetary benefits went to the class counsel, rather than the class members those attorneys were supposed to be representing. These settlements include many so-called "coupon settlements" in which class members receive nothing more than promotional coupons to purchase more products from the defendants. For example:

• A recent lawsuit involved customers who had Firestone tires that were among those that the National Highway Traffic Safety Administration investigated or recalled, but who did not suffer any personal injury or property damage. After a federal appeals court rejected class certification, plaintiffs' counsel and Firestone negotiated a settlement, which has now been approved by a Texas state court. Under the settlement, the company has agreed to redesign certain tires (a move already underway irrespective of the suit) and to develop a three-year consumer education and awareness camp,

---

[51] Class Action Lawsuits: Examining Victim Compensation and Attorneys' Fees: Hearings Before the Subcomm. on Administrative Oversight and the Courts of the Senate Comm. of the Judiciary, 105th Cong. (1997), Prepared Statement of Martha Preston.
[52] Kansas Case In Class By Itself, National Law Journal, Mar. 15, 1999. This settlement ultimately did not proceed, but only because the attorney daughter of one of the settlement class members happened to read her mother's mail, as noted in the article.

16

but the members of the class received nothing. The lawyers will receive $19 million.[53]

• In another state court class action settlement, in which a cruise line was accused of collecting "port charges" that exceeded the amount actually paid by the defendant. Under the terms of the settlement, the class members received $30 to $40 discounts from another cruise line on its two- and three-night cruises out of Port Canaveral, Florida because Premier was no longer in business.[54] In other words, a company that had not even been sued and had absolutely no risk of liability agreed to offer coupons—no doubt because they recognize that such coupons are a promotional opportunity and not a penalty. Attorney for the plaintiffs received $887,000 in fees, costs, and expenses.[55]

• Microsoft has settled antitrust class actions in ten states in which plaintiffs alleged that Microsoft used its monopoly to gouge consumers. Based on the terms of the settlement, consumers who bought Microsoft software will receive a $5 to $10 voucher good for future purchases of particular computer hardware or software products. To receive the voucher, consumers must download a form from www.microsoftproductsettlement.com/kansas and then mail it in. To redeem the voucher, consumers must mail in the voucher, a photocopy of an original receipt, and an original UPC code. Half of the unclaimed settlement money will be used to donate Microsoft products to schools. A federal judge rejected a similar settlement in part on the ground that the school donations were intended to inflict further injury on Apple. Attorneys in these cases have sought hundreds of millions of dollars in fees.[56]

• Consumers in a state court class action alleged that the beer goblets served at a Chicago restaurant chain were misrepresented to be 12 ounces, when they held only 10.6 ounces. In settlement, the company will give away 50,000 coupons for $1 off every subsequent $5 purchase at its 22 Chicago-area restaurants.[57] All cash from the settlement goes to the lawyers.

• To settle a state court class action alleging deceptive pricing practices on certain products, KB Toys agreed to hold a sale.[58] Under the settlement agreement, the toy retailer offered a 30 percent discount on selected products between October 8 and October 14, 2003. According to an independent analyst, "KB Toys will benefit from the settlement," because "they're driving traffic." [59] The

---

[53] *Shields et al.* v. *Bridgestone/Firestone Inc. et al.* (No. E–0167637, Jefferson County, Texas, 2003); Miles Moor, BFS Settles Nationwide Class Action Suit; Tire Maker to Modify Certain Models, Launch Education Program, Rubber & Plastics News, August 4, 2003.
[54] Premier Cruise Lines, (No. 96–06932 CA–FN, Fla. Cir. Ct., Brevard County, Florida, 2003); The Law Offices of Douglas Bowdoin, for Plaintiffs, and Todd Pittenger of Lowndes, Drosdick, Doster, Kantor & Reed, P.A., for Defendant, Announce a Proposed Class Action Settlement, Business Wire, Inc., July 2, 2003.
[55] Premier Cruise Line Reaches Settlement, Mealey's Litigation Report: Class Actions, July 17, 2003.
[56] In Re *Microsoft Litigation Settlement* (No. 99 CV 17089, Johnson County, Kansas, 2003); Dan Voorhis, Here's How to Claim Your Share of Microsoft Settlement, The Wichita Eagle, December 28, 2003.
[57] *Ross and Lambert* v. *Portillo's Restaurant Group, Inc.* (00 Ch 13612, Circuit Court of Cook County, Illinois, Chancery Division, 2003); Judge Approves Portillo's Class Action Settlement Over Mislabeled Beer, PR Newswire, Nov. 26, 2003.
[58] *DeGradi* v. *KB Holdings, Inc.* (No. 02 CH 15838, Circuit Court of Cook County, Illinois, Chancery Division, 2003).
[59] Betty Lin-Fisher, Shoppers Win In Suit; Customers Get a Jump on Holidays, Akron Beacon Journal, Oct. 14, 2003.

17

attorneys benefited too: they received all the cash—fees and costs of $1 million.[60]

• In a recent class action where consumers alleged that a company was selling cribs that were unsafe for use by infants, the class members received either a crib repair kit or a coupon for $55 which could be used toward the future purchase of a Dorel Juvenile Group Product.[61] Of course, the coupon is only valuable for consumers who plan to have another baby and still trust the company.

• Another recent suit involved allegations that Poland Spring water does not really come from a spring deep in the woods of Maine. The settlement calls for discounts or free water to Poland Spring customers over five years and contributions of $2.75 million to charities. In addition, the named plaintiff will receive $12,000. Plaintiffs' lawyers received $1.35 million.[62]

• Plaintiffs alleged that GameStop Corp. misrepresented some of the video games it was selling as new, when they had actually been previously purchased and returned.[63] Under the settlement, GameStop agreed to post notices in stores stating: "All software for video game consoles may have been used and returned in accordance with (the store's) return policy." Further, anyone who bought a game from particular stores on specified dates, and can produce their receipt, will receive a coupon for 5 percent off the price of any one game. In other words, customers would receive $1.25 off a $25 dollar game—as long as they kept receipts. The coupon can be redeemed at retail locations, but not on the defendant's website.[64] Lawyers for the plaintiffs were paid $125,000 in fees and costs.[65]

• Plaintiffs alleged that Register.com delayed in switching purchased domains over to their customers and continued to display the company's "Coming Soon" page which promotes the company and its advertisers. Under the settlement, class members receive coupons to use with Register.com (assuming they ever plan to register one of the company's domains again). The lawyers for the class get $642,500.[66]

• In a case involving customers who alleged that they were charged excessive late fees by Blockbuster, the class members received $1 off coupons for rentals—at the same time, their attorneys divided up a $9.25 million fee award. Experts have predicted that at most, only 20 percent of the class members will redeem the coupons. The settlement allows Blockbuster to continue its practice of charging customers for a new rental period when they return a

---

[60] Stephanie Zimmerman, KB Toys Settles Lawsuit Over "Low" Prices By Offering Discount, Chicago Sun-Times, Oct. 11,2003.

[61] Dorel Juvenile Group, Inc. (2003); Dorel Juvenile Group Settles Class Action Lawsuit, PR Newswire, Oct. 6, 2003.

[62] Ramsey v. Nestle Waters North America, Inc. d/b/a Poland Spring Water Co. (No. 03 CHK 817, Kane County, Illinois, 2003); Edward D. Murphy, et al., Conflict and Change; Maine's Employment and Price Levels Remained Stable Last Year, but its Economy Experienced Plenty of Turmoil, Portland Press Herald, January 4, 2004; see also www.noticeclass.com/springwatersettlement/LongFormNoticev2.pdf

[63] Chavez v. GameStop Corp. (No. CGC–02–406658, San Francisco Superior Court, California, 2003).

[64] Big Class Action: Settlements and Verdicts: Consumer Goods, available at http://www.bigclassaction.com/settlements/consumer.html.

[65] http://www.gamestop.com/gs/help/classaction.asp.

[66] Zurakov v. Register.com. Inc. (No. 2301, N.Y. Sup. Ct., App. Div., 2003); Tom Perrotta Panel Revives Case Over Domain Name Registry, Internet Newsletter, May 14, 2003.

18

tape late.[67] In this settlement approved by a Texas state court,
only the lawyers got cash.

• To settle an Illinois state court class action in which it was ac-
cused of improperly including asbestos in its crayons, a manufac-
turer agreed to issue class members 75-cent coupons toward the
purchase of new crayons. The attorneys got $600,000 in fees.

• In another recent case, Food Lion settled a state court class ac-
tion filed by a consumer group by offering 28-cent coupons to cus-
tomers who held an MVP discount card between 1995 and 1998.
The plaintiff class alleged that Food Lion charged too much sales
tax on discounted products purchased with the discount card.[68]
Only the lawyers got money.

• A manufacturer offered consumers who bought a dozen Pin-
nacle golf balls free golf gloves. When the manufacturer ran out of
the golf gloves and substituted a set of three free golf balls, it was
hit with a class action. The settlement provided that the manufac-
turer would send each class member three more free golf balls.
Meanwhile, by order of a state court, the attorneys who brought
the lawsuit received $100,000 in fees and the persons who served
as class representatives each received $2,500.[69]

• Under the settlement in this state court case, which resulted
from allegations regarding changes in the American Airlines fre-
quent flyer program, members of the program received vouchers
good for $25 to $75 off the price of future travel, or a similarly val-
ued reduction in the number of miles required for an award. Amer-
ican also agreed to pay the lawyers up to $25 million in fees. One
news article about the settlement quoted travel experts saying that
"the practical value of those discounts will be modest," and "Amer-
ican could end up generating enough extra revenue to more than
offset the cost of the offer."[70]

• A class action alleged that certain "zip drives" contained a de-
fect that sometimes caused the failure of the drives or the zip
disks. The plaintiffs' attorneys received $4.7 million in fees, while
the estimated 28 million purchasers of an Iomega Zip drive be-
tween 1995 and March 19, 2001 received coupons for rebate of be-
tween $5 and $40 on future purchases of Iomega products. In addi-
tion, the settlement called for the defendant to donate $1 million
of its products to schools.[71] Virtually all of the cash paid in this
state court-approved settlement went to lawyers.

• In a suit involving port charges, a sea cruise line agreed to
give vouchers for a future cruise worth $25 to $55 off a future
cruise to 4.5 million people who sailed on its cruises between April
19, 1992 and June 4, 1997. The vouchers can be used for a future
cruise or redeemed for cash at 15 percent or 20 percent of face
value.[72] In this state court class action settlement, only the lawyers
received cash payments.

• In a case alleging flawed television sets, Thomson Consumer
Electronics agreed to reimburse customers who had receipts docu-

---

[67] *Scott* v. *Blockbuster Inc.* (No. DI62–535, Jefferson County, Texas, 2001); Judge OKs Block-
buster Plan On Fees, Associated Press, Jan. 11, 2002.
[68] Attention Shoppers: Food Lion Rebate Due, Greensboro News & Record, Feb. 25, 2002.
[69] Enough Already With the Lawsuits, Kansas City Star, July 10, 1999.
[70] American Airlines Settles Lawsuits Over Frequent Flier Program, Fort Worth Star-Tele-
gram, June 22, 2000.
[71] *Rinaldi* v. *Iomega Corp.* (No. 98C–09–064–RRC, Delaware); Utah-Based Tech Company Set-
tles Lawsuit With Rebate Offer, Standard-Examiner, Apr. 14, 2001.
[72] Carnival Cruise Settles Lawsuit, Florida Today, Mar. 16, 2001.

19

menting repairs, to provide $50 rebates on the purchase of future products for consumers who did not repair their problems or did not have receipts, and to provide $25 rebates on future products to consumers who did not experience a problem. Under the terms of the settlement approved by an Illinois state court, the lawyers reportedly received $22 million in fees and costs.[73] According to news reports, more than 2,640 people opted out of the settlement; some said they opted out because the form was complicated and others said they opted out because the attorneys' fees were so high.[74]

• In the settlement of a state court class action involving allegations of overly aggressive fees and rates by a Minnesota credit card company, class members received discount coupons with a retail value of $19.95, an $8 dollar donation in their name to the Boys and Girls Clubs of America and the right to apply for a 9.9 percent interest credit card and to join a promotional travel discount club. They also had the potential to receive between $10 and $70 in cash. The company agreed to change its practices, and the lawyers received $5.6 million in fees.[75]

• In one state court class action involving faulty pipes, lawyers for a group of Alabama plaintiffs received more than $38.4 million in fees, and lawyers for a class of Tennessee plaintiffs received $45 million, or the equivalent of about $2,000 an hour. In contrast, the homeowners only received 8 percent rebates toward new plumbing—and to get those rebates, they had to first prove that they had suffered leaks and then go out and buy a new system.[76] The money in the settlement flowed primarily to class counsel.

• In March 1995, a computer manufacturer settled multiple state court class actions alleging a chip flaw that would arise only once in 27,000 years for the average spreadsheet user. It essentially agreed to do what it was already doing: offer free replacements, maintain service centers, operate toll-free phone numbers, and provide diagnostic computer programs. Meanwhile, counsel received $4.27 million in fees.[77]

• In a group of state court class actions settled in 2002, class members alleging that they were not fully advised of "energy surcharges" applied when they checked into hotels during California's electricity crisis were given $10 coupons.[78] Only the lawyers are receiving cash.

• In another case, an Illinois state court approved a coupon settlement of a class action filed against Southwestern Bell Mobile Systems, Inc., alleging that the company failed to fully disclose the fact that it rounded up customer calls to the next minute. Under the state court settlement, the class members received $15 vouch-

---

[73] Thomson Antes Up $100 Million Settlement, Mar. 12, 2001.

[74] *Baird* v. *Thomson Consumer Electronics, Inc.* (No. 00–L–00761, Madison County, Illinois); 2,640 Television Owners Tune Out Class Action Suit, Belleville (Ill.) News-Democrat, Aug. 19, 2001.

[75] *Fischl* v. *Direct Merchants Credit Card Bank, N.A.* (CT 00–007129, Hennepin County, Minnesota); Soft Firm: Too Often, The SF Law Firm Of Lieff, Cabraser, Heimann & Bernstein Strikes Settlements That Give The Firm Millions Of Dollars In Legal Fees—And Its Class Action Clients Too Little, SF Weekly, May 29, 2002.

[76] See Richard B. Schmitt, Leaky System: Suits Over Plastic Pipe Finally Bring Relief, Especially for Lawyers, Wall St. J., Nov. 20, 1995, at A1.

[77] See The (San Francisco) Recorder, Jan. 4, 1996.

[78] Hotel Chains Settle Class-Action Suit Over Energy Surcharges, San Diego Union-Tribune, July 4, 2002.

20

ers toward Cellular One products, while the lawyers took home more than $1 million in fees.[79]

• In a state court class action alleging that Coca-Cola improperly added sweeteners to apple juice, defendant agreed to distribute 50-cent coupons toward the purchase of apple juice. Meanwhile, class counsel received $1.5 million.[80]

• The Chicago Tribune reported that in a state court class action against a record company to recover the prices paid for albums by the group Milli Vanilli (that contained the voices of other performers), class members were given a settlement of $1 to $3 each. The Illinois state court awarded the lawyers $675,000, but the lawyers turned around and petitioned the court for an increase to $1.9 million.

• In a state court action alleging that General Mills treated oats with a nonapproved-pesticide, class members were offered coupons; the attorneys received $1.75 million.[81]

• In a settlement of a state court class action against Packard Bell alleging a product defect, class members were offered a six-month extended service contract for which they were each required to pay $25. Only the lawyers got cash.

• To settle a state court class action alleging collusion to fix cellular phone prices, wireless phone service providers agreed to provide coupons and discounts to customers in several California counties.[82] The lawyers, however, received cash.

• In a settlement of a similar state court antitrust class action involving cellular service in a different area, coupons and small service credits were offered. But counsel obtained agreement to be paid up to $9.5 million.[83] Virtually all the cash paid in the settlement went to lawyers.

• In another case, class action plaintiffs alleged that discount stores overstated the value of software bundles that came with computers. In a class settlement approved by a state court, consumers received coupons worth the lesser of a 7% or $25 discount off the future purchases of products from defendants' stores. The attorneys received $890,000 in fees.[84]

### 2. Judicial blackmail forces settlement of frivolous cases

• A second common abuse in state court class actions is the use of the class device as "judicial blackmail" in cases that border on frivolous. Because class actions are such a powerful tool, they can give a class attorney unbounded leverage, particularly in jurisdictions that are considered plaintiff-friendly. Such leverage can essentially force corporate defendants to pay ransom to class attorneys by settling—rather than litigating—frivolous lawsuits. This is a particularly alarming abuse because the class action device is intended to be a procedural tool and not a mechanism that affects the substantive outcome of a lawsuit. Nonetheless, state court judges often are inclined to certify cases for class action treatment

[79] See Michelle Singletary, Coupon Settlements Fall Short, Wash. Post, Sept. 12, 1999, at H01. For more examples of coupon settlements, see Hearings on S. 353, Prepared Testimony of Stephan G. Morrison.
[80] Lawyers Get $1.5 Million, Clients Get 50 Cents Off, Fulton County Daily Report, Nov. 21, 1997.
[81] Cereal Plan Called Soggy, National Law Journal, May 22, 1995.
[82] Cellular Carriers Settle Price-Fixing Allegations, Seattle Times, July 26, 1997.
[83] Judge OK's Plan For Class Members, The Recorder, Feb. 24, 1998.
[84] Los Angeles Times, June 8, 1998, at D3.

21

not because they believe a class trial would be more efficient than an individual trial, but because they believe class certification will simply induce the defendant to settle the case without trial.[85] As Judge Richard Posner of the U.S. Court of Appeals for the Seventh Circuit has explained, "certification of a class action, even one lacking merit, forces defendants to stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to settle even if they have no legal liability. * * * [Defendants] may not wish to roll these dice. That is putting it mildly. They will be under intense pressure to settle."[86] Hence, when plaintiffs seek hundreds of millions of dollars in damages, basic economics can force a corporation to settle the suit, even if it is meritless and has only a five percent chance of success.

Not surprisingly, the ability to exercise unbounded leverage over a defendant corporation and the lure of huge attorneys' fees have led to the filing of many frivolous class actions.

As District of Columbia Insurance Commissioner Lawrence Mirel has testified before the Committee, insurance companies are often forced to settle lawsuits even though the challenged actions were fully in accordance with state law—or encouraged by state policies.[87] For example, two automobile insurance companies, worried about mounting legal expenses and negative publicity, settled a lawsuit over a long-standing industry-wide practice of rounding insurance premiums up to the nearest dollar for nearly $36 million, even though the premiums were calculated according to specific instructions from the Texas Department of Insurance.[88]

Other brow-raising examples of frivolous suits are common. One such case was brought against Ford Motor Company in New York state court by the Milberg Weiss firm, one of the better known plaintiffs' class action firms in the country. The case involved an inadvertent mistake made by Ford—it had put a slightly overstated price on the window stickers on certain vehicles. As soon as Ford discovered the mistake, the company began sending letters to the affected customers apologizing for the error and enclosing checks that more than compensated them. Nonetheless, fully knowing that this refund program was already well underway, the Milberg Weiss law firm filed a class action lawsuit charging that Ford had committed fraud. Even worse, it asked the court immediately to enjoin Ford from continuing its refund efforts—presumably so that the lawyers could get a cut of the refund money. In this case, the court properly dismissed the action; nonetheless, Ford was required to waste time and corporate resources on a lawsuit that clearly served no legitimate purpose.[89]

### 3. Current class action rules can ignore due process rights

A third type of class action abuse occurs when state courts ignore the due process rights of out-of-state defendants by denying them

---

[85] See E. Donald Elliott Managerial Judging and the Evolution of Procedure, 53 U. Chi. I. Rev. 306, 323–24 (1986).

[86] In re *Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293,1299 (7th Cir. 1995). See also *Blair* v. *Equifax Check Servs. Inc.*, 181 F.3d 832, 834 (7th Cir. 1999) ("a grant of class status can put considerable pressure on the defendant to settle, even when the plaintiffs probability of success on the merits is slight").

[87] See Hearing on Class Actions, Statement of Lawrence Mirel.

[88] Id.

[89] See *Faden-Bayes Corp.* v. *Ford Motor Co.*, Index No. 97–601076 (N.Y. Sup. Ct. County of New York) (filed Feb. 28, 1997).

22

the opportunity to contest the plaintiffs' claims against them. One witness who testified before the Subcommittee on Administrative Oversight and the Courts blamed this phenomenon on a "laissez faire" attitude of some state courts.[90] The most egregious examples of this are the so-called "drive-by class certification" cases, in which a class is certified before the defendant has a chance to respond to the complaint, or in some cases, has even received the complaint. In one lawsuit filed against an auto manufacturer in a Tennessee state court, for example, the complaint was filed on July 10, 1996. Plaintiffs filed several inches of documents with their complaint. Amazingly, by the time the court closed that same day, the judge had entered a nine-page order granting certification of a nation-wide class of 23 million members. The defendant was not even noti-fied about the lawsuit before the certification and thus had no op-portunity to tell its side of the story.[91] And upon checking, the de-fendant discovered that a group of record companies had the same experience with the same judge in an antitrust class action filed several days earlier.[92] Similarly, in one of the cases to develop out of the Firestone tire controversy, a Tennessee state court certified a nationwide class just four days after the defendants were served with the complaint (and obviously without benefit of any input from defendants).[93] And in another case, a Kentucky state court or-dered injunctive relief in favor of the class before the defendant was even notified of the lawsuit.[94]

### 4. Some magnet state courts easily certify national class ac-tions

A fourth type of class action abuse that is prevalent in state courts in some localities is the "I never met a class action I didn't like" approach to class certification.[95] Some state courts with this permissive attitude have even certified classes that federal courts had already found uncertifiable. In one case, for example, a state court judge certified a nationwide class of persons who claimed that the house siding they had purchased was defective. Later, a federal district court judge presented with the same case rejected any pros-pect of certifying a class in that manner, finding that affording class treatment in that case would clearly violate the due process rights of the defendants and the purported class members.[96]

Another example of this phenomenon is a spate of class actions against automobile manufacturers alleging that the paint on 20-year-old vehicles was discoloring or peeling. Federal and state courts across the country, including the Texas Supreme Court, have consistently rejected attempts to certify classes in these cases, recognizing that each claimant's facts vary such that a jury would have to consider separately the claims of each of the thousands of class members.[97] Most recently, on August 14, 2003, the Texas

---

[90] See Hearings on S. 353, Prepared Statement of John H. Beisner.
[91] Hearings on S. 353, Prepared Statement of Stephen G. Morrison.
[92] Id.
[93] See Order of National Class Certification, *Davison* v. *Bridgestone/Firestone, Inc.,* Case No. 00C2298 (Eighth Cir. Ct., 20th Jud. Dist., Nashville, Tenn.) (dated Aug. 18, 2000).
[94] See Order, *Farkas* v. *Bridgestone/Firestone, Inc.,* Case No. 00–CI–5263 (Cir. Ct., Jefferson County, KY) (dated Aug. 18, 2000).
[95] See Hearings on S. 353, Prepared Statement of Stephen Morrison.
[96] Compare *Naef* v. *Masonite Corp.,* No. CV–94–4033 (Cir. Court, Mobile County, Alabama), with In re *Masonite Hardboard Siding Prods. Litig.,* 170 F.R.D. 417, 424 (E.D. La. 1997).
[97] See, e.g., In re *Ford Motor Co. Vehicle Paint Litig.,* 182 F.R.D. 214 (E.D. La. 1998); *Sanneman* v. *Chrysler Corp,* 191 F.R.D. 441 (E.D. Pa. 2000); *Ford Motor Co.* v. *Sheldon,* 22 S.W.

23

Court of Appeals rejected a proposed class, finding that a class trial would give a jury "the unmanageable task of separately examining numerous paint systems, assessing their different failure rates and making separate determinations about which combination of processes, if any, is defective."[98] Astoundingly, just one month after the most recent Texas court ruling, a Madison County, Illinois judge certified an even broader, more complex nationwide class asserting identical paint claims against Ford regarding vehicles in service for almost 25 years.[99]

### 5. Copy cat class actions clog the courts and permit forum shopping

Yet another common abuse is the filing of "copy cat" class actions (i.e., duplicative class actions asserting similar claims on behalf of essentially the same people). Sometimes these duplicative actions are filed by lawyers who hope to wrest the potentially lucrative lead role away from the original lawyers. In other instances, the "copy cat" class actions are blatant forum shopping—the original class lawyers file similar class actions before different courts in an effort to find a receptive judge who will rapidly certify a class. When these similar, overlapping class actions are filed in State courts of different jurisdictions, there is no way to consolidate or coordinate the cases. The "competing" class actions must be litigated separately in an uncoordinated, redundant fashion because there is no state court mechanism for consolidating state court cases. The result is enormous waste—multiple judges of different courts must spend considerable time adjudicating precisely the same claims asserted on behalf of precisely the same people.[100] As a result, state courts and class counsel may "compete" to control the cases, often harming all the parties involved. In contrast, when overlapping cases are pending in different federal courts, they can be consolidated under one single judge to promote judicial efficiency and ensure consistent treatment of the legal issues involved.

## E. National Class Actions Belong in Federal Court Under Traditional Notions of Federalism

Many of the abuses taking place in state courts are magnified by the growing trend among plaintiffs' attorneys to bring huge class actions on behalf of hundreds of thousands or even millions of consumers. These cases, which generally involve overly broad claims, put any class members with real injuries at risk. The incentive for class lawyers to gather the largest class possible is clear: why sue on behalf of just 1,000 people when you can sue for 1 million claim-

---

3d 444 (Tex. 2000); *Schurk* v. *DaimlerChrysler Corp.,* No. 97–2–04113–9 (Wash. Sup. Ct., Feb. 24, 2000).

[98] See *Ford Motor Co.* v. *Sheldon,* 113 S.W. 3d 839 (Tex. App. 2003).

[99] *Phillips* v. *Ford Motor Co.,* No. 99–L–1041 (Cir. Ct., Madison County, Illinois Sept. 15, 2003).

[100] For example, in the litigation concerning Firestone tires, approximately 100 virtually identical class actions seeking to represent the same purported class members were filed in courts all over the country. And in the recently publicized HMO cases, multiple overlapping class actions were filed against each of the major health insurance companies. No less than 17 class actions have been filed against Humana, most of which assert similar allegations and claims on behalf of similarly defined nationwide classes. In the Humana situation, the federal cases were consolidated for pretrial proceedings before a single judge. See In re *Humana Inc. Managed Care Litig.,* 2000 U.S. Dist. LEXIS 5099 (J.P.M.L. Apr. 13, 2000). There is no parallel methodology for consolidating state court class actions. In the 12 months ending September 30, 2002, over 7,000 cases were centralized for pretrial proceedings through the MDL process. See http://www.uscourts.gov/judbus2002/tables/s19sep02.pdf.

24

ants and increase your intake? The problem with such broad claims, however, is that the entire lawsuit proceeds on a lowest common denominator basis. As a result, persons with legitimate injuries will be lumped in with the "average," often meritless claims and will not be given individual attention for their grievances.[101]

The effect of class action abuses in state courts is being exacerbated by the trend toward "nationwide" class actions, which invite one state court to dictate to 49 others what their laws should be on a particular issue, thereby undermining basic federalism principles.[102] A recent study found that 77 percent of class actions brought in 2001 in a rural Illinois county known for its heavy class action docket sought to certify nationwide classes.[103] These cases challenged matters as diverse as MTBE in wells; telephone billing practices; chicken processing procedures; and insurance reimbursement policies. Clearly, a system that allows state court judges to dictate national policy on these and numerous other issues from the local courthouse steps is contrary to the intent of the Framers when they crafted our system of federalism. In one case, for example, plaintiffs filed suit in an Alabama county court on behalf of more than 20 million people alleging that the design of federally mandated airbags is faulty.[104] From the standpoint of federalism, this suit defies logic. Why should an Alabama state court tell 20 million people in all 50 states what kind of airbags they can have in their cars?

