**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- x

New Jersey Carpenters Vacation Fund and
Boilermaker Blacksmith National Pension Trust, On
Behalf of Themselves and All Others Similarly
Situated,

                             Plaintiffs,

           -against-

The Royal Bank of Scotland Group, plc, Greenwich
Capital Holdings, Inc., Greenwich Capital
Acceptance, Inc., Greenwich Capital Financial
Products, Inc., Robert J. McGinnis, Carol P. Mathis,
Joseph N. Walsh, III, John C. Anderson, James M.
Esposito, RBS Securities, Inc. f/k/a Greenwich
Capital Markets, Inc., d/b/a RBS Greenwich Capital,
Moody's Investors Service, Inc., and The McGraw-
Hill Companies, Inc.,

                           Defendants.

-------------------------------------------------------------- x

:  08-CV-5093 (HB)
:  ECF Case

## MEMORANDUM OF LAW IN SUPPORT OF THE
## DEFENDANTS' MOTION TO DISMISS

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000

*Attorneys for Defendants The Royal Bank of
Scotland Group, plc, RBS Holdings USA Inc. f/k/a
Greenwich Capital Holdings, Inc., Greenwich
Capital Acceptance, Inc., RBS Financial Products,
Inc. f/k/a Greenwich Capital Financial Products,
Inc., and RBS Securities, Inc. f/k/a Greenwich
Capital Markets, Inc., Robert J. McGinnis, Carol P.
Mathis, Joseph N. Walsh, III, John C. Anderson,
and James M. Esposito*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................5

ARGUMENT .............................................................................................................7

I.    Plaintiffs Fail to Adequately Allege Standing .................................................7

      A.    Plaintiffs Lack Standing For 13 Of The 15 Offerings In The Complaint Because They Did Not Purchase Certificates In Those Offerings .........................................................................................8

      B.    Plaintiffs Fail to Allege Any Injury .................................................9

II.    The Complaint Fails To Allege Any Material Omissions Relating To The Mortgage Loan Underwriting Guidelines ........................................................10

      A.    The Prospectuses and Prospectus Supplements Disclosed All of the Risks Plaintiffs Claim Were Omitted.................................................11

      B.    Plaintiffs Have Not Pled Any Misstatement With Respect to the Specific Loans Underlying Their Certificates .........................................14

III.    The Complaint Fails To Allege A Material Misstatement Or Omission With Respect To The Rating Agencies' Role In Structuring and Assessing The Securities ...................................................................................16

      A.    The Prospectuses And Prospectus Supplements Disclose All That The Relevant SEC Regulations Require Regarding The Ratings Agencies' Role in Structuring the Certificates .....................................16

      B.    It Was Public Knowledge That Issuers Paid The Ratings Agencies To Rate Securities, And Therefore That Fact Cannot Be A Material Omission.................................................................................17

      C.    Plaintiffs' Allegations That the Rating Agency Models Were Inaccurate Fail to State a Claim .................................................18

IV.    Plaintiffs' Claims Are Barred By The Applicable Statute Of Limitations.....21

      A.    Plaintiffs Were On Notice of Originators' Lending Practices Prior to May 14, 2007 .......................................................................23

i

**B.  Plaintiffs Were on Notice of Originators Lending Practices Prior to May 19, 2008** ....................................................................................24

**V.  Plaintiffs' Section 15 Control Person Claims Must be Dismissed Because the Underlying Claims Upon Which They Are Based Upon Fail As a Matter of Law** ...................................................................................................24

**CONCLUSION** .........................................................................................................25

## TABLE OF AUTHORITIES

### Cases

*Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336 (2d Cir. 1987) ...................................................... 8

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ...................................................................................... 7

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ........................................ 1

*Barnes v. Osofsky*, 373 F.2d 269 (2d Cir. 1967) .......................................................................... 8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................................... 7

*Compuware Corp. v. Moody's Investors Servs., Inc.,* 499 F.3d 520 (6th Cir.
     2007) .................................................................................................................................... 21

*Coronel v. Quanta Capital Holdings Ltd.,* No. 07 CIV 1405 (RPP), 2009 WL
     174656 (S.D.N.Y. Jan. 26, 2009) ........................................................................................ 20

*Dodds v. Cigna Sec., Inc.*, 12 F.3d 346 (2d Cir. 1993) ................................................................ 21

*Ehlert v. Singer*, 245 F.3d 1313 (11th Cir. 2001) ........................................................................ 10

*Finkel v. Putnam Convertible Opportunities & Income Trust*, No. 96 Civ.
     4810 RPP, 1997 WL 60847 (S.D.N.Y. Feb. 11, 1997), *aff'd*, 162 F.3d
     1147 (2d Cir. 1998) .............................................................................................................. 13

*Finkel v. Stratton Corp.*, 962 F.2d 169 (2d Cir. 1992) .................................................................. 9

*Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008) ...................................... 14, 25

*Glusband v. Fittin Cunningham Lauzon, Inc.*, 582 F. Supp. 145 (S.D.N.Y.
     1984) .................................................................................................................................... 10

*Grace v. Rosenstock*, 169 F.R.D. 473 (E.D.N.Y. 1996), *aff'd*, 228 F.2d 40 (2d
     Cir. 2000) ............................................................................................................................. 22

*Halperin v. eBanker USA.COM, Inc.*, 295 F.3d 352 (2d Cir. 2002) ............................................ 13

*Hinerfeld v. United Auto Group*, No. 97 Civ. 3533 RPP, 1998 WL 397852
     (S.D.N.Y. July 15, 1998) ...................................................................................................... 16

*In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513 (S.D.N.Y. 2005) .................................................. 22

*In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402 (S.D.N.Y. 2005) .............................................. 22

*In re AOL Time Warner Sec. & ERISA Litig.*, 381 F. Supp. 2d 192 (S.D.N.Y.
     2004) ...................................................................................................................................... 9

*In re Flag Telecom Holdings, Ltd.*, 308 F. Supp. 2d 249 (S.D.N.Y. 2004) .................................... 25

*In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189 (S.D.N.Y. 2003) ........................ 8, 21

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d
    243 (S.D.N.Y. 2003) ...................................................................................... 8, 18

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 273 F. Supp. 2d
    351 (S.D.N.Y. 2003) ........................................................................................ 21

*In re Merrill Lynch & Co., Inc. Sec., Derivative & ERISA Litig.*, 597 F. Supp.
    2d 427 (S.D.N.Y. 2009) ..................................................................................... 7

*In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207 (S.D.N.Y. 1999), *aff'd*, 202
    F.3d 81 (2d Cir. 2000) ................................................................................. 13, 17

*In re Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548 (S.D.N.Y. 2005) ........................... 17

*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8 (S.D.N.Y.
    2001) ............................................................................................................ 14

*In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678 (S.D.N.Y. 2000) .......................................... 23

*La. Mun. Police Employees Ret. Sys. v. Merrill Lynch & Co.*, No. 08 Civ.
    9063 (JSR) (S.D.N.Y. Feb. 19, 2009) ............................................................... 9

*Lone Star Fund V, L.P. v. Barclays Bank PLC*, No. 08 Civ. 0261, 2008 WL
    4449508 (N.D. Tex. Sept. 30, 2008) ............................................................... 14

*Miller v. Silbermann*, 951 F.Supp. 485 (S.D.N.Y.1997) ............................................................. 8

*Nettis v. Levitt*, 241 F.3d 186 (2d Cir. 2001) ............................................................................ 22

*New Jersey Carpenters Health Fund v. Home Equity Mortgage Trust 2006-5,
et. al.*, No. 2008-cv-05653 (S.D.N.Y. 2008) ....................................................... 1

*New Jersey Carpenters Health Fund v. Lehman XS Trust Series 2005-5N et.
al.*, No. 2008-cv-06762 (S.D.N.Y. 2008) ........................................................... 1

*New Jersey Carpenters Health Fund v. RALI Series 2006-q-1 Trust et. al.*, No.
    2008-cv-08781 (S.D.N.Y. 2008) ...................................................................... 2

*New Jersey Carpenters Health Fund, v. NovaStar Mortgage, Inc. et. al.*, No.
    08-CV-5310 (S.D.N.Y. 2008) .......................................................................... 2

*New Jersey Health Fund v. Bear Stearns Mortgage Funding Trust2006-AR1
et al.*, No. 2008-cv-08093 (S.D.N.Y. 2008) ....................................................... 1

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) ........................................ 20

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662
(S.D.N.Y. 2008) .................................................................................................. 13, 17, 20

*Pruiss v. Bosse*, 912 F. Supp. 104 (S.D.N.Y. 1996) ...................................................... 22

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ........................................................ 13

*SEC v. Universal Express, Inc.*, 546 F.Supp. 2d 132 (S.D.N.Y. 2008) ........................... 1

*Shah v. Meeker*, 435 F.3d 244 (2d Cir. 2006) ............................................................. 22

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) ........................................ 14

*Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406 (2d Cir. 2008) ..................... 22

**Rules**

15 U.S.C. § 77l(a)(2) ..................................................................................................... 9

15 U.S.C. §77m ............................................................................................................ 23

17 C.F.R. § 229.1111(a)(3) ........................................................................................... 15

17 C.F.R. § 229.1120 .................................................................................................... 18

17 C.F.R. § 229.512(a)(1) ............................................................................................. 10

**Other Authorities**

SEC Proposed Rules, 57 S.E.C. Docket 1244, 1994 WL 469347 (S.E.C.
Release Nos. 7086, 34617, 20509, 33-7086, 34-34617, IC – 20509) .............................. 22

## PRELIMINARY STATEMENT

The collapse of the U.S. residential housing market and freeze in the credit and capital markets over the last two years has triggered an unprecedented financial crisis in this country and throughout the world.[1] The fallout has affected virtually all segments of the economy, including the market for mortgage-backed securities - securities that consist of a "package" of many mortgages, the payments from which are used to make the required payments to the holders of the securities ("MBS"). Many of the world's largest financial institutions (including Goldman Sachs, Citibank, Merrill Lynch, JP Morgan, Morgan Stanley and Bank of America) have suffered billions in losses as a result of significant MBS exposure. Other one-time giants in the financial services industry (Lehman Brothers, Bear Stearns and Washington Mutual) have been dragged under by the financial storm.

The collapse in the MBS market has been followed by an avalanche of litigation. Currently, there are nearly 20 suits pending against more than 30 different financial institutions, all of which make essentially the same allegations made here. In fact, lead plaintiffs' counsel in this case, and affiliates of these very plaintiffs, have filed at least five suits against 16 different financial institutions containing virtually identical allegations.[2] Even in the one complaint in this

---

[1]    Courts routinely take judicial notice of industry wide downturns, including "the widespread decline in property values over the past year" at issue here. *SEC v. Universal Express, Inc.*, 546 F.Supp. 2d 132, 137 n. 7 (S.D.N.Y. 2008). Furthermore, in ruling on this motion to dismiss, the Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, documents possessed by or known to the plaintiff and upon which it relied in bringing the suit, and matters subject to judicial notice." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (internal citations omitted).

[2]    *See New Jersey Carpenters Health Fund v. Home Equity Mortgage Trust 2006-5, et. al.*, No. 2008-cv-05653 (S.D.N.Y. 2008); *New Jersey Carpenters Health Fund v. Lehman XS Trust Series 2005-5N et. al.*, No. 2008-cv-06762 (S.D.N.Y. 2008); *New Jersey Health Fund v. Bear Stearns Mortgage Funding Trust2006-AR1 et al.*, No. 2008-cv-08093 (S.D.N.Y. 2008); *New*

action, Plaintiffs argue that five different mortgage lenders were failing to follow the

underwriting guidelines described in the Prospectus Supplements for 15 separate securities

issued at 15 different times.

In each case, the defendants are not the originators of the mortgages (that is, the lenders

that made the mortgages to the homeowners). Rather, most of the defendants are entities that

packaged those mortgages into MBS and sold them to investors in the financial markets (the

"issuers/underwriters"). Each of the complaints attempts to allege that the issuers/underwriters

of the MBS failed to properly disclose the fact that the originators of the mortgages were not

following the underwriting guidelines described in the Prospectus Supplements pursuant to

which the securities were sold. Plaintiffs then state in a conclusory fashion that as a result of the

originators' deviation from the guidelines, the mortgages that backed their securities were not as

valuable as they were led to believe. [3]

---

*Jersey Carpenters Health Fund v. RALI Series 2006-q-1 Trust et. al.*, No. 2008-cv-08781
(S.D.N.Y. 2008); *New Jersey Carpenters Health Fund v. NovaStar Mortgage Funding Trust,
Series 2006-3, et. al.*, No. 08-CV-5310 (S.D.N.Y. 2008).

[3]     Lead Plaintiffs' Consolidated First Amended Securities Class Action Complaint in this action
(the "Complaint") asserts claims under the Securities Act of 1933 (the "1933 Act") against
Greenwich Capital Acceptance, Inc. ("GCA"), the entity that filed the Prospectuses and
Prospectus Supplements for the offerings; officers and directors of GCA (the "Individual
Defendants"); GCA's parent company Greenwich Capital Holdings, Inc. ("GCH"); GCH's
parent company Royal Bank of Scotland Group, plc ("RBSG"); Greenwich Financial
Products, Inc. ("GCFP"), the Sponsor for the offerings; Greenwich Capital Markets, Inc.
("GCM"), the offering underwriter; and The McGraw-Hill Companies, Inc. (Standard &
Poor's Rating Service) and Moody's Investors Service, Inc., the agencies that rated the
securities. GCH, GCA, GCFP and GCM are referred to herein as "RBS" or the "RBS
Entities." Plaintiffs' claims against the Individual Defendants are based solely on the fact
that these individuals signed the shelf registration statements allegedly at issue in the
Complaint. Certain of the RBS Entities recently re-branded and changed their names.
Greenwich Capital Holdings, Inc. is now known as RBS Holdings USA Inc., Greenwich
Capital Markets, Inc. is now known as RBS Securities Inc., and Greenwich Capital Financial
Products, Inc. is now known as RBS Financial Products, Inc. There were no changes in the
corporate structure for Rule 7.1 purposes. The RBS Entities are herein referred to under their
old names for ease of reference.

Plaintiffs' cookie cutter approach fails for two substantive reasons. First, all of the types of actions that Plaintiffs allege were "deviations" from the underwriting guidelines were in fact described in the Base Prospectuses ("Prospectuses") and Prospectus Supplements for the offerings. The Prospectuses and Prospectus Supplements state that "in the ordinary course of business," the originators will deviate from the underwriting guidelines and describe the risks that such deviations might present for investors. Second, each of the 15 separate security offerings that Plaintiffs seek to recover on was issued pursuant to a separate Prospectus Supplement. The Prospectus Supplement explicitly describes the mortgages that are included in the portfolio of loans that supports that particular security. Information is provided on many facets of the specific mortgage pool, including: the level of income and asset documentation required of the borrowers; the duration of the loans; the credit scores of the borrowers; the payment history on the mortgages as of the date of the Prospectus Supplement; the geographic distribution of the underlying mortgages; and the ratio of loan to value on the properties. Plaintiffs have not alleged that any of this specific information is incorrect. That is fatal to their claim. Even if Plaintiffs had adequately alleged that there were undisclosed deviations from the underwriting guidelines (they have not), that allegation on its own is immaterial. Plaintiffs must also allege that the result of the failure to follow underwriting guidelines was that the specific mortgages in the pool that underlay the security they actually purchased did not have the characteristics described in the Prospectus Supplement. Plaintiffs have not done so and therefore have not alleged a material misstatement.

Plaintiffs make one other substantive allegation that material information was omitted from the offering documents. Each of the securities at issue here was rated by both Moody's Investors Service and Standard & Poor's (the "Ratings Agencies"). Plaintiffs allege that the

offering documents did not disclose that the Rating Agencies were using outdated models to rate the securities, were involved in the structuring of the securities and were conflicted because they were paid by issuers to rate the securities. Compl. ¶ 184.[4] The Rating Agency claims are meritless. Plaintiffs do not allege that the securities did not actually receive the ratings that were disclosed in the Prospectus Supplements. There is, therefore, no misstatement. Plaintiffs' attempt to plead that the Rating Agencies should have known that their models were not accurately assessing risk is the type of classic fraud by hindsight allegation that has been repeatedly rejected by this Court. Moreover, the 1933 Act explicitly addresses what must be disclosed with regard to ratings and the Plaintiffs do not attempt to allege that the Prospectuses and Prospectus Supplements failed to accurately disclose the required information. As for the "conflict of interest" claims, years before the securities here were issued there were dozens of reports – including Congressional reports and testimony – as to how the Ratings Agencies were compensated and discussing potential conflicts of interest. Plaintiffs cannot state a claim based on an alleged failure to repeat information already in the public domain.

As a threshold matter, the Court need not even reach the substantive issues discussed above because Plaintiffs lack standing. Plaintiffs purchased in only two of the 15 securities offerings described in the Complaint. Accordingly, Plaintiffs do not have standing to sue on the other 13. Plaintiffs have also failed to allege an injury related to the two securities they allege they purchased, or any other securities for that matter. Plaintiffs hold a bond that requires interest and principal payments. Plaintiffs do not allege that they have not received any of these scheduled payments. Plaintiffs do not have an injury and do not have standing.

---

[4]    All citations to "Ex. __" or "Exhibit __" refer to exhibits to the Declaration of Thomas C. Rice.

## BACKGROUND

### The Offerings and Plaintiffs' Claims

Plaintiffs purport to bring claims on behalf of themselves and a purported class of persons who purchased MBS certificates sold in any of 15 different offerings by GCA and its affiliates (the "Certificates"). Each offering had multiple tranches, or Classes, each of which was entitled to different levels of priority in the payment (or loss) stream and therefore had different levels of risk and return. *See, e.g.,* Ex. 5 (hereinafter "2006-4 Prospectus Supplement"). Each offering was backed by a separate pool of mortgage loans that were made (or on occasion purchased) primarily by one of five different mortgage lenders. Each offering was made pursuant to a separate Prospectus Supplement that contained all of the relevant specific information regarding the originator and the pool of mortgages that would support the particular offering's Certificates.[5] Compl. ¶¶ 19-35. The named Plaintiffs allege that they purchased in only 2 of those 15 offerings.[6]

The Complaint asserts claims against GCA, GCM, the Individual Defendants and the Ratings Agencies under Section 11of the 1933 Act, against GCM under Section 12 of the 1933 Act, and against RBSG, GCH, GCM, the Individual Defendants, and the Ratings Agencies under Section 15 of the 1933 Act. All of the claims are based on

---

[5]   The April 26, 2006 Prospectus is attached as Exhibit 4. The 2006-4 Prospectus Supplement and 2007-7 Prospectus Supplement are attached as Exhibits 5 and 6 respectively. All of the other Prospectuses and Prospectus Supplements for the offerings included in the Complaint are publicly available on the SEC website at www.sec.gov, available upon request, and hereby incorporated by reference.

[6]   According to the Complaint, named plaintiff New Jersey Carpenters Vacation Fund purchased 100,000 Class B1 Certificates (junior class, higher risk, higher return) from the Series 2006-4 offering and named plaintiff Boilermaker Pension Trust purchased 3,557,554.98 Class 2A1A Certificates (senior class, lower risk, lower return) from the Series 2007-7 offering. Compl. ¶¶ 19-20; *see also* Ex. 5 (hereinafter "2006-4 Prospectus Supplement"); Ex. 6 (hereinafter "2007-7 Prospectus Supplement").

allegations that the offering documents omitted the following two categories[7] of

information:

> **Regarding Loan Origination:** "Originators ignored stated underwriting guidelines and appraisal requirements and in many cases employed fraudulent underwriting practices," and as a result the underlying mortgage loans were not as valuable as Plaintiffs were led to believe. Compl. ¶¶ 193-236.[8]

> **Regarding Certificate Ratings:** Ratings agencies used "outdated models, lowered ratings criteria and inaccurate loan information" which "produced artificially high credit ratings," and were involved in "material financial conflicts of interest [with] GCM;" Compl. ¶¶ 178, 184, 240, 252.

**Risk Disclosures In The Prospectuses and Prospectus Supplements**

The Prospectuses and Prospectus Supplements contained robust risk disclosures stating,

*inter alia,* that originators make exceptions to their guidelines, that those exceptions can result in

higher losses on the loans, and describing the various types of documentation – or lack of

documentation – that the originators require from borrowers.  They also contained specific

disclosures regarding the limitations of the ratings assigned to the securities.  These disclosures

are detailed in Exhibit 1 and discussed in Section II below, which shows that Plaintiffs have

failed to plead a material omission or misstatement.

---

[7]   Attached as Exhibit 1 is a table showing all paragraphs alleging omissions that fit into these categories.

[8]   While Plaintiffs also allege that defendants failed to conduct due diligence into the originators' practices, that allegation does not state a securities claim (but instead attempts to allege the absence of a due diligence defense).  While no response to that allegation is due on this motion, the allegation is without basis in fact as RBS conducted thorough due diligence. For example, for the securitizations, RBS hired the Clayton Group (one of the two largest MBS diligence companies in the country) to conduct due diligence on the underlying loans. Typically, teams of 30 to 40 people would review a random sample of the loans designed to provide a 95% to 98% confidence level with regard to the rest of the pool.  The reviewers also would select an "adverse" group of loans to review likely to be risky for one or more reasons.  *See, e.g.,* Ex. 4 (hereinafter "April 26, 2006 Prospectus") at 61.  Additionally, as reflected in the Prospectus, RBS obtained written representation of the originators' underwriting practices.

# ARGUMENT[9]

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint's "[f]actual allegations must be enough to raise a right of relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). On May 18, 2009, the Supreme Court in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), expressly reaffirmed the "plausibility" standard of *Twombly* as the standard that applies to "all civil actions and proceedings in the United States district courts," holding that courts must first identify "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determine whether any well-pled factual allegations "plausibly give rise to an entitlement to relief." *Id.* at 1950, 1953. Where "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint has failed to show that "the pleader is entitled to relief." *Id* at 1950.

Plaintiffs have not met the *Twombly/Ashcroft* standard. As a threshold matter, Plaintiffs have not alleged standing. Plaintiffs have also failed to adequately allege a material misstatement. Finally, Plaintiffs' claims are barred by the statute of limitations.

## I. Plaintiffs Fail to Adequately Allege Standing

Standing is a constitutional requirement that is "the key to the courthouse door." *In re Merrill Lynch & Co., Inc. Sec., Derivative & ERISA Litig.*, 597 F. Supp. 2d 427, 431 (S.D.N.Y. 2009) (internal citation omitted). Plaintiffs have the burden of alleging standing for each of their claims. *Miller v. Silbermann*, 951 F.Supp. 485, 489 (S.D.N.Y.

---

[9]    The Complaint names GCFP as a defendant. The Complaint fails, however, to assert any causes of action against GCFP. *See* Compl. at 114-120. Accordingly, GCFP should be dismissed as a defendant.

1997). In the class action context, this means that at least one named plaintiff must have

standing to sue with respect to each asserted claim. *In re Merrill Lynch & Co., Inc.*

*Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003).

### A.    Plaintiffs Lack Standing For 13 Of The 15 Offerings In The Complaint Because They Did Not Purchase Certificates In Those Offerings

To have standing to sue on behalf of a class under the 1933 Act, "at least one named

plaintiff . . . must have purchased shares traceable to the challenged offering." *In re Global*

*Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003) (dismissing a claim where

plaintiffs did not purchase shares issued pursuant to the offering at issue).[10]   Here, Plaintiffs only

allege to have purchased Certificates in *two* of the 15 certificate offerings mentioned in the

Complaint. Compl.  ¶¶ 1, 19-20.[11]  Plaintiffs therefore lack standing on the other 13 transactions.

Plaintiffs may argue that the 15 separate offerings were made under only two registration

statements, that they purchased in offerings made pursuant to each of those two registration

statements, and that they therefore have standing to sue for all of the various offerings made

pursuant to those two registration statements.  This argument is wrong.  The registration

statement is a very general document that does not describe the terms of the underlying

mortgages and only describes the securities in a very general way.  No securities were issued

pursuant to *only* a registration statement.  Rather, the issuers had first to file a Base Prospectus,

which added additional information and permitted the issuance of a Prospectus Supplement that

---

[10]   *See also Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967) ("[A]n action under § 11 may be maintained 'only by one who comes within a narrow class of persons, *i.e.*, those who purchased securities that are the direct subject of the prospectus and registration statement.'") (internal citation omitted); *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 344 (2d Cir. 1987) ("Section 12(2) imposes liability on persons who offer or sell securities and only grants standing to 'the person purchasing such security' from them"); 15 U.S.C. § 77l(a)(2).

[11]   A chart showing the thirteen offerings in which plaintiffs failed to allege Certificate purchases is attached as Exhibit 3.

contained the information relevant to each of the 15 individual offerings. It is the Prospectus

Supplement that provides the material information regarding the specific transaction,

incorporating by reference the risk disclosures in the Base Prospectus. All the information

Plaintiffs allege was omitted or misrepresented in the offering documents was addressed in the

Prospectus Supplement for each particular offering and *not* in the registration statements. *See,*

*e.g.,* Compl. ¶138. Any general statements in the registration statements regarding what might

appear in the ultimate Prospectus Supplement were ultimately amended and superseded by the

applicable Prospectus and controlling specific Prospectus Supplement for each deal.

Registration statements are incorporated into later-filed Prospectus Supplements, and not vice

versa. 17 C.F.R. § 229.512(a)(1); *see Finkel v. Stratton Corp.*, 962 F.2d 169, 174 (2d Cir. 1992).

This Court recently recognized that it is the Prospectus Supplement that is critical to the standing

analysis and that plaintiffs cannot bootstrap their way into standing merely because separate

offerings share the same shelf registration statement. *See* Ex. 7 (Transcript of Oral Argument at

5, 9, 62, *La. Mun. Police Employees Ret. Sys. v. Merrill Lynch & Co.*, No. 08 Civ. 9063 (Rakoff,

J.) (S.D.N.Y. Feb. 19, 2009) (dismissal of complaint appropriate for purchasers of different MBS

offerings for lack of standing).

**B.     Plaintiffs Fail to Allege Any Injury**

     Plaintiffs lack standing with respect to the two offerings in which they did purchase

because they have not adequately alleged any injury. *See In re AOL Time Warner Sec. & ERISA*

*Litig.*, 381 F. Supp. 2d 192, 245-46 (S.D.N.Y. 2004) (dismissing Section 11 and 12 claims where

plaintiff failed to allege a cognizable injury). Plaintiffs claim only that the market price of the

Certificates has decreased. Compl. ¶9. But the Prospectuses and Prospectus Supplements

explicitly state that there was no existing market for the Certificates, that it was not certain that

any such market would develop and that even if a market did develop it might not be an efficient

market allowing exit from the securities at any time. *See, e.g.,* Apr. 26, 2006 Prospectus at 39.

Thus, instead of relying on an efficient market, these securities are purchased based on the cash

flows that the investors receive on the bonds. Plaintiffs have not alleged that they have failed to

receive a single payment on their Certificates.[12] Allowing Plaintiffs to proceed on the basis of an

alleged decline in the so-called "market" value of the Certificates would provide Plaintiffs with a

significant windfall. Plaintiffs could continue receiving the principal and interest payments they

bargained for, while also receiving compensation for a decline in the demand for the Certificates

in a "market", which the Prospectuses and Prospectus Supplements explicitly cautioned might

never exist. [13]

## II. The Complaint Fails To Allege Any Material Omissions Relating To The Mortgage Loan Underwriting Guidelines

Plaintiffs allege that the originators failed to follow the disclosed underwriting guidelines

in a variety of ways. But the risk factors incorporated by reference into the Prospectus

Supplements specifically disclosed that each of the "deviations" Plaintiffs point to could occur

and that the risks inherent in the loans could increase as a result. There simply was no

misleading omission. Further, even if the Prospectus Supplements did not disclose all of the

---

[12]  Based on the reports to Certificate Holders, which are publicly available on Bloomberg, Plaintiffs cannot allege that they have suffered any such injury because the Certificates continue to pay Plaintiffs' scheduled monthly distributions in full. *See* Exs. 8 and 9, June HVMLT, 2006-4, 2007-7 Reports to Certificate holders (publicly available on Bloomberg).

[13]  Plaintiffs' Section 15 claims deriving from their Section 11 or 12 claims which fail for lack of standing must also be dismissed, as a plaintiff must establish standing with respect to its underlying 1933 Act claims to have standing on its derivative section 15 "control person" claims. *See Glusband v. Fittin Cunningham Lauzon, Inc.*, 582 F. Supp. 145, 150 n.10 (S.D.N.Y. 1984) ("Because [plaintiff] has no standing to sue under section 12, which is limited to purchasers, neither does [plaintiff] have standing to sue under section 15"); *Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001) (where plaintiffs fail to allege a § 11 or 12 claim, the related § 15 claim must also be dismissed).

risks that Plaintiffs claim to have been unaware of, the Complaint would still fail to allege a material misstatement.  Purchasers of Certificates did not have to rely on underwriting guidelines.  The Prospectus Supplements detailed for each Certificate the relevant financial characteristics of the pool of mortgages that backed that Certificate.  Plaintiffs have not adequately alleged that any of that information is incorrect.[14]

### A.    The Prospectuses and Prospectus Supplements Disclosed All of the Risks Plaintiffs Claim Were Omitted

Plaintiffs allege that the originators deviated from their underwriting guidelines in a number of specific ways.  Exhibit 1 is a table of Plaintiffs allegations, comparing each to the risk disclosures in the Prospectuses and Prospectus Supplements that discuss the various types of deviations that Plaintiffs complain they were unaware of.   A summary description of the allegations and related disclosures makes clear that there were no material omissions:

- **Plaintiffs claim they did not know:** "Originators ignored stated underwriting guidelines and appraisal requirements . . ." Compl. ¶ 193.

  **The Prospectuses Say:** "[F]rom time to time and in the ordinary course of business, originators will make exceptions to [underwriting] guidelines. Loans originated with exceptions may result in a higher number of delinquencies and loss severities than loans originated in strict compliance with the designated underwriting guidelines." and "The quality of [] appraisals [on the subject properties] may vary widely" and, because the appraiser is often selected by the mortgage loan broker or lender, the appraiser "may feel pressure from that broker or lender to provide" a higher appraisal value than warranted. As a result, "[i]naccurate or inflated appraisals may result in an increase in the number and severity of losses on the mortgage loans." *See, e.g.*, April 26, 2006 Prospectus at 13-14.

- **Plaintiffs claim they did not know:** "[T]he Originators were not ... thorough in getting documentation from or about borrowers..." (Compl. ¶ 197) and with little to no documentation, weak borrowers were able to falsify their income/credit histories and

---

[14]  Plaintiffs generically state that the specific information in the Prospectus Supplements is incorrect, but they cite nothing to support that claim other than that the Certificates later declined in value and that mortgage default rates increased after the Certificates were issued. This sort of "fraud by hindsight" pleading is insufficient as a matter of law to state a claim. *See infra* Section III.C., and cases cited therein.

receive loans that they did not qualify for. Compl. ¶¶ 76-78, 94, 101-2, 131-3, 200, 206-8, 216, 225, 229.

**The Prospectuses Say:** a significant number of loan programs "permit an applicant to qualify for a mortgage loan based upon monthly income as stated on the mortgage loan application" and, "Fraud committed in the origination process may increase delinquencies and defaults on the mortgage loans. For example, a borrower may present fraudulent documentation to a lender during the mortgage loan underwriting process, which may enable the borrower to qualify for a higher balance or lower interest rate mortgage loan than the borrower would otherwise qualify for." *See, e.g.*, April 26, 2006 Prospectus at 13-14. The Prospectus Supplements also disclose the number of loans in the pool specific to the Certificate that were full documentation, reduced documentation, no documentation or other types of loans. *See, e.g.*, 2006-4 Prospectus Supplement at S-32.

- **Plaintiffs claim they did not know:** The offering documents "masked the true impaired nature of the collateral since the delinquency rates for these loan pools followed [a] . . . pattern of skyrocketing delinquencies immediately following the Offering dates." Compl. at ¶ 236.

  **The Prospectuses Say:** "There is a greater likelihood of late payments on loans made to these types of borrowers than on loans to borrowers with a higher credit quality." and "[Negative changes in U.S. economic] factors would negatively impact the ability of many borrowers to meet their increased monthly mortgage payments as described above. As a consequence, defaults on adjustable payment mortgage loans may increase significantly." *See, e.g.*, April 26, 2006 Prospectus at 30-31. The Prospectus Supplements also disclose the current delinquency rates on the pool of loans. *See, e.g.*, 2006-4 Prospectus Supplement at S-27, 29, 38, 39, 48, 49, 58, 59, 68, 69, 77. Plaintiffs do not allege that the delinquency rates were incorrect as of that time.

- **Plaintiffs claim they did not know:** "[L]oan originators were instructed to push certain types of mortgage loans, such as hybrid option-ARM loans also referred to as Neg Am loans historically reserved for only those borrowers with outstanding credit history and sufficient income." Compl. ¶ 195.

  **The Prospectuses Say:** Such loans are common and "[t]he primary attraction to borrowers of these adjustable payment mortgage loan products is that . . . many borrowers are able to incur substantially greater mortgage debt using one of these adjustable payment mortgage loan products than if they used a standard amortizing fixed rate mortgage loan. These risks are magnified with respect to mortgage loans made on the basis of relatively low credit standards" and "[a]s a consequence, defaults on adjustable payment mortgage loans may increase significantly." April 26, 2006 Prospectus at 16-20. The Prospectus Supplements show the number of such "Neg Am" loans in the pool and provide details on the financial aspects of those loans. *See, e.g.*, 2006-4 Prospectus Supplement at S-38.

Because the Prospectuses and Prospectus Supplements disclosed the allegedly omitted information, Plaintiffs have not stated a claim under Section 11 or 12(a)(2) of the Securities Act. *See, e.g., Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004) (plaintiffs' "allegations . . . are undercut by the fact that the offering documents . . . did not omit such information . . ."); *Halperin v. eBanker USA.COM, Inc.*, 295 F.3d 352, 360 (2d Cir. 2002) ("The cautionary language addresses the relevant risk directly, and therefore neither offering memorandum was misleading"); *Finkel v. Putnam Convertible Opportunities & Income Trust*, No. 96 Civ. 4810 RPP, 1997 WL 60847, at *2 (S.D.N.Y. Feb. 11, 1997) (dismissing Securities Act claims where "the misleading disclosure claims are contradicted by the plain language of the Prospectus..."), *aff'd*, 162 F.3d 1147 (2d Cir. 1998).

Plaintiffs have not alleged any facts which, if proven, would demonstrate that the degree of deviation from the underwriting guidelines is greater than was disclosed in the Prospectuses and Prospectus Supplements.[15] In any event, such an allegation would be legally insufficient, as Plaintiffs are required to allege that Defendants were aware of any such fact.[16] Section 1111 of SEC Regulation AB governs the disclosure requirements of mortgage-backed security registration statements and instructs issuers to disclose "[a] description of the solicitation, credit-granting or underwriting criteria used to originate or purchase the pool assets, including, *to the extent known, any changes in such criteria and the extent to which such policies and criteria are*

---

[15] To the contrary, the Prospectuses and the Prospectus Supplements discussed that deviations "will" occur "in the ordinary course of business."

[16] *See In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 207 (S.D.N.Y. 1999), *aff'd*, 202 F.3d 81 (2d Cir. 2000) ("SEC regulations answer the question as to what material facts are required to be stated in an issuer's registration statement and prospectus."); *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008) ("Whether a duty to disclose exists depends largely on the itemized disclosures required by the securities laws and the regulations promulgated thereunder").

*or could be overridden.*" 17 C.F.R. § 229.1111(a)(3) (emphasis added). *See Garber v. Legg*

*Mason, Inc.*, 537 F. Supp. 2d 597, 611-12, 614 (S.D.N.Y. 2008) (applying comparable SEC

regulation);[17] *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194,, 1204-06 (1st Cir. 1996) (same); *In re*

*Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 12-13 (S.D.N.Y. 2001) (same).

Plaintiffs have not alleged that Defendants knew of deviations from the underwriting guidelines

that were more extensive than the Prospectuses and Prospectus Supplements disclosed.[18]

**B.    Plaintiffs Have Not Pled Any Misstatement With Respect to the Specific
       Loans Underlying Their Certificates**

As demonstrated above, Plaintiffs' allegation that each originator "systematically"

deviated from the disclosed underwriting guidelines, Compl. ¶¶ 193-236, is insufficient as a

matter of law in light of the risk disclosures made in the Prospectuses and Prospectus

---

[17]  In *Garber v. Legg Mason, Inc.*, Plaintiffs alleged that Defendants were liable for failing to
disclose information related to Legg Mason's 'swap' of assets with another entity. The Court
found, pursuant to Item 303 of SEC Regulation S-K, that Defendants were only required to
disclose "known trends or uncertainties that have had or that the registrant reasonably
expects will have a material favorable or unfavorable impact on net sales or revenues or
income from continuing operations." *Id.* at 611 (*quoting* 17 C.F.R. §229.303(a)(3)(ii)).
Ultimately the Court held disclosure of owed distribution fees was not required because
Plaintiffs did not allege that Defendants knew of a material adverse trend at offering.

[18]  Further, if Plaintiffs had alleged that as of the Offering date any specific loan or loans in a
pool underlying a Certificate did not conform to underwriting guidelines and that Defendants
knew about the non-conformity but did not disclose it in the Prospectus or Prospectus
Supplement, Plaintiffs would still have to further allege that Defendants did not subsequently
have that loan replaced with a loan that did comply. The Prospectus Supplements explicitly
limit the remedy when a non-conforming loan is discovered to: (1) cure by the mortgage
holder, (2) repurchase of the non-conforming loan by the originator; or (3) in certain
circumstances, substitute another mortgage loan." *See, e.g.*, 2006-4 Prospectus Supplement
at S-7. Plaintiffs do not allege that any non-conforming loan was not properly cured,
repurchased or substituted. *See Lone Star Fund V, L.P. v. Barclays Bank PLC*, No. 08 Civ.
0261, 2008 WL 4449508, at *10, *11 (N.D. Tex. Sept. 30, 2008) (in similar circumstances,
the court held that because the offering documents "only represented that the loans are–or
will be made–compliant" and "[p]laintiffs have not alleged that Defendants failed to
repurchase or substitute loans," the "[plaintiffs] have failed to state a claim upon which relief
can be granted" and dismissed the case).

Supplements. Moreover, even if those risk disclosures did not exist, if the characteristics of the loans underlying a particular Certificate were accurately reported in the Prospectus Supplement, there has been no misstatement. Any "systematic" issues that the originator might or might not have had did not affect this particular security.

For example, with respect to 2006-4 Certificates, the Prospectus Supplement states that 875 loans (approximately 14 percent of the pool) were "Stated Income/Stated Asset" loans. 2006-4 Prospectus Supplement at S-32. These are defined in the Prospectus Supplement as loans where no documentation is required to verify the stated income and assets on a loan application. *See id.* at S-86. Plaintiffs have not alleged that there were more than 875 no documentation loans in the portfolio. It is not enough for Plaintiffs to allege that an originator made some mortgage loans without requiring documentation from the borrowers. Plaintiffs have to allege that the Certificate that they purchased was backed by more no documentation loans than the Prospectus Supplement discloses. They have not done so.

Similarly, with respect to the 2006-4 Certificates, the Prospectus Supplement states that there were 70 Negative Amortization loans with a limit of 110% of principal (*i.e.*, they could only add unpaid interest to principal up to 110% of the original loan amount) and 5,400 Neg Am loans with a limit of 115%. 2006-4 Prospectus Supplement at S-38. Plaintiffs have not alleged that these figures are inaccurate.[19]

The same is true with respect to the other disclosures specific to the loans included in each offering. Plaintiffs cannot rely on generic statements that underwriting guidelines were not followed without providing any factual (rather than conclusory) allegations that the pool of

---

[19]    Plaintiffs allege that the Prospectus Supplements fail to disclose that there was a cap on the amount of Negative Amortization that could be added to the loan principle. Compl. ¶195. That is simply untrue. The charts in the Prospectus Supplements show this quite clearly. *See, e.g.*, 2006-4 Prospectus Supplement at S-38.

mortgages in which they invested did not have the characteristics that were specified in the Prospectus Supplement. *See Hinerfeld v. United Auto Group,* No. 97 Civ. 3533 RPP, 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) (dismissing Plaintiffs' §11 and §12 claims because the Complaint failed "to allege specific facts sufficient, even if true, to entitle plaintiffs to relief. Plaintiffs' have pointed to no specific misrepresentations, and their claims of material omissions are contradicted by disclosures made on the face of the prospectus.").

### III. The Complaint Fails To Allege A Material Misstatement Or Omission With Respect To The Rating Agencies' Role In Structuring and Assessing The Securities

#### A. The Prospectuses And Prospectus Supplements Disclose All That The Relevant SEC Regulations Require Regarding The Ratings Agencies' Role in Structuring the Certificates

Defendants had no duty to disclose that they consulted the Ratings Agencies to determine the level of over-collateralization and other credit enhancement necessary to meet particular ratings criteria. Compl. ¶ 178-183. Section 1120 of SEC Regulation AB, which governs disclosure for asset backed securities offerings, requires only the disclosure of whether the issuance or sale of any class of offered securities is conditioned on the assignment of a rating by a rating agency, and the actual rating itself. *See* 17 C.F.R. § 229.1120. Further, in 1994 the SEC sought public comment as to whether, *inter alia*, they should "require disclosure in the prospectus on the method of compensating the rating organization," "whether the extent of the rating organization involvement in the structuring of the security should be disclosed," and "whether issuers should be required to disclose activities that could be viewed as 'ratings shopping.'" *See* Ex. 10 at 8, SEC Proposed Rules, 57 S.E.C. Docket 1244, 1994 WL 469347, at *9 (S.E.C. Release Nos. 7086, 34617, 20509, 33-7086, 34-34617, IC – 20509). The SEC declined to adopt the proposed additional disclosure requirements. Therefore, the Prospectus Supplements disclosed all that was legally required – that the issuance of the Certificates was

16

conditioned on receipt of specific ratings from the Ratings Agencies and the ratings for each class of the Certificates. *See, e.g.*, 2006-4 Prospectus Supplement at S-1, S-15. There was no duty to make any further disclosure about how the ratings were determined. Plaintiffs' allegations relating to the Ratings Agencies "role" in structuring the Certificates therefore fail to state a claim. *See In re N2K Inc. Sec. Litig.*, 82 F. Supp. 2d at 207; *Panther Partners, Inc.*, 538 F. Supp. 2d at 668.

### B.      It Was Public Knowledge That Issuers Paid The Ratings Agencies To Rate Securities, And Therefore That Fact Cannot Be A Material Omission

"It is well-established law that the securities laws do not require disclosure of information that is publicly known." *In re Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552–53 (S.D.N.Y. 2005). Plaintiffs allege that because the Ratings Agencies were paid by issuers to rate securities, the ratings agencies had a conflict of interest that should have been disclosed. Compl. ¶¶ 178-183. How the rating agencies were paid was publicly known. As reported as early as 1998 "the bulk of [ratings agencies'] revenue is generated by issuers" who hire the agencies to rate their offerings.[20]

The SEC's own publications had, for years, discussed the structure of the rating agency business. In 2002, the Sarbanes-Oxley Act directed the SEC to study the Ratings Agencies,

---

[20]    *See* Ex. 11 at 1, *S&P And Moody's Have The Rate Stuff: Booming Business In New Corporate, Muni Bond Issues Bolsters Profits,* Crain's New York Business, June 15, 1998; *see also* Ex. 12 at 33, Erik Sirri, *Investment Banks, Scope, and Unavoidable Conflicts of Interest,* Economic Review – Federal Reserve Bank of Atlanta, October 1, 2004 (recognizing that "ratings agencies are paid by the issuers themselves, whose securities the agencies rate"); Ex. 13 at 7, Richard Tomlinson & David Evans, *CDO Boom Masks Subprime Losses, Abetted by S&P, Moody's, Fitch,* Bloomberg, May 31, 2007 (the Ratings Agencies "are *always* paid by the issuers of the debt they're rating") (emphasis added).

including "any conflicts of interest" in their operations.  Pub. L. No. 107-204, § 702(b), 116 Stat.

745 (2002).  In January 2003, the SEC identified several major problem areas:[21]

> Potential *conflicts of interest have existed in the credit rating business for many years* .
> . . [T]he dependence of rating agencies on revenues from the companies they rate could
> induce them to rate issuers more liberally, and temper their diligence in probing for
> negative information. This potential conflict could be exacerbated by the rating agencies'
> practice of charging fees based on the size of the issuance, as large issuers could be given
> inordinate influence with the rating agencies. *Id.* at 40-41.

That the Prospectuses and Prospectus Supplements do not repeat the SEC's published

warnings, which were common knowledge in the market, is immaterial and fails to state a claim.

*See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d at 246

(S.D.N.Y. 2003) (dismissing Section 11 claims because the "alleged conflict of interest … was a

matter of public knowledge for years").

### C.    Plaintiffs' Allegations That the Rating Agency Models Were Inaccurate Fail to State a Claim

Plaintiffs allege that the Ratings Agency models were "outdated" and inaccurate.

Plaintiffs then state in conclusory fashion that as a result of the inaccurate models, the

Certificates did not have sufficient credit enhancements to achieve the stated ratings and the

"true" ratings were not disclosed.  Compl. ¶¶ 158, 209, 249, 252.  These allegations also fail to

state a claim.

First, as discussed above, the Certificates sold in each offering did, in fact, receive the

ratings stated in the Prospectus Supplements and Plaintiffs do not assert otherwise.

Second, the ratings disclosures are not actionable because the Prospectuses and

Prospectus Supplements contained disclosures about the risks of relying solely on ratings, the

potential inadequacy of credit enhancement and the lack of historical loan performance data.  For

---

[21]    Ex. 14, SEC, *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets* (2003).

example, each Prospectus disclosed that ratings have a limited utility: **"Ratings of the securities do not address all investment risks and must be viewed with caution"** (emphasis in original)

> . . . You must not view a rating as a recommendation to purchase, hold, or sell securities because it does not address the market price or suitability of the securities for any particular investor.  There is no assurance that any rating will remain in effect for any given period of time or that the rating agency will not lower or withdraw it entirely in the future.

Apr. 26, 2006 Prospectus at 39-40.  Each also disclosed that the various forms of credit enhancement were limited in nature and may be insufficient to cover all losses on the mortgage loans: **"Credit enhancement may not be adequate to prevent losses on your securities"** (emphasis in original)

> . . . [T]he amount of any credit enhancement is subject to the limits described in the related prospectus supplement.  Moreover, the amount of the credit enhancement may decline or be depleted under certain circumstances before the securities are paid in full.  As a result, securityholders may suffer losses.

*See, e.g.*, April 26, 2006 Prospectus at 7.  The Prospectus Supplements likewise stated: **"If credit enhancement is insufficient, you could experience losses on your securities."** *See, e.g.,* 2006-4 Prospectus Supplement at S-19 (emphasis in original).

Each Prospectus further disclosed that: **"Changes in U.S. economic conditions may adversely affect the performance of mortgage loans, particularly adjustable payment loans of various types"** (emphasis in original)

> . . . Several types of adjustable payment mortgage loans discussed above, in particular 'option ARMs' and interest-only mortgage loans, have only been originated in any significant numbers in relatively recent years. Consequently, there is no material statistical information showing payment and default trends under a variety of macroeconomic conditions. In particular, it is unclear how these mortgage loan products will perform in a declining housing market or under other negative macroeconomic conditions.

*See, e.g.*, Apr. 26, 2006 Prospectus at 16, 20.

The risk disclosures render the alleged omissions with respect to the adequacy of the ratings models inactionable under the "bespeaks caution" doctrine. *See Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (internal quotations and citation omitted) (recognizing "bespeaks caution" doctrine as one that allows cautionary language to render statements inactionable); *Coronel v. Quanta Capital Holdings Ltd.*, No. 07 CIV 1405 (RPP), 2009 WL 174656, at *18 (S.D.N.Y. Jan. 26, 2009); *Zirkin v. Quanta Capital Holdings Ltd.*, 2009 WL 185940, at *13 (S.D.N.Y. Jan. 23, 2009). Defendants cannot be held liable where Plaintiffs were warned and had knowledge of such risks, but nonetheless chose to invest in the Certificates. *See, e.g., Olkey*, 98 F.3d at 5.

Third, Plaintiffs' allegations concerning the ratings are an impermissible attempt to allege fraud (or in this case omission) by hindsight. Plaintiffs assert that the Ratings Agencies' expressions of judgment and opinion concerning the Certificates likelihood of default must have been materially misleading when made, because those expressions may have later turned out to be inaccurate. But, to state a claim under Section 11 or 12 of the Securities Act, "the complaint must offer more than allegations that the [loans] failed to perform as predicted . . . . It is in the very nature of securities markets that even the most exhaustively researched predictions are fallible." *Olkey*, 98 F.3d at 8 (internal quotations and citations omitted); *see also Panther Partners,* 538 F. Supp. 2d at 669-70 (allegations implying "that what only became clear due [sic] to subsequent events was somehow known [to defendants] far earlier" is speculative and does not satisfy *Twombly*). This is particularly true of a credit rating, which is an expression of the rating agency's judgment or opinion as of a point in time, and cannot be a basis for liability unless that judgment or opinion was not "truly held." *See* Ex. 14 (SEC statement that "a credit rating reflects a rating agency's ***opinion***, as of a specific date, of the creditworthiness of a particular

20

company, security, or obligation.") (emphasis added); *Compuware Corp. v. Moody's Investors Servs., Inc.,* 499 F.3d 520, 528 (6th Cir. 2007) (describing credit rating as "a predictive opinion, dependent on a subjective and discretionary weighing of complex factors"); *In re Global Crossing,* 313 F. Supp. 2d at 210 (dismissing Section 11 claim where plaintiff did not allege adequately that "opinion or belief" was not "truly held"). Plaintiffs do not allege that the Ratings Agencies did not believe that the Certificates were deserving of the ratings given them, let alone that the RBS Entities were aware of any such belief. Rather, Plaintiffs argue, that because the ratings have since been downgraded, they must have been false when made. Compl. ¶ 252. Such pleading by hindsight is simply insufficient to state a claim.

## IV. Plaintiffs' Claims Are Barred By The Applicable Statute Of Limitations

Section 11 and 12(a)(2) claims must be brought "within one year after the discovery of the untrue statement or the omission or after such discovery should have been made by exercise of reasonable diligence." 15 U.S.C. §77m. Actual, constructive, or inquiry notice of the facts giving rise to an action trigger the one year statute of limitations. *See Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 (2d Cir. 1993). Here, Plaintiffs' claims are untimely.

"Courts in this district routinely dismiss securities fraud claims on statute of limitations grounds at the pleading stage where, as here, the facts necessary to trigger inquiry notice are apparent from the face of the complaint, the documents cited therein and other public documents." *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig..,* 273 F. Supp. 2d 351, 378-79 (S.D.N.Y. 2003). The Court may "take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice as well as other matters." *Staehr v. Hartford Fin. Servs. Group, Inc.,* 547 F.3d 406, 425

(2d Cir. 2008). "'Storm warnings' need not detail every aspect of the alleged fraudulent

scheme...[r]ather a totality-of-the-circumstances analysis applies." *Id.* at 427; *see also In re*

*Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005).

Plaintiffs filed their original complaint on May 14, 2008 in New York State Court. It set

forth allegations related to three HarborView offerings: HVMLT Series 2006-4 (April 26, 2006),

HVMLT Series 2006-5 (June 27, 2006), and HVMLT Series 2006-9 (June 27, 2007). Therefore,

the relevant date for determining whether Plaintiffs had notice of their claims related to these

three offerings is May 14, 2007. Plaintiffs filed an amended complaint on May 19, 2009 that

included 12 additional offerings.[22] These 12 offerings do not relate back to the original

complaint,[23] and the relevant date for determining whether Plaintiffs had notice of their claims

with respect to those offerings is May 19, 2008. A wealth of information publicly available

before May 14, 2007, and even more that was available before May 19, 2008, put Plaintiffs on

inquiry notice of the lending practices and other facts and circumstances upon which they base

their claims and, thus, Plaintiffs' claims are time-barred. *See, e.g., Shah v. Meeker*, 435 F.3d

244, 250-51 (2d Cir. 2006); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 692-93 (S.D.N.Y.

---

[22] *See* Exhibit 3.

[23] It is well-settled that new claims in an amended complaint will not be found to relate back
where they are based on a different transaction or new set of operative facts not included in
the original complaint, even if based on the same legal theory. *See Nettis v. Levitt*, 241 F.3d
186, 193 (2d Cir. 2001); *Pruiss v. Bosse,* 912 F. Supp. 104, 106 (S.D.N.Y. 1996). That is the
case here. The new transactions were based on entirely new pools of underlying mortgage
loans, originated by new originators, and sold to new sets of investors pursuant to a new
Prospectus Supplement. The original complaint related only to MBS backed by mortgages
originated by Countrywide. There were no allegations in that complaint regarding Downey,
American Home, IndyMac, or Bank United. These new offerings were wholly separate
transactions. As such, any claims asserted based upon these offerings do not relate back to
the original complaint. *Grace v. Rosenstock*, 169 F.R.D. 473, 481 (E.D.N.Y. 1996), *aff'd*,
228 F.2d 40 (2d Cir. 2000); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 528 (S.D.N.Y.
2005).

2000) (dismissing securities claim as time barred where news article put plaintiff on inquiry notice).

### A.    Plaintiffs Were On Notice of Originators' Lending Practices Prior to May 14, 2007

With respect to Plaintiffs' claims alleged in the original complaint, prominent press reports predating May 14, 2007 – some of which are quoted in the Complaint itself – warned of the same originator lending standards that the Plaintiffs now base their allegations on.[24]  For example, a series of March and April 2007 publications attributes Countrywide's poor mortgage credit quality during 2006 to its lax underwriting standards.[25]  Additionally, as early as mid-2006, there was substantial publicity and legal activity surrounding the firing of seven Countrywide employees, including loan officers, underwriters, and branch manager Kourosh Partow, who was subsequently hired by American Home.[26]  A December 2006 indictment accuses Mr. Partow of "closing loans quickly through the process of falsifying income and other items on the loan applications so that borrowers appeared to easily meet criteria."[27]  The Complaint itself cites to two March 2007 articles in support of its allegations that loose underwriting guidelines, including disregard for documentation, were a hallmark of Indymac's

---

[24]   See Exhibit 2, Tables 1 and 2 for a detailed list of the relevant information about Originators that was publicly available to Plaintiffs before May 14, 2007.

[25]   See, e.g., Ex. 15, Lynnley Browning, *Automated Underwriting Software Helped Fuel a Mortgage Boom*, N.Y. Times, March 23, 2007, at C1; Ex. 16, Jonathan Stempel & Dan Wilchins, *Countrywide Says Subprime Turmoil May Harm Results*, Reuters News, March 13, 2007.

[26]   See, e.g., Ex. 17, Paula Dobbyn, *Audit Shows Alaska Rules Needed*, Chicago Tribune, June 18, 2006.

[27]   Ex. 18, Indictment of Kourosh Partow, *Partow v. USA*, No 3:06-cv-00104 at ¶ 5 (D. Alaska 2006) (filed Dec. 12, 2006).

Alt-A loan practice.[28]  Similarly, the Complaint quotes a January 2007 article indicating that

BankUnited's profits came at the expense of its poor underwriting practices.[29]  The Complaint

also lists several predatory lending lawsuits against Downey brought prior to May 14, 2007.[30]

### B.    Plaintiffs Were on Notice of Originators Lending Practices Prior to May 19, 2008

A multitude of additional newspaper articles written before May 19, 2008 publicized the

fact that originators did not always adhere to their lending guidelines.  The Charlotte Observer

reported in March 2008 that Senator Charles Schumer stated that Countrywide's president

encouraged Countrywide to pursue predatory lending practices and grant loans in accordance

with lax underwriting guidelines.  In April 2008, Bloomberg noted that Countrywide's loans

were sloppy and not underwritten correctly.  American Home received similar press coverage,

with Newsday and Bloomberg reporting in July and May 2007 respectively that American Home

granted loans with loose underwriting guidelines.[31]  Indeed, some of the articles discussing

originators' non-adherence were even quoted in Plaintiffs' Complaint.  *See* Compl. ¶¶ 77, 96-98.

### V.  Plaintiffs' Section 15 Control Person Claims Must be Dismissed Because the Underlying Claims Upon Which They Are Based Upon Fail As a Matter of Law

Plaintiffs' Section 15 claims must also be dismissed because those claims are entirely

derivative of Plaintiffs' flawed Section 11 and 12 claims.  To plead a claim under Section 15 of

---

[28]  Compl. ¶¶ 97–98 (quoting Chris Isidore, *Liar Loans: Mortgage Woes Beyond Subprime*, CNNMoney.com, March 19, 2007 *and* Michael Dawson, *US Housing Market–IndyMac–We are Not a Subprime Lender!*, Housing Market, March 21, 2007).

[29]  Compl. ¶ 111 (quoting Martha Brannigan, *Troubled Loans on the Rise at BankUnited*, Miami Herald, January 23, 2007).

[30]  Compl. ¶ 137.

[31]  See Exhibit 2, Tables 1, 2, 5, 6 and 7 for a detailed list of the relevant information about originators that was publicly available to Plaintiffs before May 19, 2008.

the Securities Act, plaintiff must allege (1) a primary violation of the Act by a controlled person and (2) direct or indirect control by the defendant of the primary violator. *Garber*, 537 F. Supp. 2d at 618 (S.D.N.Y. 2008). Because Plaintiffs have failed to allege a primary violation of either Section 11 or Section 12, as described above, their Section 15 claims fail as well. *In re Flag Telecom Holdings, Ltd.*, 308 F. Supp. 2d 249, 257 (S.D.N.Y. 2004) (where plaintiffs fail to allege a § 11 or 12 claim, the related § 15 claim must also be dismissed).

## CONCLUSION

For all the foregoing reasons, the Consolidated Securities Class Action Complaint should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Dated: New York, New York
     July 15, 2009

By: _____
Thomas C. Rice
Trice@stblaw.com
James G. Gamble
Jgamble@stblaw.com
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone: 212-455-2000
Facsimile: 212-455-2502

*Attorneys for Defendants The Royal Bank of Scotland Group, plc, RBS Holdings USA Inc. f/k/a Greenwich Capital Holdings, Inc., Greenwich Capital Acceptance, Inc., RBS Financial Products Inc. f/k/a Greenwich Capital Financial Products, Inc., and RBS Securities Inc. f/k/a Greenwich Capital Markets, Inc., Robert J. McGinnis, Carol P. Mathis, Joseph N. Walsh, III, John C. Anderson, and James M. Esposito*