**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW JERSEY CARPENTERS VACATION FUND and BOILERMAKER BLACKSMITH NATIONAL PENSION TRUST, *on Behalf of Themselves and All Others Similarly Situated,* | Case No.: 08-CV-5093 (HB) |
| Plaintiffs, | |
| v. | **ECF CASE** |
| THE ROYAL BANK OF SCOTLAND GROUP, PLC, GREENWICH CAPITAL HOLDINGS, INC., GREENWICH CAPITAL ACCEPTANCE, INC., GREENWICH CAPITAL FINANCIAL PRODUCTS, INC., ROBERT J. MCGINNIS, CAROL P. MATHIS, JOSEPH N. WALSH, III, JOHN C. ANDERSON, JAMES M. ESPOSITO, RBS SECURITIES, INC. f/k/a GREENWICH CAPITAL MARKETS, INC., d/b/a RBS GREENWICH CAPITAL, MOODY'S INVESTORS SERVICE, INC. and THE MCGRAW-HILL COMPANIES, INC., | |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO THE RATINGS**
**AGENCY DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'**
**CONSOLIDATED FIRST AMENDED SECURITIES CLASS ACTION COMPLAINT**

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Joel P. Laitman (JL-8177)
Christopher Lometti (CL-9124)
Daniel B. Rehns (DR-5506)
Kenneth M. Rehns (KR-9822)
150 East 52nd Street, Thirtieth Floor
New York, New York 10022
(212) 828-7797
(212) 828-7745 (Facsimile)

Steven J. Toll (admitted pro hac vice)
S. Douglas Bunch (SB-3028)
1100 New York Avenue NW, Suite 500 West
Washington, D.C. 20005
(202) 408-4600
(202) 408-4699 (Facsimile)

*Attorneys for Plaintiff and the Class*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

SUMMARY OF FACTS .........................................................................................................2

ARGUMENT .......................................................................................................................2

I.      THE RA DEFENDANTS ARE LIABLE AS "UNDERWRITERS"
        WITHIN THE MEANING OF SECTION 11 ..........................................................................2

        A.      Plaintiffs' Claims against the RA Defendants
                Are Not Precluded by Rule 436(g) ...................................................................3

        B.      Plaintiffs Adequately Allege that the RA Defendants Were Engaged
                in the Distribution Process and Are "Underwriters" under Section 11 .....................4

                1.      The RA Defendants Were Engaged in Steps
                        Necessary to the Distribution of the Certificates ...........................................4

                2.      Plaintiffs' Comprehensive Factual Allegations
                        of Underwriter Status Are Facially Plausible .................................................7

II.     THE COMPLAINT ALLEGES ACTIONABLE
        MISSTATEMENTS AND OMISSIONS .................................................................................9

        A.      The Misstatements and Omissions Are Actionable ....................................................9

        B.      The Bespeaks Caution Doctrine Does Not Shield the
                RA Defendants from Alleged Misstatements and Omissions ...................................11

III.    PLAINTIFFS STATE VALID SECTION 15 CLAIMS.......................................................12

IV.     PLAINTIFFS' CLAIMS ARE NOT TIME BARRED .........................................................14

CONCLUSION....................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL & STATE CASES

*Ackerberg v. Johnson*,
  892 F.2d 1328 (8th Cir. 1989) ...................................................................................... 5

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) .................................................................................................. 8

*Bell Atl. Corp., v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................. 4, 7, 8

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
  551 F. Supp. 2d 210 (S.D.N.Y. 2008) ....................................................................... 12

*Ellison v. Am. Image Motor Co., Inc.*,
  36 F. Supp. 2d 628 (S.D.N.Y. 1999) ......................................................................... 13

*Foman v. Davis*,
  371 U.S. 178 (1962) .................................................................................................... 15

*Harden v. Raffensperger, Hughes & Co.*,
  65 F.3d 1392 (7th Cir. 1995) ................................................................................... 5, 6

*Heller v. Goldin Restructuring Fund, L.P.*,
  590 F. Supp. 2d 603 (S.D.N.Y. 2008) ....................................................................... 11

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
  Civ. No. 03-MD-1529 (LMM), 2007 U.S. Dist. LEXIS 66911 (S.D.N.Y. Sept. 10.
  2007). RA Mem. ..................................................................................................... 8, 13

*In re AMF Bowling Sec. Litig.*,
  No. 99-3023 (DC), 2003 U.S. Dist. LEXIS 7389 (S.D.N.Y. May 2, 2003) .............. 15

*In re AOL Time Warner, Inc. Sec. and ERISA Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) ....................................................................... 11

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) ........................................................................................ 14

*In re Falstaff Brewing Corp. Antitrust Litig.*,
  441 F. Supp. 62 (E.D. Mo. 1977) .............................................................................. 14

*In re Flag Telecom Holdings, Ltd., Sec. Litig.*,
  618 F. Supp. 2d 311 (S.D.N.Y. May 1, 2009) ........................................................... 12

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) ....................................................................... 10

*In re Morgan Stanley Technology Fund Sec. Litig.*,
  Civ Nos. 02-6153, 02-8579 (BSJ), 2008 U.S. Dist. LEXIS 106909 (S.D.N.Y. Feb. 2
  2009) ...................................................................................................................... 10

*In re Oxford Health Plans, Inc., Sec. Litig.*,
  913 F. Supp. 280 (S.D.N.Y. 1996) ........................................................................... 14

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) ........................................................................ 8

*In re Refco, Inc. Sec. Litig.*,
  Civ. No. 05-8626, 2008 U.S. Dist. LEXIS 62543 (S.D.N.Y. Aug. 14, 2008) ............................ 6

*In re Worldspace Sec. Litig.*,
  Civ. No. 07-2252 (RMB), 2008 U.S. Dist. LEXIS 56224 (S.D.N.Y. Jul. 21, 2008)................ 12

*Ingenito v. Bermec Corp.*,
  441 F. Supp. 525 (S.D.N.Y. 1977) ............................................................................. 4

*McFarland v. Memorex Corp.*,
  493 F. Supp. 631 (N.D. Cal. 1980)............................................................................. 7

*Pinter v. Dahl*,
  486 U.S. 622 (1988)................................................................................................. 4

*Resnik v. Swartz*,
  303 F.3d 147 (2d Cir. 2002) .................................................................................... 10

*SEC v. Int'l Chem. Dev. Corp.*,
  469 F.2d 20 (10th Cir. 1972) ..................................................................................... 5

*SEC v. Kern*,
  425 F.3d 143 (2d Cir. 2005) ............................................................................. 2, 5, 6

*SEC v. Lybrand*,
  200 F. Supp. 2d 384 (S.D.N.Y. 2002) ........................................................................ 5

*SEC v. N. Am. Research and Dev. Corp.*,
  280 F. Supp. 106 (S.D.N.Y. 1968) ............................................................................. 5

*Special Situations Fund, III, L.P. v. Cocchiola*,
  Civ. No. 02-3099, 2007 U.S. Dist. LEXIS 56627 (D.N.J. Aug. 3, 2007)...................... 5

*TSC Industries, Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)................................................................................................. 10

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991)................................................................................................9

## STATUTES & RULES

15 U.S.C. § 77o ......................................................................................................12

17 C.F.R. § 230.436(g)........................................................................................2, 3

Fed. R. Civ. P. 15(a)...............................................................................................14

Rule 436(g) ...........................................................................................................2, 3

Section 15 of the 1933 Act......................................................................................12

## SECONDARY AUTHORITIES

Disclosure of Security Ratings in Registration Statements, SEC Release Nos. 33-6336, 34-
   18012, 46 Fed. Reg. 42024-01, 42025 (Aug. 18, 1981) ...............................................3

H.R. Rep. No. 73-85 (1933)......................................................................................2

SEC Release No. 33-7086, 1994 SEC LEXIS 2652, at *7 (Aug. 31 1994 ......................................10

## PRELIMINARY STATEMENT

Plaintiffs respectfully submit this memorandum of law in opposition to the motion made by Defendants The McGraw-Hill Companies, Inc. ("McGraw-Hill")[1] and Moody's Investors Services, Inc. ("Moody's") (with S&P, the "Ratings Agencies"), pursuant to Rule 12(b)(6), to dismiss Plaintiffs' First Amended Securities Class Action Complaint (the "Complaint").

This is an action brought pursuant to the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l, (the "1933 Act") by Court-appointed Lead Plaintiffs New Jersey Carpenters Vacation Fund and Boilermaker Blacksmith National Pension Trust (together, "Plaintiffs" or "Lead Plaintiffs"), on their own behalf and as a class action on behalf of all persons and entities who purchased or otherwise acquired mortgage-backed securities ("MBS" or "Certificates") underwritten by Defendant RBS Securities, Inc. f/k/a Greenwich Capital Markets ("GCM") and issued by Issuing Trusts pursuant and/or traceable to two Registration Statements and accompanying Prospectuses and later-filed Prospectus Supplements incorporated into the Registration Statements.[2]

As alleged, in the issuance of the Certificates, the RA Defendants' departed significantly from their historic role of simply rating publicly offered securities.  They determined the mortgage collateral to be acquired and then effectively created the securities themselves by designing the Certificates' credit enhancement and structure, so that the Certificates could then be marketed to pension funds and insurance companies as having the highest AAA ratings.  In essence, the RA Defendants assumed the non-rating activities of underwriter investment banks.  Further, although undisclosed in the Registration Statements, the RA Defendants are alleged to have performed these non-rating functions *gratis* and then provided their ratings to RBS before they were engaged – all in an effort to obtain compensation.  Having very clearly stepped outside the scope of mere ratings agency activities, the RA Defendants are liable for the material misstatements and omissions in the

---

[1]     Standard & Poors Ratings Service ("S&P") is a division of Defendant McGraw-Hill.

[2]     In addition to the RA Defendants, Plaintiffs seek redress against Defendants Royal Bank of Scotland, plc ("RBSG"), RBS Holdings USA, Inc. f/k/a/ Greenwich Capital Holdings, Inc. ("GCH"), Greenwich Capital Acceptance, Inc. ("GCA"), RBS Financial Products f/k/a Greenwich Capital Financial Products, Inc. ("GCFP"), GCM, Robert J. McGinnis ("McGinnis"), Carol P. Mathis ("Mathis"), Joseph N. Walsh, III ("Walsh"), John C. Anderson ("Anderson") and James M. Esposito ("Esposito") (collectively, "RBS").

Registration Statements and are not insulated from liability under the 1933 Act by the SEC exemption pertaining to ratings agencies and their ratings.

## SUMMARY OF FACTS

Relevant facts, alleged in the Complaint, are set forth in the accompanying Memorandum of Law in Opposition to the RBS Defendants' Motion to Dismiss the Complaint, at 2-6, which is incorporated herein by reference.

## ARGUMENT

### I.    THE RA DEFENDANTS ARE LIABLE AS "UNDERWRITERS" WITHIN THE MEANING OF SECTION 11.

The RA Defendants argue for dismissal of Plaintiffs' Section 11 claims against them by asserting that they are exempt from liability under SEC Rule 436(g), 17 C.F.R. § 230.436(g), and, in any event, do not fall within the 1933 Act's definition of "underwriter." The RA Defendants argue that holding them liable as underwriters would be an "unprecedented" and "radical" expansion of Section 11. RA Mem. at 1.[3] In fact, quite the opposite is true. The purpose of Section 11 is to hold liable those who make misrepresentations in marketing securities to the public. Civil liability in the 1933 Act is premised on "a requirement that all those responsible for statements upon the face of which the public is solicited to invest its money shall be held to standards like those imposed by law upon a fiduciary." H.R. Rep. No. 73-85, at 5 (1933). The RA Defendants' actions, in collaborating with RBS to both choose and structure the loans underlying the Certificates and then participating in the preparation of the Prospectus Supplements, are exactly the kind typically performed by underwriters and are "necessary to the distribution of securities." *See SEC v. Kern*, 425 F.3d 143, 152 (2d Cir. 2005). Accordingly, the RA Defendants are liable for the misrepresentations made in the Registration Statements and Prospectus Supplements.

---

[3]    References to "RA Mem." are to the RA Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated First Amended Securities Class Action Complaint, dated July 15, 2009.

A.   **Plaintiffs' Claims against the RA**
     **Defendants Are Not Precluded by Rule 436(g).**

The RA Defendants claim that SEC Rule 436(g) is an "express regulatory bar" which renders them "absolutely immune" from all liability for any misstatements or omissions in the Offering Documents for which they are responsible. RA Mem. at 3. As the statute explicitly provides, the exemption that Rule 436(g) grants Nationally Recognized Statistical Rating Organizations or NRSROs, including the RA Defendants, is not a blanket protection for all NRSRO activities; rather, the exemption relates solely to "the *security rating* assigned … by a nationally recognized statistical rating organization." 17 C.F.R. § 230.436(g) (2008) (emphasis added). Thus, Rule 436(g) is intended only to "exempt the rating organization from liability *as an expert* under Section 11 of the Securities Act for security ratings included in registration statements." Disclosure of Security Ratings in Registration Statements, SEC Release Nos. 33-6336, 34-18012, 46 Fed. Reg. 42024-01, 42025 (Aug. 18, 1981) (emphasis added).[4]

Despite clear statutory language, Moody's and S&P attempt to use the ratings exemption of Rule 436(g) to shield themselves from liability for their actions. RA Mem. at 3 Although Rule 436(g) may protect the RA Defendants from liability for the actual ratings included in registration statements, this exemption does not provide "absolute[] immun[ity]" for all of the RA Defendants' actions. The RA Defendants are not sued as persons who prepared or certified the ratings pursuant to Section 11(a)(4), but rather for, *inter alia*, their activities "in determining which mortgage loans were to be included and excluded from the underlying collateral and composition of the Certificate credit enhancement needed in order to sell the Certificates with AAA ratings" and the failure to disclose this role in the Registration Statements. ¶¶39, 182-83.

---

[4]      Plaintiffs have explicitly disavowed any claim that the Ratings Agencies are liable as experts. ¶39. The RA Defendants claim that Plaintiffs seek to "erase § 11's consent requirements" by suing them as underwriters pursuant to Section 11(a)(5) instead of experts pursuant to Section 11(a)(4). The RA Defendants, however, do not and cannot cite any authority that Plaintiffs must exhaust their Section 11(a)(4) remedies first. These provisions describe two distinct types of liability. Plaintiffs allege that the RA Defendants are liable not as experts, but as underwriters.

**B.    Plaintiffs Adequately Allege that the RA Defendants Were Engaged in the Distribution Process and Are "Underwriters" under Section 11.**

**1.    The RA Defendants Were Engaged in Steps Necessary to the Distribution of the Certificates.**

The RA Defendants correctly note that "an underwriter is an entity that 'participates in the transmission process between the issuer and the public.'"  RA Mem. at 7 (citing *Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 536 (S.D.N.Y. 1977)).  The RA Defendants cleverly omit that there are two forms such "participation" may take.  An underwriter may "buy[] securities directly or indirectly from the issuer and resell[] them to the public," or, alternatively, may "perform[] some act (or acts) that facilitates the issuer's distribution."  *Ingenito,* 441 F. Supp. at 536.  Plaintiffs have adequately demonstrated that Moody's and S&P performed "some act" that facilitated MBS distribution.  Indeed, Plaintiffs have alleged that *but for* the RA Defendants' role in structuring the securities, such distribution could never have occurred.  The Complaint presents more than enough factual allegations to demonstrate that Plaintiffs' claims are "plausible on [their] face," which is all they are required to do.  *Bell Atl. Corp., v. Twombly*, 550 U.S. 544, 570 (2007).  Accordingly, the RA Defendants' motions to dismiss the Section 11 underwriter claims should be denied.[5]

While acknowledging that "participation" in the act of underwriting is all that is required to incur liability under Section 11, the RA Defendants further assert that such "participation" means "actual distribution of the security," *i.e.*, Plaintiffs must demonstrate that alleged underwriters "purchased … securities with a view to distribution or that they offered or sold [a] security."  RA Mem. at 8 (citing *In re WorldCom, Inc. Sec. Litig.,* 308 F. Supp. 2d 338, 344 (S.D.N.Y. 2004)).  In other words, the RA Defendants argue that underwriters must be the actual "conduits" for transmission of a security from an issuer to a purchaser.  *See* RA Mem. at 7 (citing *In re Lorsin,*

---

[5]      The RA Defendants' citation to the legislative history of the 1933 Act is fully consistent with this analysis.  As the RA Defendants note, the term underwriter is defined broadly enough to include not only the "ordinary underwriter," but also the "underwriters of the underwriter" and "participants in the underwriting … who may or may not be formal parties to the underwriting contract, *but who are given a certain share or interest therein*."  RA Mem. at 7 n.7 (quoting H.R. Rep. No. 73-85, 13, 1933 WL 983 (1933) (emphasis added)); *see also Pinter v. Dahl*, 486 U.S. 622 at 650 n.26 (1988) ("Congress knew of the collateral participation concept and employed it … elsewhere in the [Securities] Act, *see, e.g.*, 15 U.S.C. § 77b(11) (defining 'underwriter' … as including direct and indirect participants).").  Here, Plaintiffs allege that Moody's and S&P had a significant financial interest in the underwriting which drove the way they packaged loans and rated the Certificates.  ¶¶169, 172-174.

*Inc.*, SEC Release No. 250, 82 S.E.C. Docket 3044, Release No. 250 (May 11, 2004); *SEC v. Lybrand*, 200 F. Supp. 2d 384, 393 (S.D.N.Y. 2002); *Ackerberg v. Johnson*, 892 F.2d 1328, 1335 (8th Cir. 1989)). These decisions emphasize the necessity of a "distribution," however, only to distinguish public offerings, to which Section 11 liability may attach, from private offerings exempt from Section 11 under Section 4(1) of the Securities Act. These decisions do *not* hold that, within the context of a public offering, Section 11 liability may only attach to those who are involved in the actual "distribution" of the subject securities. *See*, *e.g.*, *Ackerberg*, 892 F.2d at 1335-36 (asserting that defendant's possible underwriter status depends on whether the transaction was a private offering or a public "distribution"). Where, as here, a public offering or "distribution" has unquestionably taken place, the RA Defendants may not claim immunity by asserting that they were not the ones who actually transmitted the subject securities to the public.

Although the definition of 'underwriter' may be linked to distribution, it does not include only those who "purchased … securities with a view to distribution," as the RA Defendants argue. RA Mem. at 8 (citing *Worldcom,* 308 F. Supp. 2d at 344). Rather, the Second Circuit has defined "underwriter" to encompass a person "who is 'engaged in steps necessary to the distribution of security issues.'" *Kern*, 425 F.3d at 152 (quoting *SEC v. Chinese Consol. Benevolent Ass'n, Inc*., 120 F.2d 738, 741 (2d Cir. 1941)).[6] As the Complaint alleges, the RA Defendants were integrally involved in "steps necessary" to bring the securities to market. ¶¶50-56, 59-60, 182-83. Courts have also held that a person need not actually buy or sell securities in order to qualify as an underwriter, so long as the person played a "necessary" role in the distribution. *See Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1400-01 (7th Cir. 1995); *Special Situations Fund, III, L.P. v. Cocchiola*, Civ. No. 02-3099, 2007 U.S. Dist. LEXIS 56627, at *17 (D.N.J. Aug. 3, 2007).[7]

---

[6]    *See also SEC v. Int'l Chem. Dev. Corp.*, 469 F.2d 20, 33 (10th Cir. 1972) (person whose "participation was a vital aspect in the steps necessary to the distribution" was an underwriter); *SEC v. N. Am. Research and Dev. Corp.*, 280 F. Supp. 106, 126 (S.D.N.Y. 1968) (person who listed securities in "Pink Sheets" but did not solicit or sell them to the public was an "underwriter" because he performed "a function essential to the [securities'] distribution").

[7]    In *Harden*, defendant was retained as a "qualified independent underwriter" pursuant to National Association of Securities Dealers ("NASD") rules to perform due diligence on the registration statement and recommend a minimum yield. At no point did defendant purchase, offer, or sell any of the securities involved. *Harden*, 65 F.3d at 1395. Nonetheless, the Seventh Circuit found that defendant qualified as an underwriter because "its role … was 'necessary to the distribution of [the] securities.'" *Id.* at 1401 (quoting *SEC v. Holschuh*, 694 F.2d 130, 139 n. 13 (7th Cir. 1982)). After its holding, the *Harden* court set forth in *dicta* an "*additional* and substantial reason[]" why qualified independent

Although the RA Defendants might not have purchased securities, as in *Harden* they were pivotally engaged in "steps necessary to the distribution" of the Certificates. Indeed, without their collaboration with RBS to rate the Certificates and structure their underlying collateral, RBS would not have been able to offer the Certificates for sale. ¶¶7, 51, 58. The RA Defendants fall squarely within the Second Circuit's definition of 'underwriter,' as one engaged in "steps necessary to the distribution." *See Kern*, 425 F.3d at 152.

The RA Defendants attempt to compare the instant case to *In re Refco, Inc. Sec. Litig.,* Civ. No. 05-8626, 2008 U.S. Dist. LEXIS 62543 (S.D.N.Y. Aug. 14, 2008) (*Refco II*). RA Mem. at 5-6. But, the *Refco II* facts are clearly distinguishable. There, plaintiffs alleged that defendants were liable as underwriters for "merely commenting on a draft of a registration statement for a bond offering in which they took no part in the distribution of the bonds." *Refco II,* 2008 U.S. Dist. LEXIS 62543, at *13. Judge Lynch did not conclude that Section 11 should be read so narrowly as to only include those who purchase securities from the issuer with a view to distribution; his decision only went so far as to say that "[w]hatever conduct may be covered by this language, it cannot easily be read to include … merely commenting on a draft of a registration statement." *Id*. The RA Defendants' involvement in the distribution, went far beyond "merely commenting on a draft;" indeed, they not only participated in producing the Prospectus Supplements, but also were largely responsible for structuring the Certificates. ¶¶ 37, 38, 51, 58,-59, 182-183. The RA Defendants' actions were "necessary steps" to distribution.[8]

---

underwriters were "underwriters": the NASD's rule requiring qualified independent underwriters to be subject to Section 11 liability. *Harden*, 65 F.3d at 1401. This "additional" reason was independent of the *Harden* court's previous determination of underwriter liability, which was based on the *Harden* court's interpretation of "the text of the statute itself" and cases interpreting its scope, and not on the NASD rule. *Id.* at 1399-140.

[8]    The RA Defendants also argue that they should not be considered underwriters because, much like the defendants in *Refco II*, they were not identified to the public as having evaluated the Certificates. RA Mem. at 5-6. Plaintiffs, however, allege that the RA Defendants' involvement in preparing RMBS for sale to the public was much more extensive than the passive, *post hoc* "behind the scenes" review that characterized the work of the defendants in *Refco II.  See Refco II,* 2008 U.S. Dist. LEXIS 62543, at *15. Rather, "[t]he Rating Agencies largely determined the amount and kind of Credit Support or Credit Enhancement to be provided for each Certificate, both before and after Rating Agencies were formally 'engaged' by Greenwich…." ¶¶7, 240. As alleged in the Complaint, the RA Defendants worked with GCM to form and structure the securitized transactions related to the Certificates. ¶¶7, 38, 39. In particular, the RA Defendants played an integral role in structuring the transactions and instructing the assemblers how to obtain the greatest profit from the MBS by maximizing the tranches with the highest ratings. ¶183. RBS relied on the RA Defendants for their ability to advise them on how to package loans. ¶¶178-181. The RA Defendants assumed the role not just of assigners of ratings, but of advisers to issuers on how to structure transactions in order to achieve inflated ratings.

The RA Defendants' reliance on *McFarland* is similarly inapposite.  RA Mem. at 6-7.  In *McFarland*, the court held that accountants who had reviewed registration statements were only liable if they were identified to the public and, even then, were only liable for "those figures which [they] certified."  *McFarland v. Memorex Corp.*, 493 F. Supp. 631, 643 (N.D. Cal. 1980).  Here again, the RA Defendants did far more than merely review and certify the figures contained in the Offering Documents.  Rather, Plaintiffs have alleged that the RA Defendants "directly participate[d] in the formation and structuring of the Certificates prior to issuance."[9]  ¶¶7, 50-61, 182-188.

Finally, the RA Defendants argue that GCM was the underwriter and was identified as such in the Registration Statements, and that the RA Defendants were not because they had no "contact" with the public.  RA Mem. at 1, 8-9 & n.9.  As a threshold matter, underwriters do not cease being underwriters merely because they are not identified as such.  Additionally, however, Plaintiffs allege that although GCM might have been the party identified in the Offering Documents as the underwriter, the Offering Documents failed to disclose that the RA Defendants actually performed many of the traditional underwriting functions which included "contact" with the public, not just through their ratings, but through their participation in producing the Offering Documents.  ¶¶ 39, 182-183, 266.  For this participation and for their work in structuring the Certificates, the RA Defendants are liable as underwriters under Section 11.[10]

### 2.    Plaintiffs' Comprehensive Factual Allegations of Underwriter Status are "Facially Plausible"

In *Twombly*, the Supreme Court held that to survive a motion to dismiss, plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."   550 U.S. at 570.

---

[9]    By the same token, the RA Defendants are also unlike the warrantholders in *McFarland*, who were deemed by the court to have "no interest, direct or indirect," in underwriting and did not play an active role in the underwriting as the RA Defendants have in this case.  *Id.* at 646.  Also unlike the warrantholders, and contrary to the RA Defendants' assertions, Moody's and S&P had a significant "financial stake in the success of the offerings."  RA Mem. at 8 n.8.  The RA Defendants were relied on for their ability to advise on how to compose and structure the securitized transactions in order to obtain optimal ratings with the least amount of loss coverage and credit enhancement, and their compensation was conditioned on providing this assistance.  ¶¶37, 38, 39, 182-183.  Moody's and S&P's prospects for repeat business from RBS depended on the successful sale of the securities they rated.  ¶¶169, 172-174.

[10]    Contrary to the RA Defendants' assertions, holding Moody's and S&P liable as underwriters would not "lead to senseless results," nor would it "render the term 'underwriter' one of 'unlimited applicability.'"  *See* RA Mem. at 7 n.6, 10 n.10.  Any ratings agency, accountant, lawyer, or other "expert" described in Section 11(a)(4) who acts as an underwriter under Section 11(a)(5) should be liable as an underwriter.  Rare, moreover, is the case where evidence of a rating agency's involvement in the underwriting process is as strong as it is here.

*Twombly*'s "facial plausibility" requirement is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Plaintiffs have satisfied this requirement as to allegations that the RA Defendants are 'underwriters' under the 1933 Act.

The RA Defendants argue that Plaintiffs' claims are "conclusory" by comparing them to plaintiffs' claims in *In re Refco, Inc. Sec. Litig.,* 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ("*Refco I*") *Refco I* which were initially dismissed. RA Mem. at 9. Here, however, Plaintiffs' claims are clearly distinguishable from those that were found inadequate by the *Refco I* court. In contrast to *Refco I*, where a "single sentence" alleging that defendants had participated in preparing the registration statement was insufficient to plead that defendants acted as underwriters, 503 F. Supp. 2d at 629-30, Plaintiffs have presented numerous factual allegations to support their claim that the RA Defendants acted as underwriters. Plaintiffs here have alleged, *inter alia*, that the RA Defendants assisted in determining "which of the purchased loans were to be included in the mortgage pools underlying the Certificates and … the structure of the Certificates themselves," ¶7; that they "participated in the drafting and dissemination of the Prospectus Supplements" and took part in "forming and structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates," ¶¶37-38; and that they were instrumental "in determining which mortgage loans were to be included and excluded from the underlying collateral and composition of the Certificate credit enhancement needed in order to sell the Certificates with AAA ratings," ¶39. These factual allegations bear no resemblance to the "single sentence" alleging participation in preparation of the registration statement that the court found inadequate in *Refco I*, 503 F. Supp. 2d at 629-30.[11]

---

[11] The RA Defendants also attempt to equate Plaintiffs' factual allegations with the "bare pleadings" that were found inadequate in *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, Civ. No. 03-MD-1529 (LMM), 2007 U.S. Dist. LEXIS 66911 (S.D.N.Y. Sept. 10. 2007). RA Mem. at 9. As in *Refco I*, Plaintiffs' allegations are clearly distinguishable from those that the court found inadequate in *Adelphia*. Plaintiffs in that case broadly alleged that the defendants extended loans to their affiliated underwriting banks, "induced and structured" public offerings, and had "direct or indirect participation" in the distribution of securities. *In re Adelphia Commc'ns*, 2007 U.S. Dist. LEXIS 66911, at *8. These claims, devoid of any additional factual detail, are simply not comparable to the specific factual allegations that Plaintiffs have included in their Complaint here. Accepting Plaintiffs' allegations as true, which the Court is obliged to do at the motion to dismiss phase, Plaintiffs have stated a claim, "plausible on its face," that the RA Defendants acted as underwriters. *Twombly*, 550 U.S. at 570.

II.    **THE COMPLAINT ALLEGES ACTIONABLE
       MISSTATEMENTS AND OMISSIONS.**

    A.    **The Misstatements and Omissions Are Actionable.**

**Subjective Belief:**  The RA Defendants assert that the Complaint does not allege that the RA Defendants did not subjectively believe their rating opinions when issued, as is required when an opinion is challenged under *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991).  RA Mem. at 11.  However, the Complaint specifically cites to the testimony of former RA managing directors indicating that they subjectively believed that the MBS ratings were faulty and inaccurate at the time of issuance.  ¶¶172-73, 180-81.  Further, the Complaint's particularized allegations of: undisclosed ratings shopping and the provision of *gratis* ratings and structuring advice to obtain ratings compensation, ¶¶50-61, 182-88, together with the allegations regarding testimony of former employees, ¶¶169-71, and the collapse in Certificate value and ratings shortly after issuance, ¶9, satisfy *Virginia Bankshares*' subjective disbelief standard.

**Duty to Disclose:**  The RA Defendants assert that Plaintiffs' allegations are not actionable because there is an  SEC Rule which does not require the disclosure of the methodology used to rate the securities.  RA Mem. at 3-4.  This argument fails.  Sections 11 and 12 assign liability for the omission or misstatement of material information.  What is material and necessary to disclose is based entirely on the circumstances of the Offering.  As a result, SEC-mandated disclosures do not create a limit on what must be disclosed, but instead create a floor of what, at the very least, must be disclosed in all Offerings.  No SEC Regulation sanctions the non-disclosure of ***material*** conflicts of interest, *e.g.*, ratings shopping and *gratis* pre-engagement structuring.  In fact, none of the regulations address the materiality or relevancy of information beyond what is asked for; nor do they operate, in any way, to limit Section 11 liability.  The undisclosed ratings shopping practice and structuring function of the Ratings Agencies were highly material to investors since each provided particularized facts undermining the credibility of the ratings.  The fact that no regulation

specifically requires this disclosure does not diminish the obligation or liability of the RA Defendants under Section 11 and 12 for their non disclosure.[12,13]

**Publicly Known Information:**  The RA Defendants assert that the fact that the Ratings Agencies are engaged and paid by issuers of the securities they rate was publicly known, and, as a result, pursuant to *TSC Industries, Inc. v. Northway, Inc*., 426 U.S. 438, 449 (1976), Plaintiffs' allegation requires a showing that disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the "total mix" of available information.  RA Mem. at 12.  However, there clearly is a material difference between knowing that fact and knowing of the Ratings Agencies commitment to a stated rating before they were engaged as an inducement to getting the engagement – which compromised the Ratings Agencies' independence and gave them the incentive to assign inflated investment grade ratings to the Certificates.  So, too, would knowing that the RA Defendants served conflicting roles as undisclosed "coach" and "referee" – not merely rating the Certificates, but creating and structuring them as well. Clearly, such disclosures would have altered the total mix of available information.

**Credit Enhancement:**  The RA Defendants also assert that Plaintiffs fail to provide facts sufficient to show that they knew at the time of the Offerings in 2006 and 2007 that credit enhancement levels were faulty as a result of outdated ratings assumptions and models.  RA Mem. at 12-13.  That is not correct.  The Complaint details: (1) the 2008 testimony of S&P's former

---

[12]    The RA's citation to *In re Morgan Stanley Technology Fund Sec. Litig*., Civ Nos. 02-6153, 02-8579 (BSJ), 2008 U.S. Dist. LEXIS 106909 (S.D.N.Y. Feb. 2 2009) is inapplicable.  In Technology Fund, the court, in determining necessary disclosures regarding the relationship between an asset manager and its broker-dealer held that the alleged disclosures fell under specifically granted SEC exceptions to disclosure, exceptions which are not applicable here, to a relationship, that of underwriter and rating agency, that is also entirely different.  Further, *Resnik v. Swartz*, 303 F.3d 147 (2d Cir. 2002), is inapplicable.  In *Resnik*, the court held that the alleged misstatements were neither misleading on their face nor did they serve as representations for purchasers to rely on.  In the present case, the ratings assigned by the Defendants were certainly material because they were relied upon by Plaintiffs when making their purchases. ¶¶7-9. These ratings became misleading when the alleged omissions were not disclosed because they directly affected the accuracy of the relied-upon ratings.  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig*., 272 F. Supp. 2d 243 (S.D.N.Y. 2003) is also distinguishable.  There, the Court held plaintiff had failed to allege facts sufficient to show a duty to disclose a relationship between the mutual fund and its broker dealer, a relationship which had been "well-recognized for decades." *Id.* at 249. As stated herein, the pre-engagement structuring relationship between the Ratings Agencies and investment banks was not disclosed until mid to late 2008.
[13]    The 1994 SEC decision not to expand the purview of statutorily required disclosures has no bearing on the RA Defendants' disclosure requirements under the Securities Act. In fact, the SEC Release states that the the requirements are  "intended to enhance security rating discloses so that investors clearly understand what terms of a security are being rated and the limitations, if any, on the rating, and are advised on a current basis of material rating changes." SEC Release No. 33-7086, 1994 SEC LEXIS 2652, at *7 (Aug. 31 1994).  With this notion as its stated purpose, the SEC regulations, can hardly be seen as supportive of a limitation on the disclosure of material information in any specific Offering.

Managing Director and RMBS head, who testified that it was known at that time that the models were not being updated to conform to then current and pervasive lending to subprime borrowers, ¶¶164-66, and (2) a 2007 confidential presentation to Moody's Board of Directors which similarly reflects a contemporaneous knowledge that the models were outdated, ¶¶167-68.

### B.    The Bespeaks Caution Doctrine Does Not Shield the RA Defendants from the Alleged Misstatements and Omissions.

The RA Defendants argue that warnings that the ratings are not recommendations to buy, sell or hold the Certificates and do not guarantee payment or preclude the risk of loss render the alleged misstatements and omissions non-actionable as a matter of law under the "bespeaks caution" doctrine. RA Mem. at 13-14 (citing Abrams Decl. ¶¶6, 8-9 and Exs. 3-6). However, these statements are all forward-looking statements that steer totally clear of the material misstatements and omissions at the heart of Plaintiffs' claims – that the rating agencies compromised their independence by providing gratis structuring advice and ratings before being engaged – to which the "bespeaks caution" doctrine does not apply. *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 617 (S.D.N.Y. 2008). "[C]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004) (citing *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)).

Further, for the bespeaks caution doctrine to apply "[t]he cautionary language must be specific, prominent and must directly address the risk that plaintiffs' claim was not disclosed," and "[t]he requirement that the cautionary language match the specific risk is particularly important, considering that most, if not all security offerings contain cautionary language." *In re Flag Telecom Holdings, Ltd., Sec. Litig.*, 618 F. Supp. 2d 311, 322 (S.D.N.Y. May 1, 2009) (citing *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5-6 (2d Cir. 1996)). None of these disclosures in any way address, specifically or otherwise, the conflicted activities of the rating agencies particularized in the Complaint.

Finally, risk disclosures are ineffective "[i]f a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability." *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) (citing cases). The generic statements in the Offering Documents about the nature of ratings and the possibility that purchasers could suffer losses, to which the RA Defendants refer, again in no way "match" the specific risks that Plaintiffs claim were not disclosed.

## III.   PLAINTIFFS STATE VALID SECTION 15 CLAIMS.

First, the RA Defendants, relying on the RBS Defendants' brief, summarily assert that Plaintiffs' Section 11 claims fail, and, as a result, so do Plaintiffs' Section 15 claims. RA Mem. at 14. As set forth in Point VI of the accompanying Memorandum of Law in Opposition to the Individual and Underwriter Defendants' Motion to Dismiss, which is incorporated herein by reference, Plaintiffs state valid Section 15 Claims against the RA Defendants. Accordingly, the RA Defendants' motion to dismiss on this basis should be denied. *See In re Worldspace Sec. Litig.*, Civ. No. 07-2252 (RMB), 2008 U.S. Dist. LEXIS 56224, at *20-21 (S.D.N.Y. Jul. 21, 2008).

Second, the RA Defendants assert that Plaintiffs' Section 15 claims fail because Plaintiffs have not adequately pled that the RA Defendants "controlled" the primary violators. RA Mem. at 14. This argument also fails.

Section 15 of the 1933 Act, 15 U.S.C. § 77o, provides that:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [section 11 or 12], shall also be liable jointly and severally with and to the same extent as such controlled person to any persons to whom such controlled person is liable

To plead a claim under Section 15, "a plaintiff must allege (1) a primary violation by a controlled person and (2) direct or indirect control by the defendant of the primary violator." *E.g., Adelphia Commc'ns,* 2007 U.S. Dist. LEXIS 66911, at *30. "Culpable participation" by the controlling person is not an element of a Section 15 claim. *E.g., id.,* at *31.

12

Control can be established by demonstrating that a defendant possessed the power to direct or cause the direction of the management and policies of a person or entity through ownership of voting securities or by contract, business relationships, interlocking directors, family relations, or the power to influence and control the activities of another. *Ellison v. Am. Image Motor Co., Inc.*, 36 F. Supp. 2d 628, 637-38 (S.D.N.Y. 1999) (analyzing control person liability under Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act")). The same considerations that apply to control person liability under the Exchange Act apply to control person liability under the Securities Act. *Id.* at 638-39 (citing *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*, 941 F. Supp. 1369, 1377-78 (S.D.N.Y. 1996)). Plaintiffs here meet this standard and state valid claims under Section 15 of the 1933 Act against the RA Defendants.

Plaintiffs allege primary violations of Sections 11 and 12 by the Defendant Issuing Trusts and the Individual Defendants. *See, supra.* Plaintiffs allege that the RA Defendants possessed the power to direct or cause the direction of the management and policies of the Defendant Issuing Trusts and the Individual Defendants because the RA Defendants controlled the ultimate decision on which mortgage loans would be included or excluded from the securitized loan pools,[14] ¶¶14, 158-74 183-88, and the ultimate amount of credit enhancement required for the Certificates to be sold as AAA and investment grade investments, without which the Certificates could not be sold to pension funds or insurance companies who could only purchase such highly-rated securities, ¶¶7-8, 182-83.[15] As a result, the RA Defendants controlled all material aspects relating to the acquisition,

---

[14]    Plaintiffs allege that the Offering Documents failed to disclose material financial conflicts of interest between the RA Defendants and RBS, including GCM's engagement of the RA Defendants through "ratings shopping," whereby the Ratings Agency that was ultimately engaged was the one which provided the most profitable rating to the investment bank in "bidding" for the engagement, which gave the RA Defendants the incentive to not update their models lest they become unable to provide to the investment bank the most profitable credit enhancement and rating structure for the MBS transaction. ¶¶14, 58-61, 17, 183-86. Specifically, Plaintiffs allege (1) that RBS sent the detailed Loan Level File of the pool of loans to be securitized and the RA Defendants ran the data through their models and provided the results as part of the bidding process for the engagement; (2) that, for example, S&P ran the loan tape through both its LEVELS and SPIRE Models again and provided RBS with the results in an effort to obtain the ratings engagement and advise RBS; (3) that RBS would then again "negotiate" with the RA Defendants before they were hired in order to get them to agree to the least amount of loss coverage and credit enhancement and the highest percentage of AAA-designated Certificates; and (4) that, for example, S&P would also again run the loan tape through its SPIRE Model in order to provide a projected subordination or over-collateralization structure. ¶¶58-61.

[15]    Plaintiffs allege (1) that the Offering Documents failed to disclose that the amount of credit enhancement provided was insufficient for the Certificates to be assigned AAA and investment grade ratings, (2) that the RA Defendants caused this understatement by failing to timely and adequately update the models employed to make those assessments; (3) that, as was only disclosed well after the issuance of the Certificates, S&P's and Moody's models had

structure and sale of the Certificates, as well as the activities of the Defendant Issuing Trusts and the Individual Defendants within the meaning of Section 15 of the Securities Act. ¶292. Plaintiffs further allege that the RA Defendants acted as underwriters for the Issuing Trusts in the sale on the Certificates, directly and indirectly participated in the distribution of the Certificates, directly and indirectly solicited offers to purchase the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents and in the promotion and sale of the Certificates pursuant to the defective Offering Documents. ¶266. These allegations are sufficient to establish a control person claim.[16]

Plaintiffs' allegations demonstrate that the RA Defendants were not merely interested in one offering. They had an ongoing financial interest – like a share in the operations. It was in their best interests when satisfying requirements of one deal to inflate the ratings so they would obtain many more transactions down the road. This was a highly exceptional situation with such significant financial incentive that the RA Defendants assumed control person status as a result.

Further, "[c]ontrol is a question of fact that 'will not ordinarily be resolved summarily at the pleading stage'" because the control issue "raises a number of complexities that should not be resolved on such an underdeveloped record." *In re Cabletron Sys.*, *Inc.*, 311 F.3d 11, 41 (1st Cir. 2002).[17] As a result, dismissal of the Section 15 claims at the pleading stage is premature.

## IV.    PLAINTIFFS' CLAIMS ARE NOT TIME BARRED

The RA Defendants assert that Plaintiffs' claims are time-barred and join in the brief filed by the RBS Defendants on this point. As set forth in Point V of the accompanying Plaintiffs' Memorandum of Law in Opposition to the RBS Defendants Motion to Dismiss, which is incorporated herein by reference, Plaintiffs' claims are not time-barred.

---

not been materially updated since 1999 and 2002, respectively; and (4) that, as a result, they failed to accurately reflect the performance of the Certificate collateral which included substantial portions of the type of loans which only began to be originated *en masse* after 2002, *i.e.*, subprime, Alt-A, no documentation, non-traditional ARMs, interest only and negative amortization loans. ¶¶13-15, 50-56, 240.

[16]    In *In re Falstaff Brewing Corp. Antitrust Litig.*, 441 F. Supp. 62, 68 (E.D. Mo. 1977), the court refused to dismiss claims that lender defendants controlled the daily affairs of a brewing corporation. Clearly, the RA Defendants' role in controlling all material aspects of the acquisition, structure and sale of the Certificates, as well as the activities of the Issuing Trusts and Individual Defendants, is at least as significant as the *Falstaff* lender's role.

[17]    *Accord In re Oxford Health Plans, Inc., Sec. Litig.*, 913 F. Supp. 280, 286 (S.D.N.Y. 1996) (denying motion to dismiss § 20 claim because the determination of control is a "fact-intensive inquiry" not resolvable on such motion).

## CONCLUSION

For all of the foregoing reasons, the RA Defendants' Motion to Dismiss Plaintiffs' Amended Securities Class Action Complaint should be denied in its entirety.[18]

---

[18]    Should the Court decide to dismiss all or part of Plaintiffs' allegations, Plaintiffs respectfully request leave to replead.  *See* Fed. R. Civ. P. 15(a) (leave to amend shall be granted freely); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re AMF Bowling Sec. Litig.*, No. 99-3023 (DC), 2003 U.S. Dist. LEXIS 7389 (S.D.N.Y. May 2, 2003) ("the only possible reasons to reject amendment would be prejudice to the defendant or misconduct by plaintiffs...").

Dated:  New York, New York
        September 21, 2009

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By:     /s/ Joel P. Laitman
        Joel P. Laitman (JL-8177)
        Christopher Lometti (CL-9124)
        Daniel B. Rehns (DR-5506)
        Kenneth M. Rehns (KR-9822)
150 East 52nd Street, Thirtieth Floor
New York, New York 10022
Telephone: (212) 828-7797
Facsimile: (212) 828-7745
*jlaitman@cohenmilstein.com*
*clometti@cohenmilstein.com*
*drehns@cohenmilstein.com*
*krehns@cohenmilstein.com*

        Steven J. Toll (*admitted pro hac vice*)
        Avi Garbow (*admitted pro hac vice*)
        S. Douglas Bunch (SB-3028)
1100 New York Avenue NW
Suite 500 West
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
*stoll@cohenmilstein.com*
*agarbow@cohenmilstein.com*
*dbunch@cohenmilstein.com*

16

## CERTIFICATE OF SERVICE

I, Kenneth M. Rehns, hereby certify that on September 21, 2009, I caused the foregoing document to be filed electronically with the United States District Court for the Southern District of New York through the Court's mandated ECF service. Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the document(s) upon confirmation of e-filing.

/s/  Kenneth M. Rehns
Kenneth M. Rehns