**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| NEW JERSEY CARPENTERS VACATION FUND and BOILERMAKER BLACKSMITH NATIONAL PENSION TRUST, *on Behalf of Themselves and All Others Similarly Situated,*<br><br>Plaintiffs,<br><br>*v.*<br><br>THE ROYAL BANK OF SCOTLAND GROUP, PLC, GREENWICH CAPITAL HOLDINGS, INC., GREENWICH CAPITAL ACCEPTANCE, INC., GREENWICH CAPITAL FINANCIAL PRODUCTS, INC., ROBERT J. MCGINNIS, CAROL P. MATHIS, JOSEPH N. WALSH, III, JOHN C. ANDERSON, JAMES M. ESPOSITO, RBS SECURITIES, INC. f/k/a GREENWICH CAPITAL MARKETS, INC., d/b/a RBS GREENWICH CAPITAL, MOODY'S INVESTORS SERVICE, INC. and THE MCGRAW-HILL COMPANIES, INC.,<br><br>Defendants. | Case No.: 08-CV-5093 (HB)<br><br><br><br>**ECF CASE** |

**MEMORANDUM OF LAW IN OPPOSITION TO THE RBS DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED FIRST AMENDED SECURITIES CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ........................................................................................1

**SUMMARY OF THE FACTS** .........................................................................................2

**SUMMARY OF THE ARGUMENT** ...............................................................................6

**ARGUMENT** ....................................................................................................................7

I.      PLAINTIFFS ADEQUATELY ALLEGE
STANDING TO ASSERT THEIR CLAIMS...........................................................7

          A.    Any Challenge to Lead Plaintiffs' Standing is Premature ........................8

          B.    There Is No Requirement That There Be a Purchaser on Each of the
15 Offerings Where the Registration Statements and Prospectus
Supplements Share Identical Alleged Misstatements and Omissions....................9

          C.    Plaintiffs Have Adequately Alleged an Injury ........................................12

II.     RISK DISCLOSURES DO NOT CURE MISSTATEMENTS AND OMISSIONS
REGARDING MORTGAGE LOAN UNDERWRITING GUIDELINES..........................13

          A.    Generalized Risk Disclosures Neither Match nor Cure the
Alleged Misstatement and Omissions .....................................................13

          B.    Plaintiffs Need Not Allege Misstatements with
Respect to Specific Underlying Loans. ...................................................17

III.    ALLEGED MISSTATEMENTS AND OMISSIONS REGARDING RATINGS
AGENCIES' PRE-ENGAGEMENT STRUCTURING ARE ACTIONABLE.................18

IV.    ALLEGATIONS OF RATINGS MODELS INADEQUACIES THAT WERE NOT
DISCLOSED IN THE OFFERING DOCUMENTS ARE ACTIONABLE......................19

V.     PLAINTIFFS' CLAIMS ARE NOT TIME BARRED .........................................21

          A.    The Standard for Inquiry Notice .............................................................21

          B.    Articles Regarding Originators' Lending
Practices Do Not Establish Inquiry Notice..............................................23

VI.    PLAINTIFFS STATE A CLAIM UNDER SECTION 15 OF THE 1933 ACT.................23

**CONCLUSION**.................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL & STATE CASES**

*Akerman v. Oryx Comm'ns, Inc.*,
    810 F.2d 336 (2d. Cir. 1987) ..............................................................................11

*Allen v. Wright*,
    468 U.S. 737 (1984) ..........................................................................................12

*Barnes v. Osofsky*,
    373 F.2d 269 (2d Cir. 1967) ..............................................................................11

*Citibank, N.A. v. Itochu Int'l Inc.*,
    Civ. No. 01-6007 (GBD), 2003 U.S. Dist. LEXIS 5519 (S.D.N.Y. Apr. 3, 2003) ...................14

*Coronel v. Quanta Capital Holdings Ltd.*,
    Civ. No. 07-1405 (RPP), 2009 U.S. Dist. LEXIS 6633 (S.D.N.Y. Jan. 26, 2009)....................20

*Ehlert v. Singer*,
    245 F.3d 1313 (11th Cir. 2001) .........................................................................12

*Foman v. Davis*,
    371 U.S. 178 (1962) ..........................................................................................25

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008) ...............................................................18

*Giarraputo v. Unumprovident Corp.*,
    Civ. No. 99-301, 2000 U.S. Dist. LEXIS 19138 (D. Me. Nov. 8, 2000) ..................................20

*Glusband v. Fittin Cunningnham Lauzon, Inc.*,
    582 F. Supp. 145 (S.D.N.Y. 1984) ...................................................................12

*Grace v. Rosenstock*,
    169 F.R.D. 473 (E.D.N.Y. 1996).......................................................................22

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)............................................................................................2

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004) ..............................................................................8, 9

*Hinerfeld v. United Auto Group*,
    Civ. No. 97-3533 (RPP), 1998 U.S. Dist. LEXIS 10601 (S.D.N.Y. July 15, 1998) .................13

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005) ....................................................................... 22

*In re AMF Bowling Sec. Litig.,*
  Civ. No. 99-3023 (DC), 2003 U.S. Dist. LEXIS 7389 (S.D.N.Y. May 2, 2003) ...................... 25

*In re AOL Time Warner Sec. & ERISA Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) ....................................................................... 12

*In re Cosi, Inc. Sec. Litig.*,
  379 F. Supp. 2d 580 (S.D.N.Y. 2005) ....................................................................... 11

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008)..............................................................*passim*

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
  Civ. No. 98-4318 (HB), 2000 U.S. Dist. LEXIS 13469 (S.D.N.Y. Sept. 19 2000) .............. 9, 10

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  618 F. Supp. 2d 3ll (S.D.N.Y. 2009) ................................................................... 13, 20

*In re Fleming Cos. Sec. & Derivative Litig.*,
  Civ. No. 03-MD-1530, 2004 U.S. Dist. LEXIS 26488 (E.D. Tex. Jun. 10, 2004)...................... 11

*In re Giant Interactive Group, Inc. Sec. Litig.*,
  Civ. No. 07-10588 (RWS), 2009 U.S. Dist. LEXIS 69414 (S.D.N.Y. Aug. 5, 2009) .............. 21

*In re Global Crossing, Ltd. Sec. Litig.*,
  313 F. Supp. 2d 189 (S.D.N.Y. 2003) ................................................................... 8, 11

*In re Initial Pub. Offering Sec. Litig.*,
  214 F.R.D. 117 (S.D.N.Y. 2004)......................................................................... 8, 9

*In re Initial Pub. Offering Sec. Litig.,*
  341 F. Supp. 2d 328 (S.D.N.Y. 2004) ....................................................................... 22

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009) ....................................................................... 22

*In re No. Nine Visual Tech. Corp. Sec. Litig.*,
  51 F. Supp. 2d 1 (D. Mass. 1999)......................................................................... 20

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
  202 F. Supp. 2d 8 (S.D.N.Y. 2001) ....................................................................... 18

*In re Ultrafem, Inc. Sec. Litig.*,
  91 F. Supp. 2d 678 (S.D.N.Y. 2000) ................................................................... 11, 22

*In re Worldcom, Inc. Sec. Litig.*,
    Civ. No. 02-3288 (DLC), 2004 U.S. Dist. LEXIS 4240 (S.D.N.Y. Mar. 19, 2004) .................11

*In re Worldspace Sec. Litig.*,
    Civ. No. 07-2252, 2008 U.S. Dist. LEXIS 56224 (S.D.N.Y. Jul. 21, 2008) ...........................24

*La. Mun. Police Employees Ret. Sys. v. Merrill Lynch & Co.*,
    Civ. No. 08-9063 (JSR) (S.D.N.Y. Feb. 19, 2009) ...................................................10

*Lapin v. Goldman Sachs Group, Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) ...............................................................22

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
    Civ. No. 08-0261, 2008 U.S. Dist. LEXIS 77146 (N.D. Tex. Sept. 30, 2008).........................14

*Luce v. Edelstein*,
    802 F.2d 49 (2d Cir. 1986) ..........................................................................20

*Nanopierce Tech., Inc. v. Southridge Capital Mgmt., LLC*,
    Civ. No. 02-0767 (LBS), 2003 U.S. Dist. LEXIS 21858 (S.D.N.Y. Dec. 4, 2003) .................18

*Nettis v. Levitt*,
    241 F.3d 186 (2d Cir. 2001) .........................................................................22

*Newman v. Warnaco Group, Inc.*,
    335 F.3d 187 (2d Cir. 2003) .........................................................................22

*Pruiss v. Bosse*,
    912 F. Supp. 104 (S.D.N.Y. 1996) ..................................................................22

*Randall v. Loftsgaarden*,
    478 U.S. 647 (1986)....................................................................................2

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..........................................................................20

*Shah v. Meeker*,
    435 F.3d 244 (2d Cir. 2006) .........................................................................21

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996).........................................................................18

*Staehr v. The Hartford Fin. Serv. Group*,
    547 F.3d 406 (2d Cir. 2008) .........................................................................21

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999) ..........................................................................22

*Tooley v. Napolitano,*
   556 F.3d 836 (D.C. Cir. 2009)................................................................................17

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP,*
   549 F.3d 100 (2d Cir. 2008) ...............................................................................12

*Zirkin v. Quanta Capital Holdings Ltd.,*
   Civ. No. 07-851 (RPP), 2009 U.S. Dist. LEXIS 4667 (S.D.N.Y. Jan 23, 2009).......................20

## STATUTES & RULES

15 U.S.C.  77 *et seq.*................................................................................................*passim*

15 U.S.C. § 78u-4(a)(3)(B) ....................................................................................... 8

17 C.F.R. § 229.1111 ...........................................................................................17-18

17 C.F.R. § 229.1120 ............................................................................................ 18

17 C.F.R. §303(a)(3)(ii) ........................................................................................ 18

Fed. R. Civ. P. 12(b)(6).......................................................................................... 1

Fed. R. Civ. P. 15(a) ............................................................................................25

## SECONDARY AUTHORITIES

Lee Christie, *Pick-a-payment Loans Turn Poisonous*, CNN Money, Sept. 3, 2008,
   http://money.cnn.com .......................................................................................17

U.S. Const. Art. III .........................................................................................12, 13

## PRELIMINARY STATEMENT

Plaintiffs respectfully submit this memorandum of law in opposition to the motion made by Defendants Royal Bank of Scotland, plc ("RBSG"), RBS Holdings USA, Inc. f/k/a Greenwich Capital Holdings, Inc. ("GCH"), Greenwich Capital Acceptance, Inc. ("GCA"), RBS Financial Products f/k/a Greenwich Capital Financial Products, Inc. ("GCFP")[1], RBS Securities, Inc. f/k/a Greenwich Capital Markets ("GCM"), Robert J. McGinnis ("McGinnis"), Carol P. Mathis ("Mathis"), Joseph N. Walsh, III ("Walsh"), John C. Anderson ("Anderson") and James M. Esposito ("Esposito") (collectively, "RBS" the "RBS Defendants" or the "Defendants"),[2] pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss Plaintiffs' First Amended Securities Class Action Complaint (the "Complaint").

This is an action brought pursuant to the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l, (the "1933 Act" or "Securities Act") by Court-appointed Lead Plaintiffs New Jersey Carpenters Vacation Fund ("Carpenters Vacation Fund") and Boilermaker Blacksmith National Pension Trust ("Boilermaker Pension Trust") (collectively "Lead Plaintiffs" or "Plaintiffs"), on their own behalf and as a class action on behalf of all persons and entities who purchased or otherwise acquired mortgage-backed securities ("MBS" or "Certificates") underwritten by Defendant GCM and issued by Issuing Trusts, ¶¶34-35, pursuant and/or traceable to two Registration Statements and accompanying Prospectuses (the "Registration Statements") and later-filed Prospectus Supplements which were incorporated into the Registration Statements (collectively, the "Offering Documents"). ¶24.

Defendants registered the securities at issue with the Securities and Exchange Commission (the "SEC"), received the benefits of an SEC-registered offering and also were obliged to comply with the strict liability provisions of the federal securities laws, including the private rights of

---

[1]    Defendants' claim that no allegations are made against GCFP and therefore GCFP should be dismissed as a defendant. This is incorrect. *See* ¶¶4, 24, 193, 197, 255, 286-88.

[2]    Defendants McGinnis, Mathis, Walsh, Anderson and Esposito are collectively referred to herein as the "Individual Defendants."

action provided in Section 11 of the 1933 Act.[3]

The Complaint asserts claims for violations of Section 11, 12(a) and 15 of the 1933 Act. These claims impose "a harsh, nearly strict-liability rule designed to make sure those involved in securities offerings meticulously prepare the registration statement." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1170 n.47 (C.D. Cal. 2008); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). As the Supreme Court has noted, liability under the 1933 Act is "virtually absolute, even for innocent misstatements." *Herman & MacLean,* 459 U.S. at 382 (citing 15 U.S.C. § 77k(b)). The 1933 Act imposes such high standards on signatories to the Registration Statement because it seeks "'to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation [and] to place adequate and true information before the investor." *Randall v. Loftsgaarden*, 478 U.S. 647 (1986) (quoting S. Rep. No. 47, 73d Cong., at 1 (1st Sess. 1933)).

<u>SUMMARY OF FACTS</u>

Pursuant to the Registration Statements signed by the Individual Defendants, Defendants GCM, and the Ratings Agency Defendants acted together to issue $25 billion of largely triple-A mortgage backed securities or Certificates. The Certificates were issued in 15 public offerings over a concentrated 17-month period ending in October 2007. ¶¶34-35. The purchasers of the Certificates were primarily conservative institutional investors such as pension funds who were required to purchase only the highest investment-grade securities. ¶7.

The Certificates were collateralized by residential mortgages, meaning the investors' interest and principal payments were derived from payments made by borrowers on the underlying mortgages. ¶¶5-6, 23, 41-42. The Registration Statements and Prospectus Supplements contained largely identical material misstatements relating to the purported "Underwriting Guidelines" used to originate the mortgage collateral. ¶¶192-233. The Guidelines provided that the originator was required to assess borrower creditworthiness through an examination and verification of borrower

---

[3]       In addition to the Individual and Company Defendants, Plaintiffs seek redress Defendants Moody's Investors Services, Inc. ("Moody's) and The McGraw-Hill Companies, Inc. ("S&P") (together, the "Ratings Agencies" or "Ratings Agency Defendants").

assets, credit history and employment, ¶¶194, 196, 199, 210, 217, 224, 228, and the valuation of the mortgaged property through standard appraisals. ¶¶191, 203, 213, 220, 224, 230. The Guidelines also provided that mortgage loans could be originated pursuant to limited or no supporting borrower documentation where there were countervailing or compensating factors justifying issuance of the loan, *e.g.*, strong credit profile or high appraisal value in relation to loan amount. ¶¶196, 205, 215, 222, 224. It is alleged that these Guidelines contained material misstatements and omissions since, in fact, the Guidelines were systematically disregarded. ¶¶69-152.

Relatively soon after issuance and in the face of unprecedented delinquencies and defaults on the underlying collateral, the Ratings Agencies in July 2007 announced the review of not only the Certificates for potential downgrades, but also the revision of the underlying ratings "methodologies" used to rate them, taking into account significantly higher than anticipated default rates. ¶¶14, 153-57. When these methodology changes were finally implemented, they resulted in downgrades mid to late 2008, of not merely one or two levels within the 23 level rating system – *i.e.,* from "AAA" to "AA" or "AA-" – but as much as 17 levels – *i.e.,* from "AAA" to "CCC." Although initially over 92% of the Certificates were assigned the highest "AAA" and "Aaa" ratings by S&P and Moody's, over 99% of the Certificates were subsequently downgraded, with over 93% of initially "AAA" rated Certificates now downgraded to speculative "junk bond" investments.[4] ¶¶8-9. Further, delinquency and default rates on the collateral underlying the Certificates continued to dramatically increase, with delinquencies and foreclosures impairing as much as 39% of the underlying Certificate mortgage loans. *Id.* Attendant to these significant downgrades and delinquencies was a commensurate collapse in the value of the bonds, with Plaintiffs' Certificates having lost, on average, 68% of their value as of filing of the Complaint. ¶ 9.

In announcing the methodology changes, and in the subsequent Certificate downgrades, the

---

[4]     As set forth herein, 95% of the downgrades of the Certificates by the Ratings Agencies to below investment grade occurred after May 14, 2007 and 87% of the downgrades occurred after May 19, 2008, one year before the filing of the Complaint.

Ratings Agency Defendants attributed, as a material cause, the aggressive underwriting practices and mortgage fraud which had infected the underlying mortgage collateral. ¶¶9-10, 67-68, 156. The Ratings Agencies' actions triggered a number of governmental and other investigations. ¶¶153-74. The findings of these investigations, which only emerged in 2008, also supported the strong inference that the mortgage collateral had been impaired from the outset; and the AAA ratings consistently assigned to the Certificates had been inflated and were the product of undisclosed material conflicts of interest.

In June 2008, the facts surrounding an investigation commenced by the New York State Attorney General ("NYAG") regarding the due diligence of various investment banks, including RBS, with respect to their underwriting and issuing of MBS, began to emerge.[5] ¶¶140-43. The investigation revealed that investment banks may have disregarded data presented to them by their outside "due diligence firms," most notably the Bohan Group ("Bohan") and Clayton Holdings, Inc. ("Clayton"), which showed that the underlying loans did not comply with the mortgage loan underwriting guidelines stated in the Offering Documents. ¶¶12, 149-52. In fact, the President of Bohan stated publicly that the investment banks which engaged his firm had significantly reduced, from 2005 through 2007, the percentage of loans which Bohan, and firms like it, examined. ¶152. Further, in 2008 and 2009, four of the five principal Originators of the underlying mortgage loan collateral were made the subject of securities fraud complaints detailing the reckless mortgage underwriting practices which they employed. ¶¶74-76, 87, 104, 129.

Furthermore, in July 2008, the SEC reported the results of its year-long investigation into the activities of Defendants S&P and Moody's in rating residential MBS in the precise period during which the Offerings had been consumated (the "2008 SEC Report"). ¶¶14, 61, 183-87. The 2008 SEC Report concluded that there were material undisclosed conflicts of interest in the

---

[5]    The RBS Defendants assert that Plaintiffs' allegations that the underwriters failed to conduct adequate due diligence is without basis, that, in fact RBS conducted "*thorough*" due diligence and even hired the Clayton Group to conduct such due diligence on the underlying loans. RBS Br. at 6. However, this assertion is plainly incorrect and belied by a wealth of allegations in the Complaint stating the opposite, namely that RBS conducted limited oversight of Clayton's and Bohan's activities as subcontractors. ¶¶19, 138-152. Further, the President of Bohan stated, that by the time the Offerings of the Certificates took place, investment banks were requiring a review of only 5% to 7% of the entire loan pools. ¶¶19, 49, 57, 152, 193.

Ratings Agency Defendants' process of rating MBS including, most notably, the Ratings Agency Defendants' role in structuring the MBS. *Id.* The Ratings Agency Defendants, in seeking the highly profitable MBS ratings engagements from the same small group of investment banks firms, were incentivized not to update their models to reflect more aggressive mortgage loan products lest the models not yield the highest investment grade ratings which would result in the greatest profit for the investment banks. ¶¶13-15, 50, 158-68, 177, 240, 249, 252. In October 2008, in testimony given before the United States House of Representatives Committee on Oversight and Governmental Reform (the "House Oversight Committee"), a former S&P managing director testified about the failure of the Ratings Agency Defendants to update their models to reflect the default rate of the loans being issued ¶¶163-74, as well as the "ratings shopping" practice employed by investment banks to engage the Ratings Agency Defendants wherein the Ratings Agencies provided ratings as part of their competitive bid for the ultimate engagement, further incenting the assignment of inflated ratings to the MBS. ¶¶7, 14-15, 58-61, 178-81.

The Complaint alleges violations of Sections 11, 12(a)(2) and 15 of the Securities Act arising from three categories of material omissions that had not been disclosed in the Offering Documents: (1) the Guidelines set forth in the Offering Documents were systematically disregarded, ¶¶10, 69-152, 191-233; (2) the credit support or investor protections built into the structure of the Certificates were inadequate and based on outdated models employed by the Ratings Agencies who had the incentive to inflate credit support and Certificate ratings, ¶¶ 13-14, 52, 158-74, 231-240, 249, 252; and (3) the Ratings Agencies' activities in connection with the Certificates were infected by undisclosed conflicts of interest, including the Ratings Agency Defendants' provision of *unpaid* services in creating and structuring the Certificates as an inducement for RBS to hire them to rate the Certificates, ¶¶14-15, 179-80, 184-90, and RBS' requirement that the Ratings Agency Defendants submit to the "ratings shopping" process as a prerequisite for being engaged to rate the Certificates. ¶¶158-90.

These material omissions resulted in material misstatements in the specific portions of the Offering Documents that described: (1) the Guidelines purportedly used to originate mortgages,

because, in fact, those Guidelines were systematically disregarded ¶¶191-233; and (2) the various forms of stated credit support or investor protections because, having been derived from outdated models employed by the conflicted Ratings Agency Defendants, they were wholly inadequate ¶¶237-240.

## <u>SUMMARY OF ARGUMENT</u>

Defendants argue that all the claims must be dismissed because: (1) Plaintiffs do not have standing to represent purchasers of all of the Certificate Offerings (RBS Defendants' Memorandum of Law in Support ("RBS Br."), D.E. No. 63, at 7); (2) there are no actionable misstatements or omissions in the stated Guidelines both because of certain risk disclosures and an "ocean" of loan data provided to investors in the Offering Documents; (3) the statements regarding the stated credit support are not actionable because the potential inadequacy was disclosed and no facts are alleged that the Ratings Agencies models used to determine Credit Support were known to be outdated at the time of the Offerings; (4) the non-disclosure of the conflicting roles of the Ratings Agencies in creating and rating the Certificates are not actionable because no reasonable investor would deem them important; (5) the non-disclosure of the ratings shopping practices used to engage the Ratings Agencies and the Ratings Agencies' role in structuring the Certificates without compensation as an inducement to be hired are all not actionable because these practices are merely the by-products of the well known practice of having securities issuers pay the Ratings Agencies so no separate disclosures were required; and, (6) all of Plaintiffs' claims are time-barred because disclosures made before May 14, 2007 provided notice to Certificate purchasers of their probable legal claims and the alleged wrongdoing.

All of these arguments fail. First, once it has been pled that Plaintiffs purchased Certificates pursuant to a Registration Statement, their standing is sufficiently stated and the issue of whether Plaintiffs may represent purchasers on all the Offerings is a matter resolved at the class certification stage. In any event, however, Plaintiffs have standing to represent investors in all the Certificate Offerings because the claims arise from common alleged omissions and misstatements in the Registration Statement and identical misstatements in the Prospectus Supplements. Further,

(1) the Risk Disclosures and other disclosures do not sufficiently "match" the alleged misstatements and omissions relating to the Guidelines to render them not actionable as a matter of law; (2) the misstatements and omissions regarding Certificate credit support also are not cured by so-called risk disclosures, nor are they based on merely "hindsight" allegations regarding the use of outdated models; and (3) the undisclosed conflicted roles of the Ratings Agencies and undisclosed ratings shopping practices used to engage them both constitute clear material non-disclosure since they are facts which undermine the purported independence of the Ratings Agencies and their Certificate ratings.  Finally, none of the claims are time barred because the disclosures prior to May 14, 2007, upon which the Defendants rely, fail to demonstrate probable wrong-doing and legal claims as a matter of law because by that date no Certificate downgrades had occurred or been announced and no pertinent governmental investigations into the roles played by the Defendants herein had even begun.

## ARGUMENT

### I.    PLAINTIFFS ADEQUATELY ALLEGE STANDING TO ASSERT THEIR CLAIMS.

The Defendants argue that, even though Plaintiffs purchased Certificates pursuant to both Registration Statements, they do not have standing to bring suit on behalf of purchasers of all the Certificate Offerings issued pursuant to those Registration Statements because: (1) each post-effective amendment to a shelf registration statement is deemed to be a new registration statement which makes each of the 15 Offerings subject to a separate registration statement; (2) the individually-named Plaintiffs purchased Certificates in two of the 15 Offerings and, accordingly, can only assert claims regarding those two specific Offerings; and (3) as a matter of constitutional law, Plaintiffs lack standing to assert claims with respect to those series of Certificates which Plaintiffs did not purchase.  RBS Br. at 12-16.  The Defendants are wrong.

A.    **Any Challenge to Lead Plaintiffs' Standing Is Premature.**

The Underwriters assert that Plaintiffs purchased Certificates in only two of the 15 challenged offerings and therefore lack standing as to the remaining 13 Offerings.[6]  RBS Br. at 7-8. However, given that it is undisputed that Plaintiffs purchased both pursuant and traceable to each of the two common Registration Statements (in which all of the Offerings were incorporated), and that the claims arise from common alleged misstatements in the Registration Statement and Prospectus Supplements, the standing requirement is satisfied.  Whether a purchaser from each Offering is required is a matter more appropriately resolved at the class certification stage.[7]

A Lead Plaintiff is responsible for managing and directing the litigation.  15 U.S.C. § 78u-4(a)(3)(B).  "Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action."  *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004).  "Because the PSLRA mandates that courts must choose a party who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim."  *Id.*  The district court in *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 204-05 (S.D.N.Y. 2003),[8] held:

> [N]othing in the PSLRA requires that the lead plaintiffs have standing to assert all of the claims that may be made on behalf of all of the potential classes and subclasses of holders of different categories of security at issue in the case.  Indeed, the imposition of any such requirement would be at odds with the purposes of the statute, since in the case of large alleged frauds involving issuers of many classes of securities, the consequence would be either the appointment of a large number of lead plaintiffs (undermining the goal of a cohesive leadership and management

---

[6]      The RBS Defendants assert at length that, with a shelf registration statement, each post-effective amendment, *e.g.*, prospectus supplement, is deemed to supersede the previous registration statement.  RBS Br. at 9.  However, as the District Court in *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d at 1166 held the regulatory definition of a registration statement does not preclude standing to assert a Section 11 claim arising from different offerings issued pursuant to a common registration statement as long as the claims arise from common alleged misstatements: "So long as (1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common 'parts' the (3) were false and misleading at each effective date, there is § 11 standing."

[7]      Lead Plaintiffs moved the District Court, pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 77z, for an order appointing them Lead Plaintiffs of this putative securities class action on behalf of all persons who acquired the Certificates pursuant and/or traceable to the Registration Statement at issue. None of the Defendants opposed that motion, and the Court issued its Order Appointing Lead Plaintiff on June 30, 2009.  *See* Order Appointing Lead Plaintiff, D.E. No. 61, June 30, 2009.

[8]      *Accord Hevesi*, 366 F.3d at 82 n.13 ("any requirement that a different lead plaintiff be appointed to bring every single available claim would contravene the main purpose of having a lead plaintiff – namely, to empower one or several investors with a major stake in the litigation to exercise control over the litigation as a whole"); *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 123 ("The only other possibility – that the court should cobble together a lead plaintiff group that has standing to sue on all possible causes of action – has been rejected repeatedly by courts in this Circuit and undermines the purpose of the PSLRA.").

group) or the premature breakdown of the action into an unmanageable number of separate cases brought by different lead plaintiffs on behalf of each potential subclass of securities holders.

It therefore is not uncommon for additional named plaintiffs to intervene prior to class certification in order to resolve standing issues. *See, e.g., Hevesi*, 366 F.3d at 82-83 (affirming lead plaintiff's ability to add named plaintiffs to aid in representing the class where lead plaintiff did not have standing to bring every available claim); *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 122-23 (S.D.N.Y. 2004) (granting leave to add new named plaintiffs for purpose of conferring standing prior to class certification). It is also not uncommon for a court to determine, at the class certification stage, that purchasers are not required for each offering where the claims arise out of common alleged misstatements and omissions. *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, Civ. No. 98-4318 (HB), 2000 U.S. Dist. LEXIS 13469, at *14-15 (S.D.N.Y. Sept. 19 2000) (permitting purchasers on one offering to represent purchasers on a different offering for purposes of asserting Section 11 claims where there were common misstatements and omissions). As a result, the RBS Defendants' assertions for dismissal based on the Lead Plaintiffs' inability to represent all Certificate purchasers are premature and more appropriately addressed at the class certification stage. *See, e.g., Countrywide*, 588 F. Supp. 2d at 1167 ("The well-developed class certification framework will better guide this inquiry and lead to more efficient resolution of class claims than standing's sometimes-arbitrary distinctions.").

### B. There Is No Requirement That There Be a Purchaser on Each of the 15 Offerings Where the Registration Statements and Prospectus Supplements Share Identical Alleged Misstatements and Omissions.

Section 11, by its terms, confers standing on any person acquiring a security where "any part of the ***registration statement***, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k (emphasis added). It is undisputed that Plaintiffs purchased Certificates pursuant and traceable to the 2006 and the 2007 Registration Statements, ¶¶19-20 – the only Registration Statements at issue. ¶24. It also is undisputed that every Certificate at issue was issued pursuant to either the 2006 or the 2007 Registration

Statement. ¶¶34-35. As such, Plaintiffs have standing to assert Section 11 claims based on the common material misrepresentations and omissions contained in these Registration Statements[9] and the identical misstatements and omissions in all 15 Prospectus Supplements. ¶¶191-92, 196, 234-35, 238-39, 241, 244, 248, 250, 251. *See* Declaration of Joel P. Laitman, (the "Laitman Decl."), dated September 21, 2009, attached hereto.

Contrary to the Underwriters' arguments, there is no requirement to have a purchaser on each offering where, as here, the claims arise from alleged misstatements and omissions in the Registration Statements and are thus necessarily common to all the offerings. *Countrywide*, 588 F. Supp. 2d at 1166. *See also Dreyfus*, 2000 U.S. Dist. LEXIS 13469, at *14-15 (permitting purchasers on one offering to represent purchasers on a different offering for purposes of asserting Section 11 claims where there are common misstatements and omissions).[10]

In *Countrywide*, the district court analyzed the identical standing issue presented here and determined that the plaintiffs had alleged sufficient Section 11 standing to survive a motion to dismiss:

> The statute contemplates the possibility that the "registration statement" in the first clause of § 11 is not the same in every respect as the "registration statement" for a particular security because "parts" of the "registration statement" may "bec[o]me effective" at different times. 15 U.S.C. § 77k(a) ("[A]ny part of the registration statement, when such part became effective . . . ."). To require that "registration statement" of § 11's first clause be absolutely identical for each security traceable to the same initial registration and prospectus would rewrite "such part" to read "registration statement." *See also* 15 U.S.C. § 77b (defining registration statement "unless the context otherwise requires"). ***The statute grants standing to anyone who buys "such security" – one traceable to a defective registration statement. Hertzberg, 191 F.3d 1076. If the initial shelf registration statement contained an actionable statement or omission that is common to more than one issuance***

---

[9]    The Defendants purport to rely upon *La. Mun. Police Employees Ret. Sys. v. Merrill Lynch & Co.*, Civ. No. 08-9063 (JSR) (S.D.N.Y. Feb. 19, 2009). Declaration of Thomas C. Rice ("Rice Decl."), Ex. 7 at 5, 9, 62. However, the court did not analyze or find, as in *Countrywide* and *Dreyfus*, that there were common misstatements and omissions giving rise to the 1933 Act claims.

[10]    In *Dreyfus*, this Court held:

> In light of these authorities, I conclude that the class representatives may represent both an AG Fund Class and a Premier Fund Class. Here, the claims of the named plaintiffs and prospective class members derive from the same course of events. The plaintiffs have alleged that both Funds made similar misrepresentations and omissions in the Registration Statements [and] Prospectuses … and thus, the named plaintiffs who purchased the AG Fund may represent a Premier Fund Class.

*Dreyfus*, 2000 U.S. Dist. LEXIS 13469, at *14-15.

> *under the shelf registration, then purchasers in those issuances may be able to trace the same injury to the same "registration statement."*

*Countrywide,* 588 F. Supp. 2d at 1166 (emphasis added).

The district court then held that "[s]o long as (1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common 'parts' that (3) were false and misleading at each effective date, there is § 11 standing." *Id.* at 1166. *Accord In re Worldcom, Inc. Sec. Litig.*, Civ. No. 02-3288 (DLC), 2004 U.S. Dist. LEXIS 4240, at *6-7 (S.D.N.Y. Mar. 19, 2004) (purchasers of one type of debt security had standing to pursue claims of purchasers of a second type of debt security issued pursuant to the same registration statement); *In re Fleming Cos. Sec. & Derivative Litig.*, Civ. No. 03-MD-1530, 2004 U.S. Dist. LEXIS 26488, at *153 (E.D. Tex. Jun. 10, 2004) ("case law holds that purchasers of one type of security have standing to sue on behalf of purchasers of other types of security issued pursuant to a single registration statement").[11]

As set forth herein, and in the Laitman Declaration, the 1933 Act claims arise out of common misstatements and omissions in Registration Statements and identical statements in Prospectus Supplements.

Because Plaintiffs purchased Certificates pursuant and traceable to both of the false and misleading Registration Statements and Prospectus Supplements at issue, Plaintiffs have standing to assert Section 11 claims on behalf of all Class members who similarly purchased Certificates pursuant and/or traceable to those same false and misleading Offering Documents.

## C.    Plaintiffs Have Adequately Alleged An Injury.

The Defendants assert that Plaintiffs do not have standing even with respect to offerings in which Plaintiffs did participate because they did not and cannot plead that they have suffered some

---

[11]    The cases upon which the RBS Defendants rely do not address the issue that was decided in *Countrywide* and that which is at issue here.  For example, in *Barnes v. Osofsky*, 373 F.2d 269 (2d Cir. 1967), the issue was simply whether class members participating in a settlement fund needed to prove that their share were traceable to the flawed registration statement.  The Second Circuit answered that question in the affirmative.  In *Global Crossing*, 313 F. Supp. 2d at 206-07, plaintiffs' Section 11 claims were dismissed because plaintiffs did not allege and were not able to trace their shares to the flawed registration statement in one challenged offering and therefore were not members of the class they purported to represent.  *Akerman v. Oryx Comm'ns, Inc.*, 810 F.2d 336 (2d. Cir. 1987) cited by the RBS Defendants, takes on the issue of standing under section 12(2) and the issues of privity and scienter, neither of which are issues herein..  Under Section 12(a)(2) of the Securities Act,  which Plaintiffs herein allege, *whe*re a plaintiff alleges that it "purchased shares 'pursuant to the Offering,' *i.e.*, in the Offering, [its] allegations may stand under Section 12[a](2)."  *In re Ultrafem, Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 693-94 (S.D.N.Y. 2000); *accord in re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 588-89 (S.D.N.Y. 2005) (citing *Ultrafem*, 91 F. Supp. 2d at 693-94).

injury.[12]  RBS Br. at 9-10.  However, as discussed in Points I.A. and B., *supra*, the Complaint, as required under Section 11 quantifies the amount the Plaintiffs' Certificates declined in value since the Offering – a decline of, on average 68% – clearly alleges that Plaintiffs have standing to assert claims under Section 11 of the 1933 Act against the Defendants.[13]  As a result, the Complaint also adequately alleges Plaintiffs' standing under Article III of the United States Constitution, which expressly refers to federal statutes as one basis for conferring subject matter jurisdiction on federal courts.  *See* U.S. Const. Art. III, § 2 ("The judicial power shall extend to all cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties…").  Because Plaintiffs' allegations satisfy the specific standing requirements of Section 11 of the 1933 Act, there is no need for the Court to undertake the more abstract and generalized Article III standing analysis.[14]

Nonetheless, Plaintiffs' claims satisfy the elements of Article III standing, pursuant to which Plaintiffs "must allege personal injury fairly traceable to the defendant's allegedly wrongful conduct and likely to be redressed by the requested relief."  *Allen v. Wright*, 468 U.S. 737, 751 (1984).  The Complaint alleges that Defendants were responsible for the filing of the Registration Statements with the SEC and subsequent issuance of billions of dollars of MBS pursuant to the materially false and misleading Offering Documents.  ¶¶191-252.  The Complaint further alleges that Plaintiffs and the Class were injured when their Certificates declined in value after the truth about the misrepresentations and omissions was revealed.  ¶¶9, 273, 282.  These injuries can

---

[12]     *In re AOL Time Warner Sec. & ERISA Litig.*, 381 F. Supp. 2d 192 (S.D.N.Y. 2004) is inapplicable. In *AOL*, the Court dismissed Plaintiff's Section 11 and 12(a)(2) claims for lack of a cognizable injury after finding that the bonds at issue were valued at a premium on the date the Defendants were added to the complaint above what Plaintiffs had originally paid for them  As alleged in the Complaint and herein, that is simply not the case.

[13]     Standing under Section 11 of the Securities Act also clearly gives Plaintiffs standing under Section 15 of the Act, and as such, Defendants' citation to *Glusband v. Fittin Cunningham Lauzon, Inc.*, 582 F. Supp. 145 (S.D.N.Y. 1984) (where plaintiff fails to adequately allege standing under Section 12(a)(2), standing is also precluded under Section 15) and *Ehlert v. Singer*, 245 F.3d 1313 (11th Cir. 2001) (In granting Defendants' motion to dismiss the court held plaintiffs had adequately allege standing, but their offering documents included adequate cautionary language to nullify Plaintiffs' section 11 and 15 claims), has no bearing on the issues at hand.

[14]     In any event, Plaintiffs have adequately alleged Article III standing.  As discussed in Point III, *infra*, the Complaint alleges that Plaintiffs have standing to assert claims under Sections 11 and 12(a)(2) of the 1933 Act against the Underwriters.  Standing under Sections 11 and 12(a)(2) clearly also gives Plaintiffs standing under Section 15 of the 1933 Act.  *See also W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008) (while an investment manager that has not alleged it suffered an injury does not have Article III standing, a plaintiff that alleges an injury in fact, causation and redressability does.  Here, Plaintiffs have alleged all three elements: an injury (loss in Certificate value) caused by common misrepresentations and omissions in the Registration Statements and Prospectus Supplements that can be remedied by an award of monetary damages.)

unquestionably be redressed by the relief sought in the Complaint. *See Countrywide*, 588 F. Supp. 2d at 1167 n.39 (rejecting defendants' Article III standing argument relating to Section 11 claims on the basis of the court's finding that the "actual injuries Plaintiffs allegedly suffered arose from the same harmful conduct and [are] of the same type as the injuries to those they propose to represent"). Plaintiffs have adequately alleged Article III standing herein.[15]

## II. RISK DISCLOSURES DO NOT CURE MISSTATEMENTS AND OMISSIONS REGARDING MORTGAGE LOAN UNDERWRITING GUIDELINES.

### A. Generalized Risk Disclosures Neither Match nor Cure the Alleged Misstatement and Omissions.

The Defendants assert that Plaintiffs have failed to allege any misstatements or omissions relating to the mortgage loan underwriting guidelines because such alleged omissions, including presumably the core omission that the stated Guidelines were systematically disregarded, were disclosed in the "risk disclosures" contained in the Offering Documents. RBS Br. at 14. This argument fails. As an initial matter, the Defendants must satisfy a high burden to demonstrate that the misstatements are immaterial as a matter of law. As Judge Conner recently wrote, it is because "risk factors" have become ubiquitous in securities offering documents that:

> The cautionary language must be specific, prominent and must directly address the risk that plaintiffs claim was not disclosed**. *Olkey*, 98 F.3d at 5-6. ***The requirement that the cautionary language match the specific risk is particularly important, considering that most, if not all, security offerings contain cautionary language***. *Miller*, 473 F. Supp. 2d at 579.

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 3ll, 322 (S.D.N.Y. 2009) (emphasis added).

The Defendants point to risk disclosures in the Offering Documents arguing that Plaintiffs have failed to alleged misstatements or omissions concerning the characteristics underlying a particular Certificate. However this argument misses the point.[16] The Complaint does not allege

---

[15]    Defendants argue that the injury alleged, *i.e.*, the substantial decline in Plaintiffs investments' market value would provide the Plaintiffs with a windfall. *See* RBS Br. at 10. This is incorrect. As stated in the Complaint, Plaintiffs and members of the class if they still hold their investment are entitled to rescind the contract which would include tendering their certificates back to Defendants. ¶¶273, 282.

[16]    The case cited by Defendants is also entirely inapplicable. In *Hinerfeld v. United Auto Group*, Civ. No. 97-3533 (RPP), 1998 U.S. Dist. LEXIS 10601 (S.D.N.Y. July 15, 1998), cited by Defendants, the court held that the Defendant's IPO prospectus sufficiently bespeaks caution to escape liability. Further, in *Hinerfield*, the Plaintiffs failed

that there were too many exceptions; but rather, that the system of exceptions was not followed; that the entire process of exceptions based on prudent lending criteria was disregarded; and that, as a result, loans were routinely made where the requisite lending justification did not exist.  As a result, quantification of exceptions would not demonstrate the alleged systematic disregard of the stated Guidelines in any event.[17]

Further, the Complaint details several categories of facts supporting a reasonable inference that the Guidelines were disregarded.  These facts include the Ratings Agencies' statements of potential and actual downgrades due, in part, to deficient underwriting; the uniform statistical data demonstrating the  same pattern of significant delinquencies soon after issuance (regardless of when the offering occurred); and independent disclosures evidencing that the five principal Certificate originators engaged in reckless underwriting practices.

Defendants also argue there can be no actionable omissions with regard to the Guidelines because the Offering Documents provided information as to, for example, the number of no documentation and limited documentation loans and the FICO scores of the borrowers.  RBS Br. at 11.  However, as discussed above, the mere fact that there were numerous "no documentation" loans, or loans issued to borrowers with low FICO scores, provides no information to investors that the Guidelines were disregarded.  Such loans were fully permitted under the Guidelines as long as

---

to allege any specific misrepresentation in the prospectus.  This is not at all the case.  Plaintiffs' have laid out in detail the specific misrepresentations and omitted information from the Registration Statements and Prospectus Supplements.  ¶¶191-252.

[17]    Defendants also argue that any allegation of nonconformity of specific loans is inactionable unless Plaintiffs allege that Defendants did not have that loan replaced.  Plaintiffs' claims are *not* against sellers or servicers of the underlying mortgage contracts which are the parties included in the cure, repurchase or substitution agreements stated in the Prospectus Supplements; nor are Plaintiffs' claims based on omissions or defects in these mortgage contracts.  Moreover, the Complaint's allegations do not concern the discovery of a representation breach in connection with one mortgage loan contract, as the Prospectus and Prospectus Supplement contemplate.  This was the complete disregard for underwriting guidelines in connection with all or virtually all of the underlying mortgage loans.  Thus, without any demand by Certificate purchasers, the seller, depositor and/or sponsor became obligated to cure, repurchase or substitute all or virtually all of the mortgage loans when they became aware of the breaches.  Clearly, they have not done so.

Defendants' sole citation for this argument is *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, Civ. No. 08-0261, 2008 U.S. Dist. LEXIS 77146 (N.D. Tex. Sept. 30, 2008).  The cure, purchase or substitution provision for misrepresentations or omissions in *Lone Star* related to the underlying mortgage loan contracts, not the offering documents.  *Id.* at *22-23.  In addition, the *Lone Star* decision completely ignores the anti-waiver provisions in the federal securities laws. See 15 U.S.C. 77k(e); *Citibank, N.A. v. Itochu Int'l Inc.*, Civ. No. 01-6007 (GBD), 2003 U.S. Dist. LEXIS 5519, at *6, *9 (S.D.N.Y. Apr. 3, 2003) ("[T]he federal securities laws have an anti-waiver provision which specifically makes void any contractual clause that allows a party to waive compliance with the federal securities laws .…  The indemnification clause in the Agreement is void to the extent that it only provides one remedy").  Further, *Lone Star* is not the law in this – or any other – Circuit and currently is on appeal.

there were prudent countervailing circumstances supporting the origination of the loan. As a result, the data provided does not and cannot cure the material omissions that Plaintiffs allege in the Complaint.

Similarly, the Defendants attempt to compare Plaintiffs' "alleged omissions" in the Complaint to "robust risk disclosures" in the Offering Documents.[18] RBS Br. at 6, 11-12 and Rice Decl. Ex. 1. This "analysis" however is critically flawed because, again, the "alleged omissions" are composed of only certain excised phrases from the Complaint, and, even more significantly, the specific Prospectus Supplement statements challenged in the Complaint and to which the "omissions" relate are omitted entirely. When the actual portions of the Offering Documents to which the "omissions" refer are examined, it is readily apparent that the general risk disclosures the Defendants purport to rely from the Registration Statements do not remotely "match" the specific Prospectus Supplement statement challenged in the Complaint.

For example, the Complaint alleges that the Offering Documents misstated that an appraisal was required on the collateral underlying each mortgage loan that conformed with standard guidelines:

> The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. ***All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.***

¶203, (quoting HVMLT Series 2006-4, at s-83).

On its face, the risk disclosure that Defendants rely upon does not match or cure these misstatements since it only states:

---

[18] For the most part, Defendants arguments do not attack what the Complaint details as the alleged omissions, but instead put forth statements from the prospectus supplements that they claim cure "Plaintiffs' allegations" that Originators deviated from their underwriting guidelines. RBS Br. at 11-12. However, Defendants arguments miss the point entirely as they fail to cite to any of the alleged misstatements put forth in the Complaint, ¶¶199, 203, 205, 210, 213, 215, 217, 220, 222, 226, 228, 230, 232, and instead go after supplemental facts and allegations.

> During the mortgage loan underwriting process, appraisals are generally obtained on each prospective mortgage property. The quality of these appraisals may vary widely in accuracy and consistency.

Rice Decl, Ex. 1, at 4.

It does not address, for example, the statements that the adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator, ¶199, that "[a]ll appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation," ¶213, or that "[t]he appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed appropriate, a replacements cost analysis based on the current cost of construction of a similar home." ¶203.

Other disclosures Defendants purport to rely upon facially provide no meaningful warning of the alleged disregard of the exception process. Defendants rely upon the following risk disclosure:

> Although mortgage originators generally underwrite mortgage loans in accordance with their pre-determined loan underwriting guidelines, from time to time and in the ordinary course of business, originators will make exceptions to these guidelines. Loans originated with exceptions may result in a higher number of delinquencies and loss severities than loans originated in strict compliance with the designated underwriting guidelines.

RBS Br. at 11 (citing Greenwich Capital Acceptance, Inc., Form S-3/A Registration Statement, filed March 31, 2006, at 19).

However, this "risk disclosure" only warns that from "time to time" there will be exceptions, and not, as alleged, that the entire process of loan exceptions – of permitting loans deviating from the guidelines only where there was a prudent lending rationale – was disregarded. As a result, Defendants argument that the risk disclosures not only match, but cure the alleged misstatements and omissions fails.

**B.    Plaintiffs Need Not Allege Misstatements With Respect to Specific Underlying Loans.[19]**

Defendants argue that Plaintiffs needed to – but did not – allege information specific to each mortgage loan, including the "extent and percentage of loans in the Pool that failed to comply" with New Century's underwriting standards and that, as a result, Plaintiffs have failed to allege the materiality of any alleged omission or misrepresentation.    RBS Br. at 14-16. Defendants, however, disregard the detail set forth in the Complaint, including the quantification of en masse default soon after issuance regardless of when the offering occurred; the unprecedented ratings collapse from AAA to junk bond status soon after issuance; and the particularized underwriting failures of principal originator.    These facts are more than sufficient on a motion on the pleadings and improperly seek to have Plaintiffs prove their claims at this stage of the litigation.    *See Tooley v. Napolitano*, 556 F.3d 836, 839 (D.C. Cir. 2009) ("*Twombly* leaves the longstanding fundamentals of notice pleading intact.").    Plaintiffs have properly alleged the materiality of the stated misstatements and omissions at this stage of the litigation.

Defendants also try to advance the argument that Section 1111 of Regulation AB, 17 C.F.R. § 229.1111, effectively imposes a scienter standard for pleading Securities Act violations against Defendants. Defendants argue that because Section 1111 requires that Defendants disclose underwriting exceptions "to the extent known," the Defendants may only be held liable for failure to disclose the systematic disregard of the Guidelines under Section 11 of the Securities Act if the complaint sets forth that the RBS Defendants had *actual knowledge* of the material omissions and related misstatements relating to this alleged non-disclosure.    RBS Br. at 13-14. This argument fails because Section 1111 is triggered by material omissions or failure to disclose the required information.    However, the regulation is inapplicable when, as Plaintiffs allege here, the Offering Documents include material misstatements regarding, for example, the "compensating factors"

---

[19]    Defendants also take issue with Plaintiffs description of Negative Amortization Loans, and the existence of a "cap" on how much negative amortization can be added to the principal before the loan resets. RBS Br. at 15, n.19. Defendants' are puzzlingly incorrect.    *See* Lee Christie, *Pick-a-payment Loans Turn Poisonous*, CNN Money, September 3, 2008, http://money.cnn.com/ (with Negative Amortization loans, "borrowers pay just the minimum … They can continue to do that for up to five years, or until their loan balance reaches 110% to 125% of the original principal.").

used to determine the appropriate use of exceptions in the underwriting process.  As a result Plaintiffs challenge affirmative statements made in the Offering Documents, not merely material omissions to which Section 1111 applies.[20]

### III.    ALLEGED MISSTATEMENTS AND OMISSIONS REGARDING RATINGS AGENCIES' PRE-ENGAGEMENT STRUCTURING ARE ACTIONABLE.

As the Complaint alleges, ¶¶58-59, the Registration Statements stated that RBS structured the Certificates.  This statement is materially false and misleading because, in fact, the Ratings Agency Defendants chose the Certificate collateral and structured the Certificates.  They thus played an equally critical role in determining the mortgages to be purchased at auction.[21]

The Defendants first argue that, because Section 1120 of Regulation AB requires Defendants to disclose only whether the issuance or sale of any class of offered securities is conditioned on the assignment of a rating, and the minimum rating assigned, Defendants had no duty to disclose their consultations with the Ratings Agencies to determine the ratings for the offered securities.  RBS Br. at 16.  This argument fails. Section 1120 does not sanction the non-disclosure of material conflicts of interest. In fact, it neither addresses the materiality of information or relevancy of information beyond what it asks for, nor does it operate to limit Section 11 liability. The undisclosed rating shopping practices and structuring function of the rating agencies were highly material to investors since each provided particularized facts undermining the credibility of the ratings.  Section 1120 does not diminish the obligation or liability under Section 11 and 12 for their non disclosure. The SEC's decision in 1994 not to

---

[20]    In each of the cases cited by Defendants, the issue under review was the failure to disclose a discrete transaction under section 303 of Regulation S-K, 17 C.F.R. §303(a)(3)(ii) (requiring disclosure of any known trends affecting financial results in the offering document's management discussion) and neither the regulation or facts at issue here.  *Garber v. Legg Mason, Inc.,* 537 F. Supp. 2d 597 (S.D.N.Y. 2008), involved the failure to disclose under section 303, $12 million in fees owed by the corporate defendant to mutual funds which adversely affected the corporate defendants financial results.  *See also, In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F. Supp. 2d 8 (S.D.N.Y. 2001) (post-offering 9% drop in operating income was not alleged to be known or a trend); *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1210 (1st Cir. 1996) (dismissing Plaintiffs' complaint finding the known trend of a price-cutting strategy adequately disclosed in the offering documents).

[21]    The Registration Statements, which discuss only the role of the investment banks in structuring the Certificates, violate the settled principal that when a disclosure is made … there is a duty to make it complete and accurate."  *Nanopierce Tech., Inc. v. Southridge Capital Mgmt., LLC*, Civ. No. 02-0767 (LBS), 2003 U.S. Dist. LEXIS 21858, at *13 (S.D.N.Y. Dec. 4, 2003) (citing *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)) (refusing to dismiss a section 11 claim where the corporation, having chosen to disclose the CEO's professional background in the prospectus, could not omit disclosure of the fact that his former company declared bankruptcy during his tenure).

expand the purview of statutorily required disclosures has no bearing on the Defendants' disclosure requirements under the Securities Act.

The omission of this information related directly to the Ratings Agencies' independence. A reasonable investor clearly would want to know that the Ratings Agencies were providing critical services instrumental to the creation of the Certificates *for no compensation* as an inducement to ultimately becoming engaged by RBS because this evidences an incentive to structure the Certificates in a manner that satisfied RBS and not in accordance with their independent professional judgment.

In addition, the Defendants argue that failure to disclose the Ratings Agencies' conflicts of interest and ratings shopping practices are not actionable because these facts were well known to investors as a result of a 2003 SEC report entitled *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets* (U.S. Securities and Exchange Commission), January 2003 (the "2003 SEC Report"). However, Defendants' reference to the 2003 SEC Report is misplaced. The 2003 SEC Report described only *potential* conflicts of interest and did not focus at all on the actual activities and conflicts of interest that existed in MBS ratings. Further, this Report not once mentions ratings shopping; nor does it discuss the practice of providing free structuring direction as a further inducement to investment banks to engage ratings agencies to rate the securities. The conflicts of interest inherent in the Ratings Agencies' involvement in the issuance of MBS only began to become known in mid to late 2008, with the announcement of the NYAG's settlement with the Ratings Agencies, the issuance of the SEC Report and the House Oversight Hearings as alleged in the Complaint. ¶¶140-74.

## IV.  ALLEGATIONS OF RATINGS MODELS INADEQUACIES THAT WERE NOT DISCLOSED IN THE OFFERING DOCUMENTS ARE ACTIONABLE.

The Defendants assert that Plaintiffs' allegations regarding outdated rating models failed to state a claim because such allegations are conclusory. RBS Br. at 18. First, Defendants argue that Certificates received the ratings stated in the Prospectus Supplements, and that Plaintiffs have not alleged otherwise making any allegation regarding the ratings inactionable. *Id.* This argument is

belied by multiple allegations in the Complaint which explicitly state that as a result of the undisclosed conflicts of interest involving the Ratings Agencies, ¶¶14-15, 180, 184-88, and the outdated and inadequate models they employed in rating such securities, ¶¶158-68, the ratings assigned to each Certificate was inflated to match the stated ratings in the Prospectus Supplements and did not accurately reflect the true risk involved in the Certificates.

Defendants also argue that the risk disclosures in the Offering Documents regarding the *potential* inadequacy of credit ratings or credit enhancements render the alleged omissions regarding the accuracy of the ratings models inactionable under the "bespeaks cause" doctrine,[22] and that such allegations are inactionable "omissions by hindsight."[23] RBS Br. at 20-21. Both of Defendants arguments fail. The risk disclosures only warn of *potential* inadequacy, not *actual* inadequacy. RBS Br. at 20. While liability may be avoided when a document states that "'actual results may vary'" on *future events*, *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (emphasis added), such "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("'The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'").[24] "The cautionary language must be specific, prominent and must directly address the risk that plaintiffs claim was not disclosed. *In re Flag Telecom*, 618 F. Supp. 2d at 322 (quoting *Olkey*, 98 F.3d at 5-6). Because all of the statements at

---

[22]    Defendants' citations to *Coronel v. Quanta Capital Holdings Ltd.*, Civ. No. 07-1405(RPP) 2009 U.S. Dist. LEXIS 6633 (S.D.N.Y. Jan. 26, 2009) (holding the bespeaks cause doctrine protects statements regarding Defendants' reserve *estimates* pertaining to Hurricane Katrina where the Prospectus explicitly stated such estimates were "preliminary" and "inherently difficult to predict") and *Zirkin v. Quanta Capital Holdings Ltd.*, Civ. No. 07-851 (RPP) 2009 U.S. Dist. LEXIS 4667, at *37-38 (S.D.N.Y. Jan 23, 2009) (same holding) are distinguishable. The omissions and misstatements complained of herein are hardly estimates that were difficult to predict, but instead consisted of information that adequate due diligence could have uncovered.

[23]    Defendants' citation for this argument is also easily distinguishable. See *Panther Partners, Inc. v. Ikanos Comms.*, Inc. 538 F. Supp. 2d 662 (S.D.N.Y. 2008) (in dismissing a Section 11 claim where Plaintiffs' allegations lacked the specificity as to what Defendants knew and when they knew it). The Complaint does not suffer from these same faults. The Complaint makes clear that the Defendants knew of the conflicts created by the Ratings Agencies role because they were involved in creating them through the process of ratings shopping and the like.

[24]    *See also, Giarraputo v. Unumprovident Corp.*, Civ. No. 99-301, 2000 U.S. Dist. LEXIS 19138, at *55-56 (D. Me. Nov. 8, 2000) ("the statement in question must be a 'forward-looking statement' such as a financial projection, future management plans or objectives, statements of future economic performance or other statements of prediction"); *In re No. Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 23 (D. Mass. 1999) ("bespeaks caution" doctrine may not be invoked to protect defendants' misrepresentations regarding present facts).

issue were historical in nature, they impacted the securities beginning when they were issued, artificially minimizing their risk of failure. By the same rationale, Plaintiffs are not arguing that the ratings were misstated because they later turned out, as the result of outside forces, to be inaccurate. In fact, the Complaint very clear states that the misstatements and omissions concerning the ratings assigned to the Certificates are actionable because of undisclosed actions between and among the Defendants that led to grossly inaccurate ratings assigned to fit the criteria that the Underwriter Defendants demanded of the Ratings Agencies, rather than a structure that was changed to satisfy accurate criteria. *See In re Giant Interactive Group, Inc. Sec. Litig.*, Civ. No. 07-10588 (RWS) 2009 U.S. Dist. LEXIS 69414, *20 (S.D.N.Y. Aug. 5, 2009) (upholding Section 11 liability for omissions in a prospectus and registration statement stating "Defendants cannot, as a matter of law, be absolved of liability pursuant to the "bespeaks caution" doctrine where they failed to disclose the existence of facts known for many months that would negatively affect Giant's business but only warned that these facts 'could' negatively affect their business").

## V.    PLAINTIFFS' CLAIMS ARE NOT TIME BARRED.

### A.    The Standard for Inquiry Notice

Defendants argue that Plaintiffs' claims are time barred because Plaintiffs have been on inquiry notice of its causes of action since before May 14, 2007 – more than one year prior to the filing of its original complaint in this action.[25]   RBS Br. at 22.  To demonstrate inquiry notice, Defendants are required to present evidence of so-called "storm warnings." *Staehr v. The Hartford Fin. Serv. Group,* 547 F.3d 406, 427 (2d Cir. 2008).  These storm warnings must be *directly* related to the legal claims such that they would apprise a person of reasonable intelligence of *probable* wrongdoing and legal claims. *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006) (storm warnings exist only when wrongdoing is "probable, not merely possible"). [26]

---

[25]    Section 13 of the 1933 Act (timeliness of claims brought pursuant to Section 11 and 12(a)(2)) provides that "[n]o cause of action shall be maintained … unless brought within one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence …"  15 U.S.C. § 77m.  Because the original complaint in this action was filed on May 14, 2008, inquiry notice of probable wrongdoing and legal claims must be must be demonstrated to have occurred before May 14, 2007.

[26]    Defendants assert that inquiry notice for the twelve additional offerings in the Amended Complaint should be determined as of May 19, 2008 because these offerings do not relate back to the initial complaint. *See* RBS at 22, n.23.

In order for courts to demonstrate inquiry notice as a matter of law at the motion to dismiss stage, defendants must present *uncontroverted* evidence that the Plaintiffs should have discovered the wrongdoing and legal claims. *See In re Initial Pub. Offering Sec. Litig.,* 341 F. Supp. 2d 328, 347 (S.D.N.Y. 2004); *accord Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193-95 (2d Cir. 2003). Where defendants offer reasonable words of comfort, the storm warnings become "controverted" and inquiry notice is defeated.[27] *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 506 (S.D.N.Y. 2009) (Plaintiffs are not put on inquiry notice when they "reasonably rely" on "reliable words of comfort from management"); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 234 (S.D.N.Y. 2006) ("A plaintiff may not be considered to have been placed on inquiry notice, 'despite the presence of some ominous indicators,' when 'the warning signs are accompanied by reliable words of comfort from management.'"). Indeed, the issue of whether media coverage apprised investors of claims arising from alleged conflicts of interest between analysts and their financial institutions and from the alleged non-independence of Moody's have been determined to be factual issues that could not be resolved on motion to dismiss. *See, e.g., Moody's Corp.*, 599 F. Supp. 2d at 506-07.

---

For the same reasons stated herein, Plaintiffs were no more likely to be put on inquiry notice before May 19, 2008 as they were before May 14, 2007.

The central inquiry under Rule 15(c)(2) is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading. *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86 (2d Cir. 1999) (reversing dismissal of a securities fraud action as time barred holding that initial complaint provided adequate notice. Plaintiffs' claims are asserted on the same facts, violative of the same laws, with identical misstatements and omissions, the same Defendants and the same registration statements as already alleged. Further, Defendants had notice of such claims as they were aware of the additional Prospectus Supplements issued pursuant to the already included Registration Statements.

As such, the cases cited by Defendants are all distinguishable. *See Nettis v. Levitt*, 241 F.3d 186 (2d Cir. 2001) (analyzing relation back doctrine under New Jersey state law); *Pruiss v. Bosse*, 912 F.Supp.104 (S.D.N.Y. 1996) (analyzing state libel claims under New York State law); *Grace v. Rosenstock*, 169 F.R.D. 473 (E.D.N.Y. 1996) (Second Amended Complaint seeks to assert an entirely different set of acts allegedly violative of a different set of laws); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513 (S.D.N.Y. 2005) finding new claims did not related back where Plaintiffs did not give defendants adequate notice in their original timely complaint that they intended to bring suit on additional claims and facts)

[27] Defendants cite *Shah*, 435 F.3d 244, where a Fortune article pre-dating the statute of limitations discussed the Defendant and the exact actions alleged in the complaint using a large "degree of specificity with which it described the alleged conflicts of interest at the heart of Shah's complaint, the court had no choice but to find inquiry notice. Similarly in *Ultrafem*, 91 F. Supp.2d 678, a Bloomberg news article put plaintiffs on inquiry notice by discussing "precisely plaintiffs' claim." As stated above, this is simply not the case here.

**B.     Articles Regarding Originators' Lending
Practices Do Not Establish Inquiry Notice.**

Regarding the Originators' lending practices, Defendants assert that the Complaint relies on pre-May 14, 2007 materials that should have put Plaintiffs on inquiry notice.  RBS Br., Point IV.A., at 23.  However, Complaint references to these materials occur only after citation to Certificate delinquencies and downgrade data.  They do not, either in the Complaint or otherwise, constitute independent grounds for a 1933 Act claim, as Defendants assert.

Despite the RBS Defendants' effort to gather together disparate news articles and reports, none, either individually or collectively, can fill the void arising from the fact that no possible, much less "probable" 1933 Act claims on behalf of Certificate purchasers can be demonstrated to have been reasonably known prior to either May 14, 2007, because 95% of the Certificates at issue in this action were downgraded after that date, or May 19, 2008, because 87% of the Certificates were downgraded after that date.

Moreover, none of the news articles and other materials upon which Defendants purport to rely as the "wealth of information publicly available before May 14, 2007, to demonstrate inquiry notice ever refer to the Certificates.  Nor do they ever refer to Credit Suisse or any of the Defendants herein.  Instead, they refer solely to Countrywide, Rice Decl. Exs. 2, 15-16, Countrywide employees, Rice Decl. Ex. 17-18, Indymac, RBS Br. at 24, n.28, BankUnited, RBS Br. at 24, n.29, and Downey, RBS Br. at 24, n.30.  This is particularly significant because the legal claims at issue are not against these parties or other subprime Originators.  In short, Plaintiffs were not on inquiry notice of probable 1933 Act claims against Defendants until well after May 14, 2007.  ¶¶9, 20-21, 49, 62-65, 70, 85, 93, 108, 121.

**VI.     PLAINTIFFS STATE A CLAIM UNDER SECTION 15 OF THE 1933 ACT.**

Section 15 of the 1933 Act, extends liability created under Sections 11 and 12 to "[e]very person who, by or thought stock ownership, agency, or otherwise … controls any person liable under Sections 11 and 12.  15 U.S.C. § 77o.  As set forth in Points II-IV, *supra*, the Complaint

adequately alleges primary violations of Sections 11 and 12 against the Defendants, and Plaintiffs therefore state claims against them under Section 15 of the 1933 Act.

Plaintiffs allege that each Individual Defendant was an officer and/or a director of GCA, that each functioned as a director to the Issuing Trusts during the relevant time period and that each signed the Registration Statement. ¶¶26-30. Plaintiffs allege that GCM acted as the sole underwriter in the sale of the Certificates and helped draft and disseminate the Offering Documents. ¶¶34, 287. Plaintiffs also allege that each Individual Defendant and GCA participated and/or conspired with the remaining Defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed in the Complaint and is responsible in some manner for the acts, occurrences and events alleged in the Complaint, ¶¶286-89; (2) had the power to influence, and exercised that power and influence, to cause GCA, GCM and the Issuing Trusts to engage in violations of the 1933 Act described in the Complaint, ¶286; (3) had the control, position and influence which made them privy to, and provided them with actual knowledge of, the material facts and omissions concealed from Plaintiffs and the other Class members, ¶286-88; (4) was a participant in the violations alleged in the Complaint, based upon having prepared, signed or authorized the signing of the Registration Statement and having otherwise participated in the consummation of the Offerings, ¶23-33, 286-89; (5) was responsible for overseeing the formation and operation of the Issuing Trusts, including routing payments from borrowers to investors, ¶¶23-25; and (6) prepared, reviewed and/or caused the Registration Statement and Prospectus Supplements to be filed and disseminated, ¶¶21-39.

These facts establish claims against these Defendants under Section 15 of the 1933 Act. *In re Worldspace Sec. Litig.*, Civ. No. 07-2252, 2008 U.S. Dist. LEXIS 56224, *20-21 (S.D.N.Y. Jul. 21, 2008). Defendants' assertions to the contrary are without merit.

## CONCLUSION

For all of the foregoing reasons, the RBS Defendants' Motion to Dismiss Plaintiffs' Amended Securities Class Action Complaint should be denied in its entirety.[28]

Dated:  New York, New York
        September 21, 2009

                                    COHEN MILSTEIN SELLERS & TOLL PLLC


                                    By:  ___/s/ Joel P. Laitman_____
                                            Joel P. Laitman (JL-8177)
                                            Christopher Lometti (CL-9124)
                                            Daniel B. Rehns (DR-5506)
                                            Kenneth M. Rehns (KR-9822)
                                    150 East 52nd Street, Thirtieth Floor
                                    New York, New York 10022
                                    Telephone: (212) 828-7797
                                    Facsimile: (212) 828-7745
                                    *jlaitman@cohenmilstein.com*
                                    *clometti@cohenmilstein.com*
                                    *drehns@cohenmilstein.com*
                                    *krehns@cohenmilstein.com*


                                            Steven J. Toll (*admitted pro hac vice*)
                                            Avi Garbow (*admitted pro hac vice*)
                                            S. Douglas Bunch (SB-3028)
                                    1100 New York Avenue NW
                                    Suite 500 West
                                    Washington, D.C. 20005
                                    Telephone: (202) 408-4600
                                    Facsimile: (202) 408-4699
                                    *stoll@cohenmilstein.com*
                                    *agarbow@cohenmilstein.com*
                                    *dbunch@cohenmilstein.com*

---

[28] Should the Court decide to dismiss all or part of Plaintiffs' allegations, Plaintiffs respectfully request leave to replead. *See* Fed. R. Civ. P. 15(a) (holding leave to amend shall be granted freely); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re AMF Bowling Sec. Litig.*, Civ. No. 99-3023 (DC), 2003 U.S. Dist. LEXIS 7389 (S.D.N.Y. May 2, 2003) ("the only possible reasons to reject amendment would be prejudice to the defendant or misconduct by plaintiffs…").

**<u>CERTIFICATE OF SERVICE</u>**

I, Kenneth M. Rehns, hereby certify that on September 21, 2009, I caused the foregoing document to be filed electronically with the United States District Court for the Southern District of New York through the Court's mandated ECF service.  Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the document(s) upon confirmation of e-filing.

<u>/s/  Kenneth M. Rehns </u>
Kenneth M. Rehns