UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
NEW JERSEY CARPENTERS VACATION
FUND and BOILERMAKER BLACKSMITH
NATIONAL PENSION TRUST, On Behalf of
Themselves and All Others Similarly Situated,

       Plaintiffs,   Civil Action No. 08-CV-5093 (HB)

  -against-

THE ROYAL BANK OF SCOTLAND GROUP,
PLC, *et al.*,

       Defendants.
------------------------------------------------------------X


# THE RATING AGENCY DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED FIRST AMENDED SECURITIES CLASS ACTION COMPLAINT


Joshua M. Rubins
James J. Coster
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue, 11th Floor
New York, New York 10169
(212) 818-9200

*Attorneys for Defendant Moody's Investors Service, Inc.*

Floyd Abrams
S. Penny Windle
Adam Zurofsky
Tammy L. Roy
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for Defendant The McGraw-Hill Companies, Inc.*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT...................................................................................................................................2

I.   PLAINTIFFS' § 11 CLAIMS AGAINST THE RAs SHOULD BE DISMISSED............ 2

    A.   The Consent Requirements of § 11(a)(4) Preclude Plaintiffs' Claims ................... 2

    B.   The RAs Were Not "Underwriters" Of The Securities They Rated ....................... 3

II.  NO "MISSTATEMENTS" ARE ALLEGED REGARDING THE RATINGS ................. 8

III. PLAINTIFFS FAIL TO STATE A § 15 CLAIM AGAINST THE RAs ......................... 10

CONCLUSION.............................................................................................................................10

## TABLE OF AUTHORITIES

Page

**Cases**

*In re Adelphia Communications Corp. Securities and Derivative Litigation*, 2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007) .......................................... 5n, 6n, 8n

*In re Global Crossing, Ltd. Securities Litigation*, 313 F. Supp. 2d 189 (S.D.N.Y. 2003) .......................................................................................... 3n

*Harden* v. *Raffensperger, Hughes & Co.*, 65 F.3d 1392 (7th Cir. 1995).............. 5-6, 5n

*Ingenito* v. *Bermec Corp.*, 441 F.Supp. 525 (S.D.N.Y. 1977).............................. 4n

*Landmen Partners Inc.* v. *Blackstone Group, L.P.*, 2009 WL 3029002 (S.D.N.Y. Sept. 22, 2009)....................................................................... 8, 10

*McFarland* v. *Memorex Corp.*, 493 F. Supp. 631 (C.D. Cal. 1980)..................... 3n, 8n

*Pinter* v. *Dahl*, 486 U.S. 622 (1988)....................................................................... 7

*Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance*, 2009 WL 3149775 (D. Mass. Sept. 30, 2009) .................................... 9

*In re Refco, Inc. Securities Litigation*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007).......................................................................................................... 4n, 6, 6n

*In re Refco, Inc. Securities Litigation*, 2008 WL 3843343 (S.D.N.Y. Aug. 14, 2008) .......................................................................................... 3, 4n, 6n, 8, 8n

*SEC* v. *Chinese Consolidated Benevolent Ass'n*, 120 F.2d 738 (2d Cir. 1941)...................................................................................................... 4n

*SEC* v. *International Chemical Development Corp.*, 469 F.2d 20 (10th Cir. 1972)..................................................................................................... 4n

*SEC* v. *Kern*, 425 F.3d 143 (2d Cir. 2005) ............................................................ 4n, 8n

*SEC* v. *North American Research & Development Corp.*, 280 F. Supp. 106 (S.D.N.Y. 1968), *aff'd in part and vacated in part*, 424 F.2d 63 (2d Cir. 1970)......................................................................................... 4n

*SEC* v. *Universal Express, Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007)............... 4n

|  | Page |
|---|---|
| *Special Situations Fund, III, L.P.* v. *Cocchiola*, 2007 WL 2261557 (D.N.J. Aug. 3, 2007) | 4n |
| *Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) | 7 |
| *Tirone* v. *Calderone-Curran Ranches, Inc.*, 1978 WL 1095 (W.D.N.Y. June 14, 1978) | 3n |

**Congressional Report**

| | |
|---|---|
| H.R. Conf. Rep. No. 73-152 (1933) | 3n |

**Regulations**

| | |
|---|---|
| SEC Rule 436(g), 17 C.F.R. § 230.436(g) (2009) | 2 |

**Statutes**

*Securities Act of 1933*

| | |
|---|---|
| § 7, 15 U.S.C. § 77g (2006) | 3, 3n |
| § 11, 15 U.S.C. § 77k (2006) | *passim* |
| § 15, 15 U.S.C. § 77o (2006) | 10 |

**OTHER AUTHORITIES**

| | |
|---|---|
| Daniel M. Covitz & Paul Harrison, *Testing Conflicts of Interest at Bond Ratings Agencies with Market Anticipation: Evidence that Reputation Incentives Dominate* (Dec. 2003) | 9n |
| NASD Manual (CCH) (1994) | 5, 5n |
| Preliminary Note to SEC Rule 144, *Persons Deemed Not to be Engaged in a Distribution and Therefore Not Underwriters,* 17 C.F.R. § 230.144 | 8n |
| *SEC Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets* (Jan. 2003) | 9n |

Defendants The McGraw-Hill Companies, Inc. ("S&P") and Moody's Investors Service, Inc. ("Moody's," and collectively, the "RAs") respectfully submit this reply brief in support of their motion to dismiss the claims asserted against them in the Amended Complaint ("AC").

## PRELIMINARY STATEMENT

The unprecedented nature of Plaintiffs' effort to treat credit rating agencies as "underwriters" under the Securities Act of 1933 (the "1933 Act") is made abundantly clear by Plaintiffs' Opposition Brief ("Pls. Br."). Plaintiffs fail to cite even *one* case in which any entity that performed the activities the RAs are alleged to have performed here was determined to be an "underwriter" under the 1933 Act. In fact, for all of Plaintiffs' repeated references in the AC and Pls. Br. to the alleged "structuring" of the securities at issue by the RAs, Plaintiffs cite no case – in the more than 70 years since the enactment of the 1933 Act – that has ever deemed "structuring," or anything like it, sufficient to trigger potential liability under the 1933 Act. Nor do Plaintiffs cite any case in which "underwriter" liability has been imposed on an entity, such as the RAs, that neither purchased, sold or distributed securities, nor was named to investors as endorsing the truth of the statements made in the registration statement. Without any legal precedent to support their claims, it is clear that what Plaintiffs are really seeking to do in this lawsuit is to amend retroactively the 1933 Act to broaden the categories of persons subject to liability.

For example, in defense of their § 11 claim, Plaintiffs latch onto out-of-context language by the Seventh Circuit in a case, which has never been applied by any court in the manner Plaintiffs suggest here, to urge the expansion of the term "underwriter" to cover essentially all persons involved in a registered offering. To do so, Plaintiffs must first hurdle the requirement, repeatedly set forth in case law, that an "underwriter" must participate in the *distribution* of securities. Plaintiffs seek to side-step this requirement with a sweepingly overbroad "but for" theory that twists the statute out of recognition. According to Plaintiffs, if an entity performed some activity in the chain of events that led to the creation of the securities at issue, it was therefore involved in the security's eventual "distribution" and thus, an "underwriter." Such a theory, if accepted, would not only improperly convert the RAs here into underwriters, but it would permit potential under-

1

writer liability to be imposed for the first time on lawyers, accountants and other third parties who often play significant roles in registered offerings but generally have no role in the distribution process and thus have never been understood to be "underwriters" under § 11. By transforming the term "underwriter" into one of unlimited applicability, Plaintiffs' theory would uproot well-established and, until now, uncontroversial law.[1]

## ARGUMENT

### I. PLAINTIFFS' § 11 CLAIMS AGAINST THE RAs SHOULD BE DISMISSED

Plaintiffs concede, as they must, that pursuant to SEC Rule 436(g), the RAs' ratings are absolutely immune from liability under § 11 of the 1933 Act. (Pls. Br. at 3; *see also* RAs' Opening Brief ("RAs Op. Br.") at 3-4). Attempting to sidestep this explicit bar, Plaintiffs claim that they are not suing the RAs on the basis of their ratings, but rather as "underwriters" under § 11(a)(5). Plaintiffs' argument fails for two reasons: 1) Plaintiffs' § 11 claims are precluded by the consent requirements of § 11(a)(4); and 2) the activities the RAs allegedly performed here do not as a matter of law constitute "underwriting."

#### A. The Consent Requirements of § 11(a)(4) Preclude Plaintiffs' Claims

Based on the activities Plaintiffs allege the RAs performed here, it is a prerequisite to § 11 liability that the RAs have been named to investors as having prepared or certified the registration statement and consented to being so named. *See* RAs Op. Br. at 5-7. Plaintiffs seek to avoid this requirement by asserting that they are not suing the RAs as experts under § 11(a)(4) and that they need not "exhaust their Section 11(a)(4) remedies first." (Pls. Br. at 3 & n.4). Plaintiffs miss the point; they cannot simply bypass the consent requirements of § 11 by characterizing the RAs' conduct as "underwriting" and their claim as one under § 11(a)(5). The types of activities Plaintiffs claim the RAs performed here, *i.e.,* providing rating opinions, drafting documents and advising on aspects of the transaction,[2] are activities that courts evaluate under the "expert" provision of

---

[1] The RAs also join in the arguments made in the reply brief filed by the RBS Defendants.

[2] While the RAs dispute the factual allegations of the AC, they have assumed as true, for purposes of this motion, Plaintiffs' allegations regarding the RAs' role in the offerings at issue. As demonstrated here and in the RAs' Open-

Footnote continued on next page.

§ 11(a)(4). *See, e.g., In re Refco, Inc. Sec. Litig.*, 2008 WL 3843343, at *3 n.5 (S.D.N.Y. Aug. 14, 2008) (Lynch, J.) ("*Refco II*") (noting that § 11 claims against "attorneys who draft the documents on which the public rely" are generally brought, and evaluated, under § 11(a)(4), not § 11(a)(5)).[3] Thus, to state a viable § 11 claim, Plaintiffs were required to allege that the RAs were named as having prepared some allegedly misleading portion of the registration statement and consented to being so named. Plaintiffs do not — and cannot — make such an allegation. In fact, Plaintiffs "explicitly disavow[]" that they have a claim against the RAs under § 11(a)(4). (Pls. Br. at 3, n.4). This is not surprising given the fact that the Registration Statements contain no statement that the RAs prepared or certified any portion of them and that no written consent by the RAs was ever filed as required under § 7 of the 1933 Act. 15 U.S.C. § 77g(a).[4] Accordingly, Plaintiffs' § 11 claims against the RAs must fail.

  B.   **The RAs Were Not "Underwriters" Of The Securities They Rated**

Beyond Plaintiffs' failure to meet the consent requirements of § 11, their claim also independently fails because, as a matter of law, they do not – because they cannot – adequately allege that the RAs were "underwriters" of the securities they rated. Plaintiffs attempt to justify their characterization of the RAs as "underwriters" by repeatedly asserting that their allegations are "facially plausible." (Pls. Br. at 7-8). By so arguing, Plaintiffs blithely ignore that even taking all of their allegations as true the activities that the RAs allegedly engaged in here simply do not fit, as a

---

Footnote continued from previous page.

ing Brief, however, such allegations do not – as a matter of law – trigger liability under the 1933 Act.

[3] *See also McFarland* v. *Memorex Corp.*, 493 F. Supp. 631, 643 (N.D. Cal. 1980) (evaluating § 11(a)(4) claim against defendant allegedly involved in the "preparation and review" of the registration statement); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 208-11 (S.D.N.Y. 2003) (Lynch, J.) (evaluating § 11(a)(4) claim against defendant alleged to have reviewed financial information and issued fairness opinions included in registration statement); *Tirone* v. *Calderone-Curran Ranches, Inc.*, 1978 WL 1095, at *8 (W.D.N.Y. June 14, 1978) (evaluating § 11(a)(4) claim brought against lawyer that "'passed on all legal matters' relative to the [offering documents]").

[4] Section 7 provides that where an expert is named as having prepared or certified a portion of the registration statement, its *written consent* "shall be filed with the registration statement." 15 U.S.C. § 77g(a). The purpose of this requirement is to protect experts that have not authorized issuers to name them as having prepared or certified the registration statement. *See* H.R. Conf. Rep. No. 73-152, at 26 (1933).

matter of law, within the long-standing definition of an "underwriter" under the 1933 Act. Plaintiffs assert – without citation to a single legal authority – that the RAs "actually performed many of the traditional underwriting functions."[5] (Pls. Br. at 7). The opposite is in fact true: not only are the RAs' alleged activities far removed from "traditional" underwriting functions, it would require a radical and unwarranted expansion of the settled terms of § 11 to force the RAs into the definition of an "underwriter."

Significantly, not one of the cases cited by Plaintiffs in support of their "underwriter" theory held that an entity that allegedly "structured" the transaction, or played any similar role in the *creation* of the securities, was an "underwriter" of the offering or subject to liability under § 11. Indeed, in all but one of the cases cited by Plaintiffs in which an entity was determined to be an "underwriter," the entity had in fact purchased, sold or distributed the securities at issue.[6] The re-

---

[5] Plaintiffs suggest that the activities the RAs allegedly performed here in ¶¶ 39, 182-83, 266 constitute "traditional underwriting functions." (Pls. Br. at 7). Yet, these alleged activities in no way relate to the role of "'underwriters' — a term generally understood to refer to those who undertake actively to sell the securities," but rather each constitute alleged "behind the scenes" activities unrelated to the distribution of the securities. As such, they are not "underwriting." *Refco II*, 2008 WL 3843343, at *3 n.5, *4. *See* AC ¶ 39 (alleging that the RAs rated the Certificates and were involved in determining the structure necessary to achieve specific rating levels); ¶¶ 182-83 (alleging that the RAs "influenc[ed] the structure of the securitization"); ¶ 266 (alleging that as a result of the RAs' alleged participation in the "structuring" of the securities, they "thereby indirectly solicited offers to purchase the Certificates").

[6] In several of the opinions cited by Plaintiffs, the court determined that the entities at issue were not "underwriters," as none had played a role in the distribution of the securities. *See Refco II*, 2008 WL 3843343, at *2-*4 (S.D.N.Y. Aug. 14, 2008) (facts discussed at RAs Op. Br. at 5-6); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 629-30 (S.D.N.Y. 2007) (Lynch, J.) ("*Refco I*") (facts discussed at RAs Op. Br. at 9); *Ingenito* v. *Bermec Corp.*, 441 F. Supp. 525, 535-36 (S.D.N.Y. 1977) (describing underwriter claim as "a fanciful machination, advanced with frightening nonchalance" where the alleged underwriter merely loaned funds to the issuer and plaintiffs failed to allege that the defendant ever sold or purchased securities "with an eye to public redistribution"). In the remaining cases, the court determined that the persons or entities at issue were "underwriters" under circumstances where, unlike here, they had purchased, sold or distributed the securities to the public. *See SEC* v. *Kern*, 425 F.3d 143, 152 (2d Cir. 2005) (entities were "underwriters" where they had "acquired securities . . . with a view to distribution"); *SEC* v. *International Chemical Development Corp.*, 469 F.2d 20, 32 (10th Cir. 1972) (individual who "purchase[d] . . . shares from . . . an issuer . . . with a view to ultimate distribution to the public" held to be an underwriter); *SEC* v. *Universal Exp., Inc.*, 475 F. Supp. 2d 412, 430, 432 n.13 (S.D.N.Y. 2007) (individual was an underwriter where there was "no dispute that [he] offered and sold millions of shares" of stock); *SEC* v. *North American Research & Development Corp.*, 280 F. Supp. 106, 118, 126 (S.D.N.Y. 1968), *aff'd in part and vacated in part*, 424 F.2d 63 (2d Cir. 1970) (defendants were "underwriters" where they had purchased, sold and/or participated in the distribution of shares to the public); *SEC* v. *Chinese Consol. Benev. Ass'n*, 120 F.2d 738, 739-41 (2d Cir. 1941) (entity was "underwriter" where it had "solicited the orders, obtained the cash from the purchasers and caused both to be forwarded [to issuer] so as to procure the bonds"); *Special Situations Fund, III, L.P.* v. *Cocchiola*, 2007 WL 2261557, at *6, *8-*9 (D.N.J. Aug. 3, 2007) (deciding on summary judgment that certain defendants that had purchased and sold shares were "underwriters" in case where all defendants had been listed in prospectus "as underwriters who had each agreed to purchase" shares).

4

maining case, *i.e.,* the case on which Plaintiffs' entire theory thus rests, is *Harden* v. *Raffensperger, Hughes & Co.,* 65 F.3d 1392 (7th Cir. 1995). (Pls. Br. at 5-6). Yet, the entity at issue in *Harden* was not alleged to have had merely a role in the creation of the securities at issue; rather *Harden* "dealt with an entirely different animal,"[7] *i.e.* the "Qualified Independent Underwriter" ("QIU"). To understand *Harden*, it is important to understand the role of a QIU.

A QIU is an entity that, *inter alia*, is legally required (as an "underwriter" would be) to conduct the due diligence on a transaction in situations where the actual underwriter is an affiliate of the issuer, a situation which the NASD and SEC have determined presents a potential conflict of interest. *NASD Manual* (CCH) ¶ 1883, Sch. E, § 3(c)(1) (1994). The QIU "thus performs the same protective function envisioned by the 1933 Congress when it defined [the term underwriter]." *Harden*, 65 F.3d at 1403. To qualify as a QIU, the NASD requires that the entity agree "to undertake the legal responsibilities and liabilities of an underwriter under the [1933 Act], specifically including those inhere in Section 11 thereof." *NASD Manual* (CCH) ¶ 1882, Sch. E, § 2(o)(7).[8] Moreover, where a QIU is used, this fact must be disclosed to investors in the "underwriting section of the registration statement," along with "the name of the member acting as [QIU], if any, and that such member is assuming the responsibilities of acting as a [QIU] in pricing the offering and conducting due diligence." *NASD Manual* (CCH) ¶ 1884, Sch. E, § 4(b). Thus, nothing in *Harden* changes the fact, discussed in the RAs' Opening Brief (pp. 7-10), that it is those entities "identified to the public as endorsing the truth of representations contained [in the registration statement]" that are the subject of § 11.

The Seventh Circuit ultimately concluded that the QIU at issue "would qualify as an un-

---

[7]*In re Adelphia Communications Corp. Sec. Litig.*, 2007 WL 2615928, at *8-*9 (S.D.N.Y. Sept. 10, 2007).

[8] As stated in the NASD Manual in effect when *Harden* was decided, both the NASD and SEC agree that "the full responsibilities and liabilities of an underwriter under the [1933 Act] attach to a 'qualified independent underwriter' . . . ." *Harden*, 65 F.3d at 1399 (citing *NASD Manual* (CCH) ¶ 1882, Sch. E, § 2(o)). Nonetheless, in proposing the requirement that a QIU affirmatively accept the legal responsibilities and liabilities of a § 11 underwriter, the NASD noted: "[The SEC] has directed . . . that the Association should institute steps directed toward amending Schedule E to specifically require, should there be any doubt as to the legal attachment of [§ 11] responsibilities and liabilities, that [QIUs] specifically undertake those responsibilities and liabilities." *Id.* at 1399 (citation omitted).

5

derwriter in this case" because "[i]ts role as [a QIU] was 'necessary to the distribution of [the] securities.'" 65 F.3d at 1401 (citation omitted).  Specifically, the Seventh Circuit held:

> The [QIU] . . . performs the same protective function envisioned by the 1933 Congress when it defined, in section 2(11), those entities who would be subject to section 11 liability.  Indeed, the [QIU] 'participates' in the issues through its voluntary and explicit assumption of the liability usually assumed by the underwriter.  That assumption of liability is an important factor in maintaining investor confidence.  Accordingly, we hold that Raffensperger was subject to section 11 liability . . . . *Id.* at 1403.

Plaintiffs' exclusive focus on the phrase "necessary to the distribution" in the *Harden* opinion ignores the unique role of the QIU, which was hired as an underwriter, paid as an underwriter, voluntarily and explicitly assumed the liability of an underwriter, performed due diligence as an underwriter would and was publicly presented as an underwriter.  *See Harden*, 65 F.3d at 1397-1403.  The RAs have not done any of those things and Plaintiffs do not allege otherwise.

Moreover, the *Harden* opinion simply does not stand for the proposition Plaintiffs seem to urge here that all entities that performed activities allegedly "necessary" to the creation of the securities are somehow transformed into underwriters.  Plaintiffs' elemental "but for" interpretation of § 11(a)(5) (*i.e.,* "*but for* the [RAs'] role in structuring the securities, [the] distribution could never have occurred"; Pls. Br. at 4) would extend the term "underwriter" to every lawyer, accountant, or other third-party professional that could be said to have contributed in some way to the creation (and thus, ultimately the distribution) of the securities.  Plaintiffs essentially seek to transform the term "underwriter" – contrary to Judge Lynch's opinion in *Refco*[9] – into one of "unlimited applicability," extending it not only to those entities involved in the actual distribution of securities but to every participant in a registered offering.  There is simply no basis for using the *Harden* case to expand the 1933 Act in this manner.  Indeed, since the opinion was issued in 1995, no court has applied *Harden* to extend underwriter liability to an entity not involved in the purchase, sale or distribution of securities.[10]

---

[9] *Refco I*, 503 F. Supp. 2d at 629.  *See* RAs Op. Br. at 10.

[10] In fact, courts in this district have recognized that the holding in *Harden* must be limited to the narrow situation presented there.  *See Adelphia*, 2007 WL 2615928, at *8-*9; *Refco II*, 2008 WL 3843343, at *4 n.6.

With no basis in current law for their claims, it is evident that Plaintiffs are not asking the Court to apply the well-settled terms of the 1933 Act to the facts of this case, but rather to amend retroactively the 1933 Act to broaden the categories of persons subject to liability. But, as the Supreme Court held in *Pinter*, interpreting another provision of the 1933 Act:

> 'The ultimate question is one of congressional intent, not one of whether this Court thinks it can improve upon the statutory scheme that Congress enacted into law.' . . . The broad remedial goals of the Securities Act are insufficient justification for interpreting a specific provision 'more broadly than its language and the statutory scheme reasonably permit.' *Pinter* v. *Dahl*, 486 U.S. 622, 653 (1988) (internal citations omitted).

Not only is Plaintiffs' request inappropriate as a jurisprudential matter, but it could also undermine the stability of the capital markets. Plaintiffs ask this Court to rewrite the 1933 Act so they can seek billions of dollars in strict liability from entities that had no meaningful way to anticipate such potential exposure – and thus no meaningful opportunity to protect themselves or to take steps to minimize that exposure. Leaving aside the fundamental injustice of such a result, Plaintiffs' theory would not only expose the RAs in this manner but, as noted, also every lawyer, accountant, or other entity that is involved in securities offerings. The resulting uncertainty would lead to dramatic inefficiencies and costs (both in time and money) in the offering process. Indeed, courts have rejected attempts to expand a cause of action where it would also necessarily expand the well-recognized limits on liability that are relied upon by market participants. *See, e.g., Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 772 (2008) (refusing to extend §10(b) to "aiders and abettors" and holding that "[t]he practical consequences of [such] an expansion . . . . provide[d] a further reason to reject [plaintiff's liability theory]" as it "would expose a new class of defendants" to the risks of "extensive discovery" and the potential "extort[ion] [of] settlements" which may force these defendants to contract to "protect against these threats, raising the costs of doing business").

Throughout the long history of the 1933 Act, the key in determining whether a defendant is

an "underwriter" is whether the defendant had a role in *distributing* the securities.[11]  *See, e.g., Refco II*, 2008 WL 3843343, at *4 ("[T]he definition of 'underwriter' is intended to sweep up all — but only — those who play a role in the distribution of the securities.").[12]  Beyond an expansive and unsupported "but for" theory that the RAs were allegedly involved in the *creation* of the securities at issue, Plaintiffs do not provide any basis, factual or legal, to conclude that the RAs had a role in the distribution of securities.  Plaintiffs' § 11 claims must accordingly fail.

## II.   NO "MISSTATEMENTS" ARE ALLEGED REGARDING THE RATINGS

Although Plaintiffs concede that the RAs' ratings themselves are not actionable (Pls. Br. at 3), they nonetheless assert that the Defendants can be held liable for allegedly omitting certain information about the ratings.  Each of Plaintiffs' arguments is without merit.

First, Plaintiffs claims against the RAs for alleged omissions ignore the fact that the RAs did not sign the Registration Statements, nor were they named as having prepared or certified them.  Thus, not one statement (or alleged omission) in the Registration Statements can be attributed to the RAs.  Beyond their exempt ratings, the RAs simply did *not* speak here, nor were they required to.  Absent a duty to disclose, which Plaintiffs have not and cannot show, the RAs can have no liability under § 11.  *See Landmen Partners Inc.* v. *Blackstone Group, L.P.*, 2009 WL 3029002, at *9 n.14 (S.D.N.Y. Sept. 22, 2009) (Baer, J.) ("Section 11 only imposes strict liability" on the "fail[ure] to include information 'required to be stated' in the registration statement.").

Second, Plaintiffs maintain that certain "omissions" relating to the quality of the RAs' ratings and ratings methodologies are actionable because, Plaintiffs assert, they have alleged facts sufficient to show, as they must, that the RAs did not subjectively believe their rating opinions

---

[11]  Plaintiffs concede, as they must, that an underwriter is one "'who is engaged in steps necessary to the distribution of security issues'" (Pls. Br. at 5 (quoting *Kern*, 425 F.3d at 152)).  This requirement is also reflected in § 11(e), which limits an underwriter's liability to "the total price at which the securities underwritten by him and distributed to the public were offered to the public."  15 U.S.C. § 77k(e).  *See also* Preliminary Note to S.E.C. Rule 144, *Persons Deemed Not to be Engaged in a Distribution and Therefore Not Underwriters*, 17 C.F.R. § 230.144.

[12]  Despite Plaintiffs' attempts to distinguish *Refco*, *McFarland* and *Adelphia* (*see* Pls. Br. at 6-8 & n.11), Plaintiffs have alleged here nothing more than what Judge Lynch found insufficient in *Refco*, *i.e.*, that S&P performed alleged "behind the scenes" activities in the offering, but "took no part in the distribution of the bonds."  *Refco II*, 2008 WL 383343, at *4; *see also McFarland*, 493 F. Supp. at 644; *Adelphia*, 2007 WL 2615928, at *8.

when issued. (Pls. Br. at 9, 10-11). Yet, Plaintiffs' hindsight attacks on the RAs rely exclusively on events occurring in 2007 and 2008 and, in large part, rest on a former S&P employee that testified that his "opinion" in 2008 was that a rating model available in 2004 "would have had an earlier warning about the performance of many of the new products." (AC ¶ 165).[13] Virtually identical allegations were just recently held insufficient by another federal court in dismissing similar 1933 Act claims with prejudice. In that case, which also concerned post-hoc statements about the RAs' ratings processes, the court recognized that "Plaintiffs' allegations rest[ed] on uncited and undated after-the-fact admissions and laments by purported insiders." *Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance*, 2009 WL 3149775, at *8 (D. Mass. Sept. 30, 2009). In finding that no actionable misstatement or omission had been pled, the court reasoned that "[n]one of the purported comments made by S&P and Moody's employees in the wake of the collapse of the sub-prime mortgage market (in 2007) 'support the inference' that the ratings were compromised as of the dates (in 2005 and 2006) when the registration statements and prospectus supplements became effective." *Id*. The same is true here.

Finally, Plaintiffs maintain that allegedly undisclosed information regarding "rating shopping" and "structuring" was "highly material to investors" and thus, can serve the basis for a § 11 claim here. (Pls. Br. at 9). In so arguing, Plaintiffs assert that the RAs' citation to a 1994 release by the SEC considering – and ultimately rejecting – the disclosure of this type of information "has no bearing" on this case. (Pls. Br. at 10 n.13). Plaintiffs miss the point. Not only does the 1994 Release make clear that these alleged activities were known to the market and thus not "undisclosed" information,[14] but it also indicates that the SEC does not deem this type of information

---

[13] The testimony (available at http://oversight.house.gov/documents/20081022102804.pdf) also makes clear that the employee left S&P in April 2005 and thus, contrary to Plaintiffs' contention, has not — and cannot — speak to S&P's ratings models and methodologies employed "in 2006 and 2007" (Pls. Br. at 10).

[14] Plaintiffs also ignore that the allegedly "undisclosed" conflicts of interest (Pls. Br. at 10) posed by the RAs' business model have long been the subject of public comment. *See, e.g., SEC Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets*, at 40-41 (Jan. 2003) ("[p]otential conflicts of interest have existed in the credit rating business for many years"); Daniel M. Covitz, *et al, Testing Conflicts of Interest at Bond Ratings Agencies with Market Anticipation: Evidence that Reputation Incentives Dominate*, at 1 (Dec. 2003).

"material." Even Plaintiffs recognize that a claim under § 11 must involve the misstatement or omission of *material* information. (Pls. Br. at 9).

### III. PLAINTIFFS FAIL TO STATE A § 15 CLAIM AGAINST THE RAs

Plaintiffs provide no basis for concluding that the RAs "controlled" the trusts or the Individual Defendants. Their claims rest solely on the strained theory that because the RA Defendants allegedly "controlled" what mortgage pools and/or credit enhancement would be sufficient for a given rating, they therefore "controlled" the entire transaction and the alleged primary violators. Again, Plaintiffs are attempting to expand the 1933 Act beyond recognition. Their theory necessarily would convert all lawyers, accountants and other third-parties that advise issuers and underwriters into "controlling persons" of the entities that follow that advice. Plaintiffs provide no legal authority for such an expansion of the 1933 Act. Moreover, such a "control" theory starkly contradicts Plaintiffs' own repeated allegations that it was RBS that controlled the RAs through its alleged "ratings shopping," *i.e.,* that "in an effort to obtain the ratings engagement," RBS allegedly "negotiat[ed]" with the RAs "in order to get them to agree" to lower rating requirements. (Pls. Br. at 13, n.14). These contradictory allegations provide no basis to support a § 15 claim.

### CONCLUSION

Plaintiffs' claims against the RAs should be dismissed with prejudice and their request for leave to replead (Pls. Br. at 15, n. 18) should be denied pursuant to this Court's Individual Practices. *See Landmen Partners*, 2009 WL 3029002, at *10.

Dated: October 12, 2009                                    Respectfully submitted,

 /s/ Joshua M. Rubins                                        /s/ Floyd Abrams
Joshua M. Rubins                                             Floyd Abrams
James J. Coster                                              S. Penny Windle
SATTERLEE STEPHENS BURKE & BURKE LLP                         Adam Zurofsky
230 Park Avenue, 11th Floor                                  Tammy L. Roy
New York, New York 10169                                     CAHILL GORDON & REINDEL LLP
*Attorneys for Moody's Investors Service, Inc.*              80 Pine Street
                                                             New York, New York 10005
                                                             *Attorneys for The McGraw-Hill Companies, Inc.*