The most egregious of such cases are those in which one state court issues nationwide rulings that actually contradict the laws of other states. This problem is particularly prevalent in insurance cases, which are being filed in increasingly greater number. As District of Columbia Insurance Commissioner Lawrence Mirel has testified before this Committee, class actions "frequently go[] around or simply ignore[] the role of state regulators." [105]

One case reported in the New York Times, for example, involved a longstanding practice of the State Farm Insurance Companies (shared by other insurers) of using non-original equipment manufacturer (OEM) parts to repair cars.[106] The practice was fully disclosed to policyholders, and the majority of states expressly permit insurers to specify non-OEM parts. Indeed, two states, Hawaii and Massachusetts, actually require the specification of non-OEM parts. Nonetheless, plaintiffs brought suit in Illinois state court claiming that all non-OEM parts used by policyholders were inferior to OEM parts, and that State Farm had breached its contractual obligation to policyholders and committed fraud each time it specified such parts. Even though the plaintiffs eventually dropped their claim that all non-OEM parts were inferior, and conceded that this could only be determined on a part-by-part basis, the trial court still permitted the jury to reach a group judgment on the class action. The court was not even deterred by the fact that the plaintiffs in the class came from states throughout the nation with

---

[101] See Hearings on S. 353, Prepared Statement of John H. Beisner.
[102] See Hearings on S. 353, Prepared Statement of John H. Beisner.
[103] See John H. Beisner, and Jessica Davidson Miller, Class Action Magnet Courts: The Allure Intensifies, 4 BNA Class Action Litig. R. 58 (Jan. 24, 2003).
[104] See *Smith* v. *General Motors Corp., et al.*, Civ. A. No. 97–39 (Cir. Ct. Coosa County, AL).
[105] See Hearing on Class Actions, Prepared Statement of Lawrence Mirel.
[106] Suit Against Auto Insurer Could Affect Nearly All Drivers, N.Y. Times, Sept. 27, 1998, at 29.

25

widely varying laws regarding the use of non-OEM parts, including the two states—Hawaii and Massachusetts—that strongly embraced the very practice condemned by plaintiffs.[107] Indeed, in affirming a $1.3 billion verdict against State Farm in this case, an Illinois state appellate court acknowledged that it had disregarded "state insurance commissioners [w]ho testified that the laws of many of our sister states permit and in some cases * * * [even] encourage" usage of non-OEM parts.[108]

The *State Farm* case is not unique. This state court interference with the laws of other jurisdictions is becoming disturbingly common. For example:

• An appellate court in Illinois recently affirmed the certification of a class consisting of Illinois residents and residents of 16 other states. The plaintiffs alleged the defendant telecommunications company had collected, on behalf of municipalities, taxes from customers located in unincorporated areas in violation of the Illinois consumer protection law. The court noted that because "50-state class actions are not uncommon in Illinois" it was not problematic that "the laws of 17 states are potentially implicated here."[109] Similarly, a year earlier another Illinois appellate court affirmed the certification of a nationwide class of consumers alleging violations of the same Illinois law with no regard for the laws of the other states involved.[110]

• The Supreme Court of Oklahoma recently affirmed the certification of a nationwide product liability class action, applying the laws of a single state to transactions that occurred in all 50 states.[111] Thus, in this case, a state court has decided effectively to override whatever policy determinations another state's legislature or courts may have made on warranty or product liability policy to protect their own residents.

• Another recent class action filed in Oklahoma involved allegations that the defendants failed to account for slop oil in monthly accountings rendered to certain oil producers. The lawsuit sounded in tort and contract, involved "millions of dollars," and transactions that occurred in "more than twenty states."[112] The Supreme Court of Oklahoma affirmed the certification of a nationwide class, ignoring the fact that the case would require resolution of the laws of twenty states.

The Minnesota Court of Appeals and the Minnesota Supreme Court recently affirmed a nationwide class action, applying the laws of a single state to transactions that occurred in many different jurisdictions (and virtually none of which occurred in the state whose laws were applied)[113] One judge who decided the case openly acknowledged that the court was engaging in the "false federalism" that has become part of the state court class action game.[114]

---

[107] See *Snider* v. *State Farm Mutual Automobile Insurance Co.*, Cir. Ct. for Williamson City, IL, Docket No. 97–L–114 (1999).
[108] *Avery* v. *State Farm Mut. Auto. Ins. Co.*, 746 N.E.2d 1242, 1254 (Ill. Ct. App. 2001).
[109] *PJ's Concrete Pumping Serv.* v. *Nextel W. Corp.*, 803 N.E.2d 1020, 1030 (Ill. Ct. App. 2004), appeal denied, 813 NE.2d 223 (Ill. 2004), cert. denied, 125 S. Ct. 410 (2004).
[110] *Clark* v. *TAP Pharm. Prods., Inc.*, 798 N.E.2d 123 (Ill. Ct. App. 2003).
[111] *Ysbrand* v. *DaimlerChrysler Corp.*, 81 P.3d 618 (Okla. 2003).
[112] *Black Hawk Oil Co.* v. *Exxon Corp.*, 1998 Okla. LEXIS 82 (Okla. 1998).
[113] *Peterson* v. *BASF Corp.*, 657 N.W. 2d 853 (Minn. Ct. App. 2003), affd., 675 N.W. 2d 57 (Minn. 2004).
[114] Id. at 875.

26

A few years ago, a state trial court in Minnesota approved for class treatment a case involving millions of claimants from 44 states that would have had the effect of dictating the commercial codes of all those states.[115] The specific issue in the case was whether individuals have a state law right to recover interest on refundable deposits paid to secure an automobile lease. In certifying a class in that case, the court adopted an understanding of Minnesota's version of the Uniform Commercial Code that was contrary to the interpretation of every other state to have considered the issue under their own versions of the UCC. And by certifying the class, the court decided that its unprecedented interpretation of the UCC would bind the remaining 43 states that had yet to decide the question (even though the "Uniform Commercial Code is not uniform" and is interpreted differently in different states[116]). In essence, the action of the Minnesota court proposed to dictate the interpretation of 43 other states' UCC provisions even though the other states might well have reached a different conclusion in applying their own state's laws.

The sentiment reflected in these cases flies in the face of basic federalism principles by embracing the view that other states should abide by a deciding court's law whenever it decides that its own laws are preferable to other states' contrary policy choices. Indeed, such examples of judicial usurpation, in which one state's courts try to dictate its laws to 49 other jurisdictions, have been duly criticized by some congressional witnesses as "false federalism."[117] Moreover, they have posed serious problems for the courts of other states. For example, the Vermont Supreme Court recently nullified the settlement in the Bank of Boston case, holding that the Alabama court that approved the settlement failed to provide due process to the Vermont class members in that case, who ended up paying $30,000 in attorneys' fees.[118] In contrast, a Connecticut court recently found that a woman who had been part of an Alabama class action settlement on roofing shingles could not have her day in court because she was bound by the settlement she knew nothing about.[119]

Given the range and severity of class action abuse, it is not surprising that defendants find it necessary to remove actions against them to a federal forum—a forum where the threat of prejudice is significantly lower. Under current law, however, plaintiffs' lawyers can easily manipulate their pleadings to ensure that their cases remain at the state level. As noted above, the two most common tactics employed by plaintiffs' attorneys in order to guarantee a state court tribunal are: adding parties to destroy diversity and shaving off parties with claims for more than $75,000. It is not rare to see complaints in which plaintiffs sue several major corporations and then add one local supplier or dealer as a defendant merely to defeat diversity.[120] Other complaints seek $74,999 in damages on be-

---

[115] *Rosen* v. *PRIMUS Automotive Fin. Servs., Inc.,* No. CT 98–2733 (Minn. D. Ct., 4th Jud. Dist., May 4, 1999).

[116] *Walsh* v. *Ford Motor Co.,* 807 F.2d 1000, 1016–17 (D.C. Cir. 1986).

[117] See Interstate Class Action Jurisdiction Act of 1999: Hearing on H.R. 1875 Before the House Comm. on the Judiciary, 106th Cong. (1999) (hereinafter "Hearing on H.R. 1875), Prepared Statement of Walter E. Dellinger III.

[118] See *State of Vermont* v. *Homeside Lending, Inc. and Bank Boston Corporation,* 826 A.2d 997 (Vt. 2003).

[119] *Rigat* v. *GAF Materials Corp.,* 2002 Conn. Super. LEXIS 272 (Conn. Super. Jan 25, 2002).

[120] See Hearings on S. 353, Prepared Statement of Stephen G. Morrison.

27

half of each plaintiff or explicitly exclude from the proposed class anybody who has suffered $75,000 or more in damages.[121]

The Committee believes that the federal courts are the appropriate forum to decide most interstate class actions because these cases usually involve large amounts of money and many plaintiffs, and have significant implications for interstate commerce and national policy. By enabling federal courts to hear more class actions, this bill will help minimize the class action abuses taking place in state courts and ensure that these cases can be litigated in a proper forum.

### V. How S. 5 Works

S. 5 is a modest attempt to address a number of the problems and abuses in the current class action system. First, S. 5 implements a consumer bill of rights that requires greater scrutiny of both coupon and net loss settlements, regulates attorneys' fee awards in coupon settlements, prohibits extra compensation to class members who are geographically located near the court, and requires notice of proposed class settlements to appropriate state and federal officials.

Second, S. 5 includes a narrowly-tailored expansion of federal diversity jurisdiction to ensure that class actions that are truly interstate in character can be heard in federal court. S. 5 also includes modest amendments to current removal provisions that will make it harder for counsel to "game the system" and keep class actions in state court by naming local defendants who are not real parties to the controversy or by amending their pleadings after the deadline for removal. These provisions will create efficiencies in the judicial system by enabling overlapping and "copycat" cases to be consolidated in a single federal court, rather than proceeding simultaneously in numerous state courts under the current system.

At the same time, however, S. 5 leaves in state court: (1) class actions in which all the plaintiffs and defendants are residents of the same state; (2) class actions with fewer than 100 plaintiffs; (3) class actions involving less than $5 million; (4) class actions in which a state government entity is the primary defendant; (5) class actions brought against a company in its home state, in which 2/3 or more of the class members are also residents; and (6) class actions involving certain local controversies.

Finally, S. 5 addresses the problem of unfair settlements and excessive attorneys' fees by directing the Judicial Conference of the United States to conduct a review of class action settlements and attorneys' fees and to present Congress with recommendations to improve the system.

#### CONSUMER BILL OF RIGHTS

S. 5 requires greater scrutiny of coupon settlements; such settlements are prohibited absent written findings by the court that they benefit the class members. In addition, S. 5 regulates attorneys' fees in class settlements in which coupons constitute all or part of the remedy provided to class members. S. 5 also prohibits extra compensation to members of a class simply because they live closer to the court. These provisions are intended to prevent some of the

---

[121] Id.

28

more abusive class action settlement practices that came to the Committee's attention during hearings on class action abuses.

S. 5 would also amend the class action rules by requiring that class counsel serve appropriate state and federal officials with notice of a proposed settlement. This notice must occur no later than 10 days after the proposed settlement is filed in federal court.

The notice to the appropriate officials would include: (1) A copy of the complaint and amended complaints, unless those materials are available through the Internet and the notice includes directions on how to access the materials on-line; (2) notice of any scheduled judicial hearing in the class action; (3) proposed or final notification to class members of the right to be excluded from the class; (4) any proposed or final class action settlement; (5) any settlement made between class counsel and defendants' counsel; (6) any final judgment or notice of dismissal; and (7) the names of the class members who reside in each respective state and the proportionate claims of such members. The designated officials would then have at least 90 days to review the proposed settlement before the court gives final settlement approval.

Nothing in this section creates an affirmative duty for either the state or federal officials to take any action in response to a class action settlement. Moreover, nothing in this section expands the current authority of the state or federal officials.

DIVERSITY JURISDICTION AND REMOVAL

S. 5 would amend the diversity jurisdiction and removal statutes applicable to larger interstate class actions by modifying 28 U.S.C. 1332 to incorporate the concept of balanced diversity. The bill grants the federal courts original jurisdiction to hear interstate class action cases where (a) any member of the proposed class is a citizen of a different state from any defendant; and (b) the amount in controversy exceeds $5 million (aggregating claims of all purported class members, exclusive of interest and costs).

The bill, however, includes several provisions ensuring that where appropriate, state courts can adjudicate certain class actions that have a truly local focus. The first is the "Home State" exception. Under this provision, if two-thirds or more of the class members are from the defendant's home state, the case would not be subject to federal jurisdiction. Conversely, class actions filed in the home state of the primary defendant would automatically be subject to federal jurisdiction (assuming the other prerequisites are met) if less than one-third of the proposed class members are citizens of that state. For cases brought in a defendant's home state in which between one-third and two-thirds of the class members were citizens of that state, federal jurisdiction would also exist; however, a federal judge would have the discretion, in the interests of justice, to decline to exercise that jurisdiction based on consideration of six factors designed to help assess whether the claims at issue are indeed local in nature.

In addition, S. 5 contains a "Local Controversy Exception" intended to ensure that state courts can continue to adjudicate truly local controversies in which some of the defendants are out-of-state corporations. In order to fall within the Local Controversy Exception, a class action must meet the following four criteria: (1) The class must be primarily local, meaning that more than two-thirds

29

of class members must be residents of the state in which the action was filed; (2) at least one real defendant (whose alleged conduct is central to the class's claims and from whom the class seeks significant relief) must also be local; (3) the "principal injuries" caused by the defendants" conduct must have occurred in the state where the suit was brought; and (4) no other similar class actions have been filed against any of the defendants (by the same or other proposed classes) in the preceding three years. If all of these four criteria are satisfied, the case will not be subject to federal jurisdiction under the bill.

S. 5 also excludes from its federal jurisdiction grant: (1) Class actions involving fewer than 100 plaintiff class members; (2) class actions in which the primary defendants are states, state officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; (3) any securities class actions covered by the Securities Litigation Reform Act; and (4) corporate governance cases.

In order to enable more class actions to be removed to federal court, S. 5 would also create three new rules regarding the removal of class actions filed in state court. First, any defendant would be able to remove a class action to federal court without the consent of any other defendant. Second, any defendant would be able to remove a class action to federal court, even if that defendant is a citizen of the state in which the action was brought. And third, the current ban on removal of a class action to federal court after one year would be eliminated, although the current requirement that removal occur within 30 days of notice of grounds for removal would be retained.

REPORT ON CLASS ACTION SETTLEMENTS

S. 5 would direct the Judicial Conference of the United States, with the assistance of the Federal Judicial Center and Administrative Office of the United States Courts, to prepare a report on class action settlements to be transmitted to the House and Senate Judiciary Committees. The report will include (1) recommendations on best practices to ensure the fairness of settlements for class members and to ensure the appropriateness of attorneys' fees and expenses, and (2) a discussion of any actions taken or planned by the Judicial Conference to implement the report recommendations.

VI. SECTION-BY-SECTION ANALYSIS

*Section 1.*—Section 1 establishes the "Class Action Fairness Act of 2005" as the short title of the bill.

*Section 2.*—Section 2 sets forth findings and purposes. The Committee is concerned that there have been abuses of the class action device over the last decade that have hurt consumers, adversely affected interstate commerce, and undermined public respect for our judicial system. In particular, the Committee is concerned about class actions that do little to benefit—and sometimes actually harm—the class members who are supposed to be the beneficiaries of such cases, while enriching their lawyers. The Committee is also concerned that this problem is exacerbated by confusing notices that make it difficult for class members to understand and effectively exercise their rights. Taken together, the Committee believes

30

that such abuses hurt consumers by resulting in higher prices and less innovation, and that they undermine the principles of diversity jurisdiction, which were established by the Framers to promote interstate commerce.

The purposes of the Act are therefore to assure fair and prompt recoveries for class members with legitimate claims; to restore the intent of the Framers by expanding federal jurisdiction over interstate class actions; and to benefit society by encouraging innovation and lowering consumer prices.

*Section 3.*—Section 3 sets forth a "Consumer Class Action Bill of Rights" to help ensure that class actions do not hurt their intended beneficiaries. This section is intended to address a number of common abuses that were discussed by witnesses at class action hearings and have been reported on in the press—and to encourage greater judicial scrutiny of proposed class action settlements.

New section 28 U.S.C. 1711 defines the term "class action" to include representative actions filed in federal district court under Rule 23 of the Federal Rules of Civil Procedure, as well as actions filed under similar rules in state courts that have been removed to federal court. It also defines the following terms: class counsel, class members, plaintiff class action and proposed settlement.

New section 28 U.S.C. 1712 is aimed at situations in which plaintiffs' lawyers negotiate settlements under which class members receive nothing but essentially valueless coupons, while the class counsel receive substantial attorneys' fees. For example, in a recent settlement of a class action against a video rental chain, customers received coupons toward video rentals and purchases, while the plaintiffs' class counsel were paid $9.25 million in fees and expenses. One commentator observed that "the real winners in the settlement are the lawyers who sued the company," who will be paid "in cash, not coupons." [122]

In order to address such inequities, Section 1712(a) states that in class action settlements in which it is proposed that an attorney fee award be based solely on the purported value of the coupons awarded to class members, the fee award should be based on the demonstrated value of coupons actually redeemed by the class members. Thus, if a settlement agreement promises the issuance of $5 million in coupons to the putative class members, but only 1/5 of potential class members actually redeem the coupons at issue, then the lawyer's contingency fee should be based on a recovery of $1 million—not a recovery of $5 million.

In some cases, the proponents of a class settlement involving coupons may decline to propose that attorney's fees be based on the value of the coupon-based relief provided by the settlement. Instead, the settlement proponents may propose that counsel fees be based upon the amount of time class counsel reasonably expended working on the action. Section 1712(b) confirms the appropriateness of determining attorneys' fees on this basis in connection with a settlement based in part on coupon relief. As is stated on its face, nothing in this section should be construed to prohibit using the "lodestar with multiplier" method of calculating attorney's fees. By the same token, nothing in this section expands the authorization

---

[122] *Scott* v. *Blockbuster Inc.,* (No, DI62–535, Jefferson County, Texas, 2001); Judge OKs Blockbuster Plan On Fees, Associated Press, Jan. 11, 2002.

31

for the use of a multiplier; a multiplier may be used only to the extent authorized by existing law.

In some class action settlements, the terms may be a combination of coupon relief, plus some form of equitable relief, including an injunction. In such circumstances, the settlement may also include fees for obtaining the equitable relief. Thus, if a proposed settlement provides for both coupons and equitable relief, then the portion of the award that is a contingent fee based on the value of the coupons must be calculated based on the value of redeemed coupons, and the portion not based on the value of the coupons should be based on the time spent by class counsel on the case.

The Committee wishes to make clear that nothing in Section 1712 is intended to change current law regarding the circumstances under which an award of attorneys' fees is appropriate. In particular, the Committee stresses that this section is not intended to change in any respect current law governing the circumstances under which fee shifting is permitted in cases that are resolved through full litigation (that is, cases that are not settled). Moreover, the Committee wishes to make clear that it does not intend to change current law in any respect regarding the circumstances under which the parties may justifiably agree to fee awards in connection with settlements. Section 1712 is intended solely to regulate the manner in which fees otherwise authorized by existing law should be calculated.

Section 1712( d) allows a court to hear expert testimony from a witness on the actual value of redeemed coupons to assist the court in determining the proper contingent fee. This provision addresses the situation where the actual value of the coupons differs from their face value. For example, a coupon for $250 off a vehicle purchase may not really be worth $250.

Section 1712(e) provides that a federal judge may not approve a coupon settlement without first conducting a hearing and determining that the settlement terms are fair, reasonable, and adequate for class members. In making that determination, the judge should consider, among other things, the real monetary value and likely utilization rate of the coupons provided by the settlement. The section further provides that a federal court may, in its discretion, require that a proposed settlement provide for the distribution of a portion of the value of unclaimed coupons to a charitable organization or governmental entity; however, any such distribution shall not be used as the basis for the award of any attorneys' fees. So, for example, if a proposed settlement provided for the distribution of one million $1 coupons, but only 250,000 were claimed and used, the federal court supervising the settlement could require that 500,000 of the unclaimed coupons be made available to the U.S. Army for distribution to enlisted personnel serving in the military. However, in determining an appropriate fee award for class counsel, counsel would be able to rely only on the value of the 250,000 coupons actually redeemed by class members. The fee award could not be based on the value of the 250,000 unused coupons or the 500,000 coupons that might be used by military personnel.

The Committee wishes to make clear that it does not intend to forbid all non-cash settlements. Such settlements may be appropriate where they provide real benefits to consumer class members

32

(e.g., where coupons entitle class members to receive something of actual value free of charge) or where the claims being resolved appear to be of marginal merit. However, where such settlements are used, the fairness of the settlement should be seriously questioned by the reviewing court where the attorneys' fees demand is disproportionate to the level of tangible, non-speculative benefit to the class members. In adopting this provision, it is the intent of the Committee to incorporate that line of recent federal court precedents in which proposed settlements have been wholly or partially rejected because the compensation proposed to be paid to the class counsel was disproportionate to the real benefits to be provided to class members.[123]

New section 28 U.S.C. 1713 prohibits federal courts from approving a proposed settlement under which class members would be required to pay class counsel a sum of money that results in a net loss (as occurred in the *Bank of Boston* case, discussed above), unless the court makes a written finding that nonmonetary benefits to the class members substantially outweigh the monetary loss.

New section 28 U.S.C. 1714 prohibits federal courts from approving proposed settlements that provide for payment of greater sums to certain class members based on where they reside. The Committee wishes to emphasize that this provision is intended solely to prohibit circumstances in which the preferential payments have no legitimate legal basis. For example, it may be perfectly appropriate for a settlement of an environmental class action to differentiate settlement payment amounts based on a claimant's proximity to an alleged chemical spill, if it appears that those persons in closer proximity have suffered greater injury. This provision is not intended to affect such a determination. But where putative class members' claims are legally and factually indistinguishable, it is inappropriate to give one class member extra settlement benefits merely because he or she resides in (or closer to) the county where the court sits.

New section 28 U.S.C. 1715 sets forth requirements for notification to appropriate federal and state officials of proposed class action settlements. New section 1715 is designed to ensure that a responsible state and/or federal official receives information about proposed class action settlements and is in a position to react if the settlement appears unfair to some or all class members or inconsistent with applicable regulatory policies. Section 1715 requires each defendant, within 10 days after a proposed class action settlement is filed in federal court, to provide notice of the proposed settlement to: (1) the U.S. Attorney General (or for banks and thrifts, the entity with primary regulatory or supervisory responsibility over the defendant); and (2) the state official that has primary regulatory or supervisory responsibility over the defendant or who licenses or otherwise authorizes the defendant to conduct business in the state (or for state depository institutions, the state bank supervisor in the state in which the defendant is incorporated or chartered). If there is no state official that meets the requirements

---

[123] See, e.g., *Cope* v. *Duggins*, 2001 WL 333102 (E.D. La. 2001) (rejecting proposed class settlement because attorneys' fees were disproportionate to class benefits); *Schwartz* v. *Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561 (E.D. Pa. 2001) (same); *Sheppard* v. *Consolidated Edison Co.*, 2000 WL 33313540 (E.D.N.Y. 2000) (same); *Polar Int'l Brokerage Corp.* v. *Reeve*, 187 F.R.D. 108 (S.D.N.Y. 1999) (same).

set forth in the Act, notice must be provided to the state attorney general. The notice must include: (1) a copy of the complaint and attached materials; (2) the date and time of any scheduled judicial hearing; (3) proposed or final notification to the class members; (4) the proposed settlement; (5) any other agreement between class counsel and the defendant; (6) any final judgment or notice of dismissal; (7) the names of class members who reside in each state and their proportional share of the settlement, or if that is not feasible, a reasonable estimate of the number of class members in the state and their share of the settlement; and (8) any written judicial opinion related to the proposed settlement. A federal court cannot issue a final order approving a settlement until 90 days after the appropriate federal and state officials are served. If the defendants do not comply with this provision, a class member can refuse to comply with—or be bound by—the settlement agreement.

The Act also clarifies that it should not be construed to impose any obligations, duties or responsibilities on the federal and state officials who receive notice of a class action settlement pursuant to this provision. Thus, federal and state officials will be notified about proposed settlements and have an opportunity to get involved if they think it is appropriate but will not be required to do so.

Abusive class action settlements in which plaintiffs receive promotional coupons or other nominal damages while class counsel receive large fees are all too commonplace. The risk of such abusive practices is particularly pronounced in the class action context because these suits often involve numerous plaintiffs, each of whom has only a small financial stake in the litigation. As a result, few (if any) plaintiffs closely monitor the progress of the case or settlement negotiations, and these cases become "clientless litigation," in which the plaintiff attorneys and the defendants have "powerful financial incentives" to settle the "litigation as early and as cheaply as possible, with the least publicity."[124] These financial incentives create inequitable outcomes. "For class counsel, the rewards are fees disproportionate to the effort they actually invested in the case.* * * For society, however, there are substantial costs: lost opportunities for deterrence (if class counsel settled too quickly and too cheaply), wasted resources (if defendants settled simply to get rid of the lawsuit at an attractive price, rather than because the case was meritorious), and—over the long run—increasing amounts of frivolous litigation as the attraction of such lawsuits becomes apparent to an ever-increasing number of plaintiff lawyers."[125]

New 28 U.S.C. 1715 requires defendants to provide notice of proposed settlements to the appropriate federal official and to the appropriate state official of each state in which a class member resides. Under new section 1715(a), the appropriate federal official is the Attorney General of the United States, or in the case of depository institutions and other banks, the person who has primary federal regulatory supervisory responsibility over the defendant if some or all of the matters at issue in the litigation are subject to regulation or supervision by that person. Thus, for example, if a national bank were sued over its lending practices, notice would

---

[124] Deborah Hensler, et al., Class Action Dilemmas, Pursuing Public Goals for Private Gain ("Class Action Dilemmas"), at 10 (1999) (executive summary).
[125] Id.

34

have to be provided to the Comptroller of the Currency. If it were sued in a nationwide lawsuit regarding the food in its cafeterias, notice would be provided to the Attorney General.

Under new section 28 U.S.C. 1715(a), the appropriate state official is defined as the person in the state who has primary regulatory or supervisory responsibility with respect to the defendant or licenses the defendant, if some or all of the matters alleged in the class action are subject to regulation by that person. If no such regulatory or licensing authority exists, or the matters are not subject to regulation by that person, then notice should be given to the state attorney general. Thus, for example, in a case against an insurance company involving insurance practices, such as how premiums are calculated, notice would be required to the state insurance commissioner in each state where the company is licensed and where class members reside. If some class members reside in states where the company does not do business and therefore is not subject to regulation, then notice would be given to those states' attorneys general. Similarly, if the company at issue were a toy manufacturer, which is not licensed by a particular regulatory body, then notice would have to be given to the state attorney general of each state where plaintiffs reside.

New section 1715(c) clarifies that in the case of federal depository institutions and other non-state depository institutions, the notice requirements are satisfied by notifying the person who has primary Federal regulatory or supervisory responsibility with respect to the defendant, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person. No notice is required to state officials in these circumstances. Thus, for example, if a national bank were sued over its depository or lending practices, notice would have to be given to the Comptroller of the Currency, who has regulatory authority over the institution. However, no notice would be required to state officials.

With regard to state depository institutions, the notice requirements are satisfied by notifying the state banking supervisor in the state where the defendant is incorporated, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person, and upon the appropriate federal official. Thus, no notice is required to state officials in other states even if some class members reside in those states.

This provision is intended to combat the "clientless litigation" problem by adding a layer of independent oversight to prohibit inequitable settlements. Under Section 1715(b), class counsel must provide the notice within 10 days after the proposed settlement is filed in court. Such notice must include, according to 28 U.S.C. 1715(b)(1)(8): a copy of the complaint; any scheduled judicial hearings; any final judgment or notice of settlement; any proposed or final notice to the class; and the names of class members who reside in each state, if feasible. The notice would also include any written judicial decision related to settlement, a final judgment, or notice of dismissal. If disagreement arises over the feasibility of providing the names of class members and their proportional share of the proposed settlement under 28 U.S.C. 1715(b), it is the intent of the Committee that class counsel bear the burden of proving that it is not feasible to provide any of this required information.

35

Once the appropriate state and federal officials have received notice under 28 U.S.C. 1715(b), they would then have at least 90 days to review the proposed settlement and decide what (if any) action to take to protect the interests of the plaintiff class. The state and federal officials are not required to take any affirmative action once they receive the proposed settlement according to new section 28 U.S.C. 1715(f); nor does this section expand their current authority in any respect.

Section 28 U.S.C. 1715(e)(1) instructs that in cases where the appropriate state and federal officials are not provided notice of the potential settlement, plaintiffs can choose not be bound by that settlement. The Committee wishes to make clear that this provision is intended to address situations in which defendants have simply defaulted on their notification obligations under this provision; it is not intended to allow settlement class members to walk away from an approved settlement based on a technical noncompliance (e.g., notification of the wrong person, failure of the official to receive notice that was sent), particularly where good faith efforts to comply occurred. In particular, the Committee wishes to note that where the appropriate officials received notification of a proposed settlement from at least one defendant, section 1715(e) should not be operative. New subsection 1715(e)(2) specifically states that a class member may not refuse to comply with a settlement if the notice was directed to the appropriate federal official and to the state attorney general or the primary licensing authority. This provision reflects the overall intent of section 1715 that a settlement should not be undermined because of a defendant's innocent error about which federal or state official should have received the required notice in a particular case.

The Committee believes that notifying appropriate state and federal officials of proposed class action settlements will provide a check against inequitable settlements in these cases. Notice will also deter collusion between class counsel and defendants to craft settlements that do not benefit the injured parties.

*Section 4.*—Section 4 amends 28 U.S.C. § 1332 to re-designate current subsection 1332(d) as subsection (e) and create a new subsection 1332(d).

The definitional provisions of Section 4—as reflected in the new section 1332(d)(1)—are self-explanatory. However, the Committee notes that as with the other elements of section 1332(d), the overall intent of these provisions is to strongly favor the exercise of federal diversity jurisdiction over class actions with interstate ramifications. In that regard, the Committee further notes that the definition of "class action" is to be interpreted liberally. Its application should not be confined solely to lawsuits that are labeled "class actions" by the named plaintiff or the state rulemaking authority. Generally speaking, lawsuits that resemble a purported class action should be considered class actions for the purpose of applying these provisions.

The new subsection 1332(d)(2) gives the federal courts original jurisdiction over class action lawsuits in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and either (a) any member of a class of plaintiffs is a citizen of a different state from any defendant; (b) any member of a class of plaintiffs is a foreign state or a citizen or subject of

36

a foreign state and any defendant is a citizen of a state; or (c) any member of a class of plaintiffs is a citizen of a state and any defendant is a foreign state or a citizen or subject of a foreign state.

The Committee notes that for purposes of the citizenship element of this analysis, S. 5 does not alter current law regarding how the citizenship of a person is determined, including the provisions of 28 U.S.C. § 1332(c) specifying that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."

While the core concept of the bill is that class actions filed against defendants outside their home state are subject to federal jurisdiction if citizens from different states are on opposing sides and more than $5 million is at issue, new subsections 1332(d)(3) and (d)(4)(B) address the jurisdictional principles that will apply to class actions filed against a defendant in its home state, dividing such cases into three categories.

First, for cases in which two-thirds or more of the members of the plaintiff class and the primary defendants are citizens of the state in which the suit was filed, subsection 1332(d)(4)(B) states that federal jurisdiction will not be extended by S. 5. Such cases will remain in state courts under the terms of S. 5, since virtually all of the parties in such cases (both plaintiffs and defendants) would be local, and local interests therefore presumably would predominate.

Second, cases in which more than two-thirds of the members of the plaintiff class or one or more of the primary defendants are not citizens of the state in which the action was filed will be subject to federal jurisdiction, pursuant to the provisions of subsection 1332(d)(2). Federal courts should be able to hear such lawsuits because they have a predominantly interstate component—they affect people in many jurisdictions, and the laws of many states may be at issue.

Finally, there is a middle category of class actions in which more than one-third but fewer than two-thirds of the members of the plaintiff class and the primary defendants are all citizens of the state in which the action was filed. In such cases, the numbers alone may not always confirm that the litigation is more fairly characterized as predominantly interstate in character. New subsection 1332(d)(3) therefore gives federal courts discretion, in the "interests of justice," to decline to exercise jurisdiction over such cases based on the consideration of six factors:

• Whether the claims asserted are of "significant national or interstate interest".—If a case presents issues of national or interstate significance, that argues in favor of the matter being handled in federal court. For example, if a nationally distributed pharmaceutical product is alleged to have caused injurious side-effects and class actions on the subject are filed, those cases presumably should be heard in federal court because of the nationwide ramifications of the dispute and the probable interface with federal drug laws (even if claims are not directly filed under such laws). Under this factor, the federal court should inquire whether the case does present issues of national or interstate significance of this sort. If such issues are identified, that point favors the exercise of federal jurisdiction. If such issues are not identified and the matter ap-

37

pears to be more of a local (or intrastate) controversy, that point would tip in favor of allowing a state court to handle the matter.

• Whether the claims asserted will be governed by laws other than those of the forum state.—As noted previously, the Committee believes that one of the significant problems posed by multi-state state court class actions is the tendency of some state courts to be less than respectful of the laws of other jurisdictions, applying the law of one state to an entire nationwide controversy and thereby ignoring the distinct, varying state laws that should apply to various claims included in the class depending on where they arose. Under this factor, if the federal court determines that multiple state laws will apply to aspects of the class action, that determination would favor having the matter heard in the federal court system, which has a record of being more respectful of the laws of the various states in the class action context. Conversely, if the court concludes that the laws of the state in which the action was filed will apply to the entire controversy, that factor will favor allowing the state court to handle the matter.

• Whether the class action has been pleaded in a manner that seeks to avoid federal jurisdiction.—The purpose of this inquiry is to determine whether the plaintiffs have proposed a "natural" class—a class that encompasses all of the people and claims that one would expect to include in a class action, as opposed to proposing a class that appears to be gerrymandered solely to avoid federal jurisdiction by leaving out certain potential class members or claims. If the federal court concludes evasive pleading is involved, that factor would favor the exercise of federal jurisdiction. On the other hand, if the class definition and claims appear to follow a "natural" pattern, that consideration would favor allowing the matter to be handled by a state court.

• Whether there is a "distinct" nexus between: (a) the forum where the action was brought, and (b) the class members, the alleged harm, or the defendants.—This factor is intended to take account of a major concern that led to this legislation—the filing of lawsuits in out-of-the-way "magnet" state courts that have no real relationship to the controversy at hand. Thus, for example, if the majority of proposed class members and the defendant reside in the county where the suit is brought, the court might find distinct nexus exists. The key to this factor is the notion of there being a distinct nexus. If the selected forum's nexus to the controversy is shared by many other forums (e.g., some allegedly injured parties live in the locality, just as allegedly injured parties live in many other localities), the nexus is not distinct, and this factor would in that circumstance weigh heavily in favor of the exercise of federal jurisdiction over the matter.

• Whether the number of citizens of the forum state in the proposed plaintiff class(es) is substantially larger than the number of citizens from any other state, and the citizenship of the other members of the proposed class(es) is dispersed among a substantial number of states.—This factor is intended to look at the geographic distribution of class members in an effort to gauge the forum state's interest in handling the litigation. To be subject to this inquiry, between one-third and two-thirds of the class members are citizens of the state in which the class action was filed and all of the primary defendants are also citizens of that state. If all of the

38

other class members (that is, the class members who do not reside in the state where the action was filed) are widely dispersed among many other states (e.g., no other state accounted for more than five percent of the class members), that point would suggest that the interests of the forum state in litigating the controversy are pre-eminent (versus the interests of any other state). The Committee intends that such a conclusion would favor allowing the state court in which the action was originally filed to handle the litigation. However, if a court finds that the citizenship of the other class members is not widely dispersed, the opposite balance would be in-dicated. A federal forum would be favored in such a case because several states other than the forum state would have a strong in-terest in the controversy.

• Whether one or more class actions asserting the same or simi-lar claims on behalf of the same or other persons have been filed in the last three years.—The purpose of this factor is efficiency and fairness: to determine whether a matter should be subject to fed-eral jurisdiction so that it can be coordinated with other overlap-ping or parallel class actions. If other class actions on the same subject have been (or are likely to be) filed elsewhere, the Com-mittee intends that this consideration would strongly favor the ex-ercise of federal jurisdiction so that the claims of all proposed class-es could be handled efficiently on a coordinated basis pursuant to the federal courts' multidistrict litigation process as established by 28 U.S.C. § 1407. Under that process, it is likely that all class ac-tions filed on an issue will be handled by a single tribunal that will, in any event, be facing the challenge of interpreting the vary-ing state laws and assessing how they should be applied to the pur-ported class claims. Thus, allowing a case to remain in federal court so that it may become part of that coordinated multi district litigation proceeding makes good sense. On the other hand, if other courts are unlikely to have to undertake the burden of handling the class claims and the state court appears positioned to handle the case in a manner that is respectful of state law variations, that consideration would favor remand of the matter to state court.

It is the Committee's intention that this factor be interpreted lib-erally and that plaintiffs not be able to plead around it with cre-ative legal theories. If a plaintiff brings a product liability suit al-leging consumer fraud or unjust enrichment, and another suit was previously brought against some of the same defendants alleging negligence with regard to the same product, this factor would favor the exercise of federal jurisdiction over the later-filed claim.

The following examples are intended to be illustrative of how these factors would work.

• If a California state court class action were filed against a California pharmaceutical drug company on behalf of a proposed class of 60% California residents and 40% Nevada residents alleg-ing harmful side effects attributable to a drug sold nationwide, it would make sense to leave the matter in federal court. The state laws that would apply in all of these cases would vary depending on where the drug was prescribed and purchased, such that allow-ing a single court to sort out such issues and handle the balance of the litigation would make sense both from an efficiency and fed-eralism standpoint. These concerns would be even greater and the

39

arguments for asserting jurisdiction stronger if another class action alleging similar side-effects has been filed in the last three years.

• On the other hand, if a checking account fee disclosure class action were filed in a Nevada state court against a Nevada bank located in a border city and the class consisted of 65% Nevada residents and 35% California residents (who crossed the border to conduct transactions in the Nevada bank), it might make sense to allow that matter to proceed in state court. It is likely that Nevada banking law would apply to all claims (even those of the California residents), since all of the transactions occurred in Nevada. And there is less likelihood that multiple actions will be filed around the country on the same subject, so as to give rise to a coordinating federal multidistrict litigation proceeding. Thus, the federalism concerns would be substantially diminished.

In sum, the Committee intends that these factors would permit a federal court, in its discretion, to allow a class action asserting primarily local claims under local law for what is primarily a local group of claimants to proceed in state court, particularly where the action has not been pleaded manipulatively to avoid federal jurisdiction and the case is not likely to become an "orphan" that cannot be coordinated with similar class actions that are or, in the future, may be pending in federal court.

New subsection 1332(d)(4)(A) is the "Local Controversy Exception" to the foregoing provisions that otherwise expand federal diversity jurisdiction over class actions. This subsection requires that federal diversity jurisdiction over a class action under the foregoing provisions be declined if the proponents of that view clearly demonstrate that each and every of the following criteria are satisfied in the case at issue: (1) more than ⅔ of class members are citizens of forum state; (2) there is at least one in-state defendant from whom significant relief is sought by members of the class and whose conduct forms a significant basis of plaintiffs' claims; (3) the principal injuries resulting from the alleged conduct, or related conduct, of each defendant were incurred in the state where the action was originally filed; and (4) no other class action asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons has been filed during the preceding three years.

This provision is intended to respond to concerns that class actions with a truly local focus should not be moved to federal court under this legislation because state courts have a strong interest in adjudicating such disputes. At the same time, this is a narrow exception that was carefully drafted to ensure that it does not become a jurisdictional loophole. Thus, the Committee wishes to stress that in assessing whether each of these criteria is satisfied by a particular case, a federal court should bear in mind that the purpose of each of these criteria is to identify a truly local controversy—a controversy that uniquely affects a particular locality to the exclusion of all others.

• The first criterion—that greater than two-thirds of all class members in the aggregate are citizens of the State in which the action was originally filed—is a critical inquiry for determining whether the matter is a local controversy. The proponents of applying the exception thus must demonstrate that a supermajority of

40

the class members are local in the sense that they all reside in the forum state.

• Under the second criterion, there must be at least one real local defendant. By that, the Committee intends that the local defendant must be a primary focus of the plaintiffs' claims—not just a peripheral defendant. The defendant must be a target from whom significant relief is sought by the class (as opposed to just a subset of the class membership), as well as being a defendant whose alleged conduct forms a significant basis for the claims asserted by the class. For example, in a consumer fraud case alleging that an insurance company incorporated and based in another state misrepresented its policies, a local agent of the company named as a defendant presumably would not fit this criteria. He or she probably would have had contact with only some of the purported class members and thus would not be a person from whom significant relief would be sought by the plaintiff class viewed as a whole. Obviously, from a relief standpoint, the real demand of the full class in terms of seeking significant relief would be on the insurance company itself. Similarly, the agent presumably would not be a person whose alleged conduct forms a significant basis for the claims asserted. At most, that agent would have been an isolated role player in the alleged scheme implemented by the insurance company.[126] In this instance, the real target in this action (both in terms of relief and alleged conduct) is the insurance company, and if that company is not local, this criterion would not be met.

• The third criterion is that the principal injuries resulting from the actions of all the defendants must have occurred in the state where the suit was filed. By this criterion, the Committee means that all or almost all of the damage caused by defendants' alleged conduct occurred in the state where the suit was brought. The purpose of this criterion is to ensure that this exception is used only where the impact of the misconduct alleged by the purported class is localized. For example, a class action in which local residents seek compensation for property damage resulting from a chemical leak at a manufacturing plant in that community would fit this criterion, provided that the property damage was limited to residents in the vicinity of the plant. However, if the defendants engaged in conduct that could be alleged to have injured consumers throughout the country or broadly throughout several states, the case would not qualify for this exception, even if it were brought only as a single-state class action.

• The fourth and final criterion is that no other class action involving similar allegations has been filed against any of the defendants over the last three years on behalf of the same or other persons. In other words, if a controversy results in the filing of multiple class actions, it is a strong signal that those cases may not be of the variety that this exception is intended to address. As such, it is a test for assessing whether a controversy is localized. The Committee wishes to stress that another purpose of this cri-

---

[126] The Committee wishes to stress that the presence of conspiracy allegations should not alter this inquiry. For example, if in the hypothetical discussed here, the class alleges that the agent conspired with the insurance company with respect to the alleged scheme, it theoretically would expose the agent to potential liability to the entire class. But that would not change the relatively minor role that the agent played in the overall misconduct that is alleged and would not change the fact that the agent is not the real target of the litigation, which is the inquiry contemplated by this criterion.

41

terion is to ensure that overlapping or competing class actions or class actions making similar factual allegations against the same defendant that would benefit from coordination are not excluded from federal court by the Local Controversy Exception and thus placed beyond the coordinating authority of the Judicial Panel on Multidistrict Litigation. The Committee also wishes to stress that the inquiry under this criterion should not be whether identical (or nearly identical) class actions have been filed. The inquiry is whether similar factual allegations have been made against the defendant in multiple class actions, regardless of whether the same causes of actions were asserted or whether the purported plaintiff classes were the same (or even overlapped in significant respects).

The following two examples are intended to illustrate how the Committee intends this provision to work:

• A class action is brought in Florida state court against a Florida funeral home regarding alleged wrongdoing in burial practices. Nearly all the plaintiffs live in Florida (about 90 percent). The suit is brought against the cemetery, a Florida corporation, and an out-of-state parent company that was involved in supervising the cemetery. No other class action suits have been filed against the cemetery. This is precisely the type of case for which the Local Controversy Exception was developed. Although there is one out-of-state defendant (the parent company), the controversy is at its core a local one, and the Florida state court where it was brought has a strong interest in resolving the dispute. Thus, this case would remain in state court.

• A class action is brought in Florida against an out-of-state automobile manufacturer and a few in-state dealers, alleging that a certain vehicle model is unsafe because of an allegedly defective transmission. The vehicle model was sold in all fifty states but the class action is only brought on behalf of Floridians. This case would not fall within the Local Controversy Exception for two reasons. First, the automobile dealers are not defendants whose alleged conduct forms a significant basis of the claims or from whom significant relief is sought by the class. Even if the plaintiffs are truly seeking relief from the dealers, that relief is just small change compared to what they are seeking from the manufacturer. Moreover, the main allegation is that the vehicles were defective. In product liability cases, the conduct of a retailer such as an automobile dealer does not form a significant basis for the claims of the class members. Second, the case falls outside the Local Controversy Exception because the "principal injuries resulting from the alleged conduct,"—i.e., selling a vehicle with a defective transmission—were incurred in all fifty states. The fact that the suit was brought as a single-state class action does not mean that the principal injuries were local. In other words, this provision looks at where the principal injuries were suffered by everyone who was affected by the alleged conduct—not just where the proposed class members were injured. Thus, any defendant could remove this case to federal court.

New subsection 1332(d)(5)(A) and (B) specify, respectively, that S. 5 does not extend federal diversity jurisdiction to class actions in which (a) the primary defendants are states, state officials, or other governmental entities against whom the district court may be foreclosed from ordering relief ("state action" cases) or (b) the num-

42

ber of members of all proposed plaintiff classes in the aggregate is fewer than 100 class members ("limited scope" cases). The purpose of the "state action" cases provision is to prevent states, state officials, or other governmental entities from dodging legitimate claims by removing class actions to federal court and then arguing that the federal courts are constitutionally prohibited from granting the requested relief. This provision will ensure that cases in which such entities are the primary targets will be heard in state courts that do not face the same constitutional impediments to granting relief. The "limited scope" cases provision is intended to allow class actions with relatively few claimants to remain in state courts.[127]

Federal courts should proceed cautiously before declining federal jurisdiction under the subsection 1332(d)(5)(A) "state action" case exception, and do so only when it is clear that the primary defendants are indeed states, state officials, or other governmental entities against whom the "court may be foreclosed from ordering relief." In making such a finding, courts should apply the guidance regarding the term "primary defendants" discussed below. The Committee wishes to stress that this provision should not become a subterfuge for avoiding federal jurisdiction. In particular, plaintiffs should not be permitted to name state entities as defendants as a mechanism to avoid federal jurisdiction over class actions that largely target non-governmental defendants. Similarly, the subsection 1332(d)(5)(B) exception for "limited scope" cases (actions in which there are fewer than 100 class members) should also be interpreted narrowly. For example, in cases in which it is unclear whether "the number of members of all proposed plaintiff classes in the aggregate is less than 100," a federal court should err in favor of exercising jurisdiction over the matter.

Pursuant to new subsection 1332(d)(6), the claims of the individual class members in any class action shall be aggregated to determine whether the amount in controversy exceeds the sum or value of $5,000,000 (exclusive of interest and costs). The Committee intends this subsection to be interpreted expansively. If a purported class action is removed pursuant to these jurisdictional provisions, the named plaintiff(s) should bear the burden of demonstrating that the removal was improvident (i.e., that the applicable jurisdictional requirements are not satisfied). And if a federal court is uncertain about whether "all matters in controversy" in a purported class action "do not in the aggregate exceed the sum or value of $5,000,000," the court should err in favor of exercising jurisdiction over the case.

By the same token, the Committee intends that a matter be subject to federal jurisdiction under this provision if the value of the matter in litigation exceeds $5,000,000 either from the viewpoint of the plaintiff or the viewpoint of the defendant, and regardless of the type of relief sought (e.g., damages, injunctive relief, or declaratory relief). The Committee is aware that some courts, especially in the class action context, have declined to exercise federal jurisdiction over cases on the ground that the amount in controversy in those cases exceeded the jurisdictional threshold only when as-

---

[127] Under federal law, a purported class action may involve as few as 21 class members. See, e.g., *Cox* v. *American Cast Iron Pipe Co.,* 784 F.2d 1546, 1553 (11th Cir. 1986) (noting that classes encompassing fewer than 21 persons normally are not subject to class certification); *Tietz* v. *Bowen,* 695 F. Supp. 441,445 (C.D. Cal. 1987) (certifying class with 27 class members).

43

sessed from the viewpoint of the defendant. For example, a class action seeking an injunction that would require a defendant to restructure its business in some fundamental way might "cost" a defendant well in excess of $75,000 under current law, but might have substantially less "value" to a class of plaintiffs. Some courts have held that jurisdiction does not exist in this scenario under present law, because they have reasoned that assessing the amount in controversy from the defendant's perspective was tantamount to aggregating damages. Because S. 5 explicitly allows aggregation for purposes of determining the amount in controversy in class actions, that concern is no longer relevant.

The Committee also notes that in assessing the jurisdictional amount in declaratory relief cases, the federal court should include in its assessment the value of all relief and benefits that would logically flow from the granting of the declaratory relief sought by the claimants. For example, a declaration that a defendant's conduct is unlawful or fraudulent will carry certain consequences, such as the need to cease and desist from that conduct, that will often "cost" the defendant in excess of $5,000,000. Or a declaration that a standardized product sold throughout the nation is "defective" might well put a case over the $5,000,000 threshold, even if the class complaint did not affirmatively seek a determination that each class member was injured by the product.

Overall, new section 1332(d) is intended to expand substantially federal court jurisdiction over class actions. Its provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.

As noted above, it is the intent of the Committee that the named plaintiff(s) should bear the burden of demonstrating that a case should be remanded to state court (e.g., the burden of demonstrating that more than two-thirds of the proposed class members are citizens of the forum state). Allocating the burden in this manner is important to ensure that the named plaintiffs will not be able to evade federal jurisdiction with vague class definitions or other efforts to obscure the citizenship of class members. The law is clear that, once a federal court properly has jurisdiction over a case removed to federal court, subsequent events generally cannot "oust" the federal court of jurisdiction.[128] While plaintiffs undoubtedly possess some power to seek to avoid federal jurisdiction by defining a proposed class in particular ways, they lose that power once a defendant has properly removed a class action to federal court.

For purposes of class actions that are subject to subsections 1332(d)(3) and (d)(5)(A), the Committee intends that "primary defendents" be interpreted to reach those defendants who are the real "targets" of the lawsuit—i.e., the defendants that would be expected to incur most of the loss if liability is found. Thus, the term "primary defendants" should include any person who has substantial exposure to significant portions of the proposed class in the action, particularly any defendant that is allegedly liable to the vast majority of the members of the proposed classes (as opposed to simply a few individual class members).

---

[128] See, e.g., *St. Paul Mercury Indem. Co.* v. *Red Cab Co.*, 303 U.S. 283, 293 (1938).

44

It is the Committee's intention with regard to each of these exceptions that the party opposing federal jurisdiction shall have the burden of demonstrating the applicability of an exemption. Thus, if a plaintiff seeks to have a class action remanded under section 1332(d)(4)(A) on the ground that the primary defendants and two-thirds or more of the class members are citizens of the home state, that plaintiff shall have the burden of demonstrating that these criteria are met by the lawsuit. Similarly, if a plaintiff seeks to have a purported class action remanded for lack of federal diversity jurisdiction under subsection 1332(d)(5)(B) ("limited scope" class actions), that plaintiff should have the burden of demonstrating that "all matters in controversy" do not "in the aggregate exceed the sum or value of $5,000,000, exclusive of interest and costs" or that "the number of all proposed plaintiff classes in the aggregate is less than 100."

The Committee understands that in assessing the various criteria established in all these new jurisdictional provisions, a federal court may have to engage in some fact-finding, not unlike what is necessitated by the existing jurisdictional statutes. The Committee further understands that in some instances, limited discovery may be necessary to make these determinations. However, the Committee cautions that these jurisdictional determinations should be made largely on the basis of readily available information. Allowing substantial, burdensome discovery on jurisdictional issues would be contrary to the intent of these provisions to encourage the exercise of federal jurisdiction over class actions. For example, in assessing the citizenship of the various members of a proposed class, it would in most cases be improper for the named plaintiffs to request that the defendant produce a list of all class members (or detailed information that would allow the construction of such a list), in many instances a massive, burdensome undertaking that will not be necessary unless a proposed class is certified. Less burdensome means (e.g., factual stipulations) should be used in creating a record upon which the jurisdictional determinations can be made.

New subsection 1332(d)(7) clarifies that the citizenship of members of proposed classes would be determined as of the date the action was filed. Thus, questions about whether two-thirds of the members of a proposed class were citizens of a particular state would be determined as of that date. The only exception is where the original complaint does not indicate the existence of federal jurisdiction and plaintiffs later serve paper (particularly an amended complaint) that creates such citizenship or makes it evident. Then, consistent with the approach in existing section 1446(b), the "snapshot" of class membership citizenship is taken as of the date on which that new paper is served.

New subsection 1332(d)(8) clarifies that the diversity jurisdiction provisions of this section shall apply to any class action before or after the entry of a class certification order by the court. The purpose of this provision is to confirm that both pre- and post-certification class actions shall be subject to the jurisdictional and removal provisions of S. 5. The Committee wishes to make clear that this provision is not intended to alter the deadlines for removal in the current Judicial Code or as are established by this legislation. This section is merely intended to indicate that the status of a

45

class action (certified or uncertified) should not affect the removability of a case as otherwise permitted by the applicable removal statutes.

Pursuant to new subsection 1332(d)(9), the Act excepts from new subsection 1332(d)(2)'s grant of original jurisdiction those class actions that solely involve claims that relate to matters of corporate governance arising out of state law. The purpose of this provision is to avoid disturbing in any way the federal vs. state court jurisdictional lines already drawn in the securities litigation class action context by the enactment of the Securities Litigation Uniform Standards Act of 1998 (P.L. 105–353).

The Committee intends that this exemption be narrowly construed. By corporate governance litigation, the Committee means only litigation based solely on (a) state statutory law regulating the organization and governance of business enterprises such as corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, and business trusts; (b) state common law regarding the duties owed between and among owners and managers of business enterprises; and (c) the rights arising out of the terms of the securities issued by business enterprises.

This exemption would apply to a class action relating to a corporate governance claim filed in the court of any state. Consequently, it would apply to a corporate governance class action regardless of the forum in which it may be filed, and regardless of whether the law to be applied is that of the State in which the claim is filed.

For purposes of this exemption, the phrase "the internal affairs or governance of a corporation or other form of business enterprise" is intended to refer to the internal affairs doctrine defined by the U.S. Supreme Court as "matters peculiar to the relationships among or between the corporation and its current officers, directors and shareholders. * * *"[129] The phrase "other form of business enterprise" is intended to include forms of business entities other than corporations, including, but not limited to, limited liability companies, limited liability partnerships, business trusts, partnerships and limited partnerships.

The subsection 1332(d)(9) exemption to new section 1332( d) jurisdiction is also intended to cover disputes over the meaning of the terms of a security, which is generally spelled out in some formative document of the business enterprise, such as a certificate of incorporation or a certificate of designations. The reference to the Securities Act of 1933 contained in new subsection 1332(d)(8)(A) is for definitional purposes only. Since that law contains an already well-defined concept of a "security," this provision simply imports the definition contained in the Securities Act.

New subsection 1332(d)(10) provides that for purposes of this new section and section 1453 of title 28, an unincorporated association shall be deemed to be a citizen of a state where it has its principal place of business and the state under whose laws it is organized. This provision is added to ensure that unincorporated asso-

---

[129] *Edgar* v. *MITE Corp.*, 457 U.S. 624, 645 (1982). See also *Draper* v. *Paul N. Gardner Defined Plan Trust*, 625 A.2d 859, 865–66 (Del. 1993); *McDermott, Inc.* v. *Lewis*, 531 A.2d 206, 214–15 (Del. 1987); *Ellis* v. *Mutual Life Ins. Co.*, 187 So. 434 (Ala. 1939); *Amberjack Ltd. Inc.* v. *Thompson*, 1997 WL 613676 (Tenn. App. 1997); *NAACP* v. *Golding*, 679 A.2d 554,559 (Ct. App. Md. 1996); *Hart* v. *General Motors Corp.*, 517 N.Y.S.2d 490, 493 (App. Div. 1987).

46

ciations receive the same treatment as corporations for purposes of diversity jurisdiction. The U.S. Supreme Court has held that "[f]or purposes of diversity jurisdiction, the citizenship of an unincorporated association is the citizenship of the individual members of the association."[130] This rule "has been frequently criticized because often * * * an unincorporated association is, as a practical matter, indistinguishable from a corporation in the same business."[131] Some insurance companies, for example, are "inter-insurance exchanges" or "reciprocal insurance associations." For that reason, federal courts have treated them as unincorporated associations for diversity jurisdiction purposes. Since such companies are nationwide companies, they are deemed to be citizens of any state in which they have insured customers.[132] Consequently, these companies can never be completely or even minimally diverse in any case. It makes no sense to treat an unincorporated insurance company differently from, say, an incorporated manufacturer for purposes of diversity jurisdiction. New subsection 1332(d)(10) corrects this anomaly.

New subsection 1332(d)(11) expands federal jurisdiction over mass actions—suits that are brought on behalf of numerous named plaintiffs who claim that their suits present common questions of law or fact that should be tried together even though they do not seek class certification status. Mass action cases function very much like class actions and are subject to many of the same abuses.

Under subsection 1332(d)(11), any civil action in which 100 or more named parties seek to try their claims for monetary relief together will be treated as a class action for jurisdictional purposes. Thus, if such a civil action met the other diversity jurisdictional prerequisites set forth for class actions in this legislation, that civil action would be subject to federal jurisdiction, subject to several exceptions. A mass action meeting the other applicable federal diversity jurisdiction criteria would not be eligible for federal jurisdiction if any of the following criteria are satisfied by the action:

• All the claims asserted in the action arise out of an event or occurrence in the state where the suit is filed and the injuries were incurred in that state and contiguous states (e.g., a toxic spill case);

• The defendants (not the plaintiffs) sought to join the claims;

• The claims are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a state statute specifically authorizing such an action; or

• The claims have been consolidated or coordinated solely for pretrial purposes.

Subsection 1332(d)(11)(B)(i) includes a statement indicating that jurisdiction exists only over those plaintiffs whose claims in a mass

---

[130] *United Steelworkers of America* v. *R.H. Bouligny, Inc.*, 382 U.S. 145 (1965).

[131] See, e.g., 14 A.L.R. Fed. 849 (2004) (noting dissatisfaction with the prevailing rule and citing one leading authority that commented that "many unincorporated associations bear functional resemblances to corporations * * * [and] the diversity citizenship status of such associations [i]s 'anomalous' in view of the fictional citizenship accorded to corporations and in view of the fact that many states treat these associations as juridical entities, and has emphatically called upon Congress to provide that where unincorporated associations have entity status under state law, they should be treated analogously to corporations for purposes of diversity jurisdiction").

[132] See *Tuck* v. *United Services Automobile Ass'n*, 859 F.2d 842 (10th Cir. 1988); *Baer* v. *United Services Automobile Ass'n*, 503 F.2d 393 (2d Cir. 1974); *Truck Insurance Exchange* v. *The Dow Chemical Co.*, 331 F. Supp. 323 (W.D. Mo. 1971).

47

action satisfy the jurisdictional amount requirements under section 1332(a). The Committee notes that the intent of this proviso is as follows. If a mass action satisfies the criteria set forth in the section (that is, it involves the monetary relief claims of 100 or more persons that are proposed to be tried jointly on the ground that the claims involve common questions of law or fact and it meets the tests for federal diversity jurisdiction otherwise established by the legislation), it may be removed to a federal court, which is authorized to exercise jurisdiction over the action. Under the proviso, however, it is the Committee's intent that any claims that are included in the mass action that standing alone do not satisfy the jurisdictional amount requirements of Section 1332(a) (currently $75,000), would be remanded to state court. Subsequent remands of individual claims not meeting the section 1332 jurisdictional amount requirement may take the action below the 100-plaintiff jurisdictional threshold or the $5 million aggregated jurisdictional amount requirement. However, so long as the mass action met the various jurisdictional requirements at the time of removal, it is the Committee's view that those subsequent remands should not extinguish federal diversity jurisdictional over the action.

Under subsections 1332(d)(11)(C) and (D), respectively, a mass action removed to a federal court under this provision may not be transferred to another federal court under the MDL statute (28 U.S.C. § 1407) unless a majority of the plaintiffs request such a transfer, and the statute of limitations for any claims that are part of a mass action will be tolled while the mass action is pending in federal court.

The Committee find that mass actions are simply class actions in disguise. They involve a lot of people who want their claims adjudicated together and they often result in the same abuses as class actions. In fact, sometimes the abuses are even worse because the lawyers seek to join claims that have little to do with each other and confuse a jury into awarding millions of dollars to individuals who have suffered no real injury.

For these reasons, it is the Committee's intent that the exceptions to this provision be interpreted strictly by federal courts. The first exception would apply only to a truly local single event with no substantial interstate effects. The purpose of this exception was to allow cases involving environmental torts such as a chemical spill to remain in state court if both the event and the injuries were truly local, even though there are some out-of-state defendants. By contrast, this exception would not apply to a product liability or insurance case. The sale of a product to different people does not qualify as an event. And the alleged injuries in such a case would be spread out over more than one state (or contiguous states)—even if all the plaintiffs in the particular case come from one state.

The third exception addresses a very narrow situation, specifically a law like the California Unfair Competition Law, which allows individuals to bring a suit on behalf of the general public. Such a suit would not qualify as a mass action. However, the vast majority of cases brought under other states' consumer fraud laws, which do not have a parallel provision, could qualify as removable mass actions.

48

The final exception would apply to claims that are consolidated or coordinated solely for pretrial proceedings. If a number of individually filed cases are consolidated solely for pretrial proceedings—and not for trial—those cases have not truly been merged in a way that makes them mass actions warranting removal to federal court. On the other hand, if those same cases are consolidated exclusively for trial, or for pretrial and trial purposes, and the result is that 100 or more persons' claims will be tried jointly, those cases have been sufficiently merged to warrant removal of such a mass action to federal court.

In addition, this provision is in no way intended to abrogate 28 U.S.C. 1367 or to narrow current jurisdictional rules in any way. Thus, if a federal court believed it to be appropriate, the court could apply supplemental jurisdiction in the mass action context as well.

The following example is intended to illustrate how this provision would work.

• Two hundred people jointly file a mass action in West Virginia against a Pennsylvania drug manufacturer and also name a local drugstore. Three of them assert claims for $1 million each, and the rest assert claims of $20,000. The federal court would have jurisdiction over the mass action because there are more than 100 plaintiffs, there is minimal diversity, the total amount in controversy exceeds $5 million and a product liability case does not qualify for the "local" occurrence exception in the provision. The Committee then intends for the judge to consider closely which claims meet the $75,000 minimum, noting that plaintiffs often seek to minimize what they are seeking in a complaint so they can stay in state court. For example, sometimes plaintiffs leave their claim for punitive damages off the original complaint to make it seem like their claims are smaller than they really are. It is the Committee's expectation that a federal judge would read a complaint very carefully, and only remand claims that clearly do not meet the amount-in-controversy threshold. If it is likely that a plaintiff is going to turn around in a month and add a claim for punitive damages, the federal court should obviously assert jurisdiction over that individual's claims.

*Section 5.*—Section 5 establishes the procedures for removal of interstate class actions over which the federal court is granted original jurisdiction in new section 1332(d).

The general removal provisions currently contained in Chapter 89 of Title 28 would continue to apply to class actions, except where they are inconsistent with the provisions of the Act. For example, like other removed actions, matters removable under this bill may be removed only "to the district court of the United States for the district and division embracing the place where such action is pending." [133] However, the general requirement contained in section 1441(b) that an action be removable only if none of the defendants is a citizen of the state in which the action is brought would not apply to the removal of class actions under the jurisdictional provisions of section 1332(d). Imposing such a restriction on removal of class actions would subvert the intent of the Act because it would essentially allow a plaintiff to defeat removal jurisdiction

---

[133] See 28 U.S.C. § 1441(a).

49

by suing both in-state and out-of-state defendants. Such a restriction on removal of class actions would perpetuate the current "complete diversity" rule for class actions that new section 1332(d) rejects. The Act does not, however, disturb the general rule that a case can only be removed to the district court of the United States for the district and division embracing the place where the action is pending.[134] In addition, the Act does not change the application of the Erie Doctrine, which requires federal courts to apply the substantive law dictated by applicable choice-of-law principles in actions arising under diversity jurisdiction.[135]

New subsection 1453(b) provides that removal may occur without the consent of any other defendant. This revision to the removal rules will prevent a plaintiffs' attorney from recruiting a "friendly" defendant (e.g., a local retailer) who could refuse to join in a removal to federal court and thereby thwart the legitimate efforts of the primary corporate defendant to seek a federal forum in which to litigate the pending claims. By this provision, it is the Committee's intent to overrule caselaw developed by the federal courts requiring the consent of all parties,[136] to the extent that such precedents might be applied to class actions subject to the expanded jurisdictional and removal provisions of S. 5.

New subsection 1453(c) provides that an order remanding a class action to state court is reviewable by appeal at the discretion of the reviewing court. The purpose of this provision is to develop a body of appellate law interpreting the legislation without unduly delaying the litigation of class actions. As a general matter, appellate review of orders remanding cases to state court is not permitted, as specified by 28 U.S.C. 1447(d). New subsection 1453(c) provides discretionary appellate review of remand orders under this legislation but also imposes time limits. Specifically, parties must file a notice of appeal within seven days after entry of a remand order. In addition, the appeals court must issue a final decision on appeal within 60 days. However, the parties may agree to give the court more time, and the court may, on its own, avail itself of one ten-day extension.

The Committee notes that the current prohibition on remand order review was added to section 1447 after the federal diversity jurisdictional statutes and the related removal statutes had been subject to appellate review for many years and were the subject of considerable appellate level interpretive law. The Committee believes it is important to create a similar body of clear and consistent guidance for district courts that will be interpreting this legislation and would particularly encourage appellate courts to review cases that raise jurisdictional issues likely to arise in future cases.

In order to be consistent with the exceptions to federal diversity jurisdiction granted under new section 1332(d), new subsection 1453(d) provides that the class action removal provisions shall not apply to claims involving covered securities or corporate governance litigation. In addition, claims concerning a covered security, as defined in section 16(f)(3) of the Securities Act of 1933 or section

---

[134] Id.

[135] See *Erie Railroad Co.* v. *Thompkins*, 304 U.S. 64 (1938).

[136] See e.g., *Hewitt* v. *City of Stanton*, 798 F.2d 1230 (9th Cir. 1986); *Mitchell* v. *Kentucky-American Water Co.*, 178 F.R.D. 140, 142 (E.D. Ky. 1997).

50

28(f)(5)(E) of the Securities Exchange Act of 1934, are excepted from the class action removal rule as well. These are essentially claims against the officers of a corporation for a precipitous drop in the value of its stock, based on fraud. Because Congress has previously enacted legislation governing the adjudication of these claims,[137] it is the Committee's intent not to disturb the carefully crafted framework for litigating in this context. Thus, claims involving covered securities are excluded from the new section 1332(b) jurisdiction. The parameters of this subsection are intended to be conterminous with new subsection 1332(d)(9).

Section 5 also amends Section 1446(b) to clarify that the provisions in that section prohibiting the removal of cases more than one year after their commencement do not apply to class actions. Thus, removals taken under these revised provisions for class actions may be taken more than one year after commencement of the action at issue. This change is intended to prevent attorneys from engaging in the type of gaming that occurs under the current class action system. In the most extreme example, a plaintiffs' attorney could file suit under current law against a friendly defendant, triggering the start of the one-year limitation after which removal may not be sought under any condition. One year and one day after filing suit, the plaintiff's attorney could then serve an amended complaint on an additional defendant, at which time it would be too late for that new defendant to remove the case to federal court—regardless of whether diversity jurisdiction exists and irrespective of the practical merits of the case. The same unfair result would also occur if plaintiffs' counsel dismisses non-diverse parties or increases the amount of damages being pled after the one-year deadline. By allowing class actions to be removed at any time when changes are made to the pleadings that bring the case within section 1332(d)'s requirements for federal jurisdiction, this provision will ensure that such fraudulent pleading practices can no longer be used to thwart federal jurisdiction. It is not the intention of the Committee to change section 1446(b)'s requirements that an action must be removed within thirty days of being served with the initial pleading or thirty days after receipt of an amended pleading, motion, order or other paper from which it may be ascertained that the case is one which is or has become removable.

*Section 6.*—Section 6 directs the Judicial Conference of the United States, with the assistance of the Director of the Federal Judicial Center and the Director of the Administrative Office of the United States Courts, to prepare and transmit to the Committees on the Judiciary of the Senate and House of Representatives a report on class action settlements. The report shall contain recommendations on the best practices that courts can use to ensure that proposed class action settlements are fair to the class members that these settlements are supposed to benefit. In addition, the report shall contain recommendations on the best practices that courts can use to ensure that fees and expenses awarded to attorneys in connection with a class action settlement appropriately reflect the extent to which counsel obtained full redress for the injuries alleged in the complaint, and the time, expense and risk de-

---

[137] See Public Law 104–67, the "Private Securities Litigation Reform Act of 1995," and Public Law 105–353, the "Securities Litigation Uniform Standards Act of 1998."

51

voted to the litigation. Finally, the report shall identify the actions that the Judicial Conference has taken and intends to take toward having the federal judiciary implement the recommendations in the report.

Section 6 contains a provision stating that nothing in the Act shall be construed to alter the authority of the federal courts to supervise the award of attorneys' fees. It is the Committee's intent not to disrupt the federal courts' broad discretion to approve attorneys' fees based on fairness determinations, notwithstanding contractual arrangements between attorneys and their clients.

*Section 7.*—Section 7 provides that the enactments of the Judicial Conference recommendations shall take effect on the date of enactment of this Act or on December 1, 2003 (as specified in that order), whichever occurs first. This provision is a relic from an earlier version of this legislation and is of no effect since the recommendations have already been enacted.

*Section 8.*—Section 8 clarifies that nothing in the bill restricts the authority of the Judicial Conference and Supreme Court to implement new rules relating to class actions. Section 8 is intended to ensure that the bill not be interpreted as restricting in any way the ongoing efforts of the federal Judicial Conference's Advisory Committee on Civil Rules and Standing Committee on Rules and Procedure to promulgate improved rules governing class actions.

*Section 9.*—Section 9 provides that the amendments made by the Act shall apply to any civil action commenced on or after the date of enactment.

VII. CRITICS CONTENTIONS AND REBUTTALS

*Critics' Contention No. 1:* S. 5 would transfer nearly every class action from state to federal court and would add to the overwhelming workload faced by our federal courts.

*Response:*

During Committee debate on previous versions of this bill, the most frequently expressed concern was that its jurisdictional provisions would overload the federal judiciary. That argument, however, ignores three key facts. First, the bill will not move most class actions to federal court. Second, many state courts, where the critics apparently would like to confine all interstate class actions, are more burdened than the federal courts, and are less equipped to deal with complex cases like class actions. Indeed, many state courts have comparatively crushing caseloads. Third, federal courts can handle duplicative class actions more efficiently through multidistrict litigation proceedings.

First, a recent study debunked the myth promoted by some of the bill's critics that S. 5 will move nearly all class actions to federal court.[138] The study looked at the only six states that had data readily available on on-line databases and found that more than 50 percent of the class actions for which there were rulings during a five-year period would not be removable to federal court under the

---

[138] John H. Beisner & Jessica Davidson Miller, There will be no Exodus: An Empirical Study of S. 2062's Effects on Class Actions, Mealey's Tort Reform Update (April 2004).

52

Class Action Fairness Act.[139] By contrast, the study found that in Madison County, Illinois, more than 85 percent of the cases would be removable to federal court under the bill.[140] Put simply, the study found that The Class Action Fairness Act is a narrowly tailored bill that will not overwhelm the federal judiciary. Rather, the bill leaves most legitimately local disputes in state court, while ensuring that large, interstate class actions like those typically brought in Madison and St. Clair counties and other magnet courts can be heard in federal court.

Second, contrary to critics' contentions, the average state court judge is assigned three times as many cases as his or her federal counterparts. State court judges are assigned (on average) 1,568 new cases each year.[141] For example, in California, the average judge was assigned 1,546 cases in 2003. In Florida, the average was 2,206. In New Jersey, the average was 2,810 cases. And in Texas, it was 1,701 cases. In contrast, each federal court judge was assigned an average of just 483 new cases during the twelve-month period ending September 30, 2003.[142]

Critics of the bill also ignore the fact that many state courts are tribunals of general jurisdiction—they hear all sorts of cases, including divorce matters, custody disputes, name change petitions, traffic violations, small claims contract disputes, minor misdemeanors, and major felonies. Thus, when a class action is filed before those courts, it diminishes the court's ability to provide a broad array of very basic legal services for the local community. The judges presiding over those state courts have far fewer resources for dealing with huge, complex cases, like class actions.

Federal court judges usually have two or three law clerks; state court judges often have none. And federal court judges usually can delegate aspects of their cases (e.g., discovery issues) to magistrate judges or special masters; state court judges typically lack such resources.

Third, critics also overlook the fact that even if both court systems were similarly burdened, federal courts could still deal with class actions more efficiently for two reasons. First, federal courts can coordinate "copy cat" or overlapping class actions. The record before the Committee indicates that it is not uncommon to see twenty, thirty, or even 100 class actions filed on the same subject matter. Sometimes, competing lawyers file these cases; other times, they are filed by the same lawyers who are simply forum-shopping for the most receptive judge. When these similar, overlapping class actions are filed in state courts of different jurisdictions, there is no way to consolidate or coordinate the cases. The result is enormous waste, to say nothing of the unfairness. Defendants are forced to defend the same case in many different courts. And class members are harmed because the various class counsel compete with each other to achieve the best settlement for the lawyers. In contrast, if overlapping or similar class actions are filed against the same defendant in two or more different federal courts, the multi-district litigation process (established by 28 U.S.C. § 1407) permits the transfer and consolidation of those cases to a single judge. The

---

[139] Id. at 16.
[140] Id. at 20.
[141] Examining the Work of State Courts at 12.
[142] See Federal Court Management.

53

federal court multidistrict litigation system regularly consolidates multiple overlapping class actions in this manner, preventing the waste that occurs in state courts.

Finally, critics who focus on the federal courts' workload are missing the point—class actions are precisely the kind of cases that should be heard in federal court. Class actions usually involve the most people, most money, and most interstate commerce issues. They also usually involve issues of nationwide implications. Interstate class actions are certainly no less deserving of a federal forum than the 2,525 cases heard in federal court each year to recover a few thousand dollars in defaulted student loans, or the 17,952 federal personal injury cases (e.g., single person medical malpractice cases).[143] Ultimately, regardless of the impact on the federal court caseload, large interstate class actions belong in federal court.

*Critics' Contention No. 2:* Abuses of class actions exist in both federal and state courts, and allowing more interstate class actions to be heard in federal court thus will not solve any problems.

> *Response:*

At congressional hearings on the subject of class actions, witness after witness provided compelling evidence that serious abuses of the class device are occurring primarily in state courts.[144]

Moreover, several studies also indicate that the class action abuse problem, particularly with respect to class settlements, is primarily a state court issue. For example, a detailed Federal Judicial Center study concluded that "[i]n most [class actions handled by federal courts subject to the study], net monetary distributions to the class exceeded attorneys' fees by substantial margins."[145] In stark contrast, an Institute for Civil Justice/RAND study indicated that in state court consumer class action settlements not involving personal injuries, class counsel typically walk off with more money than all of the class members combined.[146] The ICJ/RAND study offered three compelling rationales for allowing more interstate class actions to be heard by federal courts:

(1) "federal judges scrutinize class action allegations more strictly than state judges, and deny certification in situations where a state judge might grant it improperly;"

(2) "state judges may not have adequate resources to oversee and manage class actions with a national scope;" and

(3) "if a single judge is to be charged with deciding what law will apply in a multi state class action, it is more appropriate that this take place in federal court than in a state court."[147]

While some abuses do occur in federal court, the extent to which they take place in no way even approaches the level of abuse evi-

---

[143] See Administrative office of the U.S. Courts, Judicial Business of the United States Courts 2003 (2004) ("Judicial Business"), at 129–31.

[144] See generally Class Action Lawsuits: Examining Victim Compensation and Attorneys' Fees, Hearings Before the Subcommittee on Administrative Oversight and the Courts of the Senate Committee on the Judiciary, 105th Cong. (1997); Hearings on Mass Torts and Class Actions Before the Subcommittee on Courts and Intellectual Property of the House Committee on the Judiciary, 105th Cong. (1998), Hearing on H.R. 1875, The Class Action Jurisdiction Act of 1999 Before the House Committee on the Judiciary, 106th Cong. (1999).

[145] Federal Judicial Center, Empirical Study of Class Actions in Four Federal District Courts 68–69 (1996).

[146] Class Action Dilemmas, at 19.

[147] Id. at 28.

54

dencing itself in state court. Indeed, it is interesting that while few state court systems have attempted to address class action abuses, the federal court system, which has far less of a problem in the first place, has invested considerable effort in developing new rules reflecting best practices that courts should follow in handling class litigation, particularly in the settlement context. Those revisions, enacted last year,[148] will dovetail with the "consumer bill of rights" provisions in S. 5 to bolster federal court safeguards in the proper handling of class action cases.

*Critics' Contention No. 3:* To date, the only mechanism that has been successful in imposing liability on some industries, such as the tobacco or firearms industries, has been class action lawsuits. Allowing removal of state class actions to federal court will destroy the impact that class actions are having on these socially irresponsible businesses. Therefore, we should exempt certain industries from the diversity and removal provisions of S. 5.

*Response:*

Opponents of S. 5 would prohibit federal courts from exercising jurisdiction over those class actions brought against certain industries, including HMOs, tobacco companies, nursing homes, and firearms manufacturers. In addition, opponents have suggested that claims arising from state consumer protection statutes or state environmental protection laws should be exempt from the bill as well.

However, industry-specific exemptions from federal jurisdiction make no sense. Like bills of attainder, such exemptions irrationally single out a specific industry and slam the federal courthouse door in its face. The proposal to carve out certain legitimate, yet presently unpopular, industries contradicts the constitutional purposes of federal diversity jurisdiction—to allow interstate businesses to have claims against them heard in federal court under diversity so as to avoid local biases and to promote and enhance, rather than hamper, interstate commerce. The notion that certain industries are less entitled to federal court protection is utterly inconsistent with the purpose and goals of diversity jurisdiction. Simply put, there should not be one set of rules for one category of defendants and another for another group of defendants.

Moreover, there is no evidence that plaintiffs will be less successful in litigating their class action claims in federal court.[149] Class

---

[148] See Amendments to Federal Procedural Rules, 71 U.S.L.W. 4253, 4254–55 (U.S. Apr. 1, 2003) (Supreme Court order amending rules pursuant to Rules Enabling Act).

[149] Indeed, there is no evidence that plaintiffs' counsel believe that they must file in state court in order to succeed. Tobacco class actions prove this point. Of the purported class actions on tobacco issues initiated in recent years, many were originally filed in federal courts. Moreover, there is no evidence that classes are more likely to be certified in state courts. The reality is that the vast majority of courts—both federal and state courts—that have considered the issue have denied certification of proposed tobacco classes. The state court certification denials include: In re *Tobacco Cases II*, No. JCCP–4042, slip op. (Md. Ct. App. May 16, 2000); *Reed v. Philip Morris, Inc.*, No. 96–5070, slip op. (D.C. Super. Ct. July 23, 1999); *Philip Morris, Inc. v. Angeletti*, No. 961450501 CE212596, slip op. (Md. Ct. App. May 16, 2000); *Taylor v. American Tobacco Co.*, No. 97715975, slip op. (Mich. Cir. Ct. Jan. 20, 2000); *Constantino v. Philip Morris, Inc.*, No. MID–L–5135–97, slip op. (N.J. Super. Ct. Oct. 26, 1998); *Small v. Lorilard Tobacco Co.*, 6791 N.Y.S.2d 593 (App. Div. 1998), aff'd, 698 N.Y.S.2d 615 (1999); and *Geizer v. American Tobacco Co.*, 696 N.Y.S.2d 345 (1999). At least three federal courts have certified tobacco-related classes: In re *Simon II Litig.*, 212 F. Supp. 2d 57 (E.D.N.Y. 2002) (certifying nationwide punitive damages class of smokers' claims against tobacco companies) (appeal pending); *Iron Workers Local Union No. 17 Insurance Fund v. Philip Morris Inc.*, 182 F.R.D. 523 (N.D. Ohio 1998); *Northwest Laborers-Employers Health & Security Trust Fund v. Philip Morris Inc.*, 1997 U.S.

55

actions against unpopular corporate defendants, such as the fire-arms and tobacco industry have successfully proceeded in Federal court, and have resulted in beneficial judgments and settlements for the plaintiff classes. For example, the class action that is touted as the only real success the class counsel have had against the fire-arms industry [150] turns out to be a federal court class action.[151] Assuming that a case is a meritorious class action asserting meritorious claims, there is no reason to believe such a case heard by a federal court would have an outcome different from a state court case, particularly given that the federal court normally would apply the same state substantive law as a state court considering the same case.

*Critics' Contention No. 4:* S. 5 should exclude civil rights cases, in order to ensure that civil rights plaintiffs have maximum access to our courts.

*Response:*

Critics who would exclude civil rights cases from the scope of S. 5 have it backwards.

First, an amendment that would affirmatively exclude civil rights cases from federal jurisdiction would be contrary to a long tradition of encouraging the availability of our federal courts to address civil rights claims. Indeed, Congress has already enacted several statutes that are intended to ensure that civil rights cases can be heard in federal courts. For example, one statute permits removal

---

Dist. LEXIS 21299 (W.D. Wash. Dec. 24, 1997). In addition, a U.S. Magistrate Judge recommended certification of a class in *Oregon Laborers-Employers Health & Welfare Trust Fund* v. *Philip Morris, Inc.,* 188 F.R.D. 365 (D. Or. 1998), but that recommendation was never acted upon by the district court judge. Three state courts (two in Florida and one in Louisiana) have certified tobacco-related classes: *R.J. Reynolds Tobacco Co.* v. *Engle,* 672 So.2d 39 (Fla. Ct. App. 1996) (affirming the trial court's certification of tobacco class); *Broin* v. *Philip Morris Cos.,* 641 So. 2d 888 (Fla. Ct. App. 1996) (ordering trial court to certify tobacco class); *Scott* v. *American Tobacco Co.,* 725 So. 2d 10 (La. Ct. App. 1998) (affirming trial court certification of tobacco class). However, a Florida appeals court has decertified the *Engle* classe see *Liggett Group, Inc.* v. *Engle,* 853 So. 2d 434 (Fla. Ct. App. 2003), and the matter is under review by the Florida Supreme Court, see 873 So. 2d 1222 (Fla. 2004). Thus, the scorecard is basically even; there is no evidence that class members will be treated differently in state court.

While critics have pointed to the two Florida tobacco class actions as evidence that state courts will somehow be tougher on the tobacco industry, there is no real support for this contention. In the first tobacco class action to reach conclusion after a class was certified and the matter was tried (*Broin,* a Florida state court case), the matter ultimately settled. But the class members received no money at all. Under the terms of settlement, they obtained only a "right to sue" individually. Meanwhile, the class counsel were awarded $49 million (on the basis of a medical research contribution made by defendants). Counsel for one of the class members who protested the settlement reportedly commented: "It's mind-boggling that a court would permit this kind of settlement to go ahead. What is the class getting out of this? Nothing." The Legal Intelligencer, Sept. 22, 1999, at 4. The second case, *Engle* v. *R.J. Reynolds Tobacco Co.,* received a lot of publicity because the jury awarded a $145 billion verdict to the class of Florida smokers. However, as noted above, the verdict was vacated after an appeals court found that trying the plaintiffs' claims on a classwide basis was improper. *Engle,* 853 So. 2d 434 (Fla. Ct. App. 2003), review granted, 873 So. 2d 1222 (Fla 2004).

Moreover, there is no evidence that tobacco cases would be tried more quickly in state courts. It took six years to get the first tobacco class action to trial in state court; the second took more than four years. The average time to trial in federal court civil cases is shorter.

Finally, it is clear that certain opponents of the bill are trying to single-out certain unpopular industries, such as the firearms industry, because they are unpopular. But that is exactly what the Framers of the Constitution were trying to avoid. They were trying to ensure a fair, even-handed federal court forum for defendants that may otherwise be haled into a local court less concerned about protecting the rights of an out-of-state company.

[150] 145 Cong. Rec. H8577 (Sept. 23, 1999 (floor debate on H.R. 1789) (Rep. Nadler asserting that a "1995 class action against Remington Arms * * * settled for $31.5 million * * * [and] led to the implementation of greater safety protections or owners of shotguns").

[151] See *Garza* v. *Sporting Goods Properties, Inc.,* 1996 U.S. Dist. LEXIS 2009 (W.D. Tex. Feb. 6, 1996) (approving class settlement).

56

to federal court of a broad range of civil rights actions.[152] And more importantly, one general jurisdiction statute—28 U.S.C. § 1343—provides broad federal jurisdiction over a whole host of civil rights claims (e.g., any action "for injury to person or property or because of the deprivation of any right or privilege of a citizen of the United States," any action "to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights"). Indeed, that section provides original federal jurisdiction over any action "to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens."

Second, the assumption of the amendment that federal courts are clogged and unable to handle civil rights cases has no basis. Indeed, as discussed above, the federal court workload issue is overblown, ignoring the burdens that class actions place on ill equipped state courts. Several of our federal judicial districts may need additional resources. Wherever that need has been confirmed, additional resources should be provided (as they were in 1999 and again in 2002, when new permanent and temporary federal district court judgeships were added). But those spot shortages are no excuse for continuing to deny both consumers and corporations their due process rights by keeping interstate class actions a state court monopoly.

Third, federal courts have a long record of certifying discrimination class actions and approving hefty settlements in such cases. The most generous racial discrimination class action settlements in recent years—like the Home Depot gender discrimination case settlement (which paid class members about $65 million) and the $192 million Coca-Cola race discrimination settlement (in which each class member was guaranteed a recovery of at least $38,000)—were achieved in and approved by federal courts. These cases stand in stark contrast to the typical state court class action, in which consumers are lucky if they get a $5 coupon.

Finally, civil rights litigants have nothing to fear from federal judges. Federal judges, under Article III of the Constitution, are appointed for life. One reason the Framers designed the federal judiciary that way was to protect federal judges from political pressure and ensure that they would provide equal treatment to minority groups with less political power. It is thus no accident that federal courts have issued decisions like *Brown* v. *Board of Education* that, although unpopular at the time, paved the way for future civil rights laws like Title VII and Section 1983.

*Critics' Contention No. 5:* S. 5 would unfairly tilt the playing field by providing an advantage to defendant corporations at the expense of consumers.

> *Response:*

This concern mischaracterizes the content and intent of the bill. S. 5 is court reform—not tort reform. It would simply allow federal courts to handle more interstate class actions. It makes no changes in substantive law whatsoever. Critics of S. 5 erroneously argue

---

[152] 28 U.S.C. § 1443.

57

that the bill would reverse the ordinary presumption that a plaintiff chooses his or her own court. Yet, in this context, there is no such presumption. In fact, the whole purpose of diversity jurisdiction is to preclude any such presumption by allowing state-law based claims to be removed from local courts to federal courts, so as to ensure that all parties can litigate on a level playing field and thereby protect interstate commerce interests.[153]

Article III of the Constitution ensures that there will be a fair, uniform, and efficient forum (a federal court) for adjudicating interstate commercial disputes, so as to nurture interstate commerce. Some scholars have persuasively argued that diversity jurisdiction, of all the powers exercised under the Constitution, has had the greatest influence in melding the United States into a single nation, by fostering interstate commerce, communication and the uninterrupted flow of capital for investment into various parts of the Union, and sustaining the public credit and the sanctity of private contracts.[154]

S. 5 promotes these important constitutional norms. The statutory "gatekeeper" for federal diversity jurisdiction—28 U.S.C. § 1332—generally allows federal courts to hear cases that are large (that is, cases with large "amounts in controversy") and that have interstate implications (that is, cases involving citizens from multiple jurisdictions). These requirements were intended to ensure that diversity jurisdiction is preserved for those cases with significant interstate and economic impacts. Class actions would normally satisfy these requirements because they usually involve big dollar amounts and parties from multiple jurisdictions. Yet, because section 1332 was enacted prior to the existence of the modern-day class action, it does not take into account the unique circumstances presented by class actions. Consequently, section 1332, as presently drafted, tends to exclude the overwhelming majority of class actions from federal courts, while inviting into federal courts much smaller single-plaintiff cases having few (if any) interstate ramifications. Such a result is inconsistent with the federal judiciary's proper jurisdictional role. S. 5 would correct this technical problem and thereby promote the underlying goals of diversity jurisdiction.

As former Clinton Administration Acting Solicitor General Walter Dellinger has testified in congressional hearings, if Congress were to now re-write the federal diversity jurisdiction statute, interstate class actions undoubtedly would be one of the first categories of cases to be included within the scope of the statute.[155] This makes plain sense insofar as class action lawsuits typically involve more people, more money, and more interstate commerce issues than any other type of case. S. 5 will simply fix the technical problem in section 1332 and judicial interpretation of the diversity requirements that keep most class actions in state court.

---

[153] See, e.g., *Peaset* v. *Peck,* 59 U.S. (18 How.) 518, 520 (1856).
[154] See John J. Parker, The Federal Constitution and Recent Attacks Upon It, 18 A.B.A. J. 433, 437 (1932).
[155] See Hearings on H.R. 1875, statement of Walter E. Dellinger.

58

*Critics' Contention No. 6:* S. 5 will limit the capacity to use class actions as private attorneys general actions to deter corporate wrongdoing.

*Response:*

During past Committee debates, some members have opposed expanding federal jurisdiction over class actions on the ground that doing so would limit the use of class actions as private attorney general actions—as a deterrent to corporate wrongdoing. As one member stated, the purpose of a class action is to "dissuade. It is the same reason that we have treble damages." [156] In the view of that member, "the most important function that class actions serve is to allow private attorneys general to step forward and hold corporations accountable for decisions that affect the public safety." [157]

The problem with this argument is that for all of the reasons discussed above, S. 5 will not limit the legitimate use of class actions at all. But more fundamentally, there is no historical basis for the assertion that class actions were intended to create this private attorney general device.

Although a few courts have over the years referred to the deterrent effects of class actions, the promulgation history of the current Rule 23 of the Federal Rules of Civil Procedure reflects no intent to create a private attorney general device. In recent years, members of the Advisory Committee on Civil Rules that developed the current version of the rule have testified that Rule 23 was not intended to serve that purpose. In testimony before the Advisory Committee on Civil Rules in 1996, the Hon. William T. Coleman, Jr., specifically denounced the proposition that "a purpose of Rule 23 is to hand a private attorney general's badge to any counsel who wants it." [158] He also stated that

> back in 1966, that was not the intended purpose of Rule 23(b)(3). If there is interest in deputizing all attorneys everywhere to enforce our laws, that's a matter that should be decided by Congress, not through the class action provisions in the Federal Rules of Civil Procedure. The courts' tolerance for this vigilante-style use of class actions is a root cause of the abuses that must be correct. [159]

In congressional testimony several years ago, Prof. John P. Frank, another 1966 Advisory Committee member, sounded similar sentiments:

> What I wish to call to your attention is what I think is a serious problem here: that the class action rule, wholly without regard to its original purpose, has become something of a device for social administration, which should never have been the product of the rules at all. These are matters which should be handled by the Congress and by administrative agencies, and not attempted efforts to govern various parts of the economy by lawsuits which give

---

[156] See transcript of markup, Senate Judiciary Committee on S. 353, p. 19:2–17 (June 29, 2000) (statement of Joseph R. Biden, Jr., U.S. Senate).
[157] Id.
[158] Advisory Committee Working Papers (vol. 4), at 456.
[159] Id.

59

more to the counsel * * * that they do to those who should benefit from them.

I particularly adopt the statement of the chair of the [Advisory Committee on Civil Rules] at the present time, Judge Paul Niemeyer * * * in which he says: "I believe that Rule 23 was never intended to be a rule to enhance enforcement of substantive claims. Such legitimization should, in my judgment, be effected by Congress, and congress might well conclude * * * that it is too anarchical to authorize private attorneys to self-appoint themselves as enforcers of law without adequate accountability to the lawmakers or the public." [160]

Even if the critics were correct that deterrence was an intended purpose of class actions, that assertion is self-defeating because, in the Committee's view, the concept of class actions serving a "private attorney general" or other enforcement purpose is illegal. If the intended purpose of Rule 23 was to empower private attorneys to act as "attorneys general," the rule plainly bestows substantive rights not otherwise available under common or statutory law. Interpreted in this way, the rule runs afoul of the Rules Enabling Act, [161] which forbids federal courts from adopting "rules of practice and procedure" that may "abridge, enlarge or modify any substantive right." To the extent that class actions are characterized as having a private attorney general purpose, there are strong arguments that Rule 23 is simply null and void.[162]

*Critics' Contention No.7:* S. 5 will result in delays for injured consumers.

*Response:*

This criticism stems from baseless concerns about the federal courts' caseload and the possible impact of this legislation on the ability of the federal courts to resolve these cases in a timely manner. However, as noted above, the average state court judge is assigned three times as many cases as his or her federal counterparts. Thus, to the extent that caseloads affect how quickly cases are resolved, the problems are much worse in state court than in federal court. For all of the reasons set forth previously, there is no basis for arguing that S. 5 would overwhelm the federal courts with class action cases and thereby adversely affect the ability of consumers to find timely redress for their injuries in federal court.

---

[160] Mass Torts and Class Action Lawsuits: Hearing before the Subcom. On Courts and Intellectual Property of the House Committee on the Judiciary, 105th Cong., 2d Sess. 20–21 (March 5, 1998) (statement of John P. Frank, Esq.).

[161] 28 U.S.C. § 2072(b).

[162] The federal courts have frequently rejected efforts to use the Federal Rules of Civil Procedure to expand substantive rights. See e.g., In re *Baldwin-United Corp.* 770 F.2d 328, 335 (2d Cir. 1985) (rejecting arguments that Fed. R. Civ. P. 23 could be used as authorizing issuance of an injunction to protect class members); *Synanon Church* v. *United States,* 557 F. Supp. 1329, 1330 n.2 (D.D.C. 1983) (rejecting argument that Fed. R. Civ. P. 57 creates right to jury trials in declaratory judgment actions). Cf *Douglas* v. *NCNB Nat'l Bank,* 979 F.2d 1128, 1130 & n.2 (5th Cir. 1992) (declining to apply Fed. R. Civ. P. 13(a) where doing so would "abridge as lender's substantive rights and enlarge the debtor's substantive rights"). Similar views have been expressed by state courts. See, e.g., *Southwestern Refinery Co.* v. *Bernal,* 22 S.W. 3d 425, 432 (Tex. 2000) ("[C]lass actions do not exist in some sort of alternative universe outside our normal jurisprudence. Our procedural rules provide otherwise: the form of an action under the rules must not 'enlarge or diminish any substantive rights or obligations of any parties to any civil action.'") (quoting Tex. R. Civ. P. 815).

60

Notably, the evidence available shows that federal courts move more quickly than state courts. A study conducted last year by the Federal Judicial Center found that state courts are far more likely than federal courts to let class actions linger without ruling on class certification.[163] (The study also found that federal courts certify classes at approximately the same rate as state courts.) Moreover, the median time for final disposition of a civil claim filed in federal court is just 9.3 months, and the median time to trial in a civil matter in federal court is 22.5 months.[164] There is no evidence that on average, state courts proceed more quickly, even though most state court cases are less complicated than federal court cases.

In addition, there is no basis for the claim that the bill's appeal provision would slow down litigation. To the contrary, the bill includes strict time limits to ensure that appeals of remand orders will not meaningfully delay litigation of class actions.

Finally, as noted above, federal courts can also resolve duplicative class actions more efficiently by consolidating them. Plaintiffs' lawyers frequently file copycat class actions in various state courts around the country, clogging judges' dockets and forcing judges to duplicate each other's work. Unlike state courts, federal courts can take advantage of multi-district consolidation procedures that enable one judge to consolidate dozens of class actions and resolve them far more efficiently. This is yet another way in which The Class Action Fairness Act will speed up justice—not slow it down.

In sum, there simply is no basis to the claims that consumers will be worse off in federal court, or that the resolution of class actions will be delayed because of the federal judiciary's workload.

*Critics' Contention No. 8:* S. 5 will trample on the rights of states to manage their legal systems, thus undermining the principles of federalism that our system of government is built upon.

*Response:*

While some critics have alleged that this bill will somehow undermine federalism principles, exactly the opposite is true. S. 5 has been carefully crafted to correct a problem in the current system that does not promote traditional concepts of federalism. In fact, it is the current system and the wave of state court class actions that has trampled on the rights of states to manage their legal systems by allowing state court judges to interpret and apply the laws of multiple jurisdictions. When state courts preside over class actions involving claims of residents of more than one state, they frequently dictate the substantive laws of other states, sometimes over the protests of those other jurisdictions (as discussed previously). When that happens, there is little those other jurisdictions can do, since the judgment of a court in one state is not reviewable by the state court of another jurisdiction.

It is far more appropriate for a federal court to interpret the laws of various states (a task inherent in the constitutional concept of diversity jurisdiction), than for one state court to dictate to other

---

[163] Federal Judicial Center, The Impact of Amchem and Ortiz on Choice of a Federal or State Forum in Class Action Litigation: A Report to the Advisory Committee on Civil Rules Regarding a Case-Based Survey of Attorneys (April 2004) (2004 Federal Judicial Center Study).
[164] See Judicial Business.

61

states what their laws mean or, even worse, to impose its own state law on a nationwide case. Why should a state court judge elected by the several thousand residents of a small county in Alabama tell New York or California the meaning of their laws? Why should an Illinois state court judge interpret decisions by Virginia or Wisconsin courts? Why should a state court judge be able to overrule other state laws and policies? Why should state courts be setting national policy?

S. 5 simply allows more class action cases filed in state court to be removed to federal court. S. 5 does not change substantive law—it is, in effect, a procedural provision only. As such, class action decisions rendered in federal court should be the same as if they were decided in state court—under the *Erie* doctrine, federal courts must apply state substantive law in diversity cases. Moreover, if federal court judges are not familiar with state law on a particular issue, they have the authority to ask a state court to "certify" a question of law e.g., to advise them how a state's laws should be applied in an uncharted situation. This procedure allows the federal courts to apply state law appropriately and gives states the ability to manage their legal systems without becoming bound by other states' interpretations of their laws.

In short, contrary to critics' contentions, the real harm to federalism is the status quo—leaving the bulk of class action cases in state court. Federal courts are the appropriate forum to decide interstate class actions involving large amounts of money, many plaintiffs and interstate commerce disputes, and these matters of interstate comity are more appropriately handled by federal judges appointed by the President and confirmed by the Senate. S. 5 simply restores this proper balance by resolving an anomaly of diversity jurisdiction. True to the concept of federalism, S. 5 appropriately leaves certain "intrastate" class actions in state court: cases involving small amounts in controversy; cases with a class of 100 plaintiffs or less; cases involving plaintiffs, defendants and governing law all from the same state; cases against states and state officials; and certain securities and corporate governance cases. As such, S. 5 promotes the concept of federalism and protects the ability of states to determine their own laws and policies for their citizens.

*Critics' Contention No. 9:* S. 5 assumes that federal courts will not engage in the same "false federalism" that state courts are accused of fostering. There really is no evidence that in the class action context, federal courts will intrude less on the states' rights to interpret their own laws than have state courts.

*Response:*

A principal purpose of the Class Action Fairness Act is to correct what former Acting Solicitor General Walter Dellinger has labeled a wave of "false federalism." As he testified before the Senate Judiciary Committee last July, the problem is that "many state courts faced with interstate class actions have undertaken to dictate the substantive laws of other states by applying their own laws to * * * other states, resulting in a breach of federalism principles. * * *"

62

As discussed previously, a prime example of this situation is the *Avery* case,[165] in which defendant State Farm allegedly breached auto insurance policies nationwide by requiring the use of less expensive non-original equipment manufacturer parts ("non-OEM parts") in repairing accident-damaged vehicles. The Illinois state court certified a nationwide class, and at trial, a jury rendered a $1.3 billion verdict against State Farm.

The case is noteworthy on the "false federalism" issue because the court applied Illinois consumer protection law to all class claims in the case. It did so even though Illinois law on this subject contravened the laws and policies of other states in which some class members lived—laws and policies encouraging (or even requiring) insurers to use less expensive, non-OEM parts in making accident repairs as a means of containing auto insurance costs. In affirming the verdict, an Illinois state appellate court acknowledged that it had disregarded "state insurance commissioners [who] testified that the laws in many of our sister states permit and in some cases * * * [even] encourage" usage of non-OEM parts.[166] The New York Times reported that the decision effectively "overturn[ed] insurance regulations * * * in New York, Massachusetts, and Hawaii, among other places" establishing "what amounts to a national rule on insurance."[167] As discussed previously, *Avery* is not an isolated occurrence. Numerous state courts have trampled on these federalism principles, all in an effort to certify classes that should not be certified.[168]

A premise of the Class Action Fairness Act is that this problem can be corrected by expanding federal jurisdiction over interstate class actions, the theory being that federal courts will not engage in "false federalism" games. But what proof is there that the federal courts will not similarly botch these critical choice-of-law issues?

In reality, there is ample evidence that the federal courts will not engage in the "false federalism" that is so rampant in state court class actions. To start, it should be noted that the lead federal court—the U.S. Supreme Court—has repeatedly warned that courts should not attempt to apply the laws of one state to behaviors that occurred in other jurisdictions:

• "Laws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extra-territorial effect only by the comity of the other States." *Huntington* v. *Attrill*, 146 U.S. 657, 669 (1892).

• "[I]t would be impossible to permit the statutes of [one State] to operate beyond the jurisdiction of that State * * * without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends." *New York Life Ins. Co.* v. *Head*, 234 U.S. 149, 161 (1914).

---

[165] *Avery* v. *State Farm Mut. Auto Insurance Co.*, 746 N.E.2d 1242, 1254 (Ill. Ct. App. 2001).
[166] Id. at 1254.
[167] See Matthew J. Wald, Suit Against Auto Insurer Could Affect Nearly All Drivers, N.Y. Times, Sept. 27, 1998, § 1, at 29.
[168] See, e.g., *Ysbrand* v. *DaimlerChrysler Corp.*, 81 P. 3d 618 (Okla. 2003) (affirming certification of nationwide product liability class, applying the law of one state to all claims); *Peterson* v. *BASF Corp.*, 657 N.W.2d 853 (Minn. Ct. App. 2003), aff'd, 675 N.W.2d 57 (Minn. 2004) (affirming nationwide consumer protection act case, applying the law of one state to all claims).

63

- "A state does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that state." *Bigelow* v. *Virginia*, 421 U.S. 809, 824 (1975).
- States should not apply their own laws to matters with which they have no significant contact. *Phillips Petroleum Co.* v. *Shutts*, 472 U.S. 797, 821–22 (1985).

And on April 7, 2003, the U.S. Supreme Court again warned state courts on this issue, striking down one state's effort to apply its laws to conduct that occurred elsewhere: "A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction." *State Farm Mut. Auto. Ins. Co.* v. *Campbell*, 2003 WL 1791206 (U.S. Apr. 7, 2003).

Unlike many state courts, federal courts have consistently heeded the Supreme Court's admonitions. The record shows that in the class action context, federal courts have been extremely respectful of the interests of each state in having its laws applied (as appropriate) to its own residents, particularly in recognizing the substantial variations of those laws in the class action context.

In recent years, numerous federal courts (applying the choice-of-law doctrines of various jurisdictions) have considered which laws should apply in proposed nationwide class actions asserting state law-based claims. Those courts have consistently concluded that in a nationwide or multi-state class action, the choice-of-law rules of the state in which the action was originally filed must be applied.[169] Further, they have consistently concluded that those choice-of-law rules must be applied to "each plaintiffs claims."[170] Based on those principles, federal courts have consistently concluded that the laws of all states where purported class members were defrauded, injured, or purchased the challenged product or service must come into play.[171] And in those very few instances in which a federal district court has toyed with the idea of engaging in "false federalism" (*i.e.*, applying a single state's law to all asserted claims), that notion has been reversed on appeal almost immediately.[172]

---

[169] See, e.g., In re *Bridgestone/Firestone, Inc. Prods. Liab. Litig.*, 288 F.3d 1012 (7th Cir. 2002), cert. denied sub nom. *Gustafson* v. *Bridgestone/Firestone, Inc.*, 537 U.S. 1105 (2003).

[170] See, e.g., *Georgine* v. *Amchem Prods.*, 83 F.3d 610, 627 (3d Cir. 1996), aff'd sub nom. *Amchem Prods.* v. *Windsor*, 521 U.S. 591 (1997).

[171] See, e.g., *Georgine*, 83 F.3d at 627; *Zinser* v. *Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187–90 (9th Cir. 2001); *Zapka* v. *Coca-Cola Co.*, No. 99 CV 8238, 2000 U.S. Dist. LEXIS 16552, at *11–13 (N.D. Ill. Oct. 26, 2000); *Fisher* v. *Bristol-Myers Squibb Co.*, 181 F.R.D. 365, 369 (N.D. Ill. 1998); *Dhamer* v. *Bristol-Myers Squibb Co.*, 183 F.R.D. 520, 532–34 (N.D. Ill. 1998); *Jones* v. *Allercare, Inc.*, 203 F.R.D. 290, 307 (N.D. Ohio 2001); In re *Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 346–54 (D.N.J. 1997); *Marascalco* v. *Int'l Computerized Orthokeratology Soc'y, Inc.*, 181 F.R.D. 331, 338–39 (N.D. Miss. 1998); In re *Ford Motor Co. Bronco II Prods. Liab. Litig.*, 177 F.R.D. 360, 369–71 (E.D. La. 1997); In re *Stucco Litig.*, 175 F.R.D. 210, 214, 215–217 (E.D.N.C. 1997); *Ilhardt* v. *A.O. Smith Corp.*, 168 F.R.D. 613, 619–20 (S.D. Ohio 1996); *Harding* v. *Tambrands Inc.*, 165 F.R.D. 623, 629–30, 631–32 (D. Kan. 1996); *Walsh* v. *Ford Motor Co.*, 130 F.R.D. 260, 271–75 (D.D.C. 1990); *Feinstein* v. *Firestone Tire & Rubber Co.*, 535 F.Supp. 595, 608 (S.D.N.Y 1982).

[172] See, e.g., In re *Bridgestone/Firestone, Inc.*, 288 F.3d at 1024; *Szabo* v. *Bridgeport Machines, Inc.*, 249 F.3d 672, 674–75 (7th Cir. 2001); *Spenc* v. *Glock, GES.m.b.H.*, 227 F.3d 308, 313–15 (5th Cir. 2000); In re *AM. Med. Sys.*, 75 F.3d 1069, 1085 (6th Cir. 1996); *Castano* v. *American Tobacco Co.*, 84 F.3d 734, 741–43, 739–50 (5th Cir. 1995); In re *Rhome-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1302 (7th Cir. 1995); *Walsh* v. *Ford Motor Co.*, 807 F.2d 1000, 1017–19 (D.C. Cir. 1990).

64

The bottom line is that over the past ten years, the federal court system has not produced any final decisions—not even one—applying the law of a single state to all claims in a nationwide or multi-state class action. And there are hundreds of federal court decisions (examples of which are set forth above) flatly rejecting arguments to use such a "false federalism" choice-of-law approach—applying the laws of a single state to all claims in a multi-state case. That's the record that confirms that the passage of the Class Action Fairness Act will end the "false federalism" game that is occurring in the state court class action arena.

*Critics' Contention No. 10:* S. 5 could deny plaintiff class members any meaningful ability to recover damages for their injuries.

  *Response:*

• In arguing that this bill would hurt consumers, some opponents have gone so far as to list several state court class actions which supposedly have served consumers well, inferring that removal of such cases to federal court is tantamount to a denial of justice. This argument assumes that the federal courts are inferior to state courts—that a federal court cannot arrive at a just outcome. If the cases cited by S. 5's opponents would not have had the same outcome in federal court as they did in state court, it is because the federal courts may have been more careful to avoid the abuses of the system that occur in state courts. The only thing that would be denied when an interstate class action is removed to federal court is the plaintiffs' lawyers' ability to strike it rich on class actions that should not be certified by any court because they do not meet the requirements of a proper class.

Moreover, the claim that federal courts never certify class actions is unfounded. A study last year by the Federal Judicial Center found that federal courts certify classes at approximately the same rate as state courts. According to the study, class actions were "almost equally likely to be certified" in the two systems: federal courts certified classes 22 percent of the time, while state courts certified classes 20 percent of the time.[173] The study also found that consumers fare better in federal court class actions. According to the report, the average recovery per class member was higher in federal court: $517 vs. $350.[174]

In fact, federal courts invented class actions and have led the way in using the device to redress grievances, particularly in the civil rights and consumer protection context. Federal courts certify numerous class actions for a broad range of claims including securities fraud, antitrust violations, and discrimination every year.[175] In addition, many of the cases in which federal courts certify classes involve state law claims (even though relatively few state law-based class actions can make it into federal court under current jurisdictional law.[176] For example:

---

[173] See 2004 Federal Judicial Center Study.

[174] Id.

[175] See Responses To Written Questions From Senators Orrin G. Hatch and Charles E. Grassley to Walter Dellinger, Attachment A (list of exemplar cases in which federal courts have certified classes since 2001).

[176] Under current law, a purely state law-based class action normally can be heard in federal court only if each and every class members demands at least $75,000 in damages and none of the named plaintiffs have the same state citizenship of any of the named defendants. Since at least some class members in nearly all class actions seek less than $75,000 per class member

65

- Recently a federal court in New York certified a class of New York residents and a nationwide class of plaintiffs who alleged that they were overcharged when they used their credit cards abroad.[177] Plaintiffs' claims were based on violations of New York law and common law fraud.
- A federal district court in Massachusetts certified a class consisting of Massachusetts plaintiffs who were employed as auto damage appraisers.[178] The plaintiffs alleged that they were not properly paid for overtime and sought recovery under Massachusetts law.
- A federal district court in Texas certified a product liability class of plaintiffs whose infants had been administered the drug E-Ferol and alleged that they should have been warned of the risk of death associated with the drug.[179] Plaintiffs also alleged that the testing and approval process for the drug was flawed.
- A federal district court in New York recently certified a statewide class of plaintiffs alleging violations of New York's consumer protection law in a case involving diamond pricing.[180]
- A federal court certified a class of Tennessee residents who claimed defendants had violated various state consumer protection laws by failing to properly disclose the requirements for obtaining benefits under a long-term care insurance policy.[181]
- The federal court in this case certified a class of commercial lobstermen from New York and Connecticut who brought claims under various state laws, alleging that the use of certain insecticides by defendants caused massive lobster die-off.[182]
- A federal court recently certified a class of parking lot customers in Washington state who asserted claims against a collection agency under federal and state law.[183]
- A federal court in Florida certified a class of consumers who entered into sales contracts with a funeral home. The class members alleged claims under federal and state law.[184]
- A federal court in Minnesota certified a nationwide class of plaintiffs who sought medical monitoring under various state laws for their allegedly defective heart valves.[185]
- A federal court certified a class of Montanans who alleged that their automobile insurer acted in bad faith.[186]
- In Massachusetts, a federal court certified a six-state class action on behalf of homeowners who alleged their heating systems were defective.[187]
- The federal district court for Rhode Island certified a nationwide class action brought on behalf of credit cardholders alleging that Fleet Bank violated federal and state laws in the manner in

---

or sue at least one non-diverse defendant, there are currently very few class action cases in federal court that involve exclusively state law claims.

[177] In re *Currency Conversion Fee Antitrust Littg.,* 2004 U.S. Dist. LEXIS 24134 (S.D.N.Y. Dec. 2, 2004).

[178] *McLaughlin* v. *Liberty Mut. Ins. Co.,* 224 F.R.D. 304 (D. Mass. 2004).

[179] *Klein* v. *O'Neal, Inc.* 222 F.R.D. 564 (N.D. Tex. 2004).

[180] *Leider* v. *Ralfe,* 2004 U.S. Dist. LEXIS 15345 (S.D.N.Y. 2004).

[181] *Bradbery* v. *John Hancock Mutual Life Insurance Co.,* 217 F.R.D. 408 (W.D. Tenn. 2003).

[182] *Fox* v. *Cheminova, Inc.,* 213 F.R.D. 113 (E.D.N.Y. 2003).

[183] *Hansen* v. *Ticket Track, Inc.,* 213 F.R.D. 412 (W.D. Wash. 2003).

[184] *Brown* v. *Funeral Services of Florida, Inc.,* 212 F.R.D. 602 (S.D. Fla. 2003).

[185] In Re *St. Jude Medical Inc. Silzone Heart Valves Products Liability Litigation,* 2003 U.S. Dist. LEXIS 5188 (D. Minn. March 27, 2003).

[186] *Burton* v. *Mountain West Farm Bureau Mutual Insurance Co.,* 2003 WL 1740461 (D. Mont. March 31, 2003).

[187] *Payne* v. *Goodyear Tire & Rubber Co.,* 216 F.R.D. 21 (D. Mass. 2003).

66

which it set payment due dates and posted payments to credit cards.[188]
• In Michigan, a federal court certified a nationwide class of consumer borrowers alleging that Central Clearing's "payday loan" transactions violated federal and state laws.[189]
• A federal district court certified a class of automobile insurance policy holders in the District of Columbia alleging violations of federal and state law.[190]
• A federal court certified a class of Pennsylvanians in a case brought on behalf of consumer debt holders alleging that the defendant sent out false and deceptive debt collection letters. The complaint alleged violations of federal and state laws.[191]
• A federal court certified a class action brought on behalf of former employees at a Pennsylvania plant, alleging that Tyson Foods failed to fully pay its employees. The complaint alleged violations of federal and state laws.[192]

While opponents of the bill cite cases that allegedly achieved greater justice in state court than they would have received if they had been removed to federal court, it is clear that this is pure speculation. In fact, federal courts have certified hundreds of cases for class treatment in recent years, and the rules governing the decision of whether cases may proceed as class actions are basically the same in federal and state courts. Further, under the *Erie* doctrine, federal courts apply state substantive law in diversity cases. Consequently, a removed class action should have the same substantive law applied to it, regardless of whether it is in federal or state court.

Additionally, strict analysis by courts in deciding whether a group of plaintiffs can proceed on a class basis should be encouraged, rather than discouraged. The purpose of the current requirements in Rule 23 and similar state court class action rules is to protect the due process rights of both plaintiffs and defendants. When judges indiscriminately certify class actions, unnamed plaintiffs lose important legal rights and can be denied appropriate awards for their injuries, and defendants become more vulnerable to frivolous and unjustifiably magnified class actions.

Allowing individual states to certify classes for their own citizens on particular issues could result in a denial of relief for the citizens of other states, particularly given the limited resources available to some defendants to satisfy all pending claims. For example. some hailed the now reversed punitive damages verdict in the *Engle* tobacco class action that continues to proceed in Florida Supreme Court. There, a Florida jury awarded $135 billion in punitive damages to a class of Florida residents. But if that verdict were upheld, citizens of other states might be denied any relief whatsoever on their claims against tobacco companies because the Florida residents (through their single state class action) would have taken all available money to pay their punitive damages claims. In short, Florida residents would have been paid billions of dollars in excess of what they claim for their real personal injury damages, while

[188] *Bond* v. *Fleet Bank (RI) N.A.,* 2002 U.S. Dist. LEXIS 22324 (D.R.I. October 10, 2002).
[189] *Gilkey* v. *Central Clearing,* 202 F.R.D. 515 (E.D. Mich. 2001).
[190] *Wells* v. *Allstate Insurance Company,* 210 F.R.D. 1 (D.D.C. 2002).
[191] *Oslan* v. *Collection Bureau of Hudson Valley,* 206 F.R.D. 109 (E.D. Pa. 2002).
[192] *DeAsencio* v. *Tyson Foods,* 2002 U.S. Dist. LEXIS 13038 (E.D. Pa. July 17, 2002).

67

residents of all other states would not have even received what they claim to be owed for the basic personal injuries that they allege. As one commentator has noted.

> This is what fuels the [state court class action] litigation lottery. If you are the first in line to demand punitive damages, you may receive awards in the billions. Injured parties in later [class actions] are likely to receive less. * * * They may receive nothing if the first award killed the company or the industry. None of this makes much sense. There is no reason why one group of litigants should, solely on the basis of residency in a particular state, receive the lion's share of damages to the deprivation of hundreds of thousands of other injured parties. Moreover, there is no reason why one state should be able to impose this result on other states when a problem and its victims are shared by the nation as a whole.[193]

Of course, this situation would not arise if S. 5 were passed, since all qualifying interstate class actions on a particular subject could be removed to federal court and consolidated before a single federal court judge under the multidistrict litigation mechanism described previously. That judge would be able to manage the proceeding to ensure that no group of litigants gained advantage over the others by virtue of their residency (or any other irrelevant factor).

A large quantity of class actions in state court, like the *Broin* tobacco case in Florida, results in millions of dollars for plaintiffs' counsel but nothing of any value for plaintiffs. An Institute for Civil Justice/RAND study has confirmed this pattern, finding that class counsel in state court consumer class action settlements, typically walk off with more money than all of the class members combined.[194] The ICJ/RAND study provides three compelling rationales for allowing more interstate class actions to be heard by federal courts: (1) "federal judges scrutinize class action allegations more strictly than state judges, and deny certification in situations where a state judge might grant it improperly;" (2) "state judges may not have adequate resources to oversee and manage class actions with a national scope;" and (3) "if a single judge is to be charged with deciding what law will apply in a multistate class action, it is more appropriate that this take place in federal court than in a state court."[195] S. 5 would help assure fairer settlements by allowing the federal courts to review more class action lawsuits, as well as by providing notice to state Attorneys General so they can better protect their citizens against unfair settlement agreements.

Moreover, in contrast to many state courts, which have demonstrated a willingness to approve class action settlements where the bulk (if not all) of the benefits go to the lawyers, federal courts have certified numerous settlement classes in cases that involved alleged violations of state law. These cases typically result in real relief for the class members. Following are a few examples:

---

[193] Jonathan Turley, A Crisis of Faith: Tobacco and the Madisonian Democracy, 37 Harv. J. on Legis. 433, 475 (2000).
[194] See Class Action Dilemmas, at 23.
[195] Id. at 28.

68

• A federal district court in Texas certified a nationwide settle-
ment class alleging violations of federal lending law and state con-
sumer protection law.[196] The court approved a class settlement in
which the defendants agreed to forgive $52 million in debt incurred
by class members and establish a settlement fund totaling $11 mil-
lion for monetary payments to plaintiffs who had repaid their
loans. In addition, the defendants agreed to substantial restrictions
on future lending activities.

• A federal district court in Ohio approved a nationwide settle-
ment class in a products liability suit involving allegedly defective
orthopedic implants.[197] The settlement fund, which provided for
medical monitoring and research, totaled more than $1 billion.

• In another case, a federal district court in Pennsylvania cer-
tified a nationwide settlement class of plaintiffs alleging consumer
fraud and personal injuries related to two prescription diet drugs,
fenfluramine and dexfenfluramine.[198] The settlement provided
$3.75 billion for personal injury claims, medical monitoring and re-
search. The class counsel agreed to limit their fees to about 9 per-
cent of that.

*Critics' Contention No. 11:* S. 5 will cause delay and mass confusion
   because of (a) the difficulty of assessing compliance with juris-
   dictional requirements at the outset and (b) the potential that
   class membership and definitions will change over time.

   *Response*

The contention that S. 5 (particularly its differing treatment of
categories of cases when a suit is filed in the defendant's home
state) would complicate and delay the final resolution of jurisdic-
tional inquiries is absolutely groundless. In reality, the jurisdic-
tional standards in S. 5 will simplify—not complicate—a court's ju-
risdictional inquiries. The critics forget that under the current
standards, many (and possibly most) newly-filed state court class
actions are removed to federal court to test whether the class coun-
sel's efforts to evade federal jurisdiction have been successful (even
though those removal attempts normally fail and the cases are re-
manded to state court). Those inquiries are often quite complicated
and can create significant delays.

For example, as noted previously, counsel often include in their
complaint extraneous parties in order to prevent the complaint
from complying with the current "complete diversity" requirement.
Our federal courts have ruled that those arguably extraneous par-
ties can be ignored in the jurisdictional analysis if their claims are
meritless,[199] and quite frequently, the claims of those parties are

[196] *Purdie* v. *Ace Cash Express, Inc.,* 2003 U.S. Dist. LEXIS 22547 (N.D. Tex. 2003).
[197] In Re: *Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation,* 2002 U.S. Dist.
LEXIS 21693 (N.D. Ohio 2002).
[198] In re *Diet Drugs (Fen-Phen),* 2000 U.S. Dist. LEXIS 12275 (E.D. Pa. 2000).
[199] See, e.g., *Whitaker* v. *American Telecasting, Inc.,* 261 F.3d 196, 207 (2d Cir. 2001) ("'In
order to show that naming a non-diverse defendant is a "fraudulent joinder" effected to defeat
diversity [jurisdiction], the defendant must demonstrate, by clear and convincing evidence, ei-
ther that there has been outright fraud committed in the plaintiff's pleadings, or that there is
no possibility, based on the pleadings, that the plaintiff can state a cause of action against the
non-diverse defendant in state court.'") (citations omitted); *Morris* v. *Princess Cruises, Inc.,* 236
F.3d 1061,1067 (9th Cir. 2001) ("Joinder of a non-diverse defendant is deemed fraudulent, and
the defendant's presence in the lawsuit is ignored for purposes of determining diversity, '[i]f the
plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious
according to the settled rules of the state.'") (citations omitted); *Tillman* v. *R.J. Reynolds To-
bacco,* 253 F.3d 1302, 1305 (11th Cir. 2001) ("it is appropriate for a federal court to dismiss

69

challenged in class actions as part of the jurisdictional analysis, requiring the court to take time to engage in the complicated process of assessing the merits of their claims. Under current law, this time-consuming "fraudulent joinder" issue arises in many purported class actions that are removed to federal court.[200]

Similarly, the process of assessing whether a class action complies with the current jurisdictional amount requirement is also often "an expensive and time consuming process,"[201] requiring discovery on the nature and value of the named plaintiffs' claims. As noted previously, in some federal Circuits, the jurisdictional amount requirement in a class action is satisfied by showing that any member of the proposed class is asserting damages in excess of $75,000, and in other Circuits, the question is whether each and every member of the putative class has individually an amount in controversy exceeding $75,000."[202] Again, this time-consuming issue, often requiring significant amounts of record review and fact-finding, is litigated very frequently in the many class actions that are removed to federal court under current law.[203]

In sum, S. 5 will make the resolution of class action jurisdictional issues easier—not harder. The need to deal with the bona fides of counsel's efforts to use dubious parties to avoid diversity will evaporate. In short, it will be much easier to figure out whether any class member is diverse as to any defendant (the "minimal diversity" inquiry established by S. 5) than resolving the fraudulent joinder issues regularly presented under the current rule ("com-

---

* * * [nondiverse] defendant and retain diversity jurisdiction if the complaint shows that there is no possibility that the plaintiff can establish any cause of action against [the] defendant"); *Heritage Bank* v. *Redcom Laboratories, Inc.*, 250 F.3d 319 (5th Cir. 2001) (to similar effect).

[200] In recent years, many federal courts have been required to address fraudulent joinder issues in the context of class actions removed to federal court. See, e.g., *Jamison* v. *Purdue Pharma CO.*, 251 F. Supp. 1315 (S.D. Miss. 2003) (mass action matter); *Hardy* v. *Ducote*, 246 F. Supp. 2d 509 (E.D. La. Jan. 20, 2003) *Burns* v. *Friedli*, 241 F. Supp. 2d 519 (D. Md. 2003); *Moore* v. *Wyeth-Ayerst Labs.*, 236 F. Supp. 2d 509 (D. Md. 2002); *Shields* v. *Bridgestone/Firestone, Inc.*, 232 F. Supp. 2d 715 (E.D. Tex. 2002); *Little* v. *Purdue Pharma, L.P.*, 227 F. Supp. 2d 838 (S.D. Ohio 2002) In re *Diet Drugs Prods. Liab. Litig.*, 220 F. Supp. 2d 414 (E.D. Pa. 2002); *Doherty* v. *Aventis Pasteur, Inc.*, 2002 U.S. Dist. LEXIS 9596 (N.D. Cal. May 15, 2002); *Garcia* v. *Aventis Pasteur, Inc.*, 2002 U.S. Dist. LEXIS 15122 (W.D. Wash. Apr. 22, 2002); *Ohler* v. *Purdue Pharma L.P.*, 2002 U.S. Dist. LEXIS 2368 (E.D. La. Jan. 22, 2002); *Mead* v. *Aventis Pasteur, Inc.*, 2002 U.S. Dist. LEXIS 25645 (D. Or. Jan. 7, 2002).

[201] See C.A. Wright, A.R. Miller et al., Federal Practice and Procedure § 3707, at 225 (1998).

[202] Id. § 3705, at 65 (2003 Supp.).

[203] In recent years, many feral courts have had to resolve jurisdictional amount issues in resolving motions to remand class actions. See, e.g., In re *Bridgestone/Firestone Inc Tires Prods. Liab. Litig.*, 256 F. Supp. 2d 884 (S.D. Ind. 2003); *Adans* v. *Nationwide Mutual Ins. Co.*, 2003 U.S. Dist. LEXIS 4973 (N.D. Tex. Mar. 31, 2003); *Kary* v. *Exxon/Mobil Corp.*, 2003 U.S. Dist. LEXIS 4599 (D.N.D. Mar. 19, 2003); *Faircloth* v. *National Home Loan Corp.*, 313 F. Supp. 2d 544 (M.D.N.C. 2003), aff'd, 2004 U.S. App. LEXIS 1039 (4th Cir. 2004) *Carric* v. *Sears, Roebuck and Co.*, 252 F. Supp. 2d 116 (M.D. Pa. 2003); *Dash* v. *FirstPlus Home Loan Trust*, 248 F. Supp. 2d 489(M.D.N.C. Mar. 6, 2003); *Harris* v. *Physicians Mut. Ins. Co.*, 240 F. Supp. 3d 715 (N.D. Ohio 2003); *Radlo* v. *Rhone-Poulenc*, S.A., 241 F. Supp. 2d 61 (D. Mass. 2002); *Shields* v. *Bridgestone/Fireston, Inc.*, 232 F. Supp. 2d 715 (E.D. Tex. 2002); *Tremblay* v. *Phillip Morris, Inc.*, 231 F. Supp. 2d 411 (D.N.H. 2002); *Mentzel* v. *Comcast Cable Communications*, 222 F. Supp. 2d 923 (E.D. Mich. 2002); *Trapazzo* v. *Prudential Property & Casualty Ins. Co.*, 220 F. Supp. 2d 628 (E.D. Tex. 2002); *Perotti* v. *Black & Decker, Inc.*, 205 F. Supp. 2d 813 (N.D. Ohio 2002); *Perry* v. *Hartford Ins. Co. of the Midwest*, 198 F. Supp. 2d 836 (E.D. Tex. 2002); *City of University City, Missouri* v. *AT&T Wireless Services, Inc.*, 229 F. Supp. 2d 927 (E.D. Mo. 2002); *Mehlenbacher* v. *Akzo Nobel Salt, Inc.*, 207 F. Supp. 2d 71 (W.D.N.Y. 2002); *Perry* v. *Hartford Ins. Co. of the Midwest*, 198 F. Supp. 2d 836 (E.D. Tex. 2002); *Gavriles* v. *Verizon Wireless*, 194 F. Supp. 2d 674 (E.D. Mich. 2002); *Bethea* v. *St. Paul Guardian Ins. Co.*, 2002 U.S. Dist. LEXIS 15780 (E.D. La. Aug. 21, 2002); *Nabal* v. *BJ's Wholesale Club, Inc.*, 2002 U.S. Dist. LEXIS 15106 (E.D. Pa. Aug. 1, 2002); *Pope* v. *Independent Order of Foresters*, 2002 U.S. Dist. LEXIS 13550 (W.D. Ky. July 23, 2002); *Post* v. *General Motors Corp.*, 2002 U.S. Dist. LEXIS 9968 (S.D.N.Y. May 31, 2002); *Sylvester* v. *Daimler Chrysler Corp.*, 2002 U.S. Dist. LEXIS 17989 (N.D. Ohio May 30, 2002); *Green* v. *Party City Corp.*, 2002 U.S. Dist. LEXIS 7750 (C.D. Cal. Apr. 9, 2002); *Cigna Healthcare of St Louis Inc.*, v. *Kaiser*, 181 F. Supp. 2d 914 (N.D. Ill. 2002) aff'd and modified in part, 294 F.3d 849 (7th Cir. 2002).

70

plete diversity"). Likewise, it will be much easier to determine whether the amount in controversy presented by a purported class as a whole (that is, in the aggregate) exceeds $5 million than it is to assess the value of the claim presented by each and every individual class member, as is required by the current diversity jurisdictional statute.

The critics' concerns that events might occur after a complaint is filed or removed that would either create federal jurisdiction in a way never intended or would remove federal jurisdiction in an arbitrary manner are similarly unfounded. While questions regarding events occurring after a complaint is filed or removed to federal court will, of course, arise under S. 5, those same (or, at least, very similar) questions arise in current practice on jurisdictional issues. Well-established law exists to resolve these questions, and S. 5 does not change—or even complicate—the answers to these questions. In short, the "rules of the road" on such issues are already established, and S. 5 does not change them.

Under existing law (which S. 5 would not change), "diversity" of citizenship between the parties must exist both at the time a complaint is filed and at the time a complaint is removed to federal court.[204] For this reason, the federal court would generally only need to measure the diversity of the parties at the outset of the litigation. For example, in a case filed on behalf of a class of California citizens against a California company, there would be no minimal diversity when the case was filed—and thus the case could not be removed simply because one named plaintiff or class member later moved to Nevada. Similarly, if a class action against a California company were filed in California and more than 66% of the class members were California citizens at the time the case was filed, changes in those class members' residences would not alter the jurisdictional analysis. In other words, no court would be required to engage in a residency play-by-play after the time the complaint was filed.

If, however, the plaintiff in the above example of her or her own volition filed an amended complaint in state court that added Nevada plaintiffs (or that brought the percentage of Nevada plaintiffs above 33% in a suit in the defendant's home state), jurisdiction would exist at the time that complaint was filed. Accordingly, as dictated by current law, the defendant could remove the case to federal court.[205]

Current law (that S. 5 does not alter) is also clear that, once a complaint is properly removed to federal court, the federal court's jurisdiction cannot be "ousted" by later events. Thus, for example, changes in the amount in controversy after the complaint has been removed would not subject a lawsuit to be remanded to state court. The Supreme Court established this principle in *St. Paul Mercury Indem. Co.* v. *Red Cab Co.*,[206] stating that "events occurring subsequent to removal which reduce the amount recoverable, whether

---

[204] *Coury* v. *Prot*, 85 F.3d 244, 249 (5th Cir. 1996); *Kanzelberger* v. *Kanzelberger*, 782 F.2d 774, 776 (7th Cir. 1986).

[205] See *Caterpillar, Inc.* v. *Lewis*, 519 U.S. 61 69 (1996) ("In a case not originally removable, a defendant who received a pleading or other paper indicating the postcommencement satisfaction of federal jurisdictional requirements—for example, by reason of the dismissal of a non-diverse party—may remove the case to federal court within 30 days of receiving such information.").

[206] 303 U.S. 283, 293 (1938).

71

beyond the plaintiff's control or the result of his volition, do not oust the district court's jurisdiction once it has attached." The same would be true if a case was removed to federal court because minimal diversity existed at the time and, because of a later event, minimal diversity was eliminated. This would occur if, for example, the federal court dismissed the claims of out-of-state plaintiffs, leaving only the claims of in-state plaintiffs against an in-state defendant intact. "It uniformly has been held that in a suit properly begun in federal court the change of citizenship does not oust the jurisdiction. The same rule governs a suit brought in a state court and removed to federal court."[207]

Sound policy reasons support this rule. If a federal court's jurisdiction could be ousted by events occurring after a case was removed, plaintiffs who believed the tide was turning against them could simply always amend their complaint months (or even years) into the litigation to require remand to state court. "If the plaintiff could, no matter how bona fide his original claim in the state court, reduce the amount of his demand to defeat federal jurisdiction the defendant's supposed statutory right of removal would be subject to the plaintiff's caprice. The claim, whether well or ill founded in fact, fixes the right of the defendant to remove, and the plaintiff ought not to be able to defeat that right and bring the cause back to the state court at his election."[208] Similarly, a defendant prevailing on the merits always shows that the amount in controversy, at the end of the day, is zero. Thus, if subsequent events could unravel a federal court's jurisdiction, a defendant could prevail on the merits, only to have the federal court conclude that it lacks jurisdiction to enter a judgment.[209]

It is also clear under existing law that even if a case is not originally removable, it can become removable because of subsequent events (other than changes in the citizenship of the original parties, which, as noted above, do not effect jurisdiction). Thus, as applied under S. 5, if a plaintiff, through amendment or otherwise, increased the amount in controversy, created minimal diversity, or changed the class definition in a case filed in the defendant's home state to include more than 33% of out-of-state plaintiffs, a complaint filed in state court—and previously not subject to federal jurisdiction—could properly be removed.[210] Otherwise, the plaintiff could simply file a complaint not subject to removal and then later amend it, thereby circumventing federal jurisdiction. Similarly, if a plaintiff defines a class so as to allow diverse parties to become members of a class as the case proceeds, removal may be appropriate if diverse parties actually enter the class. For example, if a class action is filed in state court against an Indiana company on behalf of all persons affected by a chemical spill and it is initially thought that all class members are Indiana citizens, the case may become removable later in the litigation if it emerges that citizens of other states fall within the class definition or have become members of the class as the effects of the chemical spill spread. If this

---

[207] Id. at 294–95.

[208] Id. at 294.

[209] *Herremans* v. *Carrera Designs, Inc.*, 157 F.3d 1118, 1121 (7th Cir. 1998) (holding that the jurisdictional test is "not whether the plaintiff is actually entitled" to $75,000, "[o]therwise every diversity case that a plaintiff lost on the merits would be dismissed for lack of federal jurisdiction").

[210] See *Caterpillar, Inc.*, 519 U.S. at 69.

72

were not the rule, major interstate controversies could evade federal jurisdiction because counsel filed a class action before the parameters of the controversy were fully developed. Any alternative rule would allow class counsel to urge rejection of federal jurisdiction on the grounds that only non-diverse Indiana citizens were in the class and then turn around months later and purport to represent thousands of persons residing outside of Indiana. It should be noted that class counsel can limit the potential for removal as the case proceeds by defining the class to encompass only parties that were injured as of the date on which the action was filed or only parties who are citizens of a certain state.

*Critics' Contention No. 12.:* S. 5's provisions expanding federal jurisdiction over class actions are invalid because they exceed the jurisdictional authorization of Article III of the Constitution.

   *Response:*

   This concern is groundless. As viewed by many Circuits, a federal court may exercise diversity jurisdiction over a purported class action only if none of the plaintiffs named in the complaint share state citizenship with any defendant. In other words, no named plaintiff may be a citizen of the same state as any defendant. This so-called "complete diversity" prerequisite for federal jurisdiction is wholly a policy creation of Congress, establishing a scope of federal diversity jurisdiction narrower than what is authorized by Article III.[211] Broader definitions of diversity jurisdiction would be wholly consistent with Article III. "[I]n a variety of contexts, [federal courts] have concluded that Article III poses no obstacle to the legislative extension of federal [diversity] jurisdiction * * * so long as any two adverse parties are not co-citizens." [212]

   Critics suggest that S. 5 is constitutionally suspect because it would authorize federal jurisdiction over purported class actions in which there is "minimal (but not complete) diversity"—that is, cases in which any member of the purported class (whether or not explicitly named in the caption of the complaint) has state citizenship that differs from any defendant (using the definitions already in 28 U.S.C. § 1332). Citing no precedents whatsoever, the critics allege that there is an absolute bar on considering unnamed class members to be "parties" to a purported class action. They contend that those unnamed persons must be ignored completely in determining whether the two sides meet the applicable diversity requirement.

   But the premise of this challenge—that unnamed class members cannot be deemed parties to an action—is flatly inconsistent with the fact that in a variety of contexts over the years, federal court have treated unnamed class members as parties to class actions. For example:

   • In *Zahn* v. *International Paper Co.,*[213] the U.S. Supreme Court considered whether federal diversity jurisdiction existed over a purported Rule 23(b)(3) class that had not been certified. The district

---

[211] See *Strawbridge* v. *Curtiss*, 3 Cranch 267 (1806) (complete diversity requirement derives from "[t]he words of the act of Congress," not the Constitution).
[212] *State Farm Fire & Cas. Co.* v. *Tashire*, 386 U.S. 523, 530–31 (1967) (citing *Am. Fire & Cas. Co.* v. *Finn*, 341 U.S. 6, 10 n.3 (1951); *Wichita R. & Light Co.* v. *Pub. Util. Comm'n.* 260 U.S. 48 (1922); *Barney* v. *Latham*, 103 U.S. 205, 213 (1881)).
[213] 414 U.S. 291 (1973).

73

court declined to exercise federal jurisdiction (or to allow the matter to proceed as a class action) because even though "[t]he claim of each of the named plaintiffs was found to satisfy the * * * jurisdictional amount," "not every individual owner in the class has suffered * * * damages in excess of" the amount-in-controversy threshold.[214] The Supreme Court concurred, holding that in determining whether the amount-in-controversy prerequisite for diversity jurisdiction is satisfied, a trial court is obliged to look at whether each purported claimant, even if unnamed, meets the $75,000 jurisdictional amount requirement.[215] Thus, in this respect, the federal courts have for many years treated unnamed class members as "parties."

• Similarly, in *Devlin* v. *Scardelletti*,[216] the Supreme Court recently held that unnamed class members are considered "parties" for purposes of mounting an appeal. Thus, Devlin rejects the contention that unnamed class members cannot be considered "parties" to the litigation.

• Earlier, the Supreme Court ruled that normally, the filing of a class action immediately tolls the statute of limitations as to all unnamed class members.[217] In short, all unnamed class members are treated as parties—treated as if they had filed the litigation themselves. Significantly the American Pipe Court declared that "the claimed members of the class stood as parties to the suit until and unless they received notice thereof and chose not to continue.")[218]

• Along these same lines, many courts have held that under Fed. R. Civ. P. 23(e), a court must ensure that unnamed class members' interests are protected if class claims are dismissed.[219] In other words, the court is obliged (at least at some level) to treat the unnamed class members as parties to the litigation.

S. 5 proposes that Congress declare unnamed class members to be "parties" to the litigation for purposes of the "minimal diversity" jurisdictional requirement. As evidenced by the foregoing examples, such a congressional determination about who is a class action "party" would be wholly consistent with long-standing practice. For years, Congress and the courts have made practical determinations about how various categories of parties should be treated in assessing compliance with diversity jurisdiction prerequisites and specifically about the circumstances in which unnamed class members should be treated as parties to a lawsuit. The enactment of the "minimal diversity" provisions of S. 5 would be merely another such practical determination a determination that for purposes of the "minimal diversity" jurisdictional inquiry established by the legislation, unnamed class members (as well as any named class members) shall be considered "parties." Congress is certainly empowered to establish such a definition in this instance.

The critics are also wrong to suggest that The Class Action Fairness Act "dictate[s] * * * state court [rules of civil] procedure" and

---

[214] *Zahn* v. *International Paper Co.*, 53 F.R.D. 430 (D. Vt. 1971).

[215] *Zahn* v. *International Paper Co.*, 414 U.S. at 301 ("Each plaintiff in a Rule 23(b)(3) class action must satisfy the jurisdictional amount, and any plaintiff who does not must be dismissed from the case—'one plaintiff may not ride in on another's coattails.'").

[216] 536 U.S. 1 (2002).

[217] See, e.g., *American Pipe & Construction Co.* v. *Utah*, 414 U.S. 538 (1974).

[218] Id. at 550 (emphasis added).

[219] See *Diaz* v. *Trust Territory of Pacific Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989); *Glidden* v. *Chromalloy American Corp.*, 808 F.2d 621, 626–28 (7th Cir. 1986).

74

thus impinges upon the sovereignty of the state.[220] Critics quote Prof. Larry Tribe as saying that "for Congress directly, regulate the procedures used by state courts in adjudicating state-law tort claims * * * would raise serious questions under the Tenth Amendment and principles of Federalism."[221] Of course, when Professor Tribe made that statement, he was not referring to The Class Action Fairness Act. That is because The Class Action Fairness Act does not regulate the procedures "used by state courts" at all. Rather, it simply changes the federal jurisdiction statute to expand the diversity jurisdiction of federal courts to encompass more class action.

If cases subject to that broader jurisdictional grant are removed to federal court (or brought there in the first place), it is of course permissible for Congress to regulate the procedures by federal courts to resolve such cases. Indeed, if Congress cannot specify laws and procedures to be used by federal courts, then all of the federal rules of civil procedure (which are transmitted to Congress for final approval) would be unconstitutional.

The critics' contention that The Class Action Fairness Act "overstep[s] [Congress's] specific constitutional power to regulate interstate commerce"[222] is equally baseless. This final "serious" constitutional argument is another red herring. In the first place, it is difficult to imagine why The Class Action Fairness Act—which by its text regulates only very large interstate class actions involving at least two (and sometimes up to 50) states—could be unconstitutional when there is no debate that a $75,001 slip and fall case involving citizens of only two states can appropriately be heard by a federal court.

Thus, the critics would have to concede that their view of the Commerce Clause abolishes all diversity jurisdiction, in direct contravention of Article III, Supreme Court precedent, and Congressional authority exercised literally since the year of our nation's founding.

Even if the critics' attack on the Commerce Clause were not so obviously misguided given the separate authority Congress has to regulate federal courts, The Class Action Fairness Act targets activity with substantial effects on interstate commerce. It targets only those lawsuits involving parties from different states, is limited to very large lawsuits involving at least $5 million, and regulates economic activity (the transfer of resources through litigation) that collectively has substantial effects on interstate commerce. As the legislative history makes abundantly clear, abusive state court class action practices exact a staggering toll on interstate commerce. The Class Action Fairness Act is thus not only constitutional, it is necessary as a matter of public policy.

In sum, the Committee notes that the exercise of this expanded jurisdiction can be grounded on a Commerce Clause rationale as well. In that regard, the Committee notes that the legislation contains findings that the state court class action abuses identified in the record before the Committee are having a serious adverse effect on interstate commerce and that the legislation (particularly its ju-

---

[220] S. Rep. 108–123, at 77–78 (2002) (Minority views).
[221] S. Rep. 108–123, at 77–78 (2003) (Minority views).
[222] Id.

75

risdictional provisions) is intended to ameliorate those adverse effects.

*Critics' Contention No. 13:* S. 5 will make it harder for consumers to bring class action lawsuits against pharmaceutical manufacturers and should be amended to exclude drug cases.

S. 5 poses no barrier for consumers seeking to bring suits against pharmaceutical manufacturers. All the bill does is move certain class actions to federal court. Moreover, an industry-specific exemption from federal jurisdiction, such as the carve-out proposed by this critique, makes no sense, since it irrationally slams the federal courthouse door on one industry—the very kind of treatment that the Framers sought to avoid by creating diversity jurisdiction. Such an approach is ill-advised for several reasons.

First, such an amendment would unfairly single out the pharmaceutical industry and deny defendants a fair, even-handed federal court forum. Moreover, this contention is inconsistent with what the Framers had in mind in establishing diversity jurisdiction in Article III of the Constitution. They wanted to allow interstate businesses to have claims against them heard in federal court so as to avoid local biases. Nowhere in this concept is the idea that certain industries should be exempted from this right—i.e., that certain kinds of businesses are less entitled to federal court protection. In short, such an exclusion would fly in the face of the Constitution, as well as the basic purpose of the bill.

Second, the flood of litigation surrounding recent drug withdrawals demonstrates the need for class action reform. Under the current system, plaintiffs' lawyers frequently file hundreds of overlapping class action lawsuits in various state court jurisdictions around the country. And since we have 50 different state court systems, these cases cannot be coordinated or consolidated before one judge. As a result, both sides have to engage in duplicative discovery, the judges end up duplicating each others' work, and different courts often reach different decisions on the same pretrial issues. To make matters worse, the current system encourages plaintiffs' lawyers to compete against each other—vying to achieve the first nationwide settlement that will eviscerate the remaining class actions involving similar claims.

In contrast, when numerous duplicative class actions are brought in federal court, the federal multi district litigation (MDL) mechanism allows all the cases to be coordinated for pretrial proceedings in one federal court. That means all the parties in all the cases typically set up one document depository, the court issues consistent rulings on discovery issues and summary judgment motions, and the court can preside over settlement negotiations that address the concerns of all the plaintiffs in all the cases—rather than just strike a deal with one group of plaintiffs' lawyers. Put simply, MDL proceedings are fairer, more efficient, and less expensive.

Third, federal courts have demonstrated their effectiveness in handling nationwide class actions against pharmaceutical companies. Federal court proceedings have resulted in numerous pro-consumer settlements in pharmaceutical cases. For example, the settlement in In re *Diet Drugs* (Fen-Phen) provided $3.75 billion for

76

personal injury claims, medical monitoring and research.[223] Similarly, in In re: *Copley Pharmaceutical Inc., Albuterol Products Liability Litigation,* an MDL court approved a $150 million settlement for consumers.[224] And in *Bowling* v. *Pfizer,*, the federal court approved a settlement providing approximately $200 million in medical monitoring for plaintiffs who had received allegedly defective heart valves.[225]

Fourth, regulatory decisions regarding which pharmaceutical drugs are available to the American public should not be shifted away from the Food and Drug Administration into the hands of plaintiffs' lawyers, judges and juries. Many class actions against pharmaceutical manufacturers are filed in spite of the fact that the FDA has investigated an alleged problem and concluded that the drug should remain on the market. Class action lawyers borrow from the factual work undertaken by the agency and use the class action vehicle as a way to relitigate the agency's decisions. The authority to decide whether consumers should have access to pharmaceuticals should remain with the FDA. And if there are problems with FDA, the solution is to fix the agency—not to transfer its power to self-interested class action lawyers.

Finally, the claims of some critics that it is more difficult to have a class certified in federal court than in state court have been disproved. As noted previously, a study by the Federal Judicial Center found that class actions were "almost equally likely to be certified" in the two systems: federal courts certified classes 22 percent of the time, while state courts certified classes 20 percent of the time.[226] The study also debunked another myth often repeated by opponents of The Class Action Fairness Act—that state courts move more quickly than federal courts. According to the study, federal courts are much more speedy in resolving class action issues: state courts, in contrast, are more likely to let class actions linger without ruling on class certification. Finally, to the extent that caseloads affect how quickly cases are resolved, the problems are much worse in state court than in federal court. State court judges are assigned (on average) 1,568 new cases each year.[227] In contrast, each federal court judge was assigned an average of just 483 new cases during the twelve-month period ending September 30, 2003.[228]

## VIII. CBO COST ESTIMATE

S. 5 would expand the types of class-action lawsuits that would be initially heard in federal district courts and would provide guidelines for the award of attorney's fees in certain types of settlements. CBO estimates that implementing the bill would cost the federal district courts about $7 million a year, subject to appropriation of the necessary funds. Enacting the bill would not affect direct spending or revenues. S. 5 contains no intergovernmental mandates as defined in the Unfunded Mandates Reform Act (UMRA) and would impose no costs on state, local, or tribal govern-

[223] In re *Diet Drugs (Fen-Phen),* 2000 U.S. Dist. LEXIS 12275 (E.D. Pa. 2000).
[224] In re: *Copley Pharmaceutical Inc., Albuterol Products Liability Litigation,* 1 F. Supp. 2d 1407 (D. Wyo. 1998).
[225] *Bowling* v. *Pfizer Inc.,* 922 F. Supp. 1261 (S.D. Ohio 1996).
[226] See 2004 Federal Judicial Center Study.
[227] Examining the Work of State Courts at 12–13.
[228] See Federal Court Management.

77

ments. S. 5 would impose private-sector mandates, as defined in UMRA, but CBO estimates that the direct cost of those mandates would fall below the annual threshold established by UMRA ($123 million in 2005, adjusted annually for inflation).

Under S. 5, most class-action lawsuits would be heard in a federal district court rather than a state court. Therefore, CBO estimates that the bill would impose additional costs on the federal district court system. While the number of cases that would be filed in federal court under this bill is uncertain, CBO expects that a few hundred additional cases would be heard in federal court each year. According to the Administrative Office of the United States Courts, class-action lawsuits tried in federal court cost the government, on average, about $23,000. That figure includes salaries and benefits for clerks, rent, utilities, and associated overhead expenses but excludes the costs of the salaries and benefits of judges. CBO estimates that implementing S. 5 would cost about $7 million annually.

CBO also estimates that enacting this bill could increase the need for additional district judges. Because the salaries and benefits of district court judges are considered mandatory, adding more judges would increase direct spending. However, S. 5 would not—by itself—affect direct spending because separate legislation would be necessary to authorize an increase in the number of district judges. In any event, CBO expects that enacting the bill would not require a significant increase in the number of federal judges, so that any potential increase in direct spending from subsequent legislation would probably be less than $500,000 a year.

S. 5 would require the Judicial Conference of the United States to transmit a report on class-action settlements to the Congress no later than one year after the bill's enactment. CBO estimates that this provision would cost less than $500,000 in 2005.

S. 5 would impose a private-sector mandate by possibly limiting the size of awards that attorneys could receive in certain class-action settlements. If a proposed class-action settlement provides coupons to a class member, the bill would require the attorneys' fees to be based on the value of the coupons that are redeemed or on the amount of time reasonably expended working on the case by class counsel. In current practice, the attorney's fee is sometimes based on the total value of the settlement. According to information from industry representatives and academic studies, settlements with coupons account only for about 10 percent of all class-action settlements. Moreover, according to those sources, attorneys' fees correlate very closely with the amount of time spent on such cases by class counsel. Therefore, because attorneys' fees would still be negotiated as part of any settlement, CBO estimates that the direct cost of the mandate, as measured by loss of income for attorneys in class-action settlements, would be small, if any.

In addition, S. 5 would impose a private-sector mandate on defendants participating in a proposed class-action settlement. The bill would require defendants to make certain notifications and disclosures to the appropriate state official of each state in which a class member resides and the appropriate federal official within 10 days after a proposed settlement is filed in court. The bill defines a proposed settlement as an agreement regarding a class action that is subject to court approval and would be binding on the class.

78

The required notices and disclosures would include a copy of the suit, a copy of the proposed settlement, a statement of class members' rights, and certain other materials. In effect, the defendants would have to provide copies of documents and materials related to information that they usually already possess about the case. Further, the provision would allow for the use of the Internet in making such disclosures. Thus, CBO estimates that the costs of complying with this mandate would be small.

The CBO staff contacts for this estimate are Gregory Waring (for federal costs), and Paige Piper/Bach (for the private-sector impact). This estimate was approved by Peter H. Fontaine, Deputy Assistant Director for Budget Analysis.

## IX. REGULATORY IMPACT STATEMENT

In compliance with paragraph 11(b)(1), rule XXVI of the Standing Rules of the Senate, the Committee, after due consideration, concludes that S. 5 will not have a significant regulatory impact.

## X. ADDITIONAL VIEWS OF SENATOR PATRICK LEAHY

The circulation and filing of this report occurred after passage of the legislation for Senate consideration of the underlying bill. Indeed, it was filed after the House of Representatives passed this legislation and on the same day that the President signed the measure into law. Committee reports, like Committee consideration of measures, are intended to assist the Senate in its consideration of the matter. Committees tend to have Members with expertise and experience that help shape legislation for Senate consideration. In this case, that did not occur. Instead, at the insistence of the Republican leadership, this bill was rushed through the Judiciary Committee and then forced through the Senate without amendment.

The Republican leadership's timetable was so short that there was no opportunity to prepare a Committee report before final passage. There was no time for Senators to review a cost estimate from the Congressional Budget Office. There was no evaluation of the regulatory impact of the bill. That this report is being filed after Senate consideration means that it did not serve the principal purpose for which Committee reports are intended.

Several days ago, the Senate had pending before it for a few days the so-called "Class Action Fairness Act." In lockstep mode, bill supporters rejected every effort to clarify or improve the bill. During the few days it was pending, a few modest amendments were offered to clarify some ambiguous provisions and to respond to serious concerns raised by the National Conference of State Legislatures, the National Association of State Attorneys General, prominent legal scholars, consumer and environmental groups and civil rights organizations. All these efforts were rejected. Anyone who watched the Senate on C–SPAN or reviews the Congressional Record will see ample evidence that the "fix was in". Thus, despite legitimate concerns acknowledged by some of this legislation's sponsors and supporters, the bill was not improved in any regard on its short journey through the Senate.

I am disappointed that the Senate has been reduced to taking its marching orders on major legislation from corporate special interests and the White House. The Senate could have made limited but important improvements to the bill but, instead, the majority of Senators refused to even consider minor improvements let alone the major flaws in this legislation.

This legislation will make it harder for American citizens to protect themselves against violations of state civil rights, consumer, health, and environmental protection laws by forcing these cases out of local state courts. Aside from being convenient, state courts have experience with the legal and factual issues involved in these important cases. This bill will sweep these cases into federal courts

(79)

80

and, thereby, erect new barriers to lawsuits and place new burdens on plaintiffs.

The biggest concern raised by legal scholars and agreed to by several Senate sponsors of the bill would have addressed the recent trend in the federal courts not to certify class actions if multi-state laws are involved. Given this development, what this bill may result in doing is removing class actions to federal court where they will likely be dismissed for involving multiple state laws and where they will not be considered on the merits because the federal court will choose not to consider a case involving the laws of the states. Cynics might even speculate that is what the business groups behind this purported "procedural" change are really seeking, the dismissal of meritorious cases on procedural grounds by the federal courts.

Many Senators understand that this bill could deny justice to consumers and others in class actions who band together to seek relief in state court. Senator Feinstein and Senator Bingaman worked together on an amendment to alleviate this legal Catch–22. It is unfortunate that the wisdom of their common-sense solution was rejected.

Anyone who reads this bill will notice that despite its title, it affects more than just class actions. Individual actions, consolidated by state courts for efficiency purposes, are not class actions. Despite the fact that a similar provision was unanimously struck from the bill during the last Congress, mass actions reappeared in this bill this Congress. Federalizing these individual cases will no doubt delay, and possibly deny, justice for victims suffering real injuries. Senator Durbin's amendment would have clarified the bill's effect on these cases but it was not adopted.

Prominent civil rights organizations and labor advocates requested that the bill be modified to acknowledge the fact that many of our states have their own protective civil rights and employment laws. Senator Kennedy's amendment to exempt civil rights and wage and hour cases from this bill was a sensible solution. I was proud to cosponsor it and regret that this amendment was also rejected.

This class action legislation has also been criticized by nearly all of the state Attorneys General in this country. They expressed a specific concern that S. 5 could limit their official powers to investigate and bring actions in their state courts against defendants who have caused harm to their citizens because in certain instances they file suit as the class representative for the consumers of their state. Not even this minor clarification, requested by nearly every state's highest law enforcement officer, was acceptable to the bill's supporters as they to adopt Senator Pryor's amendment.

It is disappointing to me that the Senate has refused to listen to the wise counsel of our state legislatures, our state law enforcement officers, our state judges and even the views expressed by our federal judiciary. They serve in the institutions that we are affecting by enacting this legislation.

This bill contains language to reduce the delay parties can experience when a case is removed to federal court by setting a time limit for appeals of remand orders. However, no measure is included in the bill that would set a timeline for the district court

81

to rule on the actual remand motion. This means that plaintiffs' claims may be removed from state court, just to languish on the federal docket for years, without any recourse. Senator Feingold offered a modest amendment to set a reasonable time limit for the district court to rule on remand orders. This solution received praise from one of the sponsors of the legislation, yet the amendment was rejected.

I predict this legislation will be manipulated by well-paid corporate defense lawyers to create complex, expensive and lengthy litigation over the criteria and factors in the bill and whether they apply to a particular case. Unfortunately, one of the great boons—or more properly boondoggles—of this legislation, to the extent it does not simply deter meritorious class actions that would otherwise have been brought by consumers, is that it will make them more costly, burdensome and complicated.

The so-called Class Action Fairness Act falls short of the expectation set by its title. It will leave many injured parties who have valid claims with no avenue for relief, and that is anything but fair to the ordinary Americans who look to us to represent them in the United States Senate.

PATRICK LEAHY.

## XI. MINORITY VIEWS OF SENATORS LEAHY, KENNEDY, BIDEN, FEINGOLD, AND DURBIN

### I. INTRODUCTION

We strongly oppose S. 5, the "Class Action Fairness Act of 2005." Although the legislation is described by some of its proponents as a "modest bill" not effecting "a substantive change in the law", in reality it will cause a radical revision of the class action rules and diversity jurisdiction requirements. We believe it would bar most state class actions from being heard in state courts and prevent many nationwide class actions from being heard in either state or federal court.

This legislation and previous versions have been opposed by the federal [1] and state [2] judiciaries, as well as, state legislatures.[3] S. 5 is also opposed by dozens of civil rights, consumer, environmental

---

[1] See Letter from Ralph Mecham, Secretary, Judicial Conference of the United States (Mar. 26, 2003) (in 2003, the Conference voted to oppose the jurisdictional provisions that remain in S. 5 because the provisions "would add substantially to the work of the Federal courts and are inconsistent with principles of Federalism").

[2] See Letter from Annice M. Wagner, President, Conference of Chief Justices (Mar. 28, 2002) ("Absent hard evidence of the inability of the state judicial systems to hear and decide fairly class actions brought in state courts, we do not believe that such a procedure is warranted.").

[3] See Letter from Sen. Michael Balboni, Chair, National Conference of State Legislatures (Feb. 2, 2005) ("The effect of S.5 on state legislatures is that state laws in the areas of consumer protection and antitrust which were passed to protect citizens of a particular state against fraudulent or illegal activities will almost never be heard in state courts.").

83

and public interest advocates[4] and several state Attorneys General.[5]

By providing plaintiffs access to the courts in cases where a defendant may have caused small injuries to a large number of persons, class action procedures have traditionally offered a valuable mechanism for aggregating small claims that otherwise might not warrant individual litigation. This legislation will undercut that important principle by making it far more burdensome, expensive, and time-consuming for groups of injured persons to obtain access to justice. Thus, it would be more difficult for citizens to seek redress for violations of civil rights, employment discrimination, and consumer health, safety and environmental laws, to name but a few important laws. The legislation will prevent state courts from considering class action cases which involve solely violations of state laws, such as state consumer protection laws.

"The Class Action Fairness Act of 2005" will force most state class action cases into federal courts. It will provide automatically for both original jurisdiction and the removal of state class action claims to federal court at the request of either party in cases involving violations of state law if any member of the plaintiff class and at least one primary defendant are citizens of different states.[6]

---

[4] See Letters to Committee Members in opposition to similar class action measures from the AARP, ADA Watch/National Coalition for Disability Rights, AFL–CIO, Alliance for Healthy Homes, Alliance for Justice, Alliance for Retired Americans, American Association of People with Disabilities, American Association of University Women, American Cancer Society, American Heart Association, American Federation of Government Employees, American Federation of State, County and Municipal Employees, American Lung Association, American-Arab Anti-Discrimination Committee, Americans for Democratic Action, Bazelon Center for Mental Health Law, Brady Campaign to Prevent Gun Violence, United with the Million Mom March, Campaign For Tobacco-Free Kids, Center for Disability and Health, Center for Justice and Democracy, Center for Responsible Lending, Center for Women Policy Studies, Civil Justice, Inc., Clean Water Action, Coalition to Stop Gun Violence, Commission on Social Action of Reform Judaism, Communication Workers of America, Consumer Federation of America, Consumers for Auto Reliability and Safety, Consumers Union, Disability Rights Education Fund, Earthjustice, Education Law Center, Environmental Working Group, Epilepsy Foundation, Families USA, Federally Employed Women, Friends of the Earth, Gray Panthers, Greenpeace, Homeowners Against Deficient Dwellings, Jewish Labor Committee, Lawyers' Committee For Civil Rights Under Law, Leadership Conference on Civil Rights, Mexican American Legal Defense and Educational Fund, Mineral Policy Center, NAACP Legal Defense and Education Fund, National Alliance of Postal and Federal Employees, National Asian Pacific American Legal Consortium, National Association for the Advancement of Colored People, National Association for Equal Opportunity in Higher Education, National Association of Consumer Advocates, National Association of Consumer Agency Administrators, National Association of the Deaf, National Association of Protection and Advocacy Systems, National Bar Association, National Campaign for Hearing Health, National Center on Poverty Law, National Coalition on Black Civic Participation, National Committee on Pay Equity, National Consumer Law Center, National Consumers Coalition, National Consumers League, National Council of La Raza, National Employment Lawyers Association, National Fair Housing Alliance, National Gay and Lesbian Task Force, National Law Center on Homeless & Poverty, National Legal Aid and Defender Association, National Organization for Women, National Partnership for Women and Families, National Resources Defense Council, National Workrights Institute, National Women's Health Network, National Women's Law Center, North Carolina Justice Center, NOW Legal Defense Fund, People for the American Way, Pride at Work, Project Equality, Public Citizen, Religious Coalition for Reproductive Choice, Sargent Shriver National Center of Poverty Law, Service Employees International Union, Sierra Club, Tobacco Control Resource Center, Tobacco Products Liability Project, UNITE!, United Food and Commercial Workers International Union, United Policyholders, United Steelworkers of America, USAction, U.S. Public Interest Research Group, Violence Policy Center, and Women Employed (May 21, 2004).

[5] See Letter from Eliot Spitzer, Attorney General New York and W.A. Drew Edmondson, Attorney General of Oklahoma, on behalf of the Attorneys General of the States of California, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New York, Oklahoma, Vermont and West Virginia (Feb. 7, 2005).

[6] See The Class Action Fairness Act of 2005, S. 5, 109th Cong. §4(a)(2) (2005) (adding 28 U.S.C. §1332(d)(2)). Current law requires complete diversity before a state law case is eligible for removal to Federal court, meaning all of the defendants must be citizens residing in different states than the plaintiffs. See *Strawbridge* v. *Curtiss*, 7 U.S. (3 Cranch) 267 (1806). In *Snyder*
Continued

84

As part of the expanded diversity jurisdiction, the bill also provides for the removal of state class actions to federal court at the request of either party if fewer than one-third of the plaintiff class members are citizens of a different state than any primary defendant, even if the primary defendant conducts substantial business in that state.[7] The legislation would allow removal of a class action to federal court in cases where between one-third and two-thirds of the plaintiffs are citizens of the same state as the primary defendants.[8]

Under the legislation, federal courts are directed to abstain from hearing a class action only where (1) more than two-thirds of the plaintiffs are citizens of the same state as at least one of the primary defendants; (2) the principal injuries occurred in that state; (3) the matters in controversy are less than $5,000,000 or the membership of the proposed class is less than 100; or (4) the primary defendants are states, state officials, or other government entities against whom the district court may be foreclosed from ordering relief.[9]

In the context of the "Local Controversy Exception", the Committee Report erroneously conflates the concepts of citizenship and residence.[10] Contrary to the Committee report, the legislation provides that the touchstone for this exception is citizenship not residence. This more narrow exception will no doubt result in many more class actions being removed to federal court.

This bill contains a "Consumer Class Action Bill of Rights." This section includes some safeguards that we agree will improve class action litigation for all parties, such as protection against a proposed settlement that would result in a net loss to a class member and protection against discrimination based on geographic location.[11] We also recognize that improvements were made to the bill in the last Congress such as: restricting use of coupon settlements; allowing civil rights and consumer plaintiffs to be compensated for the particular hardships they endure as a result of initiating and pursuing litigation as named plaintiffs; eliminating the notification burden; prohibiting retroactivity and providing for greater judicial discretion.[12]

We object to the fact that S. 5 is written to favor corporate defendants at the expense of victims. Before even considering S. 5, the Committee and the full Senate should have insisted on receiving objective and comprehensive data justifying such a dramatic intrusion into state court prerogatives. Nothing in the way of such information now exists. Before the Committee considered this bill, a hearing on class action litigation would have helped the Com-

---

v. *Harris*, 394 U.S. 332 (1969), the Supreme Court held that the court should only consider the citizenship of named plaintiffs for diversity purposes, and not the citizenship of absent class members.

[7] Senate Bill 5 § 4(a)(2) (adding 28 U.S.C. §1332(d)(3)).

[8] Id.

[9] Senate Bill 5 § 4(a)(2) (adding 28 U.S.C. §1332(d)(4)). The legislation also excludes securities-related and corporate governance class actions from coverage and makes a number of other procedural changes, such as easing the procedural requirements for removing a class action to Federal court (i.e., permitting removal to be sought by any plaintiff or defendant and eliminating the one-year deadline for filing removal actions) and tolling the statute of limitation periods for dismissed class actions. See Senate Bill 5 § 4(a)(2) (adding 28 U.S.C. §1332(d)(9)).

[10] See Committee Report at p. 44.

[11] Senate Bill 5 §3.

[12] Id.

mittee develop consensus reforms to better serve both defendants and plaintiffs before the Committee proceeded to a markup on S. 5.

We had hoped that the Committee would undertake a deliberate and careful review of information from parties actually involved in class action litigation to provide a realistic picture of the benefits and problems with class actions. But, instead, the Committee has simply decided that the time is now for federalizing nearly all class actions where most of plaintiffs' claims will take longer and be more expensive.

We recognize that there are some genuine problems with some class action litigation that should be addressed by federal legislation for the benefit of both defendants and plaintiffs. This legislation, however, is heavily biased in favor of defendants. Rather than address the system's real failings, S. 5 will make it more difficult for the vast majority of legitimate, well-intentioned class actions to move forward, by placing cumbersome restrictions on citizens' rights to seek redress for their injuries.

In short, we agree with the position of the National Conference of State Legislatures when they urged us "to remember that state policy choices should not be overridden without a showing of compelling national need. We should await evidence demonstrating that states have broadly overreached or are unable to address the problems themselves. There must be evidence of harm to interests of national scope that require a federal response, and even with such evidence, federal preemption should be limited to remedying specific problems with tailored solutions, something that S. 5 does not do." [13]

For these and other reasons set forth herein, we strongly oppose S. 5.

## II. S. 5 WILL HURT CONSUMERS, VICTIMS, AND THE ENVIRONMENT

Proponents of this legislation claim that S. 5 will protect consumers while remedying the worst abuses of the class action system, yet consumer advocates overwhelmingly oppose these alleged "reforms." [14]

### A. Federal courts' refusal to certify class actions will leave victims in limbo

There can be little doubt that S. 5 will have a serious adverse impact on the ability of consumers and victims to obtain compensation in cases involving widespread harm. At a minimum, the legislation will force most state class action claims into federal courts where it is generally more expensive for plaintiffs to litigate cases and where defendants could force plaintiffs to travel long distances to attend proceedings. It is also typically more difficult and time consuming to certify a class action in federal court. By pushing cases from state to federal court, S. 5 creates more problems than it solves.

---

[13] National Conference of State Legislatures Letter, supra note 3.
[14] See Letter in Opposition to S. 274 from the Consumer Federation of America, Consumers Union, and U.S. Public Interest Research Group (Feb. 5, 2003).

86

Fourteen states, representing nearly one-third of the nation's population,[15] have adopted different criteria for class action rules than Rule 23 of the Federal Rules of Civil Procedure.[16] In addition, with respect to those states which have enacted an analog to Rule 23, the federal courts are likely to represent a more difficult forum for class certification to occur. This ratcheting up of the standard is the result of a series of several federal cases, such as *Castano* v. *American Tobacco Co.*,[17] In re *Rhone-Poulenc Rorer, Inc.*,[18] In re *American Medical Systems, Inc.*,[19] *Georgine* v. *Amchem Products, Inc.*,[20] *Broussard* v. *Meineke Discount Mufflers*,[21] and *Ortiz* v. *Fibreboard*,[22] which have made it more difficult to establish the 'predominance requirement' necessary to establish a class action under the federal rules.

Plaintiffs removed to Federal courts are subject to the Federal Rules of Civil Procedure. In accordance with Rule 23(b)(3), their cases will not be certified by the Federal court if they cannot show that a common question of law predominates. As this rule has been interpreted by many Circuit[23] and District Courts,[24] Federal courts are not certifying class actions involving the laws of multiple states. In fact, six Circuit Courts and 26 District Courts have consistently denied certification of multi-state consumer cases. Only

---

[15] Three states still use their common law rules, rather than statutes, to permit class actions (Mississippi, New Hampshire, and Virginia); four states use Field Code-based rules based on the "community of interest" test (California, Nebraska, South Carolina, and Wisconsin); and seven states use class action rules modeled on the original Federal Rule 23 (1938) which creates a distinction among class members which depends on the substantive character of the right asserted (Alaska, Georgia, Louisiana, New Mexico, North Carolina, Rhode Island, and West Virginia). See 3 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 13.04 (3d ed. 1992 & Supp. 1997).

[16] Fed. R. Civ. P. 23(a) (stating four factual prerequisites that must be met before a court will certify the lawsuit as a class action: (1) size—the class must be so large that joinder of all of its members is not feasible; (2) common questions—there must be questions of law or fact common to the class; (3) typical claims—the claims or defenses of the representatives must be "typical" of those of the class; and (4) representation—the representatives must fairly and adequately represent the interests of the class).

[17] 84 F.3d 734 (5th Cir. 1996) (preventing the certification of a nationwide class action brought by cigarette smokers and their families for nicotine addiction where there was found to be too wide a disparity between the various state tort and fraud laws for the class action vehicle to be superior to individual case adjudication).

[18] 51 F.3d 1293 (7th Cir. 1995) (decertifying, under the Erie doctrine, a nationwide negligence class action brought on behalf of hemophiliacs infected with the AIDS virus through use of defendants' blood clotting products because of diversity of state laws).

[19] 75 F.3d 1069 (6th Cir. 1996) (decertifying a proposed plaintiff settlement class comprising all U.S. residents implanted with defective or malfunctioning inflatable penile prostheses that were manufactured, developed, or sold by defendant company because common questions of law or fact did not predominate the action to such an extent that warranted class certification).

[20] 521 U.S. 591 (1997) (overturning consensual settlement between a class of workers injured by asbestos and a coalition of former asbestos manufacturers because of disparate levels of the class members' knowledge of their injuries and class members' large amount at stake in the litigation).

[21] 155 F.3d 331 (4th Cir. 1998) (rejecting class certification brought by Meineke franchisees alleging violations of franchise, tort, unfair trade, and other laws).

[22] 527 U.S. 815 (1999) (finding mandatory limited fund class treatment under Rule 23(b)(1)(B) is not appropriate unless the maximum funds available are clearly inadequate to pay all claims).

[23] See, e.g., *Georgine* v. *Amchem Products, Inc.*, 83 F.3d 610 (3d Cir. 1996) (refusing to certify a nationwide asbestos suit because the laws of multiple states would have to be applied), *Spence* v. *Glock, Ges.m.b.H.*, 227 F.3d 308 (5th Cir. 2000) (reversing the district court's certification because "it erred in its choice of law analysis"), In re *American Medical Systems, Inc.*, 75 F.3d 1069 (6th Cir. 1996) (denying class certification due to variances in state laws), *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002) (refusing certification because the district court would have to apply the laws of several states according to Indiana's choice of law rules), and *Zinser* v. *Accufix Research Inst.*, 253 F.3d 1180 (9th Cir. 2001) (holding the plaintiffs with pacemakers made of lead had not demonstrated which state's laws apply under California choice of law rules).

[24] See, e.g., *Chin* v. *Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998), In re *Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417 (E.D. La. 1997), *Lyon* v. *Caterpillar, Inc.*, 194 F.R.D. 206 (E.D. Pa. 2000).

87

one court has granted certification of these cases and even that case, from the Third Circuit, has been distinguished on its facts. [add footnote: See In re *School Asbestos Litig.,* 789 F.2d 996, 1011 (3d Cir. 1986)]

Not only are the courts concerned with the federalism implications of such action, but recognize that by doing so, cases become simply unmanageable as courts try to apply the laws of each plaintiff's state to the plaintiff. Scholars who track multi-state class action suits have found that if a case involves too many state laws, then Federal court judges can and do dismiss the case.[25] In fact, the U.S. Chamber of Commerce has recognized this stating, "federal courts have consistently refused to certify nationwide class actions in product defect cases because the need to apply the laws of many different states would make such a sprawling class action unmanageable."[26]

Federalizing class action cases creates an incentive for violators to break the laws of multiple states, as any collective action to hold them accountable will likely be dismissed. And, consumers, workers and victims will be prevented from having many important multi-state class actions heard in either the state or Federal courts. As a result, we will likely begin to see fewer dangerous and ineffective products and devices removed from the marketplace.

Consumers pay the price when Federal courts dismiss a case. When this occurs, "[a] consumer could bring the claim in state court as an individual action. However, individual cases would be impractical to litigate, would not have the same deterrent effect, and would have the potential to overwhelm state courts."[27]

Even if consumers get their day in Federal court under this legislation, consumer advocates argue that just outcomes are unlikely. Federal court decisions will likely be narrowly tailored, without establishing legal precedent for future state court cases brought under the particular law in question. Because of this, the class action legislation "will slow—and in some cases thwart—the continual interpretation of state law."[28]

To solve this significant problem, S. 5 should be amended to ensure that cases which are removed from state courts are at least not immediately dismissed by the Federal judge on choice of law grounds. One solution to this loophole in the legislation is the subject of Senator Bingaman's amendment. Quite simply, a Federal judge presented with a case that involves a choice of law issue should be able to apply the state law that has a sufficient connection to the case. In this way, not only are citizens' rights and access to the courts preserved, but the Federalism concerns that the removal creates are undercut because state laws are being enforced.[29] This sensible solution to a glaring deficiency in the bill also had the support of Chairman Specter, as he noted during the Committee's markup.

---

[25] Letter from Arthur R. Miller, Bruce Bromley Professor of Law, Harvard Law School (Jun. 17, 2004).
[26] Id. (quoting Brief of the Chamber of Commerce of the United States as Amicus Curiae in Support of Appellants, In re *Simon II Litigation,* No. 03–7141 (2nd Cir. June 3, 2003).
[27] See Letter from the Consumer Federation of America, Consumers Union, and U.S. PIRG (Feb. 5, 2003).
[28] Id.
[29] See id.

88

*B. One-sided delays of justice must be avoided*

Last Congress, Senators Dodd, Schumer and Landrieu were able to improve the legislation by adding a provision to the class action bill to require that any appeal of a motion to remand be ruled on by the court of appeals within 60 days. However, before a motion to remand can be appealed it first needs to be ruled on by the lower district court. S. 5 overlooks this step and creates another loophole which defendants can exploit to delay trials. The bill contains no deadline on how long district courts can take to rule on a motion to remand. By simply removing all class actions to Federal court, defendants can exploit this lack of a statutory deadline; and therefore benefit from the delay, which inevitably increases the costs of trials and leaves the plaintiffs in limbo.

Since the bill already addressed the need for speedy resolution of remand appeals, it should similarly require speedy resolution for motions to remand at the district court level. Senator Feingold proposed an amendment that would have simply required district courts to work within the same timeframe as the appeals courts. Under his proposal, any motion for remand to a state court would need to be decided by a district court within 60 days, which tracks the 60 days timeframe afforded to the appeals court. Sen. Feingold's amendment, which he withdrew at the request of Chairman Specter, also provided an automatic additional 10 days for review of the remand motion, and the ability to seek more time for review, if necessary.

*C. Barriers to justice for consumers and victims of mass torts*

This legislation will also severely limit the ability of consumers to pursue class action in state court, even when state consumer protection laws are implicated. Consumers pay the price when Federal courts dismiss a case. When this occurs, "[a] consumer could bring the claim in state court as an individual action. However, individual cases would be impractical to litigate, would not have the same deterrent effect, and would have the potential to overwhelm state courts."[30]

Even if consumers get their day in Federal court under this legislation, consumer advocates argue that just outcomes are unlikely. Federal court decisions will likely be narrowly tailored, without establishing legal precedent for future state court cases brought under the particular law in question. Because of this, the class action legislation "will slow—and in some cases thwart—the continual interpretation of state law."[31]

As the American Bar Association Task Force on Class Action Legislation's recent report noted, "any expansion [of Federal court jurisdiction] should preserve a balance between legitimate state-court interests and Federal-court jurisdictional benefits."[32] The current legislation clearly fails this test.

Proponents of S. 5 argue that while many class actions will be removed to federal courts, plaintiffs can still bring their individualized claims in state courts. This is not an adequate solution be-

---

[31] Id.

[32] ABA Task Force on Class Action Legislation, Report of the ABA Task Force on Class Action Legislation at 3 (Feb. 2003). See also Letter in Opposition to S. 274, The Class Action Fairness Act of 2003, from the Consumers Union (Apr. 2, 2003).

89

cause state judges often consolidate cases to ease their dockets. This procedure allows cases with similar questions of law and fact to be consolidated for all or part of the proceedings. Consolidation does not make the case a class action. However, S. 5 reaches not only class actions, but these consolidated cases as well, through a new term of art called "mass actions."[33] For example, the plaintiffs who have brought individual claims against Merck for injuries sustained by Vioxx have had their actions consolidated in the courts. Federalizing these cases would seriously delay not only the victims' compensation but would also prevent victims from holding the drug companies accountable. S. 5 places state court judges in a considerable Catch–22: either do not consolidate the cases and be overloaded with work, or consolidate and cede control of an issue relating to their state laws to the federal courts.

Senator Durbin proposed an amendment to rectify this Catch–22 by narrowing the scope of mass tort cases that would be affected by S. 5. Despite the fact that a similar provision was unanimously struck from the bill during the mark-up of class actions legislation in the Judiciary Committee in the last Congress, mass torts are again included in S. 5.

The net result of these various changes is that under the proposed legislation, it will be far more difficult for consumers and other injured individuals to obtain justice in class action cases at the state or Federal level.

### D. Special punishment for the environment and civil rights

By removing many important environmental class actions from state to federal court, S. 5 not only denies to state courts the opportunity to interpret their own state's environmental protection laws, it hampers and deters plaintiffs from pursuing important environmental litigation. The well-documented backlog in the federal courts and the need for attorneys to engage in choice of law debates will significantly increase the time and cost of environmental litigation. Ultimately, environmental class actions may not get litigated and the incentive polluters have to keep our environment clean will be reduced.

Moreover, by failing to carve out an exception in S. 5 to protect the environment, the majority ignores the advice of the Judicial Conference of the United States, chaired by Chief Justice Rehnquist. In its March 26, 2003, letter, the Judicial Conference noted that even if the Congress adopts class action removal legislation, there should be certain exceptions such as "a class action in which plaintiff class members suffered personal injury or physical property damage within the state, as in the case of a serious environmental disaster."[34]

Just as S. 5 turns a blind eye toward the environment and to the advice of Chief Justice Rehnquist, the proposed legislation will make it much more difficult to use class actions as a means of protecting civil rights.[35] Class actions are the most effective means to

---

[33] Senate Bill 5 § 4(a)(2) (adding 28 U.S.C. § 1332(d)(11)).
[34] See Judicial Conference Letter, supra note 1.
[35] See Letter in Opposition to S. 5 from the Leadership Conference on Civil Rights, AFL–CIO, Alliance for Justice, Lawyers' Committee for Civil Rights Under Law, Mexican American Legal
Continued

90

change a policy of discrimination and to bring claims for small amounts of individual wage loss. State laws offer more extensive protections for low wage workers and for many members of minority groups, as well as for the disabled. Several civil rights organizations have argued that S. 5 and its "additional, substantial and costly noticing requirements and built-in delays are not a matter of due process, but are overly burdensome and improperly assume that federal and state officials have proper interest in, and a capacity to respond to, each and every class action."[36]

Indeed, class action litigation has been essential to vindicating basic civil rights through our courts. For example, the landmark Supreme Court decision in *Brown* v. *Board of Education* was the culmination of appeals from four class action cases, three from federal court decisions in Kansas, South Carolina and Virginia and one from a decision by the Supreme Court of Delaware. Only the Supreme Court of Delaware, the state court, got the case right by deciding for the African-American plaintiffs. The state court justices understood that they were constrained by the existing Supreme Court law, but nonetheless held that the segregated schools of Delaware violated the Fourteenth Amendment. Before any federal court did so, a state court rejected separate and unequal schools.

S. 5 sets up several new hurdles for plaintiffs who file class actions. These requirements will be especially burdensome for many civil rights claimants.

The bill's requirement to provide "notice" to state officials, such as a state attorney general, will certainly lead to delays in the proceedings. As a result, some of the critical evidence of malice or discriminatory intent required to prevail in civil rights and discrimination cases could be lost while this additional step is taken. In addition, this added hurdle will likely be redundant because many of these plaintiffs will have already gone through an administrative proceeding before being allowed to file a discrimination claim.

As a consequence of the assault that S. 5 would launch on the defense of civil liberties, many civil rights advocates—including the Lawyers' Committee for Civil Rights Under Law, the Leadership Conference on Civil Rights, the Mexican American Legal Defense and Education Fund, and the National Asian Pacific Legal Consortium—have concluded that this legislation "would discourage civil rights class actions, impose substantial barriers to settling class actions and render Federal courts unable to provide swift and effective administration of justice."[37]

This legislation would have been greatly improved if amended by a carve-out proposed by Senator Kennedy for civil rights and employment law cases. The bill indiscriminately applies to all multistate class action suits, without pausing to consider the implications on important civil rights abuse challenges. States have

[] Defense and Educational Fund, National Asian Pacific American Legal Consortium, National Partnership for Women and Families, National Workers Rights Institute, National Women's Law Center, People for the American Way, Women Employed and others (Feb. 2, 2005).

[36] See Letter in Opposition to S. 274 from the Leadership Conference on Civil Rights, Alliance for Justice, Lawyers' Committee for Civil Rights Under Law, Mexican American Legal Defense and Educational Fund, National Asian Pacific Legal Consortium, National Partnership for Women and Families, National Workers Rights Institute, National Women's Law Center, People for the American Way, and Women Employed (Mar. 20, 2003).

[37] Id.

91

strengthened their civil rights laws after years of federal encouragement to do so, but now S. 5 will take away the states' means of enforcing those laws. If violators are allowed to side-step these protections by removing cases to the federal courts, those efforts will have been for naught.

Even if Federal courts take up the claims, state judicial interpretations of civil rights laws will be full of holes due to a lack of state-level adjudication of issues. The bill's additional notice requirement will not only lead to significant delays affecting plaintiffs' ability to gain critical evidence of malice or discriminatory intent, but also would likely be redundant as most plaintiffs already have gone through an administrative proceeding. Taken together, these barriers will certainly result in worthy claimants being discouraged from filing class action suits and civil rights violators going unpunished.

We all agree that some reform is needed to improve the efficiency and fairness of our nation's class action procedures. At the same time, many state legislatures have worked hard to develop a system of laws that defend and protect all citizens' civil rights so it is unfortunate that this bill seeks to gut those efforts through a clumsy reform effort. Senator Kennedy proposed a refined approach that would have enabled victims of civil rights violations to have their day in court. This amendment would have exempted civil rights, as well as wage and hour state law cases, from S. 5 and therefore maintain the status quo for these claims.

*E. Improvements made on coupon settlements*

This class action bill makes an improvement on the use of worthless coupon settlements, which provide little or no tangible benefits to class action plaintiffs. Typically, these settlements involve an agreement by plaintiffs' and defendants' counsel that fully pay for the attorney fees and expenses of the plaintiffs' counsel while class members are left holding coupons to buy the defendants' products. For example, in a federal class action case alleging a price-fixing conspiracy between major airlines, class members were awarded $400 million in flight coupons. However, the coupons were restricted to certain dates and small increments of travel making them virtually unusable to consumers.[38]

This version of the class action bill creates incentives for class members' attorneys to seek a remedy for their clients by tying the attorneys' compensation to the value of coupons which are actually redeemed.[39] To help the court make a determination of this value, the judge may hear from expert witnesses.[40] If the coupons are not used to determine counsel's compensation, then the award fee must at least be "based upon the amount of time class counsel reasonably expended working on the action," subject to approval by the court.[41] If the plaintiffs' attorneys secure a mixed award, i.e. coupons and an injunction, then part of their fee will be based on the coupons redeemed and part will be based on the reasonable ex-

---

[38] See In re *Domestic Air Transportation Antitrust Litigation,* 137 F.R.D. 677 (N.D. Ga. 1991).
[39] Senate Bill 5 §3 (adding 28 U.S.C. 1712 (a)).
[40] Id. (adding 28 U.S.C. 1712 (d)).
[41] Id. (adding 28 U.S.C. 1712 (b) (1–2)).

92

penditure of time.[42] Any settlement based on coupons will be subject to a hearing before the judge who will determine if the proposed settlement if "fair, reasonable and adequate." [43]

## III. S. 5 WILL DAMAGE THE FEDERAL AND STATE COURT SYSTEMS

By expanding federal class action jurisdiction to include almost all state class actions, S. 5 will inevitably result in a significant increase in the federal courts' workload. In its letter to the Judiciary Committee concerning a prior version of this bill, the Judicial Conference warned that:

> [T]he effect of the class action provisions of [S. 353] would be to move virtually all class action litigation into the Federal courts, thereby offending well-established principles of Federalism [and] * * * hold[ing] the potential for increasing significantly the number of [class action] cases currently being litigated in the Federal system.[44]

In addition to overwhelming the federal courts with new time-intensive class actions, S. 5 will undermine state courts' independent authority. State Attorneys General recently wrote to Senate leaders objecting to this "federalizing" of most class actions under this legislation:

> S. 5 would vastly expand federal diversity jurisdiction, and thereby would result in most class actions being filed in or removed to federal court. This transfer of jurisdiction in cases raising questions of state law will inappropriately usurp the primary role of state courts in developing their own state tort and contract laws, and will impair their ability to establish consistent interpretations of those laws.[45]

Even more troublesome than these potential workload problems, S. 5 raises serious constitutional issues by challenging the vision of our founders and the intent of the Constitution. This legislation undermines James Madison's vision of a federal government "limited to certain enumerated objects, which concern all the members of the republic." [46]

This bill does not merely operate to preempt state laws; rather, it unilaterally strips the state courts of their ability to use the class action procedural device to resolve state law disputes. As the Lawyers' Committee for Civil Rights Under Law observes, citing *Bank of the United States* v. *Deveaux:*

> For over 200 years, Federal diversity jurisdiction has been exercised with care and hesitation, demonstrating that Congress believed, with few exceptions "tribunals of

---

[42] Id. (adding 28 U.S.C. 1712 (c)).
[43] Id. (adding 28 U.S.C. 1712 (e)).

[44] See Letters from Judicial Conference (Jul. 26, 1999 and Aug. 23, 1999).
[45] Letter from Eliot Spitzer, Attorney General New York and W.A. Drew Edmondson, Attorney General of Oklahoma, on behalf of the Attorneys General of the States of California, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New York, Oklahoma, Vermont and West Virginia (Feb. 7, 2005).
[46] The Federalist No. 14 (James Madison).

93

the state * * * administer justice as impartially as those of the nation, to parties of every description."[47]

The courts have previously found that efforts by Congress to dictate such state court procedures implicate important Tenth Amendment Federalism concerns and should be avoided. For example, in *Fielder* v. *Casey* the Supreme Court observed that it is an "unassailable proposition * * * that States may establish the rules of procedure governing litigation in their own courts."[48]

Similarly, in *Johnson* v. *Fankell,* the Court reiterated what it termed "the general rule bottomed deeply in belief in the importance of State control of State judicial procedure * * * that Federal law takes State courts as it finds them"[49] and observed that judicial respect for the principal of Federalism "is at its apex when we confront a claim that Federal law requires a State to undertake something as fundamental as restructuring the operation of its courts" and "it is a matter for each State to decide how to structure its judicial system."[50]

These same constitutional concerns were highlighted by Professor Laurence Tribe in his testimony regarding the constitutionality of a proposed federal class action rule applicable to state courts included in tobacco legislation proposed during the 105th Congress. Professor Tribe observed: "[f]or Congress directly to regulate the procedures used by state courts in adjudicating state-law tort claims—to forbid them, for example, from applying their generally applicable class action procedures in cases involving tobacco suits—would raise serious questions under the Tenth Amendment and principles of Federalism."[51]

The Supreme Court's most recent decisions further indicate that S. 5 is an unacceptable infringement upon state sovereignty. In *United States* v. *Morrison*,[52] the Court invalidated parts of the Violence Against Women Act, claiming that Congress overstepped its specific constitutional power to regulate interstate commerce. Despite vast quantities of data illustrating the effects that violence against women has on interstate commerce, the Court essentially warned Congress not to extend its constitutional authority to "completely obliterate the Constitution's distinction between national and local authority." S. 5, introduced and considered in Committee without a hearing and without any convincing data, ignores the

---

[47] See Letter from Lawyers' Committee for Civil Rights Under Law (Apr. 9, 2003) (quoting *Bank of the United States* v. *Deveaux,* 9 U.S. (5 Cranch) 61, 87 (1809); see also *City of Indianapolis* v. *Chase Nat'l Bank,* 314 U.S. 63, 76 (1941).

[48] 487 U.S. 131, 138 (1988) (finding Wisconsin notice-of-claim statute to be preempted by 42 U.S.C. § 1983, which holds anyone acting under color of law liable for violating constitutional rights of others).

[49] 520 U.S. 911, 919 (1997) (holding that Idaho procedural rules concerning appealability of orders are not preempted by 42 U.S.C. Sec. 1983) (quoting Henry M. Hart, Jr., The Relations Between State and Federal Law, 54 Colum. L. Rev. 489, 508 (1954)).

[50] Id. at 922. See also *Howlett* v. *Rose,* 296 U.S. 356, 372 (1990) (quoting Henry M. Hart, Jr., The Relations Between State and Federal Law, 54 Colum. L. Rev 489, 508 (1954) for the proposition that Federal law should not alter the operation of the state courts); *New York* v. *United States,* 505 U.S. 144, 161 (1992) (stating that a law may be struck down on Federalism grounds if it "commandeer[s] the legislative processes of the States by directly compelling them to enact and enforce a Federal regulatory program").

[51] The Global Tobacco Settlement: Hearings Before the Senate Comm. on the Judiciary, 105th Cong. (1997) (statement of Laurence H. Tribe, Tyler Professor of Law, Harvard Law School). Indeed, Former-Chairman Hatch praised Professor Tribe at the Committee's June 4, 2003, hearing on asbestos litigation as "known here and throughout the country as one of the most respected constitutional scholars and practitioners."

[52] 529 U.S. 598 (2000).

94

Court's admonitions and subverts the federal system by hindering the states' ability to adjudicate class actions involving important and evolving questions of state law. S. 5 not only obliterates the distinction between national and local authority, it effectively annihilates local authority over state class actions.

Responding to these significant constitutional concerns, proponents of this legislation argue that state courts will not give fair hearings to out-of-state defendants, but support for their assertion is bereft of evidence. First, the Supreme Court has already made clear that the state courts are constitutionally required to provide due process and other fairness protections to the parties in class action cases. In *Phillips Petroleum Co.* v. *Shutts*,[53] the Supreme Court held that in class action cases, state courts must ensure that: (1) the defendant receives notice plus an opportunity to be heard and participate in the litigation;[54] (2) an absent plaintiff must be provided with an opportunity to remove himself or herself from the class; (3) the named plaintiff must at all times adequately represent the interests of the absent class members; and (4) the forum state must have a significant relationship to the claims asserted by each member of the plaintiff class.[55]

Secondly, as fears of local court prejudice have subsided and concerns about diverting federal courts from their core responsibilities have increased, the policy trend in recent years has been towards limiting Federal diversity jurisdiction.[56] For example, Congress enacted the Federal Courts Improvement Act of 1996,[57] which increased the amount in controversy requirement needed to remove a diversity case to federal court from $50,000 to $75,000. This statutory change was based on the Judicial Conference's determination that fear of local prejudice by state courts was no longer relevant[58] and that it was important to keep the federal judiciary's efforts focused on federal issues.[59]

## IV. Conclusion

Contrary to its supporters' assertions, S. 5's provisions are much broader than merely prohibiting nationwide class actions from being pursued in state court. In fact, this bill will override the current state laws governing class actions in the fifty states. And, in practice, it will bar many, if not most, state class actions filed solely on behalf of residents of a single state, solely involving matters of that state's law from being heard in that state court, so long as one plaintiff or one primary defendant is a citizen of a different

---

[53] 472 U.S. 797 (1985).

[54] Id. at 812 (stating that the notice must be the "best practicable, reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections") (quoting *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314–315 (1950)).

[55] Id. at 806–810. These findings were reiterated by the Supreme Court in 1995 in *Matsushita Elec. Indust. Co.* v. *Epstein*, 516 U.S. 367 (1995) (holding that state class actions are entitled to full faith and credit so long as, inter alia: the settlement was fair, reasonable, adequate and in the best interests of the settlement class; notice to the class was in full compliance with due process; and the class representatives fairly and adequately represented class interests).

[56] Ironically, during the 104th Congress, the Republican Party was extolling the virtues of state courts in the context of their efforts to limit habeas corpus rights, which permit individuals to challenge unconstitutional state law convictions in Federal court.

[57] 28 U.S.C 1332(a) (West Supp. 1998).

[58] See Judicial Conference of the United States, Long Range Plan for the Federal Courts, Recommendation 7 at 30 (1995).

[59] See id.

95

state. This is clearly an extreme and distorted change to the diversity jurisdiction standards in our court system.

As a result, these drastic changes to longstanding federal procedural rules will make it harder for citizens to protect themselves against violations of state civil rights, consumer, health, and environmental protection laws by forcing these class action cases out of convenient state courts into federal courts, with significant new barriers and burdens on plaintiffs.

For these reasons, and until we reach consensus on improvements to class action litigation for the benefit of defendants and plaintiffs, we remain strongly opposed to S. 5.

PATRICK J. LEAHY.
EDWARD M. KENNEDY.
JOSEPH R. BIDEN.
RUSSELL D. FEINGOLD.
RICHARD J. DURBIN.

## XII. Changes in Existing Law

The Committee has determined that it is necessary, in order to expedite the business of the Senate, to dispense with the requirements of rule XXVI, paragraph 12, of the Standing Rules of the Senate, with respect to comparing the proposed changes and existing provisions of the United States Code.

